**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DISTRICT**

| | |
|---|---|
| CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CERENCE INC., SANJAY DHAWAN, and MARK J. GALLENBERGER,<br><br>Defendants. | CASE NO. |

## CLASS ACTION COMPLAINT

Plaintiff the City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Cerence Inc. ("Cerence" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Cerence's website concerning the Company's public statements; and (d) review of other publicly available information concerning Cerence and the Individual Defendants.

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of all persons or entities that purchased Cerence common stock between February 8, 2021 and February 4, 2022, inclusive (the "Class Period"), against Cerence and certain of its officers (collectively, "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* (the "Exchange Act").

2.     Cerence was created on October 1, 2019 as the result of a tax-free spinoff from Nuance Communications, Inc. ("Nuance").  Cerence builds artificial intelligence-powered virtual assistants primarily for the automotive market.  The Company's customers include major automobile original equipment manufacturers ("OEMs") and the OEMs' suppliers.  For example, Cerence identifies as customers, among others, BMW, Daimler, FCA Group, Ford, GM, Renault-Nissan, SAIC, Toyota, Volkswagen Group, Bosch, and Continental.  The Company generates revenue primarily by selling software licenses and cloud-connected services to its OEM and OEM supplier customers.

3.     During the Class Period, and in the face of industry headwinds including a decline in auto-manufacturing due to supply chain issues and semiconductor shortages, Cerence continued to report growing revenues and strong demand for its software licenses.  Indeed, on February 8, 2021, the first day of the Class Period, Defendants raised the Company's fiscal year 2021 revenue and profit metrics for the year because, as Defendants represented, the Company's "business model continues to perform well."[1]

4.     Further, the Company touted its "visibility" regarding demand for its products, which allowed the Company to provide long-term guidance for fiscal year 2024.  Indeed, even

---

[1] Cerence operates on a fiscal year ending September 30 of each calendar year.

before the Class Period, Cerence instructed investors it expected to earn $600 million in revenue in fiscal year 2024.  Analysts closely tracked and repeatedly inquired with Defendants about the status of that guidance.  Based on the strong demand Cerence reported, the Company continued to reiterate its fiscal year 2024 guidance until August 9, 2021, when the Company *raised* its revenue guidance for fiscal year 2024 by more than 16%, from $600 million to $700 million.

5.      Throughout the Class Period, Defendants repeatedly assured investors that the Company's guidance took "into consideration the current risks and uncertainties of the semiconductor device shortages that are impacting auto production."

6.      Undisclosed to investors, however, the semiconductor shortage had a materially negative impact on demand for Cerence's software licenses.  In sharp contrast to Defendants' representations that demand for its software licenses remained strong, Cerence was, in reality, "pulling forward" or "pre-banking" license sales.  As a results, Defendants' statements about Cerence's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

7.      The truth regarding Defendants' Class Period misrepresentations began to be revealed before the financial markets opened on November 22, 2021, when the Company announced revenue guidance for the first quarter and full fiscal year 2022 that was well below analysts' expectations.  In response to this disclosure, Cerence's stock price declined more than 20%, from a closing price of $104.06 the prior to trading day, to close at $82.59 on November 22, 2021.  As the market digested the news, Cerence's stock price declined an additional 5% the following day, to close at $78.27 on November 23, 2021.

8.      Approximately three weeks later, Cerence issued a Current Report on Form 8-K announcing the Company's Chief Executive Officer ("CEO") Sanjay Dhawan ("Dhawan") had

abruptly resigned the previous day and that Stefan Ortmanns ("Ortmanns") had been appointed the new CEO.  In reaction to this news, the price of Cerence stock declined an additional 11%, from a closing price of $78.08 on December 14, 2021, to a closing price of $69.20 on December 15, 2021.

