UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CITY OF MIAMI FIRE FIGHTERS' AND    :
POLICE OFFICERS' RETIREMENT TRUST,
individually and on behalf of all others    :
similarly situated,

   :

              Plaintiff,        Civil Action
   :   No. 22-10321-ADB

     v.

   :

CERENCE INC., SANJAY DHAWAN, and
MARK J. GALLENBERGER,          :

           Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

Dated:  September 9, 2022        James R. Carroll
       Boston, Massachusetts       Kurt Wm. Hemr
                        Amy-Lee Goodman
                        SKADDEN, ARPS, SLATE,
                          MEAGHER & FLOM LLP
                        500 Boylston Street
                        Boston, Massachusetts 02116
                        (617) 573-4800

                        Counsel for Defendants
                        Cerence Inc., Sanjay Dhawan, and
                        Mark J. Gallenberger

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................................... 1

ALLEGATIONS AND FACTUAL BACKGROUND ......................................................................... 3

    1.    Cerence Is A Massachusetts-Based Technology Company That Creates Advanced Software Used In Automotive "Infotainment" Systems ........................ 3

    2.    Cerence Licenses Its Software Through A Variety Of Contract Arrangements ................................................................................................................. 3

    3.    Each Quarter, Cerence Disclosed The Share Of Its License Revenue Attributable To Discounted Fixed Agreements .......................................................... 4

    4.    Cerence Cautioned Investors That Its Business Was Subject To Customer Demand For Discounts, And Cerence's Management Informed Investors Of The Company's Desire To Limit The Number Of Discounted Fixed Agreements .................................................................................................................. 5

    5.    In Cerence's 4Q2021 Earnings Call, The Company Informed Investors That It Had Begun Utilizing Minimum Commitment Contracts ............................ 6

    6.    In December 2021, Mr. Dhawan Left Cerence And Took A CEO Position At Another Company ...................................................................................................... 6

    7.    In Cerence's 1Q2022 Earnings Call, The Company Withdrew Its Revenue Guidance For 2022 and Its Long-Term Revenue Guidance For 2024 .................... 7

    8.    Plaintiff Asserts That Cerence Was Not Trying To Limit Its Use Of Discounted Fixed Agreements But Was Trying To *Increase* Them As Part Of A "Pull Forward" Scheme, But Alleges No Facts Plausibly Supporting Such A Claim ............................................................................................................... 7

ARGUMENT ........................................................................................................................................ 8

I.    THE AMENDED COMPLAINT DOES NOT ALLEGE SPECIFIC FACTS SUPPORTING A "STRONG INFERENCE" OF SCIENTER AND ACCORDINGLY SHOULD BE DISMISSED .................................................................... 9

    A.    The Allegations That Plaintiff Attributes To One Former Japan-Based Sales Manager Are Embroidered With Plaintiff's Conclusory And Self-Serving Characterizations, And Do Not Give Rise To A Strong Inference Of Scienter ................................................................................................................. 10

B.  Plaintiff's Allegations Of Insider Stock Sales Fail To Raise A Strong
Inference Of Scienter ...................................................................................12

1.  Mr. Dhawan's Trading Is Not Suspicious..................................................12

2.  Mr. Gallenberger's Trading Is Not Suspicious .........................................14

C.  Plaintiff's Other Allegations Do Not Raise A "Strong Inference" Of
Scienter ......................................................................................................15

D.  A Nonculpable Inference Under *Tellabs* Is More Compelling Than Fraud ..........16

II.  THE AMENDED COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY
BECAUSE IT DOES NOT ADEQUATELY ALLEGE THAT ANY
STATEMENT OR PUTATIVE OMISSION WAS FALSE OR MISLEADING.............17

A.  Cerence's Forward-Looking Statements Expressing The Company's
Desire To Limit The Share Of Fixed License Agreements Are Protected
By The PSLRA's Safe Harbor Provisions ...............................................18

B.  Cerence's General Statements Of Corporate Optimism Are Immaterial As
A Matter Of Law........................................................................................20

III.  COUNT II SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED
TO ADEQUATELY PLEAD A PREDICATE EXCHANGE ACT VIOLATION ..........20

CONCLUSION................................................................................................20

## TABLE OF AUTHORITIES

(Securities cases are identified herein in citations after
the initial citation by the name of the corporate defendant.)

**CASES**                                                                                        **PAGE(S)**

*ACA Financial Guaranty Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008)................................................................................8, 9

*In re Bausch & Lomb, Inc. Securities Litigation*,
    592 F. Supp. 2d 323 (W.D.N.Y. 2008)................................................................13

*In re Biogen Inc. Securities Litigation*,
    857 F.3d 34 (1st Cir. 2017).................................................................................8

*In re Boston Scientific Corp. Securities Litigation*,
    686 F.3d 21 (1st Cir. 2012)................................................................................10

*In re Boston Scientific Corp. Securities Litigation*,
    No. 10-10593-DPW, 2011 WL 4381889 (D. Mass. Sept. 19, 2011),
    *aff'd*, 686 F.3d 21 (1st Cir. 2012) ....................................................................20

*Brennan v. Zafgen, Inc.*,
    853 F.3d 606 (1st Cir. 2017)..............................................................................10

*Carney v. Cambridge Technology Partners, Inc.*,
    135 F. Supp. 2d 235 (D. Mass. 2001) .................................................................15

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Waters Corp.*,
    699 F. Supp. 2d 331 (D. Mass. 2010),
    *aff'd*, 632 F.3d 751 (1st Cir. 2011) ...................................................................15

*City of Miami Fire Fighters' & Police Officers' Retirement Trust v. CVS Health Corp.*,
    No. 21-1479, 2022 WL 3570838 (1st Cir. Aug. 18, 2022).........................................18, 20

*Emerson v. Genocea Biosciences, Inc.*,
    353 F. Supp. 3d 28 (D. Mass. 2018) ..................................................................13

*In re First Marblehead Corp. Securities Litigation*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ...........................................................13, 18

*In re Genzyme Corp.*,
    No. 09-11267-GAO, 2012 WL 1076124 (D. Mass. Mar. 30, 2012),
    *aff'd sub nom. In re Genzyme Corp. Securities Litigation*,
    754 F.3d 31 (1st Cir. 2014)................................................................................17

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ........................................................................................12, 17

*Harrington v. Tetraphase Pharmaceuticals, Inc.*,
    No. 16-10133-LTS, 2017 WL 1946305 (D. Mass. May 9, 2017) .....................................16

