**Exhibit A:**
**Purported Misstatements and Misleading Omissions Alleged in Amended Complaint**

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *4Q2020 Earnings Call (November 11, 2020)* | | |
| **137.** | It was materially false and misleading for Gallenberger to represent to investors that the Company was "biased towards reducing prepays," to claim that the amount of prepays was "not always inside our control because we have our customers' demand as well," and to state with any degree of "certain[t]y" that fixed license revenue would be "down from fiscal year 2020" — i.e., $54 million — or that it would remain in the "low-40s to low-50s," without disclosing that, in truth, Defendants were directing sales personnel to increase fixed license revenue dramatically, and Gallenberger himself was approving a record number of fixed license deals. | [Mr. Gallenberger:] "So going into fiscal year '21. I certainly would expect us to be within that range. If you recall, in the past, I have said that we're sort of ***biased towards reducing prepays***. However, that's not always inside our control because we have our customers' demand as well. And so that sometimes ebbs and flows. So I think going into FY '21, my view is that it would be ***down from fiscal year '20***. But ***certainly***, I think it's going to still be within the range that we have seen over the last several years, which is low 40s to high — or ***low 40s to low 50s***." (App'x Ex. 15, at 10) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("that's not always inside our control"). (*See* Defts.' Mem. Part II.A.)<br><br>Vague statement of corporate optimism. (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **139.** | It was materially false and misleading for Dhawan to identify the purported legitimate reasons for Cerence's revenue growth — including "great adoption of our products and services by the auto OEMs, the strong recovery in the auto market, [and] the prudent financial controls we have implemented in recent quarters" — without disclosing that, in fact, the Company was driving revenue growth by engaging in a pull-forward scheme, including by (i) pressuring their customers into doing fixed license deals in exchange for steep discounts, and (ii) converting existing variable deals to prepaid deals. | [Mr. Dhawan:] "In particular, non-GAAP earnings per share at $0.61 per share was 88% above the midpoint of our guidance of $0.33 per share. The outperformance was primarily driven by ***great adoption of our products and services by the auto OEMs, the strong recovery in the auto market***, coupled with ***the prudent financial controls we have implemented in recent quarters***." (App'x Ex. 15, at 4) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Vague statement of corporate optimism. (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *1Q2021 Earnings Press Release (November 11, 2020)* | | |
| **143.** | It was materially false and misleading for Dhawan to identify the purported legitimate reasons for Cerence's financial results and revenue growth — such as "auto industry recover[y]" and Cerence's "strong competitive position" and "continued focus on innovation and speed of execution" — without disclosing that, in fact, the Company was driving revenue growth by engaging in a pull-forward scheme, including by (i) pressuring customers into doing fixed license deals in exchange for steep discounts and (ii) converting existing variable deals to prepaid deals. | [Mr. Dhawan:] "We had a stronger than expected start to the fiscal year as auto production continued to recover from the impact of Covid-19. Our 23% revenue growth, compared to the same quarter last year, reflects our ***strong competitive position*** enabled by our ***continued focus on innovation and speed of execution***." (App'x Ex. 22, at 4)<br><br>[Mr. Dhawan:] "We expect continued year-over-year revenue growth in our second quarter as the ***auto industry recovers*** from Covid-19. However, our second quarter guidance accounts for the expected impact of semiconductor shortages on auto production in the first half of the calendar year. According to IHS Markit's current forecast, these shortages should be resolved by mid-year resulting in auto production growth of 13.7% for the 2021 calendar year. Overall the company is progressing well in all directions; introducing a steady stream of new products, winning new customers, successfully entering adjacent markets, and increasing revenue and profitability." (App'x Ex. 22, at 5) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Vague statement of corporate optimism. (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **144.** | It was also materially false and misleading for Dhawan to describe Cerence as "progressing well in all directions," including by "increasing revenue and profitability," when, in truth, Defendants' pull-forward scheme was increasing revenue and profitability at the direct expense of the Company's pipeline, backlog, and future revenue growth.  Far from "progressing well in all directions," Cerence was, in fact, regressing in each of these areas because of Defendants' pull-forward scheme. | [Mr. Dhawan:] "We expect continued year-over-year revenue growth in our second quarter as the auto industry recovers from Covid-19. However, our second quarter guidance accounts for the expected impact of semiconductor shortages on auto production in the first half of the calendar year. According to IHS Markit's current forecast, these shortages should be resolved by mid-year resulting in auto production growth of 13.7% for the 2021 calendar year. Overall the company is ***progressing well in all directions***; introducing a steady stream of new products, winning new customers, successfully entering adjacent markets, and ***increasing revenue and profitability.***"  (App'x Ex. 22, at 5) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("progressing well"). (*See* Defts.' Mem. Part II.A.)<br><br>Vague statement of corporate optimism. (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *1Q2021 Earnings Call (February 8, 2021)* | | |