9.     Investors only learned the full extent of Defendants' misrepresentations on February 7, 2022, when the Company issued its results for the fiscal first quarter of 2022 ended on December 31, 2021 and shocked the market with three stunning disclosures.  First, the Company announced Chief Financial Officer ("CFO") Mark Gallenberger ("Gallenberger") would be retiring, effective March 11, 2022.  Next, during the related conference call to discuss the Company's results for the quarter, new CEO Ortmanns announced he had conducted a review of the plans, forecasts, and assumptions for each of Cerence's business units, and determined the "conversion from bookings to revenue will take longer than expected."  As a result, Cerence was forced to lower its fiscal year 2022 guidance, only a few months after providing disappointing guidance for the same period.  Finally, and as a further result of the Ortmanns' review, Cerence completely withdrew its closely watched guidance for fiscal year 2024.

10.     As the market digested these disclosures, the price of Cerence stock fell more than 30%, from a closing price of $63.58 on the prior trading day of February 4, 2022 to close at $43.61 on February 7, 2022.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## I.      <u>JURISDICTION AND VENUE</u>

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b 5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information occurred in this District as Cerence is headquartered in Burlington, Massachusetts.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## II.     <u>PARTIES</u>

16.     Plaintiff the City of Miami Fire Fighters' and Police Officers' Retirement Trust administers a retirement benefit plan for nearly 4,300 active and retired firefighters and police officers of the City of Miami, Florida.  The City of Miami Fire Fighters' and Police Officers' Retirement Trust oversees approximately $1.6 billion in assets.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Cerence common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Cerence is, and at all times herein mentioned was, a corporation organized and existing under the laws of Delaware with its principal place of business in Burlington, Massachusetts.   Cerence's common stock trades on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "CRNC."

18.     Defendant Dhawan was, at all relevant times until December 15, 2021, the President, CEO, and a member of the Board of Directors of Cerence.   Dhawan joined Cerence's predecessor, Nuance, on June 7, 2019, with the intent that he become the CEO and a member of the Board of Directors of Cerance upon the completion of the spinoff.

19.     Defendant Gallenberger was, at all relevant times, the CFO of Cerance. Gallenberger began his employment with Cerence's predecessor, Nuance, on July 1, 2019, with the intent that he become the CFO of Cerence upon the completion of the spinoff.   On February 7, 2022, Cerence announced Gallenberger would retire on March 11, 2022, but would remain with the Company in an advisory role and provide transitional assistance as requested by the Company from March 11, 2022 through November 15, 2022.

20.     Defendants Dhawan and Gallenberger (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Cerence's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Further, the Individual Defendants signed reports that Cerence filed with the SEC during the Class Period, including the Company's fiscal year 2021 Annual Report on Form 10-K, which was signed by the Individual

Defendants, and the Company's First, Second, and Third Quarters fiscal year 2021 Forms 10-Q, which were also signed by the Individual Defendants. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

21. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly and indirectly, control the conduct of Cerence's business.

22. As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to the Cerence's financial condition and performance, growth, operations and compliance with applicable laws, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Cerence's common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

III.   **SUBSTANTIVE ALLEGATIONS**

A.   **Background**

23.   Cerence builds artificial intelligence-powered virtual assistants for the mobility/transportation market.  The Company's primary target is the automobile market.  The Company represents that its software platform is a market leader for building integrated, branded, and differentiated virtual assistants for automobiles.  The Company's software platform is composed of edge computing and cloud-connected software components and a software framework linking these components together.   The Company also offers customers implementation of its software platform through a professional services organization.

24.   The Company reports revenues in three segments: (1) license; (2) connected services; and (3) professional services.  During the Class Period, the license segment generated the majority of the Company's revenue.  For example, for the Company's fiscal year 2021 ended on September 30, 2021, the Company reported $387 million in total revenue, which included $202 million in license revenue.

25.   Importantly, in connection with the spinoff from Nuance, Cerence entered into agreements with Nuance governing the allocation of intellectual property rights and data related to Nuance's business.  These agreements included restrictions for a five-year period from the date of the spinoff on October 1, 2019 that limited the Company's use of Nuance's intellectual property rights and data licensed to Cerence, including limitations on the field of use in which the Company could exercise the licenses.

26.   The five-year "field of use" restriction is to end on the first day of the Cerence's fiscal year 2024.  As a result, while the Company portrayed itself as a growth company with

visibility into its customers' demand for its products, the Company repeatedly emphasized the importance of its fiscal year 2024 guidance—when the field of use restrictions ended.