*Hensley v. Imprivata, Inc.*,
    260 F. Supp. 3d 101 (D. Mass. 2017) ...............................................................................14

*In re iRobot Corp. Securities Litigation*,
    527 F. Supp. 3d 124 (D. Mass. 2021) ...............................................................................15

*In re Keyspan Corp. Securities Litigation*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..............................................................................14

*Lirette v. Shiva Corp.*,
    27 F. Supp. 2d 268 (D. Mass. 1998) .................................................................................15

*Liu v. Intercept Pharmaceuticals, Inc.*,
    No. 17-cv-7371, 2020 WL 5441345 (S.D.N.Y. Sept. 9, 2020),
    *aff'd*, No. 20-3488, 2022 WL 2165621 (2d Cir. June 16, 2022) ......................................17

*Local No. 8 IBEW Retirement Plan v. Vertex Pharmaceuticals Inc.*,
    140 F. Supp. 3d 120 (D. Mass. 2015),
    *aff'd*, 838 F.3d 76 (1st Cir. 2016) ...............................................................................10, 11

*LSI Design & Integration Corp. v. Tesaro, Inc.*,
    No. 18-cv-12352-LTS, 2019 WL 5967994 (D. Mass. Nov. 13, 2019)................................9

*Mahoney v. Foundation Medicine, Inc.*,
    342 F. Supp. 3d 206 (D. Mass. 2018) .................................................................................9

*Maldonado v. Dominguez*,
    137 F.3d 1 (1st Cir. 1998)..................................................................................................15

*Metzler Asset Management GmbH v. Kingsley*,
    305 F. Supp. 3d 181 (D. Mass. 2018),
    *aff'd*, 928 F.3d 151 (1st Cir. 2019) ..................................................................................16

*Metzler Asset Management GmbH v. Kingsley*,
    928 F.3d 151 (1st Cir. 2019)...............................................................................................8

*New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008)......................................................................................9, 10, 11

*In re Praecis Pharmaceuticals, Inc. Securities Litigation*,
    No. 04-12581-GAO, 2007 WL 951695 (D. Mass. Mar. 28, 2007). .................................20

*In re Psychemedics Corp. Securities Litigation*,
    No. 17-10186-RGS, 2017 WL 5159212 (D. Mass. Nov. 7, 2017) ...................................16

*Shaw v. Digital Equipment Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ........................................................................................20

*Shemian v. Research in Motion Ltd.*,
    No. 11 Civ. 4068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013),
    *aff'd*, 570 F. App'x 32 (2d Cir. 2014)..............................................................................12

*Simon v. Abiomed, Inc.*,
    37 F. Supp. 3d 499 (D. Mass. 2014),f
    *aff'd sub nom. Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015) .............................................................................10, 13, 14

*In re Smith & Wesson Holding Corp. Securities Litigation*,
    604 F. Supp. 2d 332 (D. Mass. 2009) .............................................................................19

*Sousa v. Sonus Networks, Inc.*,
    261 F. Supp. 3d 112 (D. Mass. 2017) .............................................................................15

*In re Stone & Webster, Inc. Securities Litigation*,
    414 F.3d 187 (1st Cir. 2005) ..........................................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................3, 9, 16

*Whitehead v. Inotek Pharmaceuticals Corp.*,
    No. 17-cv-10025-LTS, 2018 WL 4732774 (D. Mass. June 27, 2018) ...............................9

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) ..........................................................................13

## STATUTES & RULES                                                            PAGE(S)

15 U.S.C. § 78j(b) ...............................................................................................................8

15 U.S.C. § 78t(a) ..........................................................................................................8, 20

15 U.S.C. § 78u-4(b)......................................................................................................9, 17

15 U.S.C. § 78u-5 .....................................................................................................18, 19, 20

Fed. R. Civ. P. 9(b) ............................................................................................................9

17 C.F.R. § 240.10b-5........................................................................................................8

**OTHER AUTHORITIES** **PAGE(S)**

Wayne R. Guay, Shawn Kim & David Tsui,
*Determinants of Insider Trading Windows* (Feb. 24, 2022),
https://ssrn.com/abstract=3844986 ....................................................................................14

**PRELIMINARY STATEMENT**

Cerence Inc. ("Cerence") is an artificial intelligence technology company that sells licenses for its highly advanced voice assistance software to automakers and other manufacturers.  Cerence's management advised investors of their desire to limit the share of the company's software license contracts that were subject to price discounts.  Nevertheless, in Cerence's 2020 and 2021 fiscal years — when the entire world, and the automotive industry in particular, were thrown into turmoil by the COVID pandemic —  the company's share of its revenue from discounted arrangements grew.

Plaintiff's prolix Amended Complaint (ECF No. 37) seeks to recast that utterly ordinary sequence of events as a case of securities fraud.  In its 88 pages and 260 paragraphs, that pleading refers over 30 times to a purported "pull-forward" scheme devised by management to *increase* the company's use of contracts that were subject to a discount.  (*E.g.*, Am. Compl. ¶ 79.)  According to Plaintiff, Cerence and its executives "pressured" hapless customers — including some of the largest automotive companies in the world — into accepting discounts so that Cerence could close those discounted license deals and record the associated revenue more quickly.  (*Id.* ¶ 139.)   Plaintiff further asserts that Cerence and its executives intentionally deceived the company's investors by making misleading statements concealing their true plan.

Bluntly, Plaintiff's contentions make no sense, and here is why:  In each and every quarter, Cerence *disclosed* in connection with its quarterly financial reporting what part of its license revenue was attributed to those discounted contracts.  Analysts and investors could see for themselves, quarter by quarter, whether and to what extent Cerence was succeeding in its expressed desire to limit the use of such contracts.  The Amended Complaint does not — and could not — suggest this reporting was inaccurate.  (Nor does Plaintiff allege any other misstatement in Cerence's financial reporting, which has never been restated or withdrawn.)

Accordingly, Plaintiff does not — and could not — plead any facts plausibly suggesting that Cerence acted with any intention of defrauding investors.

The Amended Complaint thus fails to plead a claim for securities fraud in two principal respects:

***First***, to plead a claim for securities fraud, Plaintiff must plead particularized facts supporting a "strong inference" of *scienter* — that is, a "conscious intent to defraud" or "a high degree of recklessness" — with respect to each statement or omission that Plaintiff challenges as fraudulent. The Amended Complaint does not plead such particularized facts: Plaintiff instead relies on a grab bag of insinuation and speculation to assert that Defendants had a secret plan to increase Cerence's use of discounted contracts. But the most compelling inference from the facts pleaded in the Amended Complaint is that the company and its management simply were not able to limit Cerence's use of such contracts on the time frame that they had hoped, but there was no intention to deceive investors in that regard. (*See* Part I *infra*.)