| 146. | It was materially false and misleading for Dhawan to describe the Company's pipeline as "strong" and "increasing," without disclosing that, by virtue of the pull-forward scheme described above, Defendants were depleting the pipeline of revenue to a highly material degree.  […] | [Mr. Dhawan:] "So in the last quarter, we booked 2 deals, which will contribute revenue to that line. So these are real bookings. But we don't break them down from a number standpoint, but there are significant bookings, right? So that was good. At least it has started now, right? This current quarter, we have a ***strong pipeline***, and I'm expecting more than 2 deals that will be booked this current quarter, that will also contribute towards that revenue line."  (App'x Ex. 23, at 13)<br><br>[Source for Plaintiff's quotation of "increasing" is unclear.] | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("pipeline" refers to future deals). (*See* Defts.' Mem. Part II.A.)<br><br>Vague statements of corporate optimism. (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **148.** | It was materially false and misleading for Gallenberger to represent that the Company's "business model continues to perform well as evidenced by our Q1 results" without disclosing that, in fact, Defendants had abandoned their stated business model in favor of their pull-forward scheme and achieved their Q1 results through that scheme. | [Mr. Gallenberger:] "So in summary, the business delivered another solid quarter. Our new products and technologies continue to enhance our competitive position, which is enabling us to maintain our strong market share. And the ***business model continues to perform well as evidenced by our Q1 results*** and by raising our revenue and profit metrics for the year. A combination of ***strength in our core business*** along with opportunities for new business from our new products and adjacent markets makes a ***bright future*** for Cerence. This concludes our prepared remarks, and now we will open it up for questions."  (App'x Ex. 23, at 7-8) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.) Forward looking statement accompanied by cautionary language ("bright future"). (*See* Defts.' Mem. Part II.A.) Vague statements of corporate optimisms("strong position," "bright future"). (*See* Defts.' Mem. Part II.B.) |
| **149.** | It also was materially false and misleading to emphasize the "strong position in the core business" and represent that it contributed to a "bright future," when in fact, the Company's financial results were driven by a pull-forward scheme — not strength in the core business — and that the scheme cannibalized future revenue. | | |

6

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **151.** | It was materially false and misleading for Gallenberger to describe the Company's pipeline as "strong" and "naturally expanding," without disclosing that, by virtue of the pull-forward scheme described above, Defendants were depleting the pipeline of revenue to a highly material degree.  […[ | [Mr. Gallenberger:] "And so with that said, I think we'll defer our commentary on bookings until our next earnings call. However, pipeline remains ***strong*** as we continue to expand our product offerings and also into adjacent markets. And that is ***naturally expanding*** the number of opportunities that we have going into our pipeline. And so that's the color I can provide at this point."  (App'x Ex. 23, at 15) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.) Forward looking statement accompanied by cautionary language ("pipeline" refers to future deals). (*See* Defts.' Mem. Part II.A.) Vague statement of corporate optimism ("strong"). (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| 154-155. | It was materially false and misleading for Gallenberger to represent to investors that the Company was "planning" and "expecting" to reduce fixed license revenue compared to the prior year and holding it within the historical range, without disclosing that, in truth, the Company was directing sales personnel to dramatically increase fixed license revenue, and Gallenberger himself was approving a record number of fixed license deals.<br><br>It was also materially false and misleading for Gallenberger to represent that Cerence was aiming to keep fixed contract revenue in a range of between $40 and $55 million without disclosing that, as the Company ultimately admitted, prepay revenue in that range (1) was "put[ting] a little bit of a damp around growth rates," (2) constituted conversions from variable revenue to prepay, (3) accelerated revenue for up to 5 years, and (4) that the Company really could only manage around $45 million per year in fixed license revenue. | [Mr. Gallenberger:] "I think it's just going to ebb and flow. There's a few things to consider, right? One is prepays, we're *planning* to be lower this year. So that's going to have to be reflected in that spread. The legacy – our legacy connected business, that's a flattening effect this year. As we all know, that program is coming to an end. So we're not projecting any year-over-year growth for fiscal year '21 for that business versus fiscal year '20, it's flat. So that has an impact as well."  (App'x Ex. 23, at 12-13)<br><br>[Mr. Gallenberger:] "So prepays can be lumpy. It's more concentrated. So as we've seen in the past, they can go up and down and so forth. Last year, we did about $54 million in prepays, and we do *expect* prepays to be down this year. We — *historically, we've been in that range of low 40s to low 50s, and I think we're going to stay in that range*. So last year, we were at the higher end of that range. This year, I would estimate we'll probably be around in the middle of that range. And so that's where we see it trending this year."  (App'x Ex. 23, at 10-11) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement ("planning," "expect") accompanied by cautionary language ("can be lumpy," "can go up and down"). (*See* Defts.' Mem. Part II.A.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *2Q2021 Earnings Press Release (May 10, 2021)* | | |