27.     For example, even prior to the Class Period, during the Company's inaugural Analyst Day on February 18, 2020, CFO Gallenberger explained "one of the key takeaways that I want you to walk away from today with as it relates to Cerence is …. the Company historically has had a very good growth trajectory even in light of the fact that we're part of an auto industry that has low-single-digit growth rates."   Gallenberger continued, "[t]he other key is our visibility."

28.     During the same Analyst Day conference, Gallenberger also provided analysts with fiscal year 2024 guidance, explaining that "we believe that we could grow our total top line from where we are today to about $600 million by fiscal year [20]24."   According to Gallenberger, "this is the target model that we've put out and we've given it a lot of thought internally."   As detailed below, throughout the Class Period, analysts closely watched the Company's 2024 guidance.

29.     Shortly after providing this guidance, the COVID-19 pandemic and associated supply chain issues had a severe impact on the automobile industry, and the global production of automobiles declined dramatically.   In 2020, the 78 million motor vehicles produced worldwide represented a 15% decline from the prior year.   A widely reported semiconductor shortage continued to ravage the global automobile industry in 2021.   Consulting firm AlixPartners estimated the chip shortage cost the global automotive industry $210 billion in revenue in 2021.

**B.     <u>Defendants' Materially False and Misleading Statements During the Class Period</u>**

30.     The Class Period begins on February 8, 2021, when, prior to the market open, Cerence issued a press release announcing the Company's financial results for the first fiscal

quarter of 2021 ended December 31, 2020.  In connection therewith, the Company increased its guidance for the fiscal year ending September 30, 2021, with the press release stating in pertinent part:

> [W]e are updating our guidance to reflect our stronger than expected first quarter revenue and margin performance, and also in consideration of the risks and uncertainties surrounding the semiconductor device shortages.  Therefore, the lower end of the revenue range was increased and is now expected to be in the range of $370M to $380M, representing a 12% to 15% increase compared to the prior year.

31.     On the conference call accompanying the Company's release of its fiscal first quarter 2021 results, CFO Gallenberger stated, "the business model continues to perform well as evidenced by our Q1 results and by raising our revenue and profit metrics for the year."  He continued, "[a] combination of strength in our core business along with opportunities for new business from our new products and adjacent markets paints a bright future for Cerence."

32.     In a question directed to then-CEO Dhawan during the same call, an analyst noted that he thought the market was "looking forward to [a promised update later in the year regarding fiscal year 2024 guidance] as it seems things are moving in the right direction."  The analyst continued, "[j]ust curious, given the long-term nature and the potential there, how much visibility do we have now versus sort of we still need things to unfold over the next couple of years."  In response, Dhawan did not change the Company's 2024 guidance, but instead explained that the Company "booked two deals which will contribute revenue to that line . . . so as of now, I'm feeling confident about the progress."

33.     On May 10, 2021, the Company released its fiscal second quarter 2021 results for the quarter ended March 31, 2021.  The press release announcing these results heralded the

Company's "record second quarter 2021 results," and Cerence again increased guidance for fiscal year 2021, stating in pertinent part:

> For the fiscal year ending September 30, 2021, we are updating our guidance to reflect stronger than expected first half revenue and margin performance, and also in consideration of the risks and uncertainties surrounding the semiconductor device shortages. Therefore, the [r]evenue range was increased and is now expected to be in the range of $380M to $390M, representing a 15% to 18% increase compared to the prior year.

34.     The same press release quoted then-CEO Dhawan, stating "[o]ur core license business, in particular, performed better than expected as the global auto recovery takes shape."

35.     During a conference call with analysts the same day, CFO Gallenberger assured investors that, "[o]ur long-term prospects remain bright and our focus on innovation and growth, while at the same time crafting a profitable business model, will benefit the Company and our shareholders well into the future."

36.     On August 9, 2021, the Company released its fiscal third quarter 2021 results for the quarter ended June 30, 2021.  The press release announcing the results again touted "strong third quarter 2021 results."  The press release quoted Defendant Dhawan, stating "[a]ccording to HIS Markit, calendar Q2 is expected to be the quarter with the most disruption due to the semiconductor shortage yet we delivered 29% revenue growth over the prior period."