***Second***, Plaintiff does not adequately plead that any of Defendants' putative class period statements were false or misleading. The Amended Complaint purports to identify dozens of statements in Cerence's earnings press releases and investor calls as fraudulent, but none are actionable. Cerence's forward-looking statements about the results it hoped to achieve are protected by a statutory safe harbor that limits spurious securities fraud claims by exempting such inherently uncertain statements from liability. Defendants' general statements of corporate optimism are also not actionable. (*See* Part II *infra*.)[1]

The Court should therefore dismiss the Amended Complaint with prejudice.

---

[1]   Exhibit A attached hereto lists the challenged statements, contextual statements omitted from the Amended Complaint that immediately precede or immediately follow each challenged statement, and the reasons why each statement is not actionable as a matter of law.

## ALLEGATIONS AND FACTUAL BACKGROUND[2]

### 1.   Cerence Is A Massachusetts-Based Technology Company That Creates Advanced Software Used In Automotive "Infotainment" Systems

Cerence is an artificial intelligence technology company with its headquarters in Burlington, Massachusetts.  (Am. Compl. ¶¶ 32, 84.)  One of its leading products is its highly advanced voice-operated virtual assistant software which is commonly installed in automotive "infotainment" systems.  Its customers include numerous leading automobile manufacturers, including Toyota, BMW, Daimler, and Ford.  (*Id.* ¶ 32.)

Cerence became a standalone company on October 1, 2019, when it was spun off from Nuance Communications, Inc.  (*Id.*)  At that time, Sanjay Dhawan served as its chief executive officer and Mark J. Gallenberger served as its chief financial officer.  (*Id.* ¶¶ 29-30.)  Cerence, Mr. Dhawan, and Mr. Gallenberger are the Defendants in this action.

### 2.   Cerence Licenses Its Software Through A Variety Of Contract Arrangements

Cerence licenses software to its customers through a variety of contract arrangements, which include "variable" and "fixed" license agreements.  (Am. Compl. ¶¶ 3, 4.)  "Fixed" agreements include both "prepaid" and "minimum commitment" arrangements.  (*Id.* ¶¶ 4, 11.)  The pertinent principal features of these arrangements are as follows:

- In a "**variable**" agreement, the customer (*e.g.*, an automaker) does not commit to purchase a particular number of licenses but instead reports to Cerence on a quarterly basis how many copies of the software it has installed into new vehicles.  Cerence then invoices the customer for those licenses and records the revenue associated with those licenses in the quarter in which it issues the invoice.  (*Id.* ¶ 3.)  In this type of agreement, Cerence is paid for licenses after the customer installs them.

---

[2]   Solely for purposes of this motion to dismiss, Defendants treat the well-pleaded allegations of the Amended Complaint as true.  In describing the factual background, Defendants rely on documents referenced in the Amended Complaint and matters of which the Court may take judicial notice, including public records and analyst reports.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Copies of such documents are included in the Appendix of Public Record Documents submitted herewith and are cited as "App'x Ex. __."

- In a "**prepaid**" (or "prepay") agreement, the customer purchases and pays for a certain number of licenses before it installs those licenses in its products. Cerence records the revenue associated with the licenses in the quarter when that agreement is made (or when any cancellation option has expired).  Because the customer is paying Cerence in advance, the customer typically receives a discount in the "mid-teens" (*e.g.*, a 15% discount from the price paid under a variable arrangement).  (*Id.* ¶ 4.)

- In a "**minimum commitment**" agreement, the customer commits to purchase a certain number of licenses over time but pays for those licenses as they are installed. The accounting presentation of these agreements is exactly the same as the presentation for prepaid agreements: Cerence records the revenue for the licenses in the quarter when the agreement is made (or when any cancellation option has expired).  However, because the customer does not pay Cerence in advance (*id.* ¶ 11), the discount on a minimum commitment agreement is "significantly lower" than the typical discount on prepay agreements.  (App'x Ex. 50, at 8.)

All those forms of agreement are entirely legal contractual arrangements: the Amended Complaint does not allege otherwise.  Cerence utilized both fixed and variable agreements before it became a standalone company in October 2019 (*see* App'x Ex. 1, at 8) and it continues to use both fixed and variable agreements to this day.  (*See* App'x Ex. 54, at 32.)  Tellingly, the Amended Complaint does *not* allege that Cerence's financial reporting relating to these arrangements failed to comply with generally accepted accounting principles ("GAAP") or with any SEC rule governing financial reporting. Cerence is not alleged to have withdrawn or restated any of its financial reporting, and Plaintiff does not allege that Cerence's independent auditor has withdrawn its opinions on Cerence's financial statements.

**3.      Each Quarter, Cerence Disclosed The Share Of Its
License Revenue Attributable To Discounted Fixed Agreements**

Cerence's financial statements prepared pursuant to GAAP report license revenue as a single line item under the heading of "revenue."  (*E.g.*, App'x Ex. 4, at 32.)  However, in each quarter from October 1, 2019 to the present, Cerence has *voluntarily* broken out in its quarterly earnings announcements its license revenue from variable and fixed arrangements:

*Summary of Cerence License Revenue Reporting, 1Q2020–3Q2022 (all figures $m)*

| | Variable License Revenue | Fixed License Revenue | Total License Revenue[3] | Total Revenue | *Fixed as % of License Revenue* | *Fixed as % of Total Revenue* |
|---|---|---|---|---|---|---|
| *1Q2020* | 33.7 | 7.1 | 40.8 | 77.5 | *17.4%* | *9.2%* |
| *2Q2020* | 28.2 | 16.4 | 44.6 | 86.5 | *36.8%* | *19.0%* |
| *3Q2020* | 18.3 | 14.2 | 32.5 | 74.8 | *43.7%* | *19.0%* |
| *4Q2020* | 29.9 | 16.5 | 46.4 | 90.9 | *35.6%* | *18.2%* |
| *1Q2021* | 36.3 | 10.1 | 46.4 | 95.0 | *21.8%* | *10.6%* |
| *2Q2021* | 37.1 | 17.3 | 54.4 | 98.7 | *31.8%* | *17.5%* |
| *3Q2021* | 31.8 | 18.2 | 50.0 | 96.8 | *36.4%* | *18.8%* |
| *4Q2021* | 26.0 | 25.4 | 51.4 | 98.1 | *49.4%* | *25.9%* |
| *1Q2022* | 21.6 | 20.1 | 46.9 | 94.4 | *42.9%* | *21.3%* |
| *2Q2022* | 20.2 | 25.6 | 46.3 | 86.3 | *55.3%* | *29.7%* |
| *3Q2022* | 23.3 | 22.3 | 46.4 | 89.0 | *50.2%* | *26.2%* |

*(Putative Class Period spans 1Q2021 through 1Q2022.)*

(*See* App'x Exs. 6, 8, 11, 14, 22, 27, 31, 36, 43, 49, 54.)  Plaintiff does not allege that any of that reporting was incorrect.