| **159.** | It was materially false and misleading for Dhawan to attribute the performance of its license business to the "global auto recovery" without disclosing that, in fact, the Company was driving license revenue growth by engaging in a pull-forward scheme, including by (i) pressuring their customers into doing fixed license deals in exchange for steep discounts, (ii) converting existing variable deals to prepaid deals, and (iii) beginning in mid-2021, inducing customers to accept minimum commitment deals. | [Mr. Dhawan:] "Once again our results were ahead of expectations as we delivered the highest revenue for any quarter in the company's history. Our core license business, in particular, performed better than expected as the ***global auto recovery*** takes shape and as our conversational AI and connected services expand into more car makes and models. We are proud to deliver both revenue growth and strong profitability." (App'x Ex. 27, at 4) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.) Anachronistic (asserts that statement is false in light of 4Q2021 events). |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *2Q2021 Earnings Call (May 10, 2021)* | | |
| **161.** | It was materially false and misleading for Gallenberger to represent that nothing had changed with respect to the Company's use of prepays, which Defendants purportedly still were holding flat to the prior year, when in fact, Dhawan personally was directing Cerence sales personnel to dramatically increase fixed license sales over the prior year, and Gallenberger was approving a record-high number of prepays.  It also was materially false and misleading for Gallenberger to attribute the increase in prepays to one customer, when, in reality, Defendants were driving a Company-wide push for salespeople to pressure their customers into doing prepaid deals, including by offering steep discounts and converting existing variable license contracts to prepaid deals. | [Mr. Gallenberger:] "I think last quarter we were around 10-ish or so in this quarter. So we were kind of a little bit below the run rate this quarter. We were above the run rate, *really driven by 1 customer that we had accounted for over 50% of the entire fixed amount*. So that kind of drove us towards the higher portion. So I think for the balance of the year, just because of what happened this quarter, *we're probably now going to be flat to up from the prior year*. That would be my rough guess right now. But it's difficult to give guidance on that line item. But last year, we did about 54 — about $54 million in total. And for the full — for the first 6 months, we're at about $27-ish million, call it. So that kind of feels like we're sort of on that same run rate as last year. And you're right, we did say we'd probably be flat to down this year. *I think now it's probably going to be at the flat level and possibly up. It's difficult to predict.*"  (App'x Ex. 28, at 12) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("probably going to be flat to up", "rough guess", "difficult to predict"). (*See* Defts.' Mem. Part II.A.)<br><br>Vague statement of corporate optimism ("strong"). (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **163.** | It was materially false and misleading for Dhawan to tout the Company's rate of bookings as sustainable when it was not.  Far from being sustainable, those bookings resulted from a scheme that cannibalized the Company's future revenue by (i) pressuring their customers into doing fixed license deals in exchange for steep discounts, (ii) converting existing variable deals to prepaid deals, and (iii) pressuring customers to accept minimum commitment deals. | [Mr. Dhawan:] "Additional first half booking highlights include strategic customer wins with Hyundai and a prominent Japanese car company. It is important to note that bookings for our new applications products were approximately $33 million. ***This is a solid start for building the bookings foundation to support our $75 million of applications revenue expectations in our target 2024 model.*** We expect these bookings to deliver initial revenue before the end of the calendar year. You may have seen our press release last week announcing P97 networks as a partner in the ecosystem of our Cerence Pay application. This further solidify Cerence Pay in the market and will connect drivers to save seamless payments through the P97 mobile commerce platform currently available to more than 30% of the retail fuel sites across the U.S."  (App'x Ex. 28, at 5)<br><br>[Mr. Dhawan:] "I think we do think we will — we don't guide our bookings number, Chris, as you know. ***But our internal goals definitely are to meet or beat last year's bookings number. We do have the pipeline to achieve that, so it's not just a pipe dream.