37.     On a conference call accompanying the Company's release of these financial results, CFO Gallenberger provided fourth quarter guidance that purportedly accounted for the "the current risks and uncertainties of the semiconductor device shortages that are continuing to impact auto production longer than we expected."  Still, Defendant Gallenberger "updated [the Company's] full year expectations based on our Q4 guidance," and highlighted that "we are now forecasting materially higher revenue, profit margins and EPS estimates versus our original

guidance that we communicated to you back in November of last year."  Defendant Gallenberger further noted that the Company "did not contemplate the semi shortages in our original guidance, [but] we are still delivering better than expected results despite this unexpected event, which reaffirms that the digital transformation of the auto industry is alive and well."

38.     During the same conference call, CFO Gallenberger explained the Company would not be holding an Analyst Day in September as scheduled due to COVID restrictions.  As a result, rather than wait for the to-be-determined Analyst Day, the Company decided to provide the market with an update to the Company's fiscal year 2024 midterm target model during the August 9, 2021 conference call.  As then-CEO Dhawan explained during the call, "we did feel, however, it was important to update you on the 2024 model given the positive updates to the original model."

39.     Defendant Dhawan explained the Company's "bookings momentum" was the basis for the Company increasing its fiscal year 2024 revenue guidance.  Specifically, highlighting that Cerence's "multifaceted growth strategy to deliver sustainable growth continues to play out," then-CEO Dhawan instructed investors that the Company's "bookings momentum was partly the reason we were able to increase our revenue expectations for [the] 2024 target model."  Defendant Gallenberger then provided the specific details of the 2024 guidance update, touting that, "on the top line, *we've increased the original target from $600 million to $700 million*."  Moreover, "this top line growth takes into account the lower forecasted auto production in 2024."  CFO Gallenberger concluded that "we are pleased to be able to raise our revenue target by $100 million."

40.     The above statements in paragraphs 30 - 39 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business,

operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose: (1) that the global semiconductor shortage had a materially negative impact on demand for Cerence's software licenses; (2) that Defendants masked the impact of the semiconductor shortage on demand for the Company's software licenses by pulling forward sales; and (3) that, as a result of the above, Defendants' statements about Cerence's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

        **C.**    **<u>The Truth Comes to Light</u>**

     41.    The truth regarding Cerence's business was partially revealed to the market before the financial markets opened on November 22, 2021, when the Company released its results for fiscal fourth quarter and full year 2021.  The press release announcing the results reported quarterly revenue of $98.1 million and full-year revenue of $387.2 million.  While these results were mostly in line with expectations, the Company provided fiscal year 2022 guidance "for revenue to be in the range of $400M to $425M," which represented guidance well below analysts' expectations.

     42.    During the call with analysts accompanying the financial results release, CFO Gallenberger explained that the Company's "fiscal [20]22 revenue growth is expected to be in the range of plus 3% to plus 10%."  Seeking to bolster investor confidence, however, Gallenberger reminded investors that the Company "continue[d] to increase our estimates throughout the [prior] year and ultimately delivered . . . ."  CFO Gallenberger then explained, "[w]e believe it's prudent for us to factor some level of conservatism into our guidance due to the ongoing semiconductor shortage plaguing the auto industry and the continued uncertainty of the timing of when the semi supply chain will ultimately be corrected."  Finally, Gallenberger

provided guidance for the first quarter of fiscal year 2022: "revenue guidance of $91 million to $96 million[, which] reflects a year-over-year change of down 3% to up 3% or essentially flat."

43.     Nevertheless, during the same call, the Company continued to "maintain its guidance for fiscal 2024."  Analysts on the call were particularly focused on the Company's fiscal 2024 guidance.  For example, Evercore analyst Chris McNally asked for Defendant Dhawan's "reiterated outlook of 2024" and whether "anything changed since you initially gave that outlook for $700 million a couple of months ago?"  Defendant Dhawan emphatically responded, "no, nothing has changed.  We stand by our guide for fiscal [20]24 and we feel good about it."  He further explained:

> the net-net basically is, in the fiscal [20]24 model, the new – the core business is going strong, and we stand behind the growth that we have projected in our core business whether it's license or connected services or professional services . . . .  So from my standpoint, no change to the fiscal [20]24 model.