**4.   Cerence Cautioned Investors That Its Business Was Subject To Customer Demand For Discounts, And Cerence's Management Informed Investors Of The Company's Desire To Limit The Number Of Discounted Fixed Agreements**

Cerence informed its investors that a "Risk Factor" faced by its business was pricing pressure from its customers to discount its software licenses:

> ***Pricing pressures from our customers may adversely affect our business.***
>
> We may experience pricing pressure from our customers in the future, which could result from the strong purchasing power of major OEMs. As a developer of automotive cognitive assistance components, *we may be expected to quote fixed prices or be forced to accept prices with annual price reduction commitments for long-term sales arrangements* or discounted reimbursements for our work. … Any price reductions could impact our sales and profit margins.

---

[3]   Variable and fixed license revenue may not total exactly to license revenue due to rounding or exceptional situations.  Percentages shown are calculated based on figures at left.

(App'x Ex. 4, at 16 (emphasis added).)[4]  Accordingly, Cerence's management expressed the

company's forward-looking intention to reduce the volume of discounted fixed agreements:

> **4Q2019:** "[T]he use of prepaid contracts is something that we expect to hold flat or potentially reduce over time."  (Am. Compl. ¶ 223; App'x Ex. 3, at 6.)

> **2Q2020:** "The prepays are initiated by the OEMs, mostly their purchasing departments do request [a] discount, each purchasing group in an OEM has yearly targets. […] We try to control it as much as we can. But to work with the automotive OEMs, some of this is something that we have to participate in." (App'x Ex. 9, at 9.)

> **3Q2020:** "I think our bias is to continue to hold those prepays flat to down over the long term.  But I think just the first year here, it's been a little bit more challenging to predict when those opportunities arise.  I think the good news, though, is with some of the short-term uncertainties, locking in some of these prepays certainly does help, not only on the revenue, but also helps us on cash flow during these difficult periods.  So we actually are a little bit more receptive during these uncertain times to lock in some of these licenses now versus waiting for the future."  (App'x Ex. 12, at 10.)

> **4Q2020:** "If you recall, in the past, I have said that we're sort of biased towards reducing prepays. However, that's not always inside our control because we have our customers' demand as well."  (Am. Compl. ¶ 136; App'x Ex. 15, at 11.)

**5.    In Cerence's 4Q2021 Earnings Call, The Company Informed
Investors That It Had Begun Utilizing Minimum Commitment Contracts**

On November 22, 2021, Cerence announced its 4Q2021 financial results.  (Am.

Compl. ¶ 15.)  In its presentation, Cerence informed investors that the mix of license contracts

that it had entered into in that quarter included minimum commitment arrangements.  (*Id.* ¶ 92.)

**6.    In December 2021, Mr. Dhawan Left Cerence
And Took A CEO Position At Another Company**

On December 15, 2021, Mr. Dhawan resigned as CEO of Cerence.  (Am. Compl.

¶ 17.)  He did not announce the reason for his departure at that time, but shortly thereafter he

took a CEO position at another technology company.  (*Id.*; App'x Ex. 58.)  Analysts following

Cerence reacted negatively to the news of Mr. Dhawan's departure.  (Am. Compl. ¶ 203.)  Stefan

---

[4]   A chart attached hereto as Exhibit B collects the company's key disclosures.

Ortmanns, an experienced senior executive at Cerence, became Cerence's new CEO.  (*Id.*  ¶ 17.)

**7.      In Cerence's 1Q2022 Earnings Call, The Company Withdrew Its
Revenue Guidance For 2022 and Its Long-Term Revenue Guidance For 2024**

On February 7, 2022, Cerence announced its 1Q2022 financial results.  (Am. Compl. ¶ 100.)  In that announcement, it voluntarily provided additional information about the company's minimum commitment arrangements, including by further breaking out the revenue attributable to fixed contracts to show the revenue attributable to prepaid and to minimum contract arrangements. (*Id.* ¶ 204; App'x Ex. 43, at 28.)  The company also announced Mr. Gallenberger's retirement from Cerence.  (*Id.* ¶ 101; App'x Ex. 43, at 2.)

In that same announcement, Cerence lowered its FY2022 revenue guidance by approximately 9%.  It also withdrew its long-term revenue guidance extending to FY2024.  (Am. Compl. ¶ 101.)  Following that announcement, Cerence's stock price fell by 31% (*id.*), and as night follows day, this putative class action lawsuit asserting securities fraud quickly followed.

**8.      Plaintiff Asserts That Cerence Was Not Trying To Limit Its Use Of
Discounted Fixed Agreements But Was Trying To *Increase* Them As Part Of A
"Pull Forward" Scheme, But Alleges No Facts Plausibly Supporting Such A Claim**

In the Amended Complaint, Plaintiff contends that from November 16, 2020 to February 4, 2022 — the putative "Class Period," running from Cerence's 4Q2020 earnings announcement to the business day before its 1Q2022 announcement — Mr. Dhawan and Mr. Gallenberger were undertaking to inflate the company's stock price through a fraudulent scheme:

> Dhawan and Gallenberger entered into [prepaid and minimum commitment] deals solely to allow Defendants to create the materially false impression that Cerence was meeting its aggressive revenue guidance through transactions that actually benefitted the Company, as well as to maintain their story that Cerence was a successful tech spin-off.  In reality, and unbeknownst to shareholders, these deals did the exact opposite: rather than establish Cerence as a strong, successful company with a growing revenue stream, they harmed the company by cannibalizing its future business.

(Am. Compl. ¶ 1.)  Plaintiff's complaint identifies dozens of statements made in Cerence's

7

earnings announcements, in its earnings calls, and at industry conferences as purported misstatements, generally because they expressed optimism about the company's future prospects without disclosing the purported scheme to increase the use of fixed contracts. (*See id.* ¶¶ 137, 139, 143-144, 146, 148-149, 151, 154, 155, 159, 161, 163-164, 168, 170-172, 175, 178, 182-183, 185-187, 189-191, 194, 196.)[5] Plaintiff further asserts that Mr. Dhawan and Mr. Gallenberger made "suspicious" sales of Cerence stock during the putative Class Period. (*See id.* ¶¶ 130-132.)