*** It's — there is — it's supported by facts and a strong pipeline and a strong start to Q3. Like I said in my prepared remarks, in last year, Q2 was a big — first half was bigger than second half. This year — this fiscal year, it all appears that it will be reversed. The second half will be a bigger bookings half as compared to first half. And the timing of that, as you all know, it's totally driven by kind of OEMs and their cycles and so on and so forth, right? So we don't control that. It's a big-- very important decision that OEMs have to take. But to summarize pipeline, is there and we surely hope that, that will meet or exceed last year's $800 million number."  (App'x Ex. 28, at 8) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("internal goals"; "pipeline" refers to future deals). (*See* Defts.' Mem. Part II.A.)<br><br>Vague statement of corporate optimism ("solid start"). (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **164.** | It was also materially false and misleading for Dhawan to describe its pipeline as "strong" while concealing that, by virtue of Defendants' pull-forward scheme described above, they were depleting the pipeline of revenue to a highly material degree.  As Ortmanns later revealed, it would take up to 10 fiscal quarters for the Company to normalize its license revenue following Defendants' pull-forward scheme. | [Mr. Dhawan:] "Overall, ***our pipeline continues to be strong***, and our win rate remains extremely high. We had no competitive loss of note in the first half, and we won back an important multinational customer that had chosen a competitor when the business was still part of Nuance."  (App'x Ex. 28, at 5)<br><br>[Mr. Dhawan:] "So that $30 million that we mentioned comes from 2 customers, 1 of them we announced, which was Xevo, that works with a number of OEMs; and the second one is a direct contract with another European OEM. And for the first one, its — the Cerence Pay is the main product. For the second one, there are multiple products included in that bookings, would be — which is the one with the OEM directly. The — in terms of the momentum, since the — since Q2 into Q3, we have 1 more OEM that has signed up with our — for our apps products. And that one is for the — travel guide product basically, and that is included in — we mentioned in our remarks that there is over $100 million of bookings in Q3 that has already happened, which is a very strong start. And there is one more OEM, which is going to launch the travel pro app. ***The pipeline remains strong.*** I can — there are probably half a dozen to 10-plus RFP/core conversations going on with a number of OEMs right now."  (App'x Ex. 28, at 8)<br><br>[Mr. Dhawan:] "Yes. I think we do think we will — we don't guide our bookings number, Chris, as you know. But our internal goals definitely are to meet or beat last year's bookings number. We do have the pipeline to achieve that, so it's not just a pipe dream. It's — there is — it's supported by facts and ***a strong pipeline*** and a strong start to Q3. Like I said in my prepared remarks, in last year, Q2 was a big — first half was bigger than second half. This year — this fiscal year, it all appears that it will be reversed. The second half will be a bigger bookings half as compared to first half. And the timing of that, as you all know, it's totally driven by kind of OEMs and their cycles and so on and so forth, right? So we don't control that. It's a big-- very important decision that OEMs have to take. But to summarize pipeline, is there and we surely hope that, that will meet or exceed last year's $800 million number."  (App'x Ex. 28, at 8) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("pipeline" refers to future deals). (*See* Defts.' Mem. Part II.A.)<br><br>Vague statement of corporate optimism ("strong"). (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | **3Q2021 Earnings Call (August 8, 2021)** | | |
| 168. | It was materially false and misleading for Dhawan to describe the Company's financial results as evidence of "sustainable growth" and strong bookings when, in fact, (i) those results reflected revenues that had been inflated by Defendants' pull-forward scheme, (ii) that scheme cannibalized future revenue at the expense of the Company's long-term growth, and (iii) thus, the growth was not sustainable. | *[Mr. Dhawan:]* "Our multifaced growth strategy to deliver ***sustainable growth*** continues to play out. It starts with a strong core of leading conversational AI technology for the car and extends to new applications in adjacent markets. We continue to push the innovation envelope for our customers so that they can offer their customers the safest, most enjoyable experience inside the car, which also represents a seamless transition of their digital life from outside the car to inside the car." (App'x Ex. 32, at 6) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **170.** | It was materially false and misleading for Gallenberger to emphasize the strength of the Company's "long-term prospects" and represent that its business model supported revenue growth "well into the future," when, in reality, Defendants were directing a scheme to pull forward revenue from future quarters at the expense of the Company's long-term growth.  By furthering this scheme, Defendants were snuffing out the Company's long-term growth opportunities. | [Mr. Gallenberger:] "So in summary, we had another quarter of excellent financial performance. While we remain cautious in the near term due to the semiconductor shortages impacting the auto industry, we are continuing to benefit from the secular tailwinds caused by the digital transformation of the auto industry. Our ***long-term prospects*** remain strong and as demonstrated in our updated target model, and our focus on innovation and growth, while at the same time crafting a profitable business model will benefit the company and our shareholders ***well into the future.***"  (App'x Ex. 32, at 8) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("long-term prospects", "well into the future"). (*See* Defts.' Mem. Part II.A.)<br><br>Vague statement of corporate optimism ("strong"). (*See* Defts.' Mem. Part II.B.) |