44.     Defendant Gallenberger added, "the bookings that we're seeing today gives us that level of comfort that the revenue will come into that 2024 target model."

45.     Despite Defendants' efforts to assure investors, in reaction to the Company lowering its fiscal year 2022 guidance, the price of Cerence stock dropped by more than 20% on extremely high trading volume, from a closing price of $104.06 on November 19, 2021, to a closing price of $82.59 per share on November 22, 2021.  As the market digested the news, Cerence's stock price declined an additional 5% the following day, to close at $78.27 on November 23, 2021.

46.     The truth continued to leak out to investors when, before the markets opened on December 15, 2021, the Company filed a Current Report on Form 8-K with the SEC announcing CEO Dhawan had resigned the prior day and that Dhawan was being replaced as CEO by Stefan Ortmanns.  The announcement of the abrupt resignation of Dhawan caused the price of Cerence

stock to fall an additional 11%, from a closing price of $78.08 per share on December 14, 2021, to close at $69.20 per share on December 15, 2021.

47.    The full truth was finally revealed to the market on February 7, 2022, when the Company announced its financial results for the fiscal first quarter of 2022 and the impending retirement of Defendant Gallenberger.

48.    First, the Company filed a Form 8-K with the SEC announcing that CFO Gallenberger "intends to retire from the Company effective March 11, 2022."

49.    Next, the Company's press release announcing the fiscal first quarter 2022 financial results revealed that the Company was now providing:

> full-year guidance [] for revenue to be in the range of $365 million to $385 million, representing a 9% decrease at the midpoint compared to the initial FY22 guidance provided on November 22, 2021, and a 3% decrease at the mid-point compared to last year's actual revenue of $387 million.

50.    New CEO Ortmanns explained, during the conference call held with analysts that same day, that "since being appointed CEO, [he] reviewed each business unit plans, forecasts and assumptions."  Following his assessment, Ortmanns found "the conversion from bookings to revenue will take longer than expected."

51.    Finally, CEO Ortmanns announced the Company was "***withdrawing the fiscal [20]24 target model previously provided*** as we are defining the new vision and strategy for growth and profitability over the next five years."

52.    Analysts on the conference call expressed confusion about the Company's revenue prospects, among other things.  For example, one analyst questioned the amount of dollars "you effectively pulled ahead here," and the "cumulative dollar amount that you think you've basically pre-banked?"

53.     In response to these disclosures, the price of Cerence stock dropped more than 30%, from a closing price of $63.58 on February 4, 2022, to a closing price of $43.61 per share on February 7, 2022.

54.     Analysts excoriated the Company for these disclosures.  For example, Craig-Hallum analyst Jeff Van Rhee issued a report on February 8, 2022 describing the "shockingly messy quarter, guide and explanation as new leadership resets expectations."  In downgrading the Company, Wedbush analyst Daniel Ives reported the same day that the "very weak guidance [for 2022] indicates that underlying OEM deals and momentum is slowing in a concerning fashion."  He went on to note that "The disappointing guide was blamed on uncertainty around deals, chip shortage, and *a host of other issues which were not clear to investors (and us)*."  Also downgrading Cerence, Jefferies analyst David Kelley noted "pre-booked, yet to be consumed licenses suggest ongoing revenue headwinds."  Finally, RBC Capital Markets analyst Joseph Spak, in a report dated February 8, 2022, observed that "the optics of the old CEO and now the CFO leaving amid lower guidance and withdrawing FY24 targets is not great in our view," and "we see little reason for investors to buy the stock."

## IV.   CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Cerence common stock between February 8, 2021 and February 4, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Cerence common stock actively traded on NASDAQ (an open and efficient market) under the symbol "CRNC."  Millions of Cerence shares were traded publicly during the Class Period on the NASDAQ.  As of January 31, 2022, the Company had more than 39 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Cerence or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b.      whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Cerence;

d.     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Cerence;

e.     whether the market price of Cerence common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.     the extent to which the members of the Class have sustained damages and the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

V.     **UNDISCLOSED ADVERSE INFORMATION**

61.     The market for Cerence's common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Cerence's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased Cerence's common stock relying upon the integrity of the market price of the

Company's common stock and market information relating to Cerence and have been damaged thereby.