## ARGUMENT

The Amended Complaint purports to allege a claim for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, against all Defendants and a claim for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Mr. Dhawan and Mr. Gallenberger. To state a claim under Section 10(b) and Rule 10b-5(b), Plaintiff must plead "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019) (quoting *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017)); *accord ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008).

Securities fraud claims are also subject to the rigorous requirements of Rule 9(b)

---

5    On this motion to dismiss, the Court need not address Plaintiff's contentions that fixed license contracts necessarily "harm[] the company by cannibalizing its future business." (Am. Compl. ¶ 1.) That said, those contentions are not well taken. To be sure, a company can only record particular revenue from a license sale once, whether it does so "up front" when the license is sold (under a fixed contract) or subsequently when the license is installed, reported, and invoiced (under a variable contract). But when that revenue is recorded as an accounting matter does not affect the company's business operations. Whether a fixed arrangement that includes a price discount is desirable as a business matter might depend on such factors as (i) the size of the discount, (ii) whether up-front payment is desirable for cash flow reasons, (iii) ensuring customer loyalty, and (iv) accommodating customer preferences, among others. Cerence continues to use both fixed and variable contracts today. (*See* App'x Ex. 9, at 9; Ex. 12, at 10; Ex. 54, at 32.)

and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Rule 9(b) requires that circumstances constituting fraud be stated "with particularity."  Fed. R. Civ. P. 9(b).  Under the PSLRA, Plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1)(B), and must allege with particularity specific "facts giving rise to a strong inference" of scienter.  *Id.* § 78u-4(b)(2)(A).

## I.    THE AMENDED COMPLAINT DOES NOT ALLEGE SPECIFIC FACTS SUPPORTING A "STRONG INFERENCE" OF SCIENTER AND ACCORDINGLY SHOULD BE DISMISSED

Here, Plaintiff asserts that Cerence and its senior executives made misstatements and misleading omissions to investors with scienter — that is, with a "conscious intent to defraud" or "a high degree of recklessness."  *ACA Fin.*, 512 F.3d at 58.  But Plaintiff utterly fails to plead facts supporting that assertion.  To sufficiently plead scienter, Plaintiff must "with respect to each act or omission . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  "To qualify as 'strong,' 'an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *LSI Design & Integration Corp. v. Tesaro, Inc.*, No. 18-cv-12352-LTS, 2019 WL 5967994, at *3 (D. Mass. Nov. 13, 2019) (quoting *Tellabs*, 551 U.S. at 314).  Courts "must weigh not only inferences urged by the plaintiff but also competing inferences rationally drawn from the facts alleged."  *Whitehead v. Inotek Pharms. Corp.*, No. 17-cv-10025-LTS, 2018 WL 4732774, at *3 (D. Mass. June 27, 2018) (quoting *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008)).  Accordingly, complaints that sufficiently plead scienter often include "clear allegations [of admissions], internal records, or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendants were aware that they were withholding vital information." *Mahoney v. Found. Med.,*

9

*Inc.*, 342 F. Supp. 3d 206, 213 (D. Mass. 2018) (quoting *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 614 (1st Cir. 2017)); *accord In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012). But this Amended Complaint "contains no specific allegations (whether from a confidential witness, a document, or otherwise) that any defendant actually *knew* that the statements were false." *Local No. 8 IBEW Ret. Plan v. Vertex Pharms., Inc.*, 140 F. Supp. 3d 120, 132-33 (D. Mass. 2015), *aff'd*, 838 F.3d 76 (1st Cir. 2016).

Instead, Plaintiff "assert[s] an entirely circumstantial case, essentially alleging that [Defendants] *must have known*" that their statements were wrong or that their putative omissions were misleading. *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 522 (D. Mass. 2014) (emphasis added), *aff'd*, 778 F.3d 228 (1st Cir. 2015). But Cerence was voluntarily disclosing its fixed license revenue to investors each quarter, and accordingly no Defendant could reasonably have expected that investors would be misled as to whether the company was succeeding in limiting its use of fixed license contracts. The Amended Complaint thus pleads no facts supporting any inference of scienter — much less a strong inference — as to any Defendant.

### A.    The Allegations That Plaintiff Attributes To One Former Japan-Based Sales Manager Are Embroidered With Plaintiff's Conclusory And Self-Serving Characterizations, And Do Not Give Rise To A Strong Inference Of Scienter

Plaintiff's allegation that Cerence's management sought to increase the company's share of fixed contracts relies heavily on a single confidential informant identified as "FE1" — presumably for "former employee #1," even though no other former employee is identified as an informant. (*See* Am. Compl. ¶¶ 69-85; *see also id.* ¶¶ 211-215, 217-218 (repeating those same allegations).) In the First Circuit, "there must be a hard look at such [confidential witness] allegations to evaluate their worth." *Biogen IDEC*, 537 F.3d at 51. This "hard look" requires a court considering whether such allegations meet the heightened pleading requirements of the PSLRA to "evaluate . . . factors such as 'the level of detail provided by the

10

confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations . . . and similar indicia.'" *Vertex*, 140 F. Supp. 3d at 127 n.5 (quoting *Biogen IDEC*, 537 F.3d at 51).

The Amended Complaint's allegations fail to meet the rigorous standard set forth by the First Circuit.  Here, FE1 is purportedly a former Cerence sales manager based in Japan who worked three organizational levels below Mr. Dhawan. (Am. Compl. ¶ 69.)  Yet, the 12 paragraphs of the Amended Complaint in which Plaintiff purports to recount the information provided by FE1 (*id.* ¶¶ 70-74, 77-78, 80-81, 83-85) are made up of Plaintiff's self-serving and conclusory characterizations surrounding just a few quotations directly attributed to FE1.  Seven of those 12 paragraphs quote 5 or fewer words from FE1 (*id.* ¶¶ 70, 72-74, 83-85); four of those contain *not even one word* quoted from FE1.  (*Id.* ¶¶ 73, 83-85.)  Overall, less than 9% of the text in those 12 paragraphs is directly attributed to FE1; the other 91% is Plaintiff's characterization.[6]

Even the small amount of quoted material that Plaintiff attributes to FE1 does not support an inference of scienter.  FE1 was putatively based in Japan (*id.* ¶ 69) and Plaintiff acknowledges that prepaid and minimum commitment arrangements are most popular with Cerence's Asian customers (*id.* ¶ 71 n.2).  It is therefore not surprising that a Cerence sales manager in Asia would be encouraged to make fixed license deals and that supervisors would be unhappy if the sales manager failed to close those deals. (*See id.* ¶¶ 70-74.)  Nor is it surprising that a sales manager might complain that supervisors had set "un-achievable goals." (*Id.* ¶ 78.) None of that is inconsistent with any statement to investors challenged by Plaintiff.