14

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **172.** | This fundamental assumption — and, in turn, the Company's guidance — was materially false and misleading.  It was materially false and misleading for Defendants to issue guidance based on the assumption that fixed license revenue would remain within its historical range, when, in fact, Defendants had personally approved a record number of fixed license deals and thus knew that the Company's fixed license revenue had skyrocketed beyond its historical range.  Indeed, Gallenberger made this statement toward the end of the fourth quarter of fiscal year 2021 — i.e., the quarter during which the Company generated $25.4 million in fixed license revenue, which drove the Company's fixed license revenue for 2021 to a record-setting high of $71 million. | (Apparently refers to same text as ¶ 171.) | (*See* ¶ 171 *supra.*) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | ***Raymond James Diversified Industrials Conference (August 24, 2021)*** | | |
| **171.** | Defendants also misled investors by increasing the Company's guidance for fiscal year 2024. Defendants based this guidance on certain present or historical facts, namely, (i) the Company's then-present purported strategy to decrease its fixed license revenue or hold it within the historical range and (ii) the absence of any meaningful changes in the Company's business.  Indeed, as Gallenberger confirmed just two weeks later, during the August 24, 2021 Raymond James Diversified Industrials Conference, the assumption that Cerence's fixed license revenue would remain within its historical range of "around $40 million to $55 million per year" was "built into the forecast" in connection with the Company's 2024 guidance. | [Mr. Gallenberger:] "Prepays, we historically, we typically see around ***$40 million to $55 million per year***. And so, we're going to see if we're going to keep that those prepays, which we call fixed volume contracts within that historical range. So that's what we ***built into the forecast*** as well."  (App'x Ex. 34, at 5) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("forecast", "we're going to see"). (*See* Defts.' Mem. Part II.A.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **175.** | It was materially false and misleading for Gallenberger to represent that Defendants were committed to minimize and hold the Company's fixed license revenue within its historical range without disclosing that, in truth, the Company was dramatically increasing fixed license revenue, and Gallenberger himself was approving a record number of fixed license deals.  When Gallenberger made this statement, the Company was more than halfway through the fourth quarter of fiscal year 2021 — i.e., the quarter during which sales of fixed licenses skyrocketed to $25.4 million and, in turn, drove the Company's fixed license revenue for 2021 to a record-setting high of $71 million, vastly in excess of its historical range. | (Apparently refers to same text as ¶ 174.) | (*See* ¶ 174 *supra.*) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *Evercore ISI Autotech & AI Forum (September 21, 2021)* | | |
| 178. | It was materially false and misleading for Defendants to represent that all of Cerence's fixed license deals were "prepays," when, in fact, a material amount of the Company's fixed license business consisted of minimum commitment deals, in which there was no prepayment whatsoever.  In fact, during the fourth quarter, when Defendants made these statements, just 13% of the Company's fixed license deals were prepays, and 87% were minimum commitment deals, in which the Company had booked the full value of the contract up front but actually received no payment at all.  […] | [Mr. Gallenberger:] "[I]t's a very difficult thing to predict. Even the experts are having a hard time predicting it and they're constantly revising downwards some of their auto production estimates for this year and now even going into next year. So, it's a challenge. It's a definite challenge. The good news as you mentioned, we do — we don't have 100% exposure, *about one-third of our business is directly tied to what we get from our customers each quarter which we call quarterly royalty reports and we take revenue, our licensed revenue based upon these quarterly royalty reports. And that tells us how many cars did our customers ship in that given three-month window and based upon those reports, we obviously invoice in revenue based upon those reports. And that accounts for about a third of the company's total revenue. The other two-thirds is a combination of fixed contracts — volume contracts, which some people call as prepays.*" (App'x Ex. 35, at 8) | Misstates the transcript: Gallenberger did not represent that all of Cerenece's fixed license deals were prepays. Use of minimum commitment arrangements in 4Q2021 was disclosed in the company's 4Q2021 earnings presentation (App'x Ex. 36).  (*See* Defts.' Mem. Part II.) |

18

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *4Q2021 Earnings Press Release (November 22, 2021)* | | |