62.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Cerence's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Cerence's business, operations, and prospects as alleged herein.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchase the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## VI.     SCIENTER ALLEGATIONS

63.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

64.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Cerence, their control over, receipt and/or modification of Cerence's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Cerence, participated in the fraudulent scheme alleged herein.

## VII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

65.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

66.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Cerence who knew that the statement was false when made.

## VIII.  LOSS CAUSATION

67.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

68.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the prices of Cerence's common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Cerence's stock fell precipitously, as the prior artificial inflation came out of the price.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

69.     The market for Cerence stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Cerence common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Cerence common stock and market information relating to Cerence and have been damaged thereby.

70.     At all times relevant, the market for Cerence common stock was an efficient market for the following reasons, among others:

a.     Cerence was listed and actively traded on NASDAQ, a highly efficient and automated market;

b.     As a regulated issuer, Cerence filed periodic public reports with the SEC and/or the NASDAQ;

c.     Cerence regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and/or

       d.    Cerence was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

71.    As a result of the foregoing, the market for Cerence common stock promptly digested current information regarding Cerence from all publicly available sources and reflected such information in Cerence's stock price.  Under these circumstances, all purchasers of Cerence stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

72.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects— information that Defendants were obligated to disclose during the Class Period but did not— positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.      COUNTS AGAINST DEFENDANTS

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against All Defendants**

73.     Plaintiff repeats and realleges each and every allegation contained above as if
fully set forth herein.

74.     During the Class Period, Defendants carried out a plan, scheme, and course of
conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing
public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and
maintain the market price of Cerence common stock; and (iii) cause Plaintiff and other members
of the Class to purchase Cerence stock at artificially inflated prices.   In furtherance of this
unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set
forth herein.

75.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made
untrue statements of material fact and/or omitted to state material facts necessary to make the
statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that
operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to
maintain artificially high market prices for Cerence common stock in violation of Section 10(b)
of the Exchange Act and Rule 10b-5 promulgated thereunder.   All Defendants are sued either as
primary participants in the wrongful and illegal conduct charged herein or as controlling persons
as alleged below.

76.     Defendants, individually and in concert, directly and indirectly, by the use, means,
or instrumentalities of interstate commerce and/or the mails, engaged and participated in a
continuous course of conduct to conceal adverse material information about Cerence's business,

operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cerence's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Cerence and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

77.   Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

78.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cerence's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

79.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Cerence common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Cerence common stock during the Class Period at artificially inflated prices and were damaged thereby.

80.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that Cerence was experiencing, which were not disclosed by Defendants, Plaintiff and other members

of the Class would not have purchased their Cerence common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

81.     By virtue of the foregoing, Cerence and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

83.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

84.     The Individual Defendants acted as controlling persons of Cerence within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control,  directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Further,

the Individual Defendants signed the Company's fiscal year 2021 Annual Report on Form 10-K and the First, Second, and Third fiscal Quarterly Reports on Form 10-Q.

85.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

86.     As set forth above, Cerence and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## XII.   **JURY DEMAND**

Plaintiff demands a trial by jury.


Dated:  February 25, 2022

By: */s/ Joseph E. White, III*

**SAXENA WHITE P.A.**
Joseph E. White III (BBO# 648498)
7777 Glades Road
Suite 300
Boca Raton, Florida 33434
Telephone: (561) 394-3399
Facsimile:  (561) 394-3382

*Counsel for Plaintiff City of Miami Fire*
*Fighters' and Police Officers' Retirement*
*Trust*

**KLAUSNER KAUFMAN JENSEN**
**& LEVINSON**
Robert D. Klausner
Stuart A. Kaufman
780 NW 4th Street
Plantation, Florida 33317
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Plaintiff City of Miami*
*Fire Fighters' and Police Officers' Retirement*
*Trust*