Other quoted material that Plaintiff attributes to FE1 simply sets forth FE1's own inferences or suppositions.  FE1 asserts that he converted variable contracts to fixed contracts

---

[6]    Plaintiff is presumably quoting from written correspondence with FE1 as the quotations include parentheses (*id.* ¶ 77) and a capitalization change is identified with brackets (*id.* ¶ 81).

even though, in his view, such conversions "crashed the future opportunity [sic]" and "[e]very sales person knew about [that]."  (*Id.* ¶¶ 77, 81.)  FE1 further opines that, in his view, such conversions could "hide" performance gaps.  (*Id.* ¶ 78.)  FE1 is entitled to his own views of the company's business operations, but none of those opinions supports an inference that Mr. Dhawan, Mr. Gallenberger, or anyone else at Cerence thought that they were misleading investors in any way.  Plaintiff cannot convert a low-level employee's criticisms of Cerence's management into facts supporting a "strong inference" of scienter. *See Shemian v. Research in Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *15 (S.D.N.Y. Mar. 29, 2013) (dismissing securities fraud premised on allegations of failure to disclose product delays where plaintiff's confidential witness allegations "loosely establish[ed] that a general atmosphere of delay and lackluster delivery existed at [the company] . . . [b]ut these statements, though damaging to a claim of managerial competence, do not support a strong inference of reckless disregard for the truth"), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

**B.      Plaintiff's Allegations Of Insider Stock Sales
Fail To Raise A Strong Inference Of Scienter**

Plaintiff contends (*e.g.*, Am. Compl. ¶ 12, 227) that Mr. Dhawan and Mr. Gallenberger engaged in "suspicious insider trading." But it is well settled that such allegations cannot establish scienter on their own: to "support a strong inference of scienter," Plaintiff must allege with particularity that those sales were "unusual" and "well beyond the normal patterns of trading by those defendants." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999). Here, Plaintiff's trading allegations fail to support any inference of scienter.

**1.      Mr. Dhawan's Trading Is Not Suspicious**

Plaintiff alleges that "[i]n a highly suspicious series of transactions, [Mr. Dhawan first immediately sold more than 100,000 shares in the first month and a half following the start

12

of the Class Period," and that in 2021, Mr. Dhawan "sold more than 147,000 Cerence shares." (Am. Compl. ¶ 131.)  Plaintiff learned about those sales from SEC filings that also informed Plaintiff that more than half of those shares were sold pursuant to Rule 10b5-1 prearranged trading plans.[7]  "[T]he existence of a Rule 10b5-1 trading plan 'generally rebuts an inference of scienter and supports the reasonable inference that stock sales were pre-scheduled and not suspicious.'"  *Emerson v. Genocea Biosciences, Inc.*, 353 F. Supp. 3d 28, 42 (D. Mass. 2018) (citation omitted).  Courts have so held even when those plans were adopted during the putative class period and large quantities of shares are sold.  *See Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1116-17 (N.D. Cal. 2003); *Abiomed*, 37 F. Supp. 3d at 524.  Plaintiff's failure to note that those sales were made pursuant to Rule 10b5-1 plans is conspicuous by its absence.

Further, because Mr. Dhawan's sales were widely distributed before and throughout the alleged Class Period,[8] that timing refutes any suggestion that they were made in contemplation of a fraud.  Courts have held that a "broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter."  *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164 (D. Mass. 2009); *see also In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 344-45 (W.D.N.Y. 2008) (where "stock sales at issue took place, for the most part, over two months prior to the release of the negative disclosure," "[s]uch timing [did] not suggest that the Individual Defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price").  Here, Plaintiff purports to allege an intentional

---

[7]    A chart setting out Mr. Dhawan's trading in Cerence stock from the company's October 2019 spin-off through his December 2021 departure from the company is attached as Exhibit C.

[8]    Cerence awarded Mr. Dhawan "make whole" shares to compensate him for loss of anticipated compensation from his prior employer (*see* App'x Ex. 5, at 20) and many of his sales were of those "make whole" shares.  (*See* App'x Ex. 56, at 8, 9, 11, 20, 22, 24-26, 30, 37, 40.) Company policy required Mr. Dhawan to maintain Cerence share ownership at a level of at least five times his base salary.  (*See* App'x Ex. 5, at 12.)

13

fraud that went on for almost a year and half, but relies heavily on trades that occurred just days after the beginning of the putative Class Period.[9]  Indeed, all of the trades that Plaintiff challenges occurred many months prior to the alleged corrective disclosure.  Such "sales do not appear 'calculated to maximize personal benefit from insider information.'"  *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 384-85 (E.D.N.Y. 2003) ("[T]he long lapse of time between the sales and the alleged ultimate disclosures suggests that one or more other factors, unrelated to the alleged fraud, led to defendants' decisions to make the sales.").  Plaintiff also fails to note that Mr. Dhawan held nearly $20 million in Cerence stock when he left the company (*see* App'x Ex. 56, at 45), which further rebuts any inference of fraudulent intent on his part.

### 2.      Mr. Gallenberger's Trading Is Not Suspicious

Nor is Mr. Gallenberger's trading suspicious.[10]  His sole non-tax-related sale during the putative Class Period was made pursuant to a Rule 10b5-1 plan set up before that period.  In addition, Mr. Gallenberger held 107,977 shares at the beginning of that period and 105,208 shares at its end, a difference of just 2.6%.  (*See* App'x Ex. 57, at 12, 20.)  Where a defendant substantially maintains an equity position over the course of a putative class period, courts have not found such trading suspicious.  *See*, *e.g.*, *Hensley v. Imprivata, Inc.*, 260 F. Supp. 3d 101, 115, 122-23 (D. Mass. 2017) (no scienter where individuals "retained anywhere from 86 to 93[%] of the stock and options that they owned before the class period"); *Abiomed*, 37 F.