| 182. | Although the truth began to leak out when Defendants were forced to disclose the Company's sky-high fixed license revenue, Defendants attempted to obscure their scheme and past deceit through another series of false and misleading statements. For instance, in the press release, Dhawan stated, "Our total company revenue grew 17% compared to the auto production growth of 9% over the same time-period, which is [a] testament to . . . the innovative products and services we continue to bring to market." | [Mr. Dhawan:] "We finished the year strong, especially considering the production challenges our customers are facing due to semiconductor shortages. ***Our total company revenue grew 17% compared to the auto production growth of 9% over the same time-period, which is testament to*** the secular tailwinds, as well as, ***the innovative products and services we continue to bring to market.***" (App'x Ex. 36, at 4) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Vague statement of corporate optimism ("innovative"). (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|------|-----------|------------------------------------------------------|--------------------|
| 183. | These statements were materially false and misleading.  It was materially false and misleading for Defendants to identify the purported legitimate reasons for its revenue growth — including "innovative products and services" — without disclosing that, in fact, the Company was driving revenue growth by engaging in a pull-forward scheme, including by (i) pressuring their customers into doing fixed license deals in exchange for steep discounts, (ii) converting existing variable deals to prepaid deals, and (iii) beginning in mid-2021, inducing customers to accept minimum commitment deals.  As the Company's current CFO later acknowledged, conversions did not generate new revenue, but merely "dropped down revenue" from future quarters — "taking it inside the quarter" so that Cerence could recognize the revenue immediately. | [Mr. Dhawan:] "We finished the year strong, especially considering the production challenges our customers are facing due to semiconductor shortages. Our total company revenue grew 17% compared to the auto production growth of 9% over the same time-period, which is testament to the secular tailwinds, as well as, the ***innovative products and services*** we continue to bring to market."  (App'x Ex. 36, at 4) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)  Vague statement of corporate optimism ("innovative"). (*See* Defts.' Mem. Part II.B.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *4Q2021 Earnings Call (November 22, 2021)* | | |
| 185. | It was materially false and misleading for Gallenberger to attribute the increase in fixed license deals to "two larger than typical deals" and "timing," when, in reality, Defendants had driven a Company-wide increase in fixed license sales throughout fiscal year 2021, by directing salespeople to (i) pressure their customers into doing fixed license deals in exchange for steep discounts, (ii) convert existing variable deals to prepaid deals, and (iii) induce customers to accept minimum commitment deals. | [Mr. Gallenberger:] "Yes. So as I mentioned in my prepared remarks, it was driven by *2 larger than typical deals* that we had closed in the quarter. And if I look at historically, we may have maybe one large deal in any given quarter, which tends to — as I mentioned before, it tends to swing those numbers around, and they're difficult to predict, the size of those deals. And so it's very unusual to have 2 happen at the same time. And that's really what sort of drove the spike in Q4.<br><br>[Mr. Gallenberger:] "Like I said, typically, it's one customer or it's a series of customers on smaller deals, which, typically, would keep us in that $10 million to $15 million type of range. And so it was just that *timing* which drove it. I think if you look into fiscal '22, we do expect it to recede. We certainly don't think it's going to be a repeat of last year where we had a $71 million record. And if you look at our historical range, we've typically been in that low 40s to mid-50 type range. If you go back 3 or 4 years, that's typically been the range from one year to the next." (App'x Ex. 37, at 13) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **186.** | It also was materially false and misleading for Gallenberger to represent that the Company's fixed license revenue would recede in fiscal year 2022, without disclosing that, in fact, Defendants already had begun the first quarter of fiscal year 2022 by continuing their strategy of aggressively pushing Cerence sales teams to drive up fixed license revenue through the means discussed above.  Cerence has since acknowledged that because of Defendants' aggressive fixed license sales during the first half of 2022, the Company expects that its fixed license revenue for fiscal year 2022 will be <u>at least $80 million</u>. | [Mr. Gallenberger:] "Like I said, typically, it's one customer or it's a series of customers on smaller deals, which, typically, would keep us in that $10 million to $15 million type of range. And so it was just that timing which drove it. I think if you look into fiscal '22, *we do expect it to recede*. We certainly don't think it's going to be a repeat of last year where we had a $71 million record. And if you look at our historical range, we've typically been in that low 40s to mid-50 type range. If you go back 3 or 4 years, that's typically been the range from one year to the next."  (App'x Ex. 37, at 13) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("we do expect it …"). (*See* Defts.' Mem. Part II.A.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **187.