---

9    Plaintiff's suggestion that sales executed shortly after an earnings release are suspicious (*see* Am. Compl. ¶ 132) is not well taken.  Corporate policies addressed to trading by executives generally establish a "trading window" in which trading may be permitted shortly after the prior quarter's earnings release, including to avoid any suggestion that executives are trading based on unreleased earnings information.  *See* Wayne R. Guay, Shawn Kim & David Tsui, *Determinants of Insider Trading Windows*, at 1-2 (Feb. 24, 2022), https://ssrn.com/abstract=3844986.  It is therefore not surprising that many trades by executives take place shortly after such releases.

10    A chart setting out Mr. Gallenberger's trading in Cerence stock from the company's October 2019 spin-off through his February 2022 retirement is attached as Exhibit D.

14

Supp. 3d at 511, 524-25 (no scienter where defendant's holdings decreased by 6.52% during class period); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 699 F. Supp. 2d 331, 346 (D. Mass. 2010) (no scienter where defendant retained over 70% of holdings), *aff'd*, 632 F.3d 751 (1st Cir. 2011).  So too here.

C.      **Plaintiff's Other Allegations Do Not Raise A "Strong Inference" Of Scienter**

Plaintiff's other allegations relating to scienter fare no better:

*Awareness*.  Plaintiff contends that by virtue of their senior positions at Cerence and their knowledge of its business, Mr. Dhawan and Mr. Gallenberger must have understood that their statements to investors were deceptive.  But "[a]ttempts to plead scienter by general allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss." *Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 255-257 (D. Mass. 2001) (granting motion to dismiss); *accord Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 283 (D. Mass. 1998).[11]  For example, in *In re iRobot Corp. Securities Litigation*, 527 F. Supp. 3d 124 (D. Mass. 2021), Judge Casper declined to infer scienter based on the executive defendants' alleged possession of "intimate knowledge" of the corporation's sales and market share figures:

> [I]it is expected that "responsible management [will] engage in such monitoring," and absent any further information regarding what [defendants] "learned from such monitoring, and whether what they learned was at odds with" [the company's] disclosures . . . a generalized statement about their monitoring is not sufficient indicia of scienter.

*Id.* at 140 (citation omitted).  Here, too, Plaintiff fails to allege with particularity why any Defendant should have known a particular statement to investors was misleading in view of what

---

[11]   *See also Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998) (rejecting argument that defendants "'must have known'" of facts due to their positions: "these are precisely the types of inferences which this court, on numerous occasions, has determined to be inadequate to withstand Rule 9(b) scrutiny"); *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017) ("A vague assertion that defendants must have known something by virtue of their position of authority does not suffice to adequately allege a strong inference of scienter.").

that Defendant actually knew at that time.

*Incentive Compensation.*  Plaintiff asserts that Mr. Dhawan's and Mr. Gallenberger's receipt of incentive compensation awards for meeting the company's FY2021 revenue targets suggests that they acted with scienter.  (*E.g.*, Am. Compl. ¶¶ 14, 226.)  But such incentive plans are commonplace, and Plaintiff offers nothing — other than hyperbolic characterizations of the amounts awarded —  to suggest that Cerence's plan was unusual. Courts routinely hold that such allegations do not plead scienter.  *E.g.*, *In re Psychemedics Corp. Sec. Litig.*, No. 17-10186-RGS, 2017 WL 5159212, at *7 (D. Mass. Nov. 7, 2017).  In any event, nothing about a desire to achieve revenue goals suggests that Mr. Dhawan and Mr. Gallenberger believed that investors were being deceived, which is the critical inquiry on scienter.

*Departures.*  Plaintiff repeatedly refers to Mr. Dhawan's resignation and Mr. Gallenberger's retirement from Cerence as "resignations" in quotation marks, as if dramatic punctuation might suffice to plead scienter.  (*See* Am. Compl. ¶¶ 1, 17; *id.* at 37 (heading); *id.* ¶¶ 202-203.)  No inference of wrongdoing is warranted:  Mr. Dhawan took another CEO position upon leaving Cerence, and Mr. Gallenberger continued with Cerence following his retirement in an advisory position.  (*See* App'x Exs. 43, 58.)  Conclusory allegations about executive resignations do not support an inference of scienter.  *See Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 219 (D. Mass. 2018), *aff'd*, 928 F.3d 151 (1st Cir. 2019); *Harrington v. Tetraphase Pharms., Inc.,* No. 16-10133-LTS, 2017 WL 1946305, at *7 (D. Mass. May 9, 2017).

**D.**     **A Nonculpable Inference Under *Tellabs* Is More Compelling Than Fraud**

The Supreme Court has held the PSLRA requires that an inference of fraudulent intent must be "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Here, the simplest and most logical and compelling inference from the facts alleged by the Amended Complaint is that Cerence's management hoped

to limit the company's use of fixed contracts but were unable to do so on the time frame that they had anticipated in the midst of the COVID pandemic.  Failing to accurately predict commercial setbacks is not securities fraud.  *See In re Genzyme Corp.*, No. 09-11267-GAO, 2012 WL 1076124, at *12 (D. Mass. Mar. 30, 2012) ("nonculpable explanation" that defendants "reasonably did not expect . . . the setbacks the company experienced" was "stronger" than culpable inference plaintiff alleged), *aff'd sub nom. In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31 (1st Cir. 2014).  That nonculpable inference is particularly compelling in light of these two facts:

*First*, Cerence voluntarily disclosed to the investing public its share of revenue from fixed contracts in each quarter.  It would be extraordinary to infer that a company that made such disclosures nevertheless believed that it could mislead investors about whether it was successful in limiting its use of those contracts.  *See Liu v. Intercept Pharms., Inc.*, No. 17-cv-7371, 2020 WL 5441345, at *7 & n.57 (S.D.N.Y. Sept. 9, 2020) (public reporting of adverse events from company's pharmaceutical "undermine[d] an inference of scienter"), *aff'd*, No. 20-3488, 2022 WL 2165621 (2d Cir. June 16, 2022).

*Second*, Cerence continued to use fixed contracts after Mr. Dhawan's departure and Mr. Gallenberger's retirement.  Indeed, the company entered into a *greater* volume of fixed contracts in 2Q2022 and 3Q2022 than it had in 1Q2022, when Mr. Dhawan left Cerence.  (*See* App'x Exs. 43, 49, 54; *see also* p. 5 *supra* (chart).)  That fact alone rebuts Plaintiff's contention that the company's use of those contracts was driven by Mr. Dhawan or Mr. Gallenberger.  The Amended Complaint thus does not adequately plead scienter and should be dismissed.