** | Further, Defendants' repeated statements that they were aiming to keep fixed contract revenue in a range of between $40 and $55 million were materially misleading because Defendants failed to disclose, as the Company ultimately admitted, that (i) fixed license revenue in that range was "put[ting] a little bit of a damp around growth rates"; (ii) Defendants often converted variable revenue contracts to prepaid deals; (iii) the Company's sales of fixed deals accelerated up to 5 years of revenue; and (iv) the Company could only manage around $45 million per year in fixed license revenue. | [Mr. Gallenberger:] "So because we were outside that range, that does ***put a little bit of a damper on growth rates*** for next year and possibly into fiscal '23 as well as those licenses get consumed. Right now, it's hard to predict exactly where that number is going to be, but I would say that it's going to be down $12 million, $13 million, $14 million or so year-over-year. ***So that kind of gets you back into our historical range, but at the higher end of the historical range.*** That's what I'm anticipating." (App'x Ex. 37, at 14) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Forward looking statement accompanied by cautionary language ("Right now, it's hard to predict … but I would say it's going to be …"). (*See* Defts.' Mem. Part II.A.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| 189. | It was materially false and misleading for Defendants to state that "nothing has changed" and to reaffirm the 2024 guidance based on the purported absence of any change, when, in truth, Defendants' pull-forward scheme had crippled the Company's prospects for future revenue.  Contrary to the statement that "nothing ha[d] changed," Defendants' pull-forward scheme had brought about a fundamental change that made the Company's 2024 guidance unachievable — a fact that was confirmed in short order when the new CEO withdrew the guidance, precisely because it was unachievable, in part because the "dampening" effect of prepaid deals would last well into 2024, contrary to Gallenberger's representation. | [Mr. Dhawan:] "So let me start, and then I'll ask Mark to add in, Chris. So from my standpoint, no, ***nothing has changed.*** We stand by our guide for fiscal '24 and we feel good about it. As you heard in my prepared remarks, the new products contribute a lot towards that guide and 20% of our bookings, about $120 million was set from a bookings standpoint. We also have — we'll be announcing some new aftermarket products. We have received an award letter for one of them already, which is not part of our bookings yet. They will be part of our fiscal quarter 1 bookings. So from that standpoint, I feel good that our new products are  further contributing towards the contribution."  (App'x Ex. 37, at 9) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *4Q2021 Earnings Presentation (November 22, 2021)* | | |
| 190. | In the investor presentation for the Company's earnings call, Defendants finally, for the very first time, referenced minimum commitments — but did so in an obfuscatory and incomplete manner, which left analysts and investors in the dark as to this new type of fixed deal and its impact. The sole reference to minimum commitments appeared in two inconspicuous, small-text footnotes, which Defendants buried at the bottom of two slides in an investor presentation. Both footnotes read, "Fixed license revenue includes prepaid and minimum commitment deals." The footnotes appeared in a line item for "fixed license revenue," which disclosed the Company's fixed license revenues and year-over year growth for (i) the fourth quarter of fiscal years 2020 and 2021 and (ii) the full fiscal years 2020 and 2021. | **Revenue Growth Powered by License and Pro Services**<br><br>| | Q4FY21 | Q4FY20 | YoY Growth |<br>|---|---|---|---|<br>| License: | $51.4M | $46.4M | ↑ 11% |<br>| Variable | $26.0M | $29.9M | ↓ (13%) |<br>| Fixed[1] | $25.4M | $16.5M | ↑ 54% |<br>| Connected Services: | $25.6M | $25.4M | ↑ 1% |<br>| New | $9.5M $11.2M[2] | $9.5M | 0% 18%[2] |<br>| Legacy | $16.1M | $15.9M | ↑ 1% |<br>| Professional Services | $21.1M | $19.4M | ↑ 9% |<br>| Total Revenue: | $98.1M | $91.2M | ↑ 8% |<br><br>[1]Fixed license revenue includes prepaid and minimum commitment deals.<br>[2]Excluding a one-time accounting adjustment of $1.7M to correct an amortization schedule, year-over-year growth would have been 18%<br><br>"[1] Fixed license revenue includes prepaid and minimum commitment deals."<br>"[2] Excluding a one-time accounting adjustment of $1.7M to correct an amortization schedule, year-over-year growth would have been 18%"<br>(App'x Ex. 36, at 31) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Use of minimum commitment arrangements in 4Q2021 was disclosed in the company's 4Q2021 earnings presentation (App'x Ex. 36). (*See* Defts.' Mem. Part II.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **191.** | These footnotes were materially false and misleading and omitted material facts.  Nowhere did these footnotes disclose (i) that minimum commitments were a new type of fixed license deal, which were not sold at all during fiscal year 2020, (ii) what a minimum commitment deal was, (iii) that minimum commitments were different from prepays in the critical respect that the Company received <u>zero</u> cash up front, or (iv) the breakdown of fixed license revenue as between prepays and minimum commitments for the fourth quarter of 2021, which would have shown that these deals had skyrocketed to comprise 87% of fixed revenue. | (Apparently refers to same text as ¶ 190.) | (*See* ¶ 190 *supra.*) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | **4Q2021 Earnings Call (continued) (November 22, 201)** | | |