## II.    THE AMENDED COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE IT DOES NOT ADEQUATELY ALLEGE THAT ANY STATEMENT OR PUTATIVE OMISSION WAS FALSE OR MISLEADING

A Section 10(b) complaint must plead specific facts showing why the statements or putative omissions were false or misleading.  *See* 15 U.S.C. § 78u-4(b)(1); *FTP Software*, 194

17

F.3d at 193-94.  Here, Plaintiff has failed to plead any particularized facts plausibly suggesting that Defendants were engaged in a scheme to increase Cerence's use of fixed contract arrangements.  Nor can Plaintiff assert a Section 10(b) claim based on any concealment of such agreements:  as noted above (p. 5 *supra*), Cerence disclosed its revenue from such contracts in each quarter, and also disclosed its use of minimum commitment contracts in the quarters in which they were introduced (4Q2021 and 1Q2022; *see* App'x Ex. 36, 43).  *See City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, No. 21-1479, 2022 WL 3570838, at *6 (1st Cir. Aug. 18, 2022) ("For accurate figures to mislead, plaintiffs would need to point us to some more concrete and inaccurate conclusions that those figures would invite . . . ."); *First Marblehead*, 639 F. Supp. 2d at 155 ("A plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed.").  Any other putative misstatements identified by Plaintiff are not actionable.

A.    **Cerence's Forward-Looking Statements Expressing The Company's Desire To Limit The Share Of Fixed License Agreements Are Protected By The PSLRA's Safe Harbor Provisions**

Plaintiff faults Defendants for making forward-looking statements about the future of Cerence's business, *e.g.*:

> **3Q2021:** "*Our long-term prospects remain strong* and as demonstrated in our updated target model, and our focus on innovation and growth, while at the same time crafting a profitable business model *will benefit the company and our shareholders well into the future.*"  (*See* Am. Compl. ¶ 170, quoting App'x Ex. 32, at 8 (emphasis added).)

In enacting the PSLRA, Congress recognized that predictions are inherently subject to uncertainty, and added Section 21E to the Exchange Act as a safe harbor for such "forward-looking statements."  *See generally* 15 U.S.C. § 78u-5.  A forward-looking statement, whether written or oral, cannot be a basis of a Section 10(b) claim if it is (i) "'identified as forward-looking, and is accompanied by meaningful cautionary statements identifying important factors

18

that could cause actual results to differ'" *or* (ii) immaterial *or* (iii) plaintiff does not sufficiently plead that the statement was made "'with actual knowledge'" that it was false or misleading. *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 211-12 (1st Cir. 2005) (quoting 15 U.S.C. § 78u-5(c)(1)). Thus, if a company expressly warns about risks that ultimately materialize, such predictions cannot form the basis of a Section 10(b) claim. *See In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 341 (D. Mass. 2009). Indeed, a defendant's state of mind is irrelevant if forward-looking statements are accompanied by meaningful cautionary language. *See Stone & Webster*, 414 F.3d at 212.

Here, each of Cerence's earnings releases and earnings calls include cautionary language noting that those announcements included forward-looking statements subject to uncertainty "which may cause actual results or performance of the company to be materially different from any future results or performance expressed or implied by such forward-looking statements," including as a result of "escalating pricing pressures from our customers" as described in the company's Form 10-K. (*See* App'x Ex. 19, at 17-18.) Defendants' forward-looking statements advising that the company intended to limit its use of discounted fixed contractual arrangements (*e.g.*, Am. Compl. ¶¶ 137, 154-155, 161, 175, 186-187) are therefore not actionable: investors and analysts who followed Cerence were on notice that the company's actual results may or may not conform to that goal. Similarly, forward-looking statements indicating that the company hoped to close deals in its "pipeline" (*e.g.*, *id.* ¶¶ 146, 151, 164) — a term which by definition refers to future contract prospects — are also not actionable.

Cerence's forward-looking statements are not actionable for the independent reason that Plaintiff does not allege facts giving rise to a strong inference that any Defendant had actual knowledge that any such forward-looking statement was false when made. *See* 15 U.S.C.

19

§ 78u-5(c)(1)(B).  "Recklessness" is not enough to overcome the "known falsity" safe harbor; rather, "the facts pled by the plaintiffs must be sufficient to raise a strong inference that the issuer of the statement had *actual knowledge* of the statement's falsity."  *In re Praecis Pharms., Inc. Sec. Litig.*, No. 04-12581-GAO, 2007 WL 951695, at \*9 (D. Mass. Mar. 28, 2007).  As discussed above, the Amended Complaint does not plead particularized facts of actual knowledge.

### B.   Cerence's General Statements Of Corporate Optimism Are Immaterial As A Matter Of Law

Plaintiff also faults Defendants for making optimistic statements about the company's condition and prospects, *e.g.*:

> **1Q2021:** "*Overall the company is progressing well in all directions*; introducing a steady stream of new products, winning new customers, successfully entering adjacent markets, and increasing revenue and profitability."  (*See* Am. Compl. ¶ 144, quoting App'x Ex. 22, at 5 (emphasis added).)

But it is well settled that vaguely optimistic statements "'about both a company's current state of affairs and its future prospects'" are immaterial as a matter of law and cannot give rise to Section 10(b) liability.  *In re Boston Sci. Corp. Sec. Litig.*, No. 10-10593-DPW, 2011 WL 4381889, at \*11 (D. Mass. Sept. 19, 2011) (citation omitted), *aff'd*, 686 F.3d 21 (1st Cir. 2012); *accord, e.g.*, *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996).  Defendants' statements that the company's prospects were "strong" (*e.g.*, Am. Compl. ¶ 143) and the like are not actionable.

### III.   COUNT II SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ADEQUATELY PLEAD A PREDICATE EXCHANGE ACT VIOLATION

Having failed to plead a violation of Section 10(b) of the Exchange Act, Plaintiff has no basis to maintain a claim under Section 20(a) of that Act.  *See* 15 U.S.C. § 78t(a); *CVS Health*, 2022 WL 3570838, at \*4.  His Section 20(a) claim should thus be dismissed as well.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted.

Dated:  September 9, 2022
        Boston, Massachusetts

Respectfully submitted,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
Kurt Wm. Hemr (BBO #638742)
Amy-Lee Goodman (BBO #705403)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
kurt.hemr@skadden.com
amy-lee.goodman@skadden.com

Counsel for Defendants
Cerence Inc., Sanjay Dhawan, and
Mark J. Gallenberger

21