| **193.** | It was materially false and misleading for Gallenberger to agree that the Company's prepaid license revenue had increased to $25 million in the fourth quarter and $71 million in fiscal year 2021, when, in fact, the Company's prepaid license revenue was $3.3 million in the fourth quarter and $48.9 million in fiscal year 2021. It was also materially misleading for Gallenberger to agree that the Company's prepaid license revenue had increased to $25 million in the fourth quarter and $71 million in fiscal year 2021 without disclosing that, in fact, $22.1 million of the fourth quarter revenue and full-year revenue derived from particularly damaging minimum commitment deals, in which there was no prepayment at all. | [Mr. Gallenberger:] "So we — you have to look at what we are sort of modeling internally for our Q1 revenues. And if you look at the Q4 revenues, we did have a large amount of fixed contract revenue, which we don't expect to repeat to that same level. ***And so in last quarter, in Q4, if you look at the slides, we had $25 million of fixed revenue — fixed license revenue that is.*** And so that's a pretty substantial number, and we don't expect that to repeat. So when you factor that down, that number down quarter-over-quarter, that's really what's driving it. So we do expect variable licenses, which is most tightly coupled to auto production. We expect that number to increase sequentially."  (App'x Ex. 37, at 10-11)<br><br>[Mr. Gallenberger:] "Like I said, typically, it's one customer or it's a series of customers on smaller deals, which, typically, would keep us in that $10 million to $15 million type of range. And so it was just that timing which drove it. I think if you look into fiscal '22, we do expect it to recede. We certainly don't think it's going to be a repeat of last year where we had a ***$71 million*** record. And if you look at our historical range, we've typically been in that low 40s to mid-50 type range. If you go back 3 or 4 years, that's typically been the range from one year to the next."  (App'x Ex. 37, at 13) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Use of minimum commitment arrangements in 4Q2021 was disclosed in the company's 4Q2021 earnings presentation (App'x Ex. 36).  (*See* Defts.' Mem. Part II.) |

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| **194.** | Further, it was materially false and misleading for Cerence to state that "[f]ixed license revenue includes . . . minimum commitment deals" in a table that summarized the Company's fixed license revenue in 2020, when, in fact, <u>none</u> of the Company's revenues in 2020 resulted from minimum commitments, which in 2020, had not been introduced yet.  This materially false and misleading disclosure perpetuated the mistaken impression that the Company had not introduced a new and damaging type of fixed license deal, when, in fact, it had. | (Apparently refers to same text as ¶ 190.) | (*See* ¶ 190 *supra.*) |

28

| AC ¶ | Allegation | Quoted Language in Context (quoted text in *italics*) | Why Not Actionable |
|---|---|---|---|
| | *Goldman Sachs Global Automotive Conference (December 2, 2021)* | | |
| 196. | This statement was materially false and misleading.  It was materially false and misleading for Gallenberger to attribute the Company's increase in "unbilled" revenue to a mere technicality concerning payment terms, without disclosing that, in truth, most of that increase had resulted from the introduction of and reliance on the minimum commitment deal.  In fiscal year 2021, the Company's "recognized but not billed" revenues increased by approximately $36.5 million from the previous year.  Of that increase, minimum commitment deals accounted for $22.1 million — i.e., more than 60%.[6]  Instead of disclosing that minimum commitments were, in fact, the main driver of the Company's revenues that had been recognized but not billed, Gallenberger continued to obscure minimum commitment deals from investors.<br><br>[Footnote 6:] For minimum commitments, the "payment terms" were such that the Company could recognize 100% of the revenue, even if 0% of that revenue had been billed — resulting in the entire value of the contract falling in the "recognized but unbilled" category.  In other words, the full value of every minimum commitment deal was "recognized but unbilled." | [Analyst:] "Just one last one, the 10-K's out. We have some questions coming in around this from some of the investors with just around the amount of revenue that's been ***recognized but unbilled*** has been increasing and we just see that in the 10-K. So, Mark, I don't know if you have anything you can share around? Are you guys [indiscernible] (00:40:02) business practices or what's leading to that?"<br><br>[Mr. Gallenberger]: "Yeah. The biggest driver of that, Mark, is the fact that our fixed contract license revenue went up substantially this year versus last year. And with that, components of ***payment terms***, some of those payment terms, ***if they're not scheduled yet, then it becomes unbilled***, natural movement up in that fixed license contract's line from last year to this year. This year, we're forecasting the fixed contract revenue to actually come down. So, I would expect by the end of next or this fiscal year, a year from now, call it, that that number would probably start to come back down because of what we're forecasting this year." (App'x Ex. 41, at 12) | Plaintiffs fail to plead particularized facts supporting strong inference of scheme to increase fixed license contracts. (*See* Defts.' Mem. Part I.)<br><br>Use of minimum commitment arrangements in 4Q2021 was disclosed in the company's 4Q2021 earnings presentation (App'x Ex. 36).  (*See* Defts.' Mem. Part II.) |