# EXHIBIT 5

*(Cerence Schedule 14A,*
*dated January 24, 2020)*

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## SCHEDULE 14A INFORMATION

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐      Preliminary Proxy Statement

☐      **Confidential, for use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒      Definitive Proxy Statement

☐      Definitive Additional Materials

☐      Soliciting Material Pursuant to § 240.14a-12

# CERENCE INC.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒      No fee required.

☐      Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

     (1)      Title of each class of securities to which transaction applies:

     (2)      Aggregate number of securities to which transaction applies:

     (3)      Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

     (4)      Proposed maximum aggregate value of transaction:

     (5)      Total fee paid:

☐      Fee paid previously with preliminary materials.

☐      Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

     (1)      Amount Previously Paid:

     (2)      Form, Schedule or Registration Statement No.:

     (3)      Filing Party:

     (4)      Date Filed:

**Table of Contents**



**Cerence Inc.**
**15 Wayside Road**
**Burlington, MA 01803**

January 24, 2020

To Our Shareholders:

We are pleased to invite you to attend the first annual meeting of shareholders of Cerence Inc. ("Annual Meeting") on Thursday, February 20, 2020 at 11:00 a.m. Eastern Time. We have adopted a virtual format for our Annual Meeting to provide a consistent and convenient experience to all shareholders regardless of location. You may attend the Annual Meeting virtually via the Internet at www.proxydocs.com/CRNC, where you will be able to vote electronically and submit questions. In order to attend, you must register in advance at www.proxydocs.com/CRNC prior to the deadline of February 13, 2020 at 5:00 pm Eastern Time. Upon completing your registration, you will receive further instructions via email, including your unique links that will allow you access to the meeting and will also permit you to submit questions. Please be sure to follow instructions found on your Proxy Card and/or Voting Authorization Form and subsequent instructions that will be delivered to you via email.

The Notice of the 2020 Annual Meeting of Shareholders and the proxy statement contain details of the business to be conducted at the Annual Meeting, including the nominees for election as directors. Only shareholders of record at the close of business on December 23, 2019 will be entitled to notice of, and to vote at, the Annual Meeting.

Your vote is important. Regardless of whether you plan to participate in the Annual Meeting, we hope that you will vote as soon as possible. You may vote by proxy over the Internet, by telephone, or by mail (if you received paper copies of the proxy materials) by following the instructions on the proxy card or voting instruction card. Voting over the Internet or by telephone, written proxy or voting instruction card will ensure your representation at the Annual Meeting regardless of whether you attend the meeting.

Thank you for your ongoing support of, and continued interest in, Cerence.

Sincerely,

Arun Sarin
*Chairman of the Board*

Sanjay Dhawan
*Chief Executive Officer*

**Table of Contents**



**Cerence Inc.**
**15 Wayside Road**
**Burlington, MA 01803**

## NOTICE OF THE 2020 ANNUAL MEETING OF SHAREHOLDERS

Dear Shareholders:

The 2020 Annual Meeting of Shareholders (the "2020 Annual Meeting") of Cerence Inc. (the "Company") will be held on Thursday, February 20, 2020 at 11:00 a.m. Eastern Time. The 2020 Annual Meeting will be a virtual shareholders meeting at www.proxydocs.com/CRNC being held for the following purposes:

(1)   Election of the two Class I directors named in the proxy statement.

(2)   Ratification of the appointment of BDO USA, LLP as the Company's independent registered public accounting firm for the fiscal year ending September 30, 2020.

(3)   Transaction of such other business as may properly come before the meeting or any adjournment or postponement of the meeting.

The Board of Directors has fixed the close of business on December 23, 2019 as the record date for determination of shareholders entitled to notice of, and to vote at, the 2020 Annual Meeting and at any adjournments or postponements thereof. A list of shareholders entitled to vote at the 2020 Annual Meeting will be available at 15 Wayside Road, Burlington, MA 01803 on the date of, and for ten days prior to, the 2020 Annual Meeting. To participate in the 2020 Annual Meeting virtually via the Internet, please visit www.proxydoc.com/CRNC. In order to attend, you must register in advance at www.proxydocs.com/CRNC prior to the deadline of February 13, 2020 at 5:00 pm Eastern Time. Upon completing your registration, you will receive further instructions via email, including your unique links that will allow you access to the meeting and will permit you to submit questions. You will not be able to attend the 2020 Annual Meeting in person.

The Company's Annual Report on Form 10-K for the fiscal year ended September 30, 2019 accompanies this Notice of the 2020 Annual Meeting of Shareholders and the proxy statement. These documents also may be accessed free of charge at www.proxyvote.com.

Please refer to the proxy statement for further information with respect to the business to be transacted at the 2020 Annual Meeting.

By Order of the Board of Directors,

Leanne Fitzgerald
*Secretary*

Burlington, Massachusetts
January 24, 2020

**Table of Contents**

**PROXY STATEMENT**

**ANNUAL MEETING OF SHAREHOLDERS
OF CERENCE INC.**

**February 20, 2020**

This proxy statement (this "Proxy Statement") is furnished in connection with the solicitation by Cerence Inc. ("we," "us," "our," "Cerence" or the "Company") on behalf of the Board of Directors (the "Board" or the "Board of Directors") of proxies for use at the 2020 Annual Meeting of Shareholders of the Company to be held on Thursday, February 20, 2020 at 11:00 a.m. Eastern Time (the "2020 Annual Meeting"). This year's meeting is a virtual shareholders meeting at www.proxydocs.com/CRNC. We intend to mail proxy materials to shareholders, and this Proxy Statement and the accompanying form of proxy, on or about January 24, 2020.

**EXPLANATORY NOTE**

We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act. As an emerging growth company, we may take advantage of specified reduced reporting and other burdens that are otherwise applicable generally to public companies. These provisions include, among other things, an exemption from the requirement to seek non-binding advisory votes on executive compensation and reduced disclosure about executive compensation arrangements. We may take advantage of these provisions until the end of the fiscal year following the fifth anniversary of September 6, 2019, the date of effectiveness of our registration statement on Form 10, or such earlier time that we are no longer an emerging growth company. We will cease to be an emerging growth company upon the earliest of: (1) the end of the fiscal year following the fifth anniversary of September 6, 2019, the date of effectiveness of our registration statement on Form 10; (2) the first fiscal year after our annual gross revenues are $1.07 billion or more; (3) the date on which we have, during the previous three-year period, issued more than $1.0 billion in non-convertible debt securities; or (4) the end of any fiscal year in which the market value of our common stock held by non-affiliates exceeded $700 million as of the end of the second quarter of that fiscal year. For as long as we take advantage of the reduced reporting obligations, the information that we provide shareholders may be different from information provided by other public companies.

**Table of Contents**

Table of Contents

**PROXY STATEMENT SUMMARY**

This Proxy Statement provides information for shareholders of Cerence, as part of the solicitation of proxies by the Company and its Board of Directors from holders of the outstanding shares of the Company's common stock ("Common Stock"), for use at the 2020 Annual Meeting.

This summary highlights select information that is provided in more detail throughout this Proxy Statement. This summary does not contain all of the information you should consider before voting. You should read the full Proxy Statement before casting your vote.

**2020 Annual Meeting**

**Date and Time:**          Thursday, February 20, 2020, at 11:00 a.m. Eastern Time.

**Location:**                  The meeting is a virtual shareholders one only at www.proxydocs.com/CRNC

**Record Date:**          December 23, 2019

## Voting Items

The following table summarizes the proposals to be considered at the 2020 Annual Meeting and the voting recommendations of the Board of Directors with respect to each proposal.

| Proposal Number | Proposal | Board Voting Recommendation | Page Number |
|---|---|---|---|
| 1 | Elect the two nominees named in this Proxy Statement as Class I directors | **FOR** each director nominee | 4 |
| 2 | Ratify the appointment of BDO USA, LLP as the Company's independent registered public accounting firm for the fiscal year ending September 30, 2020 | **FOR** | 27 |

## Business Overview

Cerence builds automotive cognitive assistance solutions to power natural and intuitive interactions between automobiles, drivers and passengers, and the broader digital world. We are a premier provider of AI-powered assistants and innovations for connected and autonomous vehicles, including one of the world's most popular software platforms for building automotive virtual assistants, such as "*Hey BMW*" and "*Ni hao Banma*."

Our platform utilizes industry-leading speech recognition, natural language understanding, speech signal enhancement and acoustic modeling technology. Automotive virtual assistants built with our platform can enable a wide variety of modes of human-vehicle interaction, including speech, touch, handwriting, gaze tracking and gesture recognition, and can support the integration of third-party virtual assistants into the in-vehicle experience. We expanded our offerings and services in both our edge and cloud platform to capture opportunities in the automobile market and improve our position as a trusted partner to our customers as the intelligence and connectivity capabilities of automobiles increases.

## Recent Event Highlights

On October 1, 2019, we became an independent publicly traded company on The Nasdaq Global Select Market under the symbol CRNC, after our former parent company completed the previously announced complete legal and structural separation and distribution to its shareholders of all of our then outstanding shares (the "Spin-Off").

i

Table of Contents

Our solutions have been installed in more than 280 million automobiles to date, including over 45 million new vehicles in 2018 alone. Based on royalty reports provided by our customers and third-party reports of total vehicles shipped worldwide, we estimate that approximately 52% of all shipped cars during the fiscal year ended September 30, 2019 included Cerence technologies, compared to approximately 48% for the fiscal year ended September 30, 2018. Cerence hybrid solutions shipped on approximately 7.8 million vehicles during the fiscal year ended September 30, 2019, an increase of approximately 37% compared to approximately 5.7 million vehicles for the fiscal year ended September 30, 2018. In aggregate, over 60 automobile brands worldwide use our solutions, covering over 70 languages and dialects, including English, German, Spanish, French, Mandarin, Cantonese and Shanghainese.

**Board of Directors**

Our Board of Director has a diverse mix of directors with complimentary qualifications, skills, expertise, experience and attributes, which is essential to ensuring effective oversight of our business strategy and corporate governance practices. The Board includes two women and members from varying ethnic and professional backgrounds. The members of the Board are:

| | | | | |
|---|---|---|---|---|
| **Arun Sarin**<br>*Independent Board Chairman*<br>Former CEO, Vodafone Group Plc. | Seasoned global technology and telecommunications executive. | | **Sanjay Jha**<br>Former CEO GlobalFoundries, Inc., Motorola Mobility Devices and COO Qualcomm | Extensive knowledge and leadership of technology organizations with significant global management experience. |
| **Sanjay Dhawan**<br>*CEO* | Expert in technologies, services, software and go-to-market strategy for the automotive industry. | | **Kristi Ann Matus**<br>Former Chief Financial and Administrative Officer<br>athenahealth | Finance and accounting expert with extensive executive and administrative experience in network enabled services. |
| **Thomas Beaudoin**<br>Executive Vice President, Business Transformation<br>Nuance Communications, Inc. | Abundance of executive finance, and operational experience in global technology companies. | | **Alfred Nietzel**<br>Former CFO CDK Global Inc. | Finance and accounting expert with extensive executive experience in the automotive supplier market. |
| **Marianne Budnik**<br>Chief Marketing Officer<br>CyberArk Software Ltd. | Seasoned technology marketing executive at both mature and growth companies. | | | |

ii

Table of Contents

All of our non-employee directors have extensive professional experience. The chart below highlights specific areas in which we believe our directors have particularly deep experience relevant to our current profile and strategic needs.

| Skills and Qualifications | Arun Sarin | Thomas Beaudoin | Marianne Budnik | Sanjay Jha | Kristi Ann Matus | Alfred Nietzel |
|---|---|---|---|---|---|---|
| **Board Diversity**<br>We are an organization benefitting from directors with a wide range of diverse experience and backgrounds. | ✓ | | ✓ | ✓ | ✓ | |
| **Business/Industry Knowledge**<br>We are a software, solutions and professional services organization benefiting from experienced directors knowledgeable in the industry, markets and channels in which we operate. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Financial**<br>We are a global publicly traded company conducting complex financial transactions requiring oversight in order to oversee the processes associated our financial management and the integrity of our financial results. | ✓ | ✓ | | | ✓ | ✓ |
| **Global/Emerging Markets Experience**<br>We are a global organization participating in both mature and emerging markets, and benefit from a Board with prior international exposure and experience. | ✓ | ✓ | | ✓ | | ✓ |
| **Leadership**<br>We are a complex, global organization benefiting from experienced oversight of our overall strategy and management including assessing our strategies and operations. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Technology/Innovation**<br>We are a leading provider of cognitive assistants using voice recognition and natural language understanding solutions in highly dynamic and competitive markets and benefit from experience in understanding market trends and disruptive technologies and solutions. | ✓ | | ✓ | ✓ | | |

## Corporate Governance

As a new company, we are committed to good corporate governance, and we believe our early adoption of good governance practices, promotes the long-term interests of our shareholders, fosters sustained business success, and strengthens our Board of Directors and management accountability.

**See Corporate Governance for more information.**

iii

Table of Contents

**TABLE OF CONTENTS**

| | Page |
|---|---|
| VOTING RIGHTS | 1 |
| VIRTUAL ANNUAL MEETING | 1 |
| RECORD DATE AND SHARE OWNERSHIP | 1 |
| PROXIES | 2 |
| SHAREHOLDER PROPOSALS AND DIRECTOR NOMINATIONS FOR THE 2021 ANNUAL MEETING OF SHAREHOLDERS | 2 |
|     Inclusion of Shareholder Proposals in Proxy Statement | 2 |
|     Inclusion of Director Nominees in Proxy Statement | 2 |
|     Inclusion of Shareholder Proposals or Nominations in Annual Meeting Agenda but Not in Proxy Statement | 2 |
| PROXY SOLICITATION COSTS | 3 |
| PROPOSAL ONE—ELECTION OF CLASS I DIRECTORS | 4 |
|     Information Regarding the Nominees for Election as Class I Directors | 4 |
|     Information Regarding the Continuing Directors | 5 |
|     Recommendation of the Board | 6 |
| CORPORATE GOVERNANCE | 7 |
|     Corporate Governance Overview | 7 |
|     Framework | 7 |
|     Board Leadership Structure | 7 |
|     Independence of our Board | 7 |
|     Corporate Governance Guidelines | 8 |
|     Committees of the Board of Directors | 8 |
|     Functions of the Committees | 9 |
|     Compensation Committee Interlocks and Insider Participation | 10 |
|     Meeting Attendance | 10 |
|     Consideration of Director Nominees | 11 |
|     Communication with the Board of Directors | 11 |
|     Code of Business Conduct and Ethics | 11 |
|     Stock Ownership Guidelines | 12 |
|     Derivatives Trading, Hedging and Pledging Policies | 12 |
|     Board's Role in Strategy Risk Oversight | 12 |
| COMPENSATION OF NON-EMPLOYEE DIRECTORS | 13 |
| FISCAL 2019 DIRECTOR COMPENSATION TABLE | 14 |
| EXECUTIVE COMPENSATION | 15 |
|     Overview and Philosophy | 15 |
|     Components of Executive Compensation | 15 |
|     Independent Compensation Consultant | 15 |
|     Compensation Tables | 15 |
| EXECUTIVE OFFICERS | 17 |
| FISCAL 2019 SUMMARY COMPENSATION TABLE | 18 |
| FISCAL 2019 OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END TABLE | 19 |
|     Employment Arrangement with Mr. Dhawan | 19 |
|     Employment Arrangement with Mr. Gallenberger | 20 |
|     CEO Change of Control and Severance Agreement | 20 |
|     Change of Control and Severance Agreement with Other NEOs | 21 |
| EQUITY COMPENSATION PLAN INFORMATION | 22 |
| TRANSACTIONS WITH RELATED PERSONS | 22 |
|     Our Policy Regarding Related Party Transactions | 22 |
|     Agreements with Nuance | 23 |

**Table of Contents**

|  | Page |
|---|---|
| PROPOSAL TWO—RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 27 |
|     Audit Fees During Fiscal Year 2019 and Fiscal Year 2018 | 27 |
|     Policy on Audit Committee Pre-Approval of Audit and Permissible Non-Audit Services of Independent Registered Public Accounting Firm | 27 |
|     Recommendation of the Board | 27 |
| AUDIT COMMITTEE REPORT | 28 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 29 |
| SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE | 30 |
| ADDITIONAL INFORMATION | 31 |
|     Other Matters | 31 |
|     Householding | 31 |
|     Annual Report On Form 10-K | 31 |
|     Incorporation by Reference | 31 |

ii

Table of Contents

**VOTING RIGHTS**

Each share of Common Stock entitles the holder thereof to one vote on matters to be acted upon at the 2020 Annual Meeting, including the election of directors. Votes cast in person or by proxy at the 2020 Annual Meeting will be tabulated by Mediant Communications, Inc., the Inspector of Elections. Any proxy that is voted according to the instructions included in the proxy card will be voted in accordance with the instructions thereon, and if no instructions are given, will be voted: (1) "FOR" the election of the two director nominees described in Proposal 1; and (2) "FOR" ratification of the appointment of BDO USA, LLP as the Company's independent registered public accounting firm described in Proposal 2. A shareholder may indicate when it votes by the Internet, by telephone or on the enclosed proxy that it is abstaining from voting on a particular matter (an "abstention"). A broker may indicate that it does not have discretionary authority as to certain shares to vote on a particular matter (a "broker non-vote"). Abstentions and broker non-votes are each tabulated separately.

The Inspector of Elections will determine whether or not a quorum is present at the 2020 Annual Meeting. In general, Delaware law and our By-laws provide that a majority of the shares of Common Stock issued and outstanding and entitled to vote, present in person or represented by proxy, constitutes a quorum. Abstentions and broker non-votes of shares that are entitled to vote are treated as shares that are present in person or represented by proxy for purposes of determining the presence of a quorum.

For Proposal 1 (Election of Class I Directors), each nominee receiving a majority of the votes cast will be elected. For this purpose, a majority of the votes cast means the number of votes cast for a director nominee must exceed the votes cast against that director nominee, with abstentions and broker non-votes not counted as a vote cast with respect to that director nominee. Each director nominee has provided an irrevocable resignation effective upon such person's failure to receive a majority of the votes cast in an uncontested election and the acceptance of such resignation by the Board. If such director nominee fails to receive a majority of the votes cast, then the Board shall consider such resignation and may either accept such resignation or reject such resignation and seek to address the underlying cause of the vote. The Board shall decide whether to accept or reject the resignation within 90 days following the certification of the shareholder vote. Once the Board makes this decision, the Company will promptly make a public announcement of the Board's decision, including, in the event that the Board rejects the resignation, a statement regarding the reasons for its decision.

For Proposal 2 (Ratification of the appointment of BDO USA, LLP as the Company's independent registered public accounting firm for fiscal year 2020), an affirmative vote of a majority of the shares of Common Stock, present in person or represented by proxy, is required to approve the proposal. In determining whether this proposal has been approved, abstentions are treated as present in person or represented by proxy and entitled to vote, but not as voting for such proposal, and hence have the same effect as votes against such proposal. Proposal 2 is considered a routine matter for which brokers have discretionary voting power.

**VIRTUAL ANNUAL MEETING**

The 2020 Annual Meeting will be a completely virtual meeting. There will be no physical meeting location. The meeting will only be conducted via live webcast.

In order to attend, you must register in advance at www.proxydocs.com/CRNC prior to the deadline of February 13, 2020 at 5:00 pm Eastern Time. Upon completing your registration, you will receive further instructions via email, including your unique link that will allow you access to the meeting and you will have the ability to submit questions. Please be sure to follow instructions found on your Proxy Card and/or Voting Authorization Form and subsequent instructions that will be delivered to you via email.

**RECORD DATE AND SHARE OWNERSHIP**

Holders of record of Common Stock as of the close of business on December 23, 2019 have the right to receive notice of, and to vote at, the 2020 Annual Meeting. On December 23, 2019, the Company had 36,398,349 shares of Common Stock issued and outstanding.

Table of Contents

**PROXIES**

Proxies for use at the 2020 Annual Meeting are being solicited by the Company from its shareholders. Any person giving a proxy in the form accompanying this Proxy Statement has the power to revoke it at any time before its exercise by (1) filing with the Corporate Secretary of the Company a signed written statement revoking his, her or its proxy or (2) submitting an executed proxy bearing a date later than that of the proxy being revoked. A proxy also may be revoked by attendance at the 2020 Annual Meeting and the election to vote in person. Attendance at the 2020 Annual Meeting will not by itself constitute the revocation of a proxy.

**SHAREHOLDER PROPOSALS AND DIRECTOR NOMINATIONS FOR THE 2021 ANNUAL MEETING OF SHAREHOLDERS**

Shareholders may present proper proposals or nominations for consideration at next year's annual meeting of shareholders by submitting their proposals or nominations in writing to the Company's Corporate Secretary in a timely manner. Our Amended and Restated By-laws ("By-laws") require that certain information and acknowledgements with respect to the proposal or nomination be set forth in the shareholder's notice. A copy of the relevant By-law provision is available upon written request to Cerence Inc., 15 Wayside Road, Burlington, MA 01803, Attention: Investor Relations. In addition, the By-laws were filed as Exhibit 3.2 to the Company's Current Report on Form 8-K, filed with the U.S. Securities and Exchange Commission (the "SEC") on October 2, 2019 and may be accessed through the SEC's website at www.sec.gov.

### Inclusion of Shareholder Proposals in Proxy Statement

Proposals of shareholders that are intended to be presented at the Company's 2021 Annual Meeting of Shareholders (the "2021 Annual Meeting") must comply with the requirements of SEC Rule 14a-8. A shareholder's proposal must be delivered to or mailed and received by us no later than September 26, 2020 in order for it to be included in the Company's proxy statement and form of proxy relating to the meeting.

### Inclusion of Director Nominees in Proxy Statement

Our By-laws provide that a shareholder, or group of up to 20 shareholders, that has owned continuously for at least three years an aggregate of at least 3% of the outstanding Common Stock, may nominate and include in the Company's proxy materials director nominees constituting up to the greater of two or 20% of the number of directors in office as of the deadline for such nomination, provided that the shareholder(s) and nominee(s) satisfy the requirements in the By-laws (a "proxy access nomination"). To be timely, a nomination notice and required information must be delivered to or mailed and received by the Company's Corporate Secretary at our principal executive offices not less than 120 days nor more than 150 days prior to the anniversary of the date that the definitive proxy statement with respect to the preceding year's annual meeting was first released to shareholders; provided, however, that in the event the date of the annual meeting is more than 30 days earlier or more than 60 days later than such anniversary date, notice by the shareholder to be timely must be so delivered or received no earlier than the 150th day prior to such annual meeting and not later than the close of business on the later of (1) the 120th day prior to such annual meeting or (2) the 10th day following the date on which we publicly announce the meeting date. Assuming the date of our 2021 Annual Meeting is not so advanced or delayed, shareholders who wish to include a director nominee in our 2021 proxy statement must notify us no earlier than August 27, 2020 and no later than the close of business on September 26, 2020. Such notice must provide the information required by our By-laws.

### Inclusion of Shareholder Proposals or Nominations in Annual Meeting Agenda but Not in Proxy Statement

A shareholder proposal or a nomination for director to be presented at the 2021 Annual Meeting that is not to be included in the Company's proxy statement and form of proxy relating to the meeting must be delivered to or mailed and received by the Company's Corporate Secretary at our principal executive offices not less than 90 days nor more than 120 days prior to the first anniversary of the date of the immediately preceding annual meeting as first specified in the Company's notice of meeting; provided, however, that in the event the date of the annual meeting is more than 30 days earlier or more than 60 days later than such anniversary date, notice by the shareholder to be timely must be so delivered

2

Table of Contents

or received no earlier than the 120th day prior to such annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or the 10th day following the date on which we publicly announce the meeting date. Assuming the date of our 2021 Annual Meeting is not so advanced or delayed, shareholders who wish to include a director nominee in our 2021 proxy statement must notify us no earlier than October 23, 2020 and no later than the close of business on November 22, 2020. Such notice must provide the information required by our By-laws.

**PROXY SOLICITATION COSTS**

The expense of solicitation of proxies will be borne by the Company. In addition to solicitation of proxies by mail, certain officers, directors and Company employees, who will receive no additional compensation for their services, may solicit proxies by telephone or in person. The Company is required to request brokers and nominees who hold stock in their name to furnish this proxy material to beneficial owners of the stock and will reimburse such brokers and nominees for their reasonable out-of-pocket expenses in so doing.

3

**Table of Contents**

**PROPOSAL ONE**

**ELECTION OF CLASS I DIRECTORS**

Our Board of Directors is currently divided into three classes. Our Amended and Restated Certificate of Incorporation provides that, until the 2023 Annual Meeting of Shareholders (the annual meeting in the year that is three years after the Spin-Off) (the "2023 Annual Meeting"), our Board will be divided into three classes, with each class consisting, as nearly as may be possible, of one-third of the total number of directors. The directors designated as Class I directors have terms expiring at the 2020 Annual Meeting. The directors designated as Class II directors have terms expiring at the 2021 Annual Meeting, and the directors designated as Class III directors have terms expiring at our 2022 Annual Meeting. Commencing with the 2020 Annual Meeting, directors elected to succeed those directors whose terms then expire will be elected for a term of office to expire at our 2023 Annual Meeting. As a result, beginning at the 2023 Annual Meeting, all of our directors will stand for election each year for annual terms, and our Board will therefore no longer be divided into three classes.

At the 2020 Annual Meeting, two directors will be elected to the Board. The Nominating & Governance Committee of the Board of Directors recommended, and the Board of Directors approved, Thomas Beaudoin and Marianne Budnik as nominees for election at the 2020 Annual Meeting as Class I directors. The term of office of each person elected as a Class I director will continue until the 2023 Annual Meeting or until a successor has been duly elected and qualified or until his or her earlier resignation or removal.

The names of and certain biographical information about the directors in each of the three classes are set forth below. The information below also includes the specific experience, qualifications, attributes and skills that led to our Board's conclusion that the nominees should serve as a director of Cerence or, with respect to each director who is not standing for election at the 2020 Annual Meeting, that the Board would expect to consider if it were making a conclusion currently as to whether he or she should serve as a director.

**Information Regarding the Nominees for Election as Class I Directors**

| Board Nominee | Qualifications |
|---|---|
| **Thomas Beaudoin**<br>Age: 66<br><br>**Compensation Committee Member**<br>*Board Member since: October 2019* | Mr. Beaudoin has served as Executive Vice President Business Transformation of Nuance Communications, Inc. ("Nuance") since 2017 and is responsible for leading efforts to align and fully leverage technologies within Nuance's key vertical markets, and drive growth while improving margins and cost structure. Prior to re-joining Nuance in 2017, Mr. Beaudoin held several executive leadership roles, including CFO of SimpliVity Corp. (now HPE SimpliVity) from 2015 to 2017; Executive Vice President and CFO of Nuance from 2008 to 2015; President and CFO of Polaroid Corporation; Senior Vice President and CFO of Parametric Technology Corporation; and a number of senior finance positions during his 24-year career at Digital Equipment Corporation then Compaq Computer Corporation (now Hewlett Packard).<br>Mr. Beaudoin holds a B.S.B.A. degree and an M.B.A. from Babson College. With more than 40 years' experience, Mr. Beaudoin has deep insight and experience in developing financial and operational leadership strategies for global enterprises, all of which we believe makes him well qualified to serve as a member of our Board. |

4

Table of Contents

| Marianne Budnik<br>Age: 51<br><br>**Compensation Committee and Nominating & Governance Committee Member**<br>*Board Member since: October 2019* | Ms. Budnik has served as Chief Marketing Officer at CyberArk Software Ltd. since 2017. Prior to joining CyberArk, Ms. Budnik served as Chief Marketing Officer for SimpliVity Corporation (acquired by Hewlett Packard Enterprise) from 2014 to 2017. Her prior experience also includes serving as Chief Marketing Officer for Acme Packet, Inc. (acquired by Oracle Corporation) and Chief Marketing Officer for CA Technologies. Ms. Budnik currently serves as a director at Schibsted Media Group. Ms. Budnik holds an M.B.A. from Boston University Questrom School of Business, a bachelor's degree from Babson College and a Corporate Director Certificate from Harvard Business School. Ms. Budnik is a seasoned technology marketing executive, experienced in leading both transformational marketing initiatives at mature and growth companies, and driving market disruption with some of the fastest growing B2B start-ups in the technology and telecommunications industries, all of which we believe makes her well qualified to serve as a member of our Board. |

**Information Regarding the Continuing Directors**

| Class II Directors<br>(terms expiring in 2021): | Qualifications |
|---|---|
| Sanjay Jha<br>Age: 57<br><br>**Compensation Committee Chair and Audit Committee Member**<br>*Board Member since: October 2019* | Mr. Jha has served as a General Partner at Eclipse Ventures since 2019. Mr. Jha was Chief Executive Officer of GlobalFoundries Inc., the world's second-largest semiconductor foundry business, from 2014 to 2018. Prior to joining GlobalFoundries, Mr. Jha was Chief Executive Officer for Motorola Mobile Devices from 2008 to 2012, a role he held until the company's acquisition by Google. Before joining Motorola, Mr. Jha was at Qualcomm for over 14 years, ending his tenure at Qualcomm as the Chief Operating Officer (2006 to 2008) and President of Qualcomm CDMA Technologies (2002 to 2008). Mr. Jha was a member of the board of directors of the Semiconductor Industry Association and also served as Chairman of the Global Semiconductor Alliance. Additionally, he is a member of the board of trustees of UC San Diego and the Salk Institute and serves on the board of several private start-ups. Mr. Jha holds a Ph.D. (2001), and D.Sc (Hon) in Electrical and Electronics Engineering from the University of Strathclyde. He was inducted into the US National Academy of Engineering in 2018. Mr. Jha has an extensive background in the semiconductor and mobility industries and significant managerial, international and technological experience, all of which we believe makes him well qualified to serve as a member of our Board. |
| Alfred Nietzel<br>Age: 58<br><br>**Audit Committee and Nominating & Governance Committee Member**<br>*Board Member since: October 2019* | Mr. Nietzel has been an independent consultant since 2017. From 2014 to 2017, Mr. Nietzel served as the Chief Financial Officer and Executive Vice President at CDK Global, Inc. Prior to CDK's spin-off, Mr. Nietzel was with Automatic Data Processing, Inc. since 2001 and served as Chief Financial Officer for the Dealer Services Division, Chief Financial Officer for the Employer Services Division and ADP's Corporate Controller. Prior to joining ADP, Mr. Nietzel served for 17 years with Proctor & Gamble Inc. in numerous financial management roles in the United States, United Kingdom, and Australia. Mr. Nietzel holds a B.S. degree from Eastern Illinois University. Mr. Nietzel led and orchestrated the financial and administrative execution of the spin-off creating CDK Global in 2014 and has extensive management, financial and corporate experience, all of which we believe makes him well qualified to serve as a member of our Board. |

**Table of Contents**

| Class III Directors (terms expiring in 2022): | Qualifications |
|---|---|
| **Sanjay Dhawan** Age: 56 <br><br> *Board Member since: October 2019* | Mr. Dhawan was appointed our Chief Executive Officer on October 1, 2019. From August 2019 until such appointment, Mr. Dhawan served in the position of Advisor to the Automotive Division of Nuance Communications, Inc. From 2015 to 2019, Mr. Dhawan served as President of the Connected Services Division and Chief Technology Officer of Harman Industries International. Prior to joining Harman, he served as President and Chief Executive Officer of Symphony Teleca Corporation since 2010. Mr. Dhawan holds a Master's degree in Electrical Engineering from Brunel University, England, and a Bachelor of Science degree in Electronics and Communications from REC Kurukshetra, India. With more than 30 years of technology leadership and extensive experience in the automotive industry, Mr. Dhawan brings a deep understanding of AI and machine learning applications, with particular focus on developing solutions at the intersection of devices, sensors, cloud solutions and data integration, all of which we believe makes him well qualified to serve as a member of our Board. |
| **Kristi Ann Matus** Age: 51 <br><br> **Audit Committee Chair** *Board Member since: September 2019* | Ms. Matus has been an executive advisor to Thomas H. Lee Partners since 2017. From 2014 to 2016, Ms. Matus served as the Executive Vice President, Chief Financial and Administrative Officer at athenahealth, Inc. From 2012 to 2013, Ms. Matus served as Executive Vice President and Head of Governmental Services at Aetna, Inc. Prior to Aetna, she held several senior leadership roles at United Services Automobile Association, including Executive Vice President and Chief Financial Officer from 2008 to 2012. She began her career at Thrivent where she held various financial and operational roles for over a decade. Ms. Matus currently serves as a director at AXA Equitable Holdings, Inc. and AllianceBernstein Holding L.P. Ms. Matus holds a B.S. degree from University of Wisconsin, Oshkosh. Ms. Matus has extensive management and financial expertise as well as corporate governance and key leadership skills developed through her decades of experience, all of which we believe makes her well qualified to serve as a member of our Board. |
| **Arun Sarin** Age: 64 <br><br> **Independent Chairman of the Board and Nominating & Governance Committee Chair** *Board Member since: October 2019* | Mr. Sarin served as Chief Executive Officer of Vodafone Group Plc from 2003 until his retirement in 2008. Mr. Sarin began his career at Pacific Telesis Group in 1984. He progressed through various management positions there and at AirTouch Communications Inc., from which Pacific Telesis spun off in 1994, and was named President and Chief Operating Officer of AirTouch in 1997. After AirTouch merged with Vodafone in 1999, he was appointed Chief Executive Officer of Vodafone's U.S./Asia-Pacific region. He left Vodafone in 2000 to become Chief Executive Officer of InfoSpace, Inc., and from 2001 until 2003, he served as Chief Executive Officer of Accel-KKR Telecom. After his retirement in 2008, he served as a senior advisor to Kohlberg Kravis Roberts & Co. for five years. Mr. Sarin currently serves as a director at Cisco Systems, Inc., The Charles Schwab Corporation and Accenture plc. He previously served as a director of Safeway, Inc. from 2009 to 2015 and Blackhawk Network Holdings, Inc. from 2009 to 2018. Mr. Sarin holds M.B.A. and Master of Science (Engineering) degrees from University of California-Berkeley and a B.S. from the Indian Institute of Technology in Kharagpur, India. Because of his significant global, managerial and financial experience and background in technology and telecommunications, we believe Mr. Sarin is well qualified to serve as a member of our Board. |

**Recommendation of the Board**

**THE BOARD UNANIMOUSLY RECOMMENDS THAT SHAREHOLDERS VOTE "FOR" THE ELECTION OF THOMAS BEAUDOIN AND MARIANNE BUDNIK TO SERVE AS CLASS I DIRECTORS.**

Table of Contents

**CORPORATE GOVERNANCE**

### Corporate Governance Overview

We are committed to good corporate governance, which we believe promotes the long-term interests of our shareholders and strengthens our Board of Directors and management accountability. Highlights of our corporate governance practices include the following:

- ✓ Annual elections of directors beginning in 2023
- ✓ Separate Chairman and CEO
- ✓ Board composed of all non-employee directors (other than CEO)
- ✓ Majority voting for directors
- ✓ Shareholder right to call special meeting
- ✓ Proxy access
- ✓ Independent directors regularly meet in executive session
- ✓ Annual Board self-assessment

### Framework

We have developed a corporate governance framework designed to ensure our Board has the opportunity, authority and practices to review, advise and evaluate our business operations and make decisions independent of management. Our goal is to align the interests of directors, management and shareholders and comply with or exceed the requirement of Nasdaq, and applicable laws and regulations. The framework establishes the practices our Board follows with respect to Board meetings, involvement of senior management, director compensation, CEO performance evaluation, management succession planning and Board committees.

**Our Corporate Governance Documents**

| | |
|---|---|
| • Amended and Restated Certificate of Incorporation | • Compensation Committee Charter |
| • Amended and Restated Bylaws | • Nominating & Governance Committee Charter |
| • Corporate Governance Guidelines | • Audit Committee Charter |
| • Code of Business Conduct and Ethics | • Executive Stock Ownership Policy |
| | • Related Party Transactions Policy |

### Board Leadership Structure

Our current leadership structure splits the roles of CEO and Chairman, with Mr. Sarin serving as our independent Chairman. Our Corporate Governance Guidelines provide our Board of Directors with flexibility to select the appropriate leadership structure based on the specific needs of our business and the best interests of our shareholders. If the Chairperson of the Board is not independent, the Board will appoint a Lead Independent Director upon the recommendation of the Nominating & Governance Committee, which will be a director who qualifies as independent under the applicable rules of Nasdaq.

### Independence of our Board

Having an independent Board is core to our governance practices. Our Board is comprised of seven directors. The Board has determined that five are independent under the director independence standards of Nasdaq and the SEC, including Rule 10A-3(b)(1) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). In making these determinations, the Board solicited information from each of our directors regarding whether such director, or any member of his or her immediate family, had a direct or indirect material interest in any transaction involving Cerence or its former parent, or received personal benefits outside the scope of such person's normal consideration.

7

Table of Contents

There are not any family relationships among any of our directors or executive officers.

**Corporate Governance Guidelines**

The Board is governed by its Corporate Governance Guidelines, which were adopted by the Board in September 2019 and are available under "Governance—Documents & Charters" in the Investors section of our website, www.cerence.com. These guidelines cover, among other items, the following significant topics:

*Board Selection Process and Qualifications*.    The Nominating & Governance Committee is responsible for reviewing the appropriate skills and characteristics required of prospective Board members and is responsible for recommending to the Board candidates for directorship. The Nominating & Governance Committee evaluates each individual in the context of the Board as a whole, with the objective of recommending a group that will best serve the interests of the Company and its shareholders. Among the criteria the Board may consider are experience and diversity, and, with respect to diversity, the Board may consider such factors as gender, race, ethnicity, differences in professional background, experience at policy making levels in business, finance and technology and other areas, education, skill, and other individual qualities and attributes. While we do not have a formal policy with regard to the consideration of diversity in identifying director nominees, the Board does endorse the value of seeking qualified directors from backgrounds relevant to the Company's mission, strategy and business operations and perceived needs of the Board at a given time.

*Director's Eligibility, Education, and Term of Office.*    Directors may not serve on the board of directors of more than four other public companies without first obtaining specific approval from the Board. Each director is required to notify the Chairman and the Chair of the Nominating & Governance Committee prior to accepting service on the board of any other company. Each director also is required to notify the Chairman and the Chair of the Nominating & Governance Committee upon a change in principal professional responsibilities. The Nominating & Governance Committee may consider such change of status in recommending to the Board whether the director should continue serving as a member of the Board. The Board encourages, and the Company will reimburse the costs associated with, directors participating in continuing director education. The Board does not presently believe that it should establish term limits or a mandatory retirement age, as term limits and mandatory retirement ages may result in the loss of long-serving directors who over time have developed unique and valuable insights into our business and therefore can provide a significant contribution to the Board. As an alternative to term limits or a mandatory retirement age, the Board will routinely evaluate the directors and evaluate the need for changes to Board composition based on an analysis of skills and experience necessary for the Company.

*Board Leadership.*    The leadership of the Board shall include a Chairman of the Board and, if the Chairman of the Board is not independent, a Lead Independent Director recommended by the Nominating & Governance Committee who shall be independent under the applicable rules of Nasdaq. The Chairman of the Board or the Lead Independent Director, as applicable, shall serve as the focal point for independent directors in resolving conflicts with the CEO, or other independent directors, and coordinating feedback to the CEO on behalf of independent directors regarding business issues and Board management.

*Committees*.    The current committee structure of the Board includes the following standing committees: Audit, Compensation and Nominating & Governance. Additional committees may be created or disbanded upon approval of the Board. The Nominating & Governance Committee recommends, and the full Board approves, the composition of the Board's standing committees. The charter of each standing committee is subject to review periodically to determine that the charter continues to address the purposes for which the committee was formed.

**Committees of the Board of Directors**

The composition, duties and responsibilities of the standing committees of our Board of Directors are as set forth below. Each of these committees has a written charter approved by our Board. Copies of these committee charters as well as our Corporate Governance Guidelines are available, without charge, upon request in writing to Cerence Inc., 15 Wayside Road, Burlington, MA 01803, Attention: Corporate Secretary, or under "Governance—Documents & Charters" in the Investors section of our website, www.cerence.com.

8

Table of Contents

The table below provides current membership for each standing committee of the Board.

| Director | Audit | Compensation | Governance and Nominating |
|---|---|---|---|
| **Arun Sarin** | | | C |
| **Thomas Beaudoin** | | M | |
| **Marianne Budnik** | | M | M |
| **Sanjay Dhawan** | | | |
| **Sanjay Jha** | M | C | |
| **Kristi Ann Matus** | C F | | |
| **Alfred Nietzel** | F | | M |

C  Chair        M  Member        F  Financial expert

**Functions of the Committees**

**Audit Committee**

Did not meet prior to the Spin-Off, which occurred after the end of fiscal year 2019.

Current Committee Members:

- Kristi Ann Matus (Chair)
- Sanjay Jha
- Alfred Nietzel

**Primary Responsibilities**

The Audit Committee was established in accordance with Section 3(a)(58)(A) and Rule 10A-3 under the Exchange Act. The responsibilities of our Audit Committee are more fully described in our Audit Committee charter, and they include, among other duties:

- Reviewing the engagement of our independent registered public accounting firm;
- Reviewing our annual financial statements;
- Considering matters relating to our accounting policies and internal controls;
- Reviewing whether non-audit services provided by the independent registered public accounting firm affect the accountants' independence; and
- Reviewing the scope of our annual audits.

**Financial Expertise and Independence**

The Audit Committee has three members, each of whom is financially literate and meets the independence requirements set forth in the Nasdaq rules and Rule 10A-3 under the Exchange Act. In addition, our Board has determined that Ms. Matus and Mr. Nietzel are audit committee financial experts as defined by Item 407(d)(5)(ii) of Regulation S-K of the Exchange Act.

**Report**

The Audit Committee Report is included in this Proxy Statement.

9

Table of Contents

| Compensation Committee | Primary Responsibilities |
|---|---|
| Did not meet prior to the Spin-Off, which occurred after the end of fiscal year 2019.<br><br>Current Committee Members:<br>• Sanjay Jha (Chair)<br>• Thomas Beaudoin<br>• Marianne Budnik | The responsibilities of our Compensation Committee are more fully described in our Compensation Committee charter, and they include, among other duties:<br><br>• Overseeing compensation plans and benefit programs applicable to our executive officers;<br><br>• Approving the compensation of our executive officers; and<br><br>• Overseeing the administration of our cash and equity-based incentive compensation plans that are shareholder approved and/or where participants include executive officers and directors.<br><br>**Independence**<br><br>Pursuant to the phase-in provisions of the Nasdaq rules and Rule 10C-1 under the Exchange Act, a majority of the Compensation Committee consists of independent directors, and within one year of the date of effectiveness of our registration statement related to the Spin-Off, the Compensation Committee will consist solely of independent directors. The members of our Compensation Committee are all "non-employee directors" (within the meaning of Rule 16b-3 under the Exchange Act). |
| **Nominating & Governance Committee**<br><br>Current Committee Members:<br>• Arun Sarin (Chair)<br>• Marianne Budnik<br>• Alfred Nietzel | **Primary Responsibilities**<br><br>The responsibilities of our Nominating & Governance Committee are more fully described in our Nominating & Governance Committee charter, and they include, among other duties:<br><br>• Overseeing our corporate governance practices;<br><br>• Considering and reporting to our Board on matters relating to the identification, selection and qualification of candidates to serve as directors;<br><br>• Recommending to our Board on an annual basis the candidates to be nominated by our Board for election as directors at our annual meeting of shareholders; and<br><br>• Overseeing our Board's annual self-evaluation.<br><br>**Independence**<br><br>The Nominating & Governance Committee consists entirely of independent directors, each of whom meet the independence requirements set forth in the Nasdaq rules. |

**Compensation Committee Interlocks and Insider Participation**

None of the members of the Compensation Committee has been or is an officer or employee of the Company. In addition, none of the Company's executive officers serve on the board of directors or compensation committee of a company that has an executive officer that serves on the Board or Compensation Committee.

**Meeting Attendance**

Our Board was not fully constituted until completion of the Spin-Off, which occurred after the end of fiscal year 2019. Therefore, there were no meetings of the Board or any committees of the Board in fiscal year 2019.

Table of Contents

Although we do not have a formal policy regarding attendance by members of the Board of Directors at our annual meetings of shareholders, directors are encouraged to attend annual meetings of the Company. The Company did not hold an annual meeting in 2019.

**Consideration of Director Nominees**

The Nominating & Governance Committee will consider properly submitted shareholder nominations for candidates for membership on the Board as well as candidates recommended for consideration by the Nominating & Governance Committee. Any shareholder nominations must comply with the requirements of the By-laws. In addition, shareholder nominations should be submitted within the timeframe as specified under "Shareholder Proposals and Director Nominations for the 2021 Annual Meeting of Shareholders" above for inclusion in the proxy materials or agenda, as appropriate, and addressed to: Cerence Inc., 15 Wayside Road, Burlington, MA 01803, Attention: Corporate Secretary.

A shareholder that instead desires to merely recommend a candidate for consideration by the Nominating & Governance Committee shall direct the recommendation in writing to Cerence Inc., 15 Wayside Road, Burlington, MA 01803, Attention: Corporate Secretary, and must include the candidate's name, home and business contact information, detailed biographical data and qualifications, information regarding any relationships between the candidate and the Company within the last three years and evidence of the nominating person's ownership of Company stock.

The Board believes that candidates for director should have certain minimum qualifications, including: (1) the highest personal and professional ethics and integrity; (2) skills that are complementary to those of the existing Board; (3) proven achievement and competence in the nominee's field; (4) relevant expertise upon which to be able to offer meaningful advice and guidance to management and make significant contributions to the Company's success; (5) sufficient time to devote to affairs of the Company and contribute to the Company's goals; (6) demonstrated excellence in their field; (7) the ability to exercise sound business judgment; (8) the ability to meet other requirements as may be required by applicable rules, such as financial literacy or financial expertise with respect to Audit Committee members; and (9) an understanding of the fiduciary responsibilities that are required of a member of the Board and the commitment of time and energy necessary to diligently carry out those responsibilities.

**Communication with the Board of Directors**

Although we do not have a formal policy regarding communications with our Board, we have provided instructions so that shareholders who are interested in communicating with our Board will be able to do so by writing to us at Cerence Inc., 15 Wayside Road, Burlington, MA 01803, Attention: Corporate Secretary. Shareholders who would like their submission directed to a particular member of our Board may so specify.

**Code of Business Conduct and Ethics**

We have adopted a written Code of Business Conduct and Ethics that is designed to deter wrongdoing and to promote, among other things:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- the avoidance of conflicts of interest, including disclosure to an appropriate person or persons identified in the code of any transaction or relationship that reasonably could be expected to give rise to such a conflict;

- full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in other public communications we make;

- compliance with applicable governmental laws, rules and regulations;

- adherence to all policies, including Foreign Corrupt Trade Practices and insider trading policies;

- the prompt internal reporting to an appropriate person or persons identified in the code of violations of the code; and

- accountability for adherence to the code.

11

Table of Contents

A copy of the Company's Code of Business Conduct and Ethics is available under "Governance—Documents & Charters" in the Investors section of our website, www.cerence.com.

**Stock Ownership Guidelines**

In November 2019, the Board of Directors approved stock ownership guidelines for our executive officers and non-employee directors. These guidelines were adopted to align the interests of our executive officers and non-employee directors with the interests of our shareholders and also to promote the Company's commitment to sound corporate governance practices.

Under these guidelines, the target share ownership levels are five times base salary for our CEO, two times base salary for our other executive officers, and three times the annual cash retainer for the non-employee directors. The following shares count towards satisfaction of the guidelines: shares owned outright by the executive or non-employee director or his or her immediate family members residing in the same household; shares held in trust for the benefit of the executive or non-employee director or his or her family and shares held through an ERISA qualified benefit plan or through the Cerence 2019 Employee Stock Purchase Plan maintained by the Company. Unvested performance awards, unexercised stock options or unvested stock awards granted pursuant to the Company's short-term incentive program ("STIP") do not count for purposes of satisfying the guidelines.

Each executive and non-employee director must achieve the guideline amount within five years of becoming subject to the guidelines. In addition, until an individual has reached the appropriate target level, an executive is required to retain 25% of the net shares, except as set forth above, received as a result of the exercise of stock options or vesting of equity awards, and a non-employee director is required to retain 25% of the net shares received as a result of the exercise of stock options or vesting of restricted stock. Satisfaction of the stock ownership guidelines is calculated on a yearly basis at the end of the calendar year.

**Derivatives Trading, Hedging and Pledging Policies**

We prohibit our employees and members of the Board from speculating in our equity securities, including the use of short sales or any trading in publicly available options or derivative securities with respect to Cerence stock. In addition, we prohibit our employees and members of the Board from purchasing Cerence stock on margin (*i.e.*, borrowing money from a brokerage firm, bank or other entity in order to buy Cerence stock).

**Board's Role in Strategy Risk Oversight**

Overseeing management's development and execution of the Company's strategy is one of our Board's primary responsibilities. The Board works closely with the executive team to advise and respond to a dynamically changing business environment. The executive team and other leaders from across the Company provide business and strategy updates to our Board quarterly.

The Board has an active role, as a whole and also at the committee level, in overseeing management of Company risk. This role is one of informed oversight rather than direct management of risk. The Board reviews and consults with management on strategic direction, challenges and risks faced by the Company. The Board also reviews and discusses with management quarterly financial results and forecasts.

The Audit Committee oversees management of financial risks, including investment and foreign currency fluctuation risk mitigation policies and risks. The Board's oversight on cybersecurity includes reporting and updates from senior management and the Company's experts in areas such as cybersecurity threats, and technologies and solutions deployed internally and for the benefit of the Company's customers and technologies, policies and procedures to address these risks.

The Compensation Committee is responsible for overseeing the management of risks relating to and arising from the Company's compensation plans and arrangements. These committees provide regular reports—generally on a quarterly basis—to the full Board.

12

Table of Contents

Management has responsibility for the direct management and oversight of legal, financial, cybersecurity, privacy and commercial compliance matters, which includes identifying areas of risk and implementing policies, procedures and practices to mitigate the identified risks. Additionally, the CFO and General Counsel provide periodic reports to the Audit Committee concerning financial, tax, legal and compliance related risks and the Company's experts report to the Board on cybersecurity. Management also provides the Audit Committee with periodic reports on the Company's compliance programs and efforts, investment policy and practices, and compliance with debt covenants. Management and the Compensation Committee's compensation consultant provide analysis of risks related to the Company's compensation programs and practices to the Compensation Committee.

The leadership structure of the Board, with the separation of the Chairman and CEO roles and the charters of the standing committees, supports the Board's oversight of the Company's risk management.

## COMPENSATION OF NON-EMPLOYEE DIRECTORS

For fiscal year 2020, we compensate our non-employee directors with an annual cash retainer of $100,000, plus an annual equity grant with a grant date fair value of $125,000, as well as reimbursement for travel or other expenses incurred in connection with their service. The Chairman of the Board receives an additional annual cash retainer of $80,000, the Chair of the Audit Committee receives an additional annual cash retainer of $15,000, the Chair of the Compensation Committee receives an additional annual cash retainer of $12,500, and the Chair of the Nominating & Governance Committee receives an additional annual cash retainer of $10,000.

In connection with each current non-employee director's first year of service, in November 2019, each such director received an initial sign-on equity grant with a grant date fair value of approximately $250,000 (or, for Mr. Sarin, with a grant date fair value of approximately $500,000). Annual equity grants will vest in full on the one-year anniversary of the date of grant and initial sign-on grants vest in equal installments on the first three anniversaries of the date of grant.

**Fiscal Year 2020 Compensation Structure for Directors**

| | |
|---|---|
| **Regular Retainers** | |
| Annual Base Retainer (TOTAL—Cash and Equity) | $225,000 |
| Cash | $100,000 |
| Stock Award | $125,000 |
| **Independent Board Chair Retainer** | $ 80,000 |
| **Committee Chair Retainers** | |
| Annual Audit Committee Chair Retainer | $ 15,000 |
| Annual Compensation Committee Chair Member Retainer | $ 12,500 |
| Annual Nominating and Governance Chair Member Retainer | $ 10,000 |

Our current Board was not fully constituted until completion of the Spin-Off and no cash or equity compensation was paid to our non-employee directors with respect to fiscal year 2019. Certain employees of Nuance prior to the Spin-Off, namely Leanne Fitzgerald and Steven Okypch were directors of the Company, prior to the Spin-Off, in fiscal year 2019 and resigned as directors effective October 1, 2019, immediately prior to the Spin-Off. Ms. Matus was appointed as an independent director of the Company prior to the Spin-Off in September 2019. None of the directors of the Company earned any compensation for their service as directors of the Company prior to the Spin-Off.

13

Table of Contents

**FISCAL 2019 DIRECTOR COMPENSATION TABLE** [1]

| Name | Fees Earned or Paid in Cash ($)[1] | Stock Awards ($)[2] | Total ($) |
|---|---|---|---|
| Leanne Fitzgerald | — | — | — |
| Kristi Ann Matus | — | — | — |
| Steven Okypch | — | — | — |

(1) None of our employee directors received any cash or equity compensation for their service as a director in fiscal year 2019.
(2) None of our non-employee directors held outstanding equity awards of the Company as of September 30, 2019.

14

**Table of Contents**

**EXECUTIVE COMPENSATION**

**Overview and Philosophy**

Our compensation philosophy is designed to attract, motivate and retain highly skilled employees with the business experience and acumen that management and the Board of Directors believe is necessary for the promotion and achievement of our business objectives, and to ensure the compensation provided to these employees remains competitive with the compensation paid to similarly situated employees at comparable companies. The compensation program is also designed so that it does not encourage our executive officers to take unnecessary risks relating to our business. In addition, the compensation program is designed to reward both short-term and long-term performance and align the financial interests of our Named Executive Officers with the interests of our shareholders. Our guiding principles are:

- Align executive compensation with long-term shareholder value;

- Attract, retain and motivate a high-performing team;

- Reward executives for achieving near and long-term business goals;

- Pay for performance, with a significant portion of executive compensation linked to long-term performance;

- Provide competitive total pay opportunity to executives in line with companies in our peer group; and

- Discourage unnecessary or excessive risk-taking, assisted by our mix of compensation elements and our stock ownership requirements.

**Components of Executive Compensation**

The executive compensation program consists of a mix of variable and fixed compensation. The elements of compensation include:

| Pay Component | Rationale and Value to Shareholders |
|---|---|
| Base Salary | • Forms basis for competitive compensation package<br>• Reflects competitive market conditions |
| Annual Bonus (Short-Term Incentive Program) | • Motivates achievement of strategic priorities for the fiscal year as measured by financial metrics<br>• Diversified group of metrics to drive growth and shareholder value |
| Performance-Based Restricted Stock Units (PSUs) | • Encourages focus on long-term shareholder value creation and achievement of specified corporate objectives<br>• Aligns to shareholder interests |
| Restricted Stock Units (RSUs) | • Encourages focus on long-term shareholder value creation<br>• Aligns to shareholders interests<br>• Provides retention incentive |

**Independent Compensation Consultant**

In November 2019, the Compensation Committee engaged the Radford division of Aon to be the independent compensation consultant for the Compensation Committee. The Compensation Committee considered Radford's advice on certain compensation matters as they deemed appropriate. The Compensation Committee has assessed the independence of Radford consistent with Nasdaq listing standards and has concluded that the engagement of Radford does not raise any conflict of interest.

**Compensation Tables**

The historical compensation shown below was determined by Nuance. Prior to the Spin-Off, we were part of Nuance, and therefore compensation of our executives in fiscal year 2019 was determined based on the design and objectives of the Nuance executive compensation programs. Future compensation levels of our executives will be determined based on the compensation policies, programs and procedures established by our Compensation

15

Table of Contents

Committee. Accordingly, the amounts and forms of compensation reported below are not necessarily indicative of the compensation that our Named Executive Officers will receive in fiscal year 2020 or thereafter, which could be higher or lower than the amounts shown below. All references in the following tables to equity awards are to equity awards granted by Nuance in respect of Nuance common stock.

The "Named Executive Officers" for purposes of the disclosure set forth below are:

- Sanjay Dhawan, who serves as our Chief Executive Officer and served as Advisor to the Auto Division of Nuance from August 26, 2019 through September 30, 2019;

- Mark Gallenberger, who serves as our Chief Financial Officer and served as Finance Executive to the Auto Division of Nuance from July 1, 2019 through September 30, 2019; and

- Stefan Ortmanns, who serves as our Executive Vice President and served as Executive Vice President and General Manager of the Automotive Division of Nuance during the entirety of fiscal year 2019.

The information set forth in the table below reflects compensation paid to or earned by our Named Executive Officers for the years indicated below. Mr. Ortmanns was our only Named Executive Officer that was also designated as an officer of Nuance in fiscal year 2019. Mr. Dhawan started on August 26, 2019 and Mr. Gallenberger started on July 1, 2019 at Nuance and the compensation tables set forth below include information with respect to their fiscal year 2019 compensation received from Nuance.

16

Table of Contents

**EXECUTIVE OFFICERS**

| Executive Officer | Biography |
|---|---|
| **Sanjay Dhawan**<br>Age: 56<br><br>**Chief Executive Officer**<br>*Executive Officer since: October 2019* | Mr. Dhawan was appointed our Chief Executive Officer on October 1, 2019. From August 2019 until such appointment, Mr. Dhawan served in the position of Advisor to the Automotive Division of Nuance. From 2015 to 2019, Mr. Dhawan served as President of the Connected Services Division and Chief Technology Officer of Harman Industries International. Prior to joining Harman, he served as President and Chief Executive Officer of Symphony Teleca Corporation since 2010. Mr. Dhawan holds a Master's degree in Electrical Engineering from Brunel University, England, and a Bachelor of Science degree in Electronics and Communications from REC Kurukshetra, India. |
| **Mark Gallenberger**<br>Age: 56<br><br>**Chief Financial Officer**<br>*Executive Officer since: October 2019* | Mr. Gallenberger was appointed our Chief Financial Officer on October 1, 2019. From July 2019 until such appointment, Mr. Gallenberger served in the position of Finance Executive to the Automotive Division of Nuance. Prior to joining Nuance, he served as Senior Vice President, Chief Operating Officer, Chief Financial Officer and Treasurer of Xcerra Corporation from 2014 to 2018. Mr. Gallenberger previously served as Xcerra's Vice President, Chief Financial Officer and Treasurer from 2000 to 2014. Prior to joining Xcerra, Mr. Gallenberger was a Vice President with Cap Gemini, Ernst & Young's consulting practice. During his six years with Ernst & Young, Mr. Gallenberger established the Deals & Acquisitions Group, where he was involved in numerous domestic and international strategic acquisitions, joint ventures, alliances and equity investments. Prior to joining Ernst & Young, Mr. Gallenberger served in several technical and management positions within Digital Equipment Corporation's semiconductor products group. Mr. Gallenberger holds an M.B.A. degree from J.L. Kellogg School of Management, Northwestern University and a B.S. in electrical engineering degree from Rochester Institute of Technology. |
| **Stefan Ortmanns**<br>Age: 56<br><br>**Executive Vice President**<br>*Executive Officer since: October 2019* | Mr. Ortmanns was appointed our Executive Vice President, Core Automotive on October 1, 2019. Prior to his appointment, Mr. Ortmanns was with Nuance and served as its Executive Vice President and General Manager of the Automotive Division from March 2018 until his appointment as our Executive Vice President. Core Automotive. As GM of the Automotive Division of Nuance, Mr. Ortmanns was responsible for hybrid, conversational AI-powered solutions for the digital car and automotive related services that are used by almost all of the world's leading automotive manufacturers. He joined Nuance in 2003 and previously held other positions at Nuance including SVP of Engineering and Professional Services for the former Mobile Division. Mr. Ortmanns started working in the speech industry in 1993. Before he joined Nuance, he worked at Philips Speech Processing, Bell Labs, Lucent Technologies, and the University of Technology Aachen. He holds degrees in mechanical engineering, computer science and a Ph.D. in computer science. |
| **Leanne Fitzgerald**<br>Age: 54<br><br>**General Counsel**<br>*Executive Officer since: October 2019* | Ms. Fitzgerald was appointed our General Counsel on October 1, 2019. Prior to her appointment, Ms. Fitzgerald was with Nuance and served as its Vice President, Associate General Counsel, Corporate, Securities and Compliance and Assistant Secretary from 2018 until her appointment as our General Counsel. Previously, Ms. Fitzgerald served at Nuance as Vice President, Associate General Counsel and Assistant Secretary since 2014, and Associate General Counsel Intellectual Property since 2008. Prior to joining Nuance, she served in a variety of positions with increasing responsibility in the legal department at EMC Corporation from 1994 to 2008, culminating as Associate General Counsel. Ms. Fitzgerald holds a B.S. in engineering from the University of Massachusetts at Amherst and a J.D. from the University of New Hampshire School of Law, the Franklin Pierce Law Center. |

17

**Table of Contents**

**FISCAL 2019 SUMMARY COMPENSATION TABLE**

The Summary Compensation Table shows the compensation paid to or earned by the Cerence Named Executive Officer listed below for the fiscal years indicated under Nuance's compensation programs and plans. Following the Spin-Off, the Named Executive Officers have received, and will continue to receive, compensation and benefits under our compensation programs and plans.

| Name and Principal Position | Year | Salary ($)(1) | Bonus ($) | Stock Awards ($)(2) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($)(6) | Total ($) |
|---|---|---|---|---|---|---|---|
| **Sanjay Dhawan** | 2019 | 46,154 | — | — | 59,170(3) | — | 105,324 |
| *Chief Executive Officer* | | | | | | | |
| **Stefan Ortmanns** | 2019 | 318,365 | — | 3,775,377 | 238,438(4) | 30,608 | 4,362,788 |
| *Executive Vice President and General Manager Automotive Division* | 2018 | 315,944 | — | 1,645,918 | 136,603(4) | 21,049 | 2,119,514 |
| **Mark Gallenberger** | 2019 | 92,308 | — | — | 74,779(5) | — | 167,087 |
| *Chief Financial Officer* | | | | | | | |

(1) Mr. Dhawan joined Nuance on August 26, 2019 as Advisor to the Auto Division and continued in that role through September 30, 2019 and his annualized base salary for fiscal year 2019 was $600,000 and Mr. Gallenberger joined Nuance on July 1, 2019 as Financial Executive and continued in that role through September 30, 2019 and his annualized base salary for fiscal year 2019 was $400,000. The amounts reported for Mr. Ortmanns reflect the compensation paid to him by Nuance with respect to his role as Executive Vice President and General Manager Automotive Division prior to the Spin-Off. Mr. Ortmanns' compensation was originally denominated in euros and the amount reported above uses an exchange ratio of 1.165097 for fiscal year 2018, and an exchange ratio of 1.128 for fiscal year 2019.

(2) These amounts represent the grant date fair value of equity awards granted to the Named Executive Officers by Nuance, calculated in accordance with FASB ASC Topic 718 with respect to the grant of restricted stock units and performance-based restricted stock units disregarding the effect of any estimated forfeitures related to service-vesting conditions. Assumptions used in calculating these amounts are described in Note 15 to our Audited Combined Financial Statements, which are included in our Annual Report on Form 10-K for the fiscal year ended September 30, 2019.

(3) Mr. Dhawan's fiscal year 2019 bonus, which was granted pursuant to the Nuance Fiscal 2019 Company Bonus Program under which bonuses are earned upon the achievement of certain corporate performance metrics (the "Nuance Bonus Program"). The value reflected in the table was converted into, and paid in the form of, 3,537 shares of Nuance common stock, which vested in full on September 27, 2019.

(4) These amounts represent Mr. Ortmanns' fiscal year 2018 and 2019 bonuses, which were granted pursuant to the Nuance Bonus Program. The values reflected in the table were converted into, and paid in the form of 14,253 shares of Nuance common stock for 2019, which vested in full on September 27, 2019, and 8,543 shares of Nuance common stock for 2018, which vested in full on November 30, 2018.

(5) Mr. Gallenberger's fiscal year 2019 bonus, which was granted pursuant to the Nuance Bonus Program. The value reflected in the table was converted into, and paid in the form of, 4,470 shares of Nuance common stock which vested in full on September 27, 2019.

(6) The amounts reported in the All Other Compensation for Mr. Ortmanns for 2019 consists of $18,332 for automobile and mileage allowances and $12,276 associated with bringing a guest to Nuance's President's Club, a company sponsored annual event recognizing Nuance's top sales earners.

18

Table of Contents

**FISCAL 2019 OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END TABLE**

The following table sets forth all outstanding equity awards held by our Named Executive Officers as of September 30, 2019. The equity awards were all in the form of Nuance restricted stock units ("RSUs") and performance-based restricted stock units ("PSUs"). For purposes of valuing the outstanding awards, the amounts below are based on a per-share price of $16.31 for the Nuance common stock, which was the closing market price of the Nuance common stock as reported on Nasdaq on September 30, 2019, the last business day of the fiscal year.

Effective with the Spin-Off on October 1, 2019, outstanding equity awards were equitably adjusted to preserve the value of the awards. The awards were adjusted by a conversion ratio of 0.95695 per one RSU or PSU then held. The share numbers presented in the table below are pre-spin share numbers that have not been adjusted to account for the Spin-Off.

| Name | Grant Date | Type of Award | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Type of Award | Equity Incentive Plan Awards: Number of Unearned Shares, or Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
|---|---|---|---|---|---|---|---|
| Sanjay Dhawan | — | — | — | — | — | — | — |
| Mark Gallenberger | — | — | — | — | — | — | — |
| Stefan Ortmanns | 12/22/2016 | — | — | — | PSU | 10,750 | 175,333 |
|  | 1/16/2018 | RSU | 10,750 | 175,333 | PSU | 21,500 | 350,665 |
|  | 3/28/2018 | RSU | 5,750 | 93,783 | PSU | 17,750 | 289,503 |
|  | 11/6/2018 | RSU | 49,563 | 808,373 | PSU | 49,563 | 808,373 |
|  | 11/6/2018 | RSU | 49,563 | 808,373 | — | — | — |

Treatment of Outstanding Equity in the Spin-Off for Mr. Ortmanns

- Generally, except as noted below, all outstanding equity, including PSUs scheduled to be measured after December 1, 2019, were cancelled and exchanged for RSUs of comparable value in Cerence.

- RSUs that were scheduled to vest on or before November 30, 2019 were accelerated to vest on September 27, 2019 and were settled in shares of Nuance common stock. Shares were adjusted by Nuance prior to settlement pursuant to a formula designed to preserve the pre-spin value.

- PSUs that were scheduled to be measured on or before November 30, 2019 were assessed at measurement date and earned value was paid out in the form of cash.

- For each RSU award, the number of RSUs was adjusted to preserve the same underlying value immediately following the Spin-Off.

**Employment Arrangement with Mr. Dhawan**

On February 14, 2019, Nuance entered into an offer letter with Sanjay Dhawan providing for his employment initially as Advisor to the Auto Division of Nuance and, upon the completion of the Spin-Off, as Chief Executive Officer of Cerence. Mr. Dhawan's offer letter provides Mr. Dhawan with a starting annual base salary of $600,000 and an initial cash incentive target opportunity equal to 100% of his annual base salary, prorated with respect to fiscal year 2019, and up to 150% of his annual cash base salary for subsequent years beyond 2019. In addition, pursuant to the terms of Mr. Dhawan's offer letter, Mr. Dhawan is eligible to receive reimbursement of up to $350,000 for expenses associated with his relocation to the Boston, MA area by September 30, 2019. Mr. Dhawan did not relocate to the Boston area.

19

Table of Contents

In connection with the Spin-Off and pursuant to the terms of his offer letter, Mr. Dhawan received an initial grant of RSUs and PSUs, having an aggregate grant date fair value of $3,000,000, divided equally between the RSUs and PSUs (respectively the "Initial RSUs" and "Initial PSUs"). The RSUs vest as to one third on each of October 1, 2020, 2021 and 2022, subject to Mr. Dhawan's continued service with Cerence through each applicable vesting date. The PSUs vest as to one-third each following the end of each of fiscal years 2020, 2021 and 2022, subject to achievement of certain corporate EBITDA and revenue performance targets, and all are subject to Mr. Dhawan's continued service through each applicable vesting date. PSUs that are not earned in one performance period remain eligible to be earned in a future performance period. The PSUs are eligible to vest at up to 200% of target, subject to Mr. Dhawan's continued service with Cerence through each applicable vesting date and achievement of the performance targets. If maximum performance targets are met in each of the three performance periods, Mr. Dhawan's PSUs will vest with respect to an additional 50% of target. Also pursuant to the terms of his offer letter, Mr. Dhawan received a one-time make-whole grant of a number of RSUs ("Make-Whole RSUs") having a grant date fair value of $5,000,000, which vests in equal quarterly installments beginning on January 1, 2020 and ending on October 1, 2021.

Mr. Dhawan was also granted an additional Spin-Off launch award of RSUs and PSUs, having an aggregate grant date fair value of $3,750,000 divided equally between RSUs and PSUs. The RSUs and PSUs have the same vesting terms as the Initial RSUs and the Initial PSUs.

**Employment Arrangement with Mr. Gallenberger**

On June 12, 2019, Nuance entered into an offer letter with Mark Gallenberger providing for his appointment initially as Finance Executive to the Auto Division of Nuance and, upon the completion of the Spin-Off, as Chief Financial Officer of Cerence Mr. Gallenberger's offer letter provides Mr. Gallenberger with an initial annual base salary of $400,000 and a cash incentive target opportunity equal to 75% of his annual base salary, prorated for any partial year of service.

In connection with the Spin-Off and pursuant to the terms of his offer letter, Mr. Gallenberger received an initial grant of RSUs and PSUs, having an aggregate grant date fair value of $1,200,000, divided equally between the RSUs and PSUs (respectively the "Initial RSUs" and "Initial PSUs"). The RSUs vest as to one-third on each of October 2020, 2021 and 2022 and the PSUs vest as to one-third each year following the end of each of fiscal years 2020, 2021 and 2022, subject to the achievement of corporate EBITDA and revenue performance targets and subject to Mr. Gallenberger's continued service with Cerence through each vesting date. PSUs that are not earned in one performance period remain eligible to be earned in a future performance period and are eligible to vest at up to 150% of target. If maximum performance targets are met in each of the three performance periods, the PSUs will vest with respect to an additional 25% of target. Mr. Gallenberger also received an additional Spin-Off launch award of RSUs and PSUs, having an aggregate grant date fair value of $1,500,000 divided equally between the RSUs and PSUs. The RSUs and PSUs have the same vesting terms as the Initial RSUs, and the Initial PSUs granted to Mr. Gallenberger.

**CEO Change of Control and Severance Agreement**

In July 2019, Nuance entered into a Change of Control and Severance Agreement with Mr. Dhawan, which was assumed by the Company in the Spin-Off (the "Dhawan Severance Agreement"). Pursuant to the Dhawan Severance Agreement, upon a termination of Mr. Dhawan's employment by Cerence without "cause" (as defined in the Dhawan Severance Agreement) and other than due to Mr. Dhawan's death or "disability" (as defined in the Dhawan Severance Agreement) that occurs outside of the one-year period following a "change of control" (as defined in the Dhawan Severance Agreement), Mr. Dhawan will be entitled to receive a lump sum cash payment equal to (i) twenty-four (24) months of his base salary then in effect, (ii) 100% of his target annual bonus for the fiscal year in which such termination of employment occurs, (iii) a prorated target annual bonus for the fiscal year in which such termination occurs (iv) eighteen (18) months of COBRA premiums (at the coverage levels in effect immediately prior to his termination), (v) accelerated vesting of the Initial RSUs and the Make-Whole RSUs, as well as any other Company equity awards that would otherwise vest solely on the basis of his continued employment and that would have vested within the twelve (12) months immediately following the date of his termination of employment and, (vi) if such termination occurs prior to end of the performance period applicable to the Initial PSUs, the Initial PSUs shall vest as to that number of shares determined by multiplying the target number of Initial PSUs by a fraction, the numerator of which is twelve (12) and the denominator of which is the greater of (1) the number of months in the applicable performance period or (2) twelve (12).

20

Table of Contents

Upon a change of control, the Initial PSUs, to the extent then outstanding and unvested, shall be deemed to be earned based on actual performance through such change of control and such Initial PSUs that are earned shall be subject to time-based vesting based on Mr. Dhawan's continued employment though the performance period and subject to accelerated vesting as set forth below.

In the case of a termination without "cause" or a resignation for "good reason" (as defined in the Dhawan Severance Agreement) within twelve (12) months following a change of control of Cerence, Mr. Dhawan is entitled to receive a lump sum cash payment equal to (i) thirty (30) months of his base salary then in effect, (ii) 200% of his target annual bonus for the fiscal year in which such termination of employment occurs, (iii) a prorated target annual bonus for the fiscal year in which such termination occurs, (iv) eighteen (18) months of COBRA premiums (at the coverage levels in effect immediately prior to his termination) and (v) accelerated vesting of all Company equity awards that have been previously awarded to Mr. Dhawan that vest on the basis of his continued employment, including the Initial RSUs and the Make-Whole RSUs, as well as all of the Initial PSUs then outstanding and eligible to vest based on his continued employment.

The Dhawan Severance Agreement provides for an initial one-year term and for automatic renewal of additional one-year terms unless the Company or the Mr. Dhawan provides timely notice of non-renewal. The receipt of any severance payments or benefits under the Dhawan Severance Agreement is subject to Mr. Dhawan's execution and non-revocation of a separation agreement and release of claims in favor of the Company as well as continued compliance with the terms of any agreements concerning inventions, confidentiality, or restrictive covenants.

**Change of Control and Severance Agreement with Other NEOs**

In November 2019, the Company entered into a Change of Control and Severance Agreement (the "NEO Severance Agreements") with each of our Named Executive Officers, other than Mr. Dhawan (whose arrangements are described above). The NEO Severance Agreements provide that in the event that a Named Executive Officer's employment is involuntarily terminated by us without "cause" (as defined in the applicable NEO Severance Agreement) and not in connection with his death or "disability" (as defined in the applicable NEO Severance Agreement) and such termination occurs outside of the one-year period following a "change of control" (as defined in the applicable NEO Severance Agreement), the Named Executive Officer will be eligible to receive (i) a lump sum payment equal to 100% of his annual base salary then in effect, (ii) a lump sum payment equal to 100% of his target bonus and a pro-rated percentage of his target bonus for the fiscal year in which the termination occurs, (iii) vesting of the prorated portion of the time-based equity that would have vested in the twelve (12) months following the date on which the termination of employment occurs; provided, however, that if such termination occurs prior to September 30, 2020, 100% of the Named Executive Officer's unvested time-based equity awards that were converted from equity awards covering Nuance shares will become vested in full, and (iv) up to twelve (12) months Company-paid health insurance under COBRA (at the coverage levels in effect immediately prior to the Named Executive Officer's termination).

If the Named Executive Officer's employment is terminated by us without cause or he resigns for "good reason" (as defined in the applicable NEO Severance Agreement) within twelve (12) months following a change of control of the Company, he will instead be eligible to receive, (i) 150% of his annual base salary then in effect, payable in a lump sum, (ii) a lump sum payment equal to 150% of the greater of (1) Named Executive Officer's target bonus for the year in which the Named Executive Officer's termination occurs, or (2) Named Executive Officer's target bonus in effect immediately prior to the change of control plus (B) a prorated percentage of the greater of (1) the Named Executive Officer's target bonus for the year in which the Named Executive Officer's termination of employment occurs, or (2) the Named Executive Officer's target bonus in effect immediately prior to the change of control, (iii) 100% vesting acceleration of the Named Executive Officer's unvested and time-based equity awards, and (iv) for Named Executive Officers based in the United States, twelve (12) months Company-paid health insurance under COBRA. Upon a change of control, PSUs that are subject to performance goals for the year in which the change of control occurs will become eligible to vest based on the number of shares that would vest based on actual performance through the change of control, subject to continued service through the end of the performance period, or upon earlier termination without cause or for good reason. Upon a change of control, PSUs that are subject to performance goals for years after the year in which the change of control occurs will continue to remain subject to the terms of the applicable award agreement except that if, during the twelve (12) month period following a change of control, the Named Executive Officer's employment is terminated by the successor other than for cause or by the Named Executive Officer for good reason, 50% of the PSUs that would have vested at 100% of target performance will vest.

21

Table of Contents

To receive the foregoing severance payments and benefits, the Named Executive Officer is required to enter into a separation and release agreement in favor of the Company and must continue to comply with his existing confidentiality and restrictive covenant agreements.

The NEO Severance Agreements provide for an initial term through September 30, 2022 and for automatic renewal of additional one-year terms unless the Company or the Named Executive Officer provides timely notice of non-renewal.

## EQUITY COMPENSATION PLAN INFORMATION

Our Board has adopted, and Nuance as our sole shareholder prior to the Spin-Off approved, the Cerence 2019 Equity Incentive Plan for the benefit of certain of our current and future employees and other service providers and the Cerence 2019 Employee Stock Purchase Plan for the benefit of our current and future employees. The following table provides information as of September 30, 2019, with respect to the securities authorized for issuance under these equity compensation plans.

| | (a)<br>Number of<br>Securities to be<br>Issued Upon<br>Exercise of<br>Outstanding<br>Options,<br>Warrants<br>and Rights | (b)<br>Weighted-<br>Average<br>Exercise Price<br>of<br>Outstanding<br>Options,<br>Warrants and<br>Rights | (c)<br>Number of<br>Securities<br>Remaining<br>Available for Future<br>Issuance Under<br>Equity<br>Compensation<br>Plans (Excluding<br>Securities<br>Reflected<br>in Column (a)) |
|---|---|---|---|
| Equity compensation plans approved by shareholders (1) | — | — | 5,300,000 |
| Equity compensation plans not approved by shareholders | — | — | — |
| Total equity compensation plans | — | — | 5,300,000 |

(1)  Includes the following plans: our 2019 Equity Incentive Plan and our 2019 Employee Stock Purchase Plan. These equity compensation plans were approved by the sole shareholder of the Company prior to the Spin-Off. As of September 30, 2019, there were no equity awards outstanding under our equity compensation plans.

## TRANSACTIONS WITH RELATED PERSONS

**Our Policy Regarding Related Party Transactions**

Our Board has adopted a written policy regarding the review, approval and ratification of transactions with related persons. This policy provides that our Audit Committee will review each of Cerence's transactions involving an amount exceeding $120,000 and in which any "related person" had, has or will have a direct or indirect material interest. In general, "related persons" are our directors, director nominees, executive officers and shareholders beneficially owning more than 5% of our outstanding Common Stock and immediate family members or certain affiliated entities of any of the foregoing persons. Our Audit Committee will approve or ratify only those transactions that are fair and reasonable to Cerence and in our and our shareholders' best interests.

A copy of our related party transactions policy can be found under "Governance – Documents & Charters" in the Investors section of our website, www.cerence.com.

For fiscal 2019, we believe that there have not been any transaction or series of transactions in which we were or are to be a participant in which the amount involved exceeds $120,000 and which any director, nominee for director, executive officer, or holder of more than 5% of our Common Stock or members of such person's immediate family, had or will have a direct or indirect material interest, other than the compensation described in the sections entitled "Executive Compensation" or "Director Compensation" elsewhere in this Proxy Statement.

22

Table of Contents

**Agreements with Nuance**

In order to govern the ongoing relationships between us and Nuance after the Spin-Off and to facilitate an orderly transition, we and Nuance entered into agreements providing for various services and rights following the Spin-Off, and under which we and Nuance agreed to indemnify each other against certain liabilities arising from our respective businesses. The following summarizes the terms of the material agreements we entered into with Nuance.

### *Separation and Distribution Agreement*

We entered into a Separation and Distribution Agreement with Nuance in advance of the Spin-Off. The Separation and Distribution Agreement sets forth our agreements with Nuance regarding the principal actions taken in connection with the Spin-Off. It also sets forth other agreements that govern aspects of our relationship with Nuance following the Spin-Off.

*Transfer of Assets and Assumption of Liabilities*.    The Separation and Distribution Agreement identifies certain transfers of assets and assumptions of liabilities that were necessary in advance of our separation from Nuance so that we and Nuance retain the assets of, and the liabilities associated with, our respective businesses. Except as described below with respect to intellectual property, the Separation and Distribution Agreement generally provides that the assets comprising our business consist of those primarily related to our current business and operations. The liabilities we assumed in connection with the Spin-Off generally consist of those related to the past and future operations of our business, including our locations used in our current operations. The Separation and Distribution Agreement also provides for the settlement or extinguishment of certain liabilities and other obligations between us and Nuance.

The Separation and Distribution Agreement provides for (1) us to own certain specified patents and patent applications, a collection of software and other technology assets, and all other intellectual property rights exclusively related to the Cerence business, and the liabilities relating to, arising out of or resulting therefrom and (2) Nuance to retain any of its other intellectual property rights related to the Cerence business and the liabilities relating to, arising out of or resulting therefrom. The selection of intellectual property rights allocated to us in the agreement was generally determined to provide us with intellectual property rights with respect to technologies exclusively used by Nuance's automotive business, and those intellectual property rights for which the development, enhancement and maintenance has historically been conducted by Nuance's automotive business. Any technologies that are not allocated to us have been retained by Nuance, including certain patents, software and other technology assets related to Nuance's healthcare and enterprise businesses.

*Reorganization Transactions*.    The Separation and Distribution Agreement described certain actions related to our separation from Nuance that occurred prior to the Spin-Off, including: (1) pursuant to a series of internal transfers to certain foreign subsidiaries that are now held under a Netherlands holding company, the non-U.S. assets and operations relating to our business were separated from the other non-U.S. assets and operations of Nuance, and the Netherlands holding company was in turn distributed to Nuance in an internal spin-off; (2) the U.S. assets and operations of our business were contributed to a new U.S. holding company; (3) employees relating to our business that were previously employed by Nuance subsidiaries that did not become subsidiaries of Cerence became employees of the appropriate Cerence subsidiaries; (4) both of the new holding companies were contributed to Cerence; and (5) prior to the Spin-Off, Cerence incurred indebtedness and distributed the proceeds to Nuance.

*Intercompany Arrangements*.    All agreements, arrangements, commitments and understandings, including most intercompany accounts payable or accounts receivable, between us, on the one hand, and Nuance, on the other hand, terminated and/or were repaid effective as of the Distribution or shortly thereafter, except specified agreements and arrangements that are intended to survive the Spin-Off.

*Credit Support.*    We agreed to use reasonable best efforts to arrange, prior to the Spin-Off, for the replacement of all guarantees, covenants, indemnities, surety bonds, letters of credit or similar assurances of credit support, other than certain specified credit support instruments, currently provided by or through Nuance or any of its subsidiaries for the benefit of us or any of our subsidiaries.

23

Table of Contents

*Representations and Warranties*.    In general, neither we nor Nuance made any representations or warranties regarding any assets or liabilities transferred or assumed, any consents or approvals that may be required in connection with these transfers or assumptions, the value or freedom from any lien or other security interest of any assets transferred, the absence of any defenses relating to any claim of either party or the legal sufficiency of any conveyance documents. Except as expressly set forth in the Separation and Distribution Agreement, all assets have been transferred on an "as-is," "where-is" basis.

*Further Assurances*.    The parties will use reasonable best efforts to effect any transfers contemplated by the Separation and Distribution Agreement that have not yet been consummated as promptly as practicable following the Spin-Off. In addition, the parties will use reasonable best efforts to effect any transfer or re-transfer of any asset or liability that was improperly transferred or retained as promptly as practicable following the Spin-Off.

*Exchange of Information*.    We and Nuance agreed to provide each other with information reasonably necessary to comply with reporting, disclosure, filing or other requirements of any national securities exchange or governmental authority, for use in judicial, regulatory, administrative and other proceedings and to satisfy audit, accounting, litigation and other similar requests. We and Nuance also agreed to use reasonable best efforts to retain such information in accordance with our respective record retention policies as in effect on the date of the Separation and Distribution Agreement. Each party also agreed to use its reasonable best efforts to assist the other with its financial reporting and audit obligations.

*Release of Claims*.    We and Nuance each agreed to release the other and its affiliates, successors and assigns, and all persons that prior to the Spin-Off have been the other's shareholders, directors, officers, members, agents and employees, and their respective heirs, executors, administrators, successors and assigns, from any claims against any of them that arise out of or relate to events, circumstances or actions occurring or failing to occur or any conditions existing at or prior to the time of the Spin-Off. These releases are subject to exceptions set forth in the Separation and Distribution Agreement.

*Indemnification*.    We and Nuance each agreed to indemnify the other and each of the other's current, former and future directors, officers and employees, and each of the heirs, administrators, executors, successors and assigns of any of them, against certain liabilities incurred in connection with the Spin-Off and our and Nuance's respective businesses. The amount of either Nuance's or our indemnification obligations will be reduced by any insurance proceeds the party being indemnified receives. The Separation and Distribution Agreement also specifies procedures regarding claims subject to indemnification.

### Transition Services Agreement

We entered into a Transition Services Agreement pursuant to which Nuance is providing us, and we are providing Nuance, with certain specified services for a limited time to help ensure an orderly transition following the Spin-Off. For a limited time after the Spin-Off, we may request that additional services in the same functional categories as the specified services provided by Nuance to us so long as such additional services were provided historically by Nuance to our business. The services are generally intended to be provided for a period no longer than twelve months following the Spin-Off, with a possibility to extend the term of each service up to an additional twelve months. Each party may terminate the agreement in its entirety in the event of a material breach of the agreement by the other party that is not cured within a specified time period. Each recipient party may also terminate the services on an individual basis upon prior written notice to the party providing the service.

The service recipient is required to pay to the service provider a fee equal to the cost of service specified for each service, which is billed on a monthly basis.

We agreed to indemnify and hold Nuance harmless from any damages to the extent arising out of Nuance's provision of the services unless such damages are the result of Nuance's gross negligence, willful misconduct, breach of the agreement or violation of law in providing services. Additionally, Nuance's liability is generally subject to a cap in the amount of fees actually received by Nuance from us in connection with the provision of the services. We also generally indemnify Nuance for all liabilities to the extent arising out of Nuance's provision of the services unless such liabilities are the result of Nuance's gross negligence, willful misconduct, breach of the agreement or violation of law in providing

24

Table of Contents

services, in which case, Nuance indemnifies us for such liabilities. These indemnification and liability terms are customary for agreements of this type.

### *Tax Matters Agreement*

We entered into a Tax Matters Agreement with Nuance that governs the respective rights, responsibilities and obligations of Nuance and us with respect to all tax matters (including tax liabilities, tax attributes, tax returns and tax contests).

The Tax Matters Agreement generally provides that we are responsible and will indemnify Nuance for all taxes, including income taxes, sales taxes, VAT and payroll taxes, relating to our business for all periods following the Spin-Off; and Nuance is responsible and will indemnify us for all taxes relating to our business for all periods preceding the Spin-Off. In addition, the Tax Matters Agreement addresses the allocation of liability for taxes that were incurred as a result of restructuring activities undertaken to effectuate the Spin-Off. Nuance has the right to control any audit or contest relating to any taxes with respect to all periods prior to the Spin-Off, but we have the right to review and comment on Nuance's conduct of any such audit or contest, to the extent that we could be liable for taxes under the Tax Matters Agreement as a result of such audit or contest.

In addition, the Tax Matters Agreement provides that we are required to indemnify Nuance for any taxes (and reasonable expenses) resulting from the failure of the Spin-Off and related internal transactions to qualify for their intended tax treatment under U.S. federal, state and local income tax law, as well as foreign tax law, where such taxes result from (1) breaches of covenants and representations we made and agreed to in connection with the Spin-Off, (2) the application of certain provisions of U.S. federal income tax law to the these transactions or (3) any other action or omission (other than actions expressly required or permitted by the Separation and Distribution Agreement, the Tax Matters Agreement or other ancillary agreements) we take after the Spin-Off that gives rise to these taxes. Nuance has the exclusive right to control the conduct of any audit or contest relating to these taxes, but we have the right to review and comment on Nuance's conduct of any such audit or contest, to the extent that we could be liable for taxes under the Tax Matters Agreement as a result of such audit or contest.

The Tax Matters Agreement imposes certain restrictions on us and our subsidiaries (including restrictions on share issuances, redemptions or repurchases, business combinations, sales of assets and similar transactions) that are designed to address compliance with Section 355 and related provisions of the Code and are intended to preserve the tax-free nature of the Spin-Off. Under the Tax Matters Agreement, these restrictions apply for two years following the Spin-Off, unless we or Nuance obtain a private letter ruling from the IRS or an opinion of counsel, in each case acceptable to Nuance in its reasonable discretion, that the restricted action would not impact the non-recognition treatment of the Spin-Off, or unless Nuance otherwise gives its consent for us to take a restricted action. Even if we do obtain such a private letter ruling or opinion, or Nuance does otherwise consent to our taking an otherwise restricted action, we will remain liable to indemnify Nuance in the event such restricted action gives rise to an otherwise indemnifiable liability. These restrictions may limit our ability to pursue strategic transactions or engage in new businesses or other transactions that may maximize the value of our business, and might discourage or delay a strategic transaction that our shareholders may consider favorable.

### *Employee Matters Agreement*

We entered into an Employee Matters Agreement with Nuance that addresses employment and employee compensation and benefits matters. The Employee Matters Agreement addresses the allocation and treatment of assets and liabilities relating to employees and compensation and benefit plans and programs in which our employees participated prior to the Spin-Off. Except as specifically provided in the Employee Matters Agreement, we are generally responsible for all employment and employee compensation and benefits-related liabilities relating to our employees, former employees and other service providers. In particular, we assumed certain assets and liabilities with respect to our current and former employees under certain of Nuance's U.S. and non-U.S. defined benefit pension plans (with assets and liabilities allocated based on formulas specified in the Employee Matters Agreement for each pension plan). Generally, except as may be provided in the Transition Services Agreement, each of our employees ceased active participation in Nuance compensation and benefit plans as of the Spin-Off. The Employee Matters Agreement also provides that we establish certain compensation and benefit plans for the benefit of our employees following the Spin-Off,

25

Table of Contents

including a 401(k) savings plan, which accepts direct rollovers of account balances from the Nuance 401(k) savings plan for any of our employees who elect to do so. Generally, we assume and are responsible for any annual bonus payments, including with respect to the year in which the Spin-Off occurs, and any other cash-based incentive or retention awards to our current and former employees. The Employee Matters Agreement incorporates the indemnification provisions contained in the Separation and Distribution Agreement and described above. In addition, the Employee Matters Agreement provides that we indemnify Nuance for certain employee-related liabilities associated with the Transition Services Agreement.

### Agreements Governing Intellectual Property

*Intellectual Property Agreement*.    We entered into an Intellectual Property Agreement with Nuance, pursuant to which we granted to Nuance, and Nuance granted to us, perpetual, non-exclusive, royalty-free licenses to certain patents and technology, as well as certain other intellectual property that have historically been shared between us and Nuance. The intellectual property licensed to us under the Intellectual Property Agreement includes patents, software and technologies that have generally been more significant to the business of Nuance, but are used in our business following the Spin-Off, and are technologies in the general areas of automatic speech recognition and natural language understanding.

Following the Spin-Off, the patent and technology licenses are generally limited to the respective licensee's defined field of use, and after the fifth anniversary of the Spin-Off, the technology licenses will extend to all fields. The field of use for intellectual property licensed from Nuance to Cerence is generally for the automotive industry and certain ancillary fields, including (1) providing customer service and call center solutions to vehicle manufacturers and transportation service providers and (2) providing certain internet of things devices for the China market (excluding the healthcare and enterprise solutions markets). The field of use for intellectual property licensed from Cerence to Nuance is generally for industries other than the automotive industry. The Intellectual Property Agreement also provides arrangements for each of us and Nuance to utilize certain data used by both us and Nuance. In addition, we agreed not to challenge Nuance's rights in its existing intellectual property rights or act to impair such intellectual property rights, and Nuance agreed not to challenge our rights in our existing intellectual property rights or act to impair such intellectual property rights. The non-exclusive license to us will generally be transferable with any sale or transfer of an entity or line of business of ours that utilizes Nuance's intellectual property, and the license to Nuance will generally be transferable with any sale or transfer of an entity or line of business of Nuance that utilizes our intellectual property.

*Transitional Trademark License Agreement*.    We entered into a Transitional Trademark License Agreement with Nuance, pursuant to which Nuance granted us a non-exclusive, royalty free license to continue using certain of Nuance's trademarks, trade names and service marks with respect to the "Nuance" and "Dragon" brands in connection with the sale, marketing and other commercialization of our products and services. The term of the licenses generally do not exceed six months. The Transitional Trademark License Agreement also provides that we use commercially reasonable efforts to cease using the licensed trademarks as soon as reasonably practicable. The license to us is generally transferable with any sale or transfer of an entity or line of business of ours that utilizes Nuance's trademarks.

### Other Arrangements

Prior to the Spin-Off, we have had various other arrangements with Nuance, including arrangements whereby Nuance provided us with finance, human resources, legal, privacy, information technology, general insurance, security and other corporate functions. These arrangements, other than those contemplated pursuant to the Transition Services Agreement, were generally terminated in connection with the Spin-Off. We do not consider these arrangements with Nuance to be material. In addition, we entered into certain other arm's-length arrangements regarding access to certain software and technology.

26

**Table of Contents**

**PROPOSAL TWO**

**RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC
ACCOUNTING FIRM**

On November 19, 2019, the Audit Committee approved the retention of BDO USA, LLP ("BDO") as the Company's independent registered public accounting firm for the fiscal year ending September 30, 2020. We expect that a representative of BDO will be present at the 2020 Annual Meeting to make a statement if he or she desires to do so, and such representative is expected to be available to respond to appropriate questions.

The shareholders are being asked to ratify the appointment of BDO as independent registered public accounting firm for the Company for the fiscal year ending September 30, 2020.

**Audit Fees During Fiscal Year 2019 and Fiscal Year 2018**

The following table sets forth the approximate aggregate fees paid by the Company to BDO during the fiscal year ended September 30, 2019.

|  | Fiscal 2019 | Fiscal 2018 |
| --- | --- | --- |
| Audit Fees | $2,038,000 | $1,460,000 |
| Audit-Related Fees |  | 0 |
| Tax Fees | 0 | 0 |
| All Other Fees | 0 | 0 |
| Total Fees | $2,038,000 | $1,460,000 |

**Policy on Audit Committee Pre-Approval of Audit and Permissible Non-Audit Services of Independent Registered Public Accounting Firm**

The Sarbanes-Oxley Act of 2002 and the auditor independence rules of the SEC require all independent registered public accounting firms that audit issuers to obtain pre-approval from their respective audit committees in order to provide professional services without impairing independence. As such, our Audit Committee has a policy and has established procedures by which it pre-approves all audit and other permitted professional services to be provided by our independent registered public accounting firm.

The pre-approval procedures include execution by the CFO and Audit Committee Chairperson, on behalf of the Company and the entire Audit Committee, of an audit and quarterly review engagement letter and pre-approval listing of other permitted professional services anticipated to be rendered during the foreseeable future. Additionally, from time to time, we may desire additional permitted professional services for which specific pre-approval is obtained from the Audit Committee Chairperson, acting on behalf of the Company and the entire Audit Committee, before provision of such services commences. In doing this, the Company and Audit Committee have established a procedure whereby a BDO representative, in conjunction with the CFO, contacts the Audit Committee Chairperson and obtains pre-approval for such services on behalf of the entire Audit Committee, to be followed by a written engagement letter, as appropriate, confirming such arrangements between BDO and the Company. In addition, on a periodic basis, the entire Audit Committee is provided with a summary of all pre-approved services, if any, to date for its review.

**Recommendation of the Board**

**THE BOARD UNANIMOUSLY RECOMMENDS THAT SHAREHOLDERS VOTE "FOR"
RATIFICATION OF THE APPOINTMENT OF BDO USA, LLP AS THE
COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR FISCAL
YEAR 2020.**

27

Table of Contents

**AUDIT COMMITTEE REPORT**

The Audit Committee oversees the accounting and financial reporting processes of the Company and audits of the financial statements of the Company on behalf of the Board. The Company's management has primary responsibility for the financial statements and for maintaining effective internal control over financial reporting.

The Audit Committee acts pursuant to a written charter. A copy of the charter is available under "Governance – Documents & Charters" in the Investors section of the Company's website, www.cerence.com. The Audit Committee is comprised solely of independent directors as defined by the Nasdaq listing standards and Rule 10A-3 of the Exchange Act.

The Audit Committee reviewed with management the combined financial statements in the Annual Report on Form 10-K for the fiscal year ended September 30, 2019, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in such financial statements. The Audit Committee reviewed with BDO USA, LLP, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the quality, not just the acceptability, of the Company's accounting principles. In addition, the Audit Committee has discussed with BDO USA, LLP the matters required to be discussed by applicable requirements of the Public Company Accounting Oversight Board. The Audit Committee has received the written disclosures and the letter from BDO USA, LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding BDO USA, LLP's communications with the Audit Committee concerning independence, and has discussed with BDO USA, LLP its independence.

In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the Board, and the Board has approved, that the audited combined financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 2019 for filing with the SEC.

**The Audit Committee**
Kristi Ann Matus (Chair)
Sanjay Jha
Alfred Nietzel

28

Table of Contents

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table and accompanying footnotes set forth, as of December 31, 2019, information regarding the beneficial ownership of the outstanding shares of our Common Stock by:

- each member of our Board of Directors and each of our Named Executive Officers individually;

- all members of our Board of Directors and executive officers as a group; and

- each other person who is known to be the beneficial owner of more than 5% of our Common Stock.

Beneficial ownership has been determined under rules promulgated by the SEC. The information does not necessarily indicate beneficial ownership for any other purpose. Shares of Common Stock subject to options currently exercisable and convertible securities currently convertible, or exercisable or convertible within 60 days after December 31, 2019, are deemed outstanding for purposes of computing the percentage beneficially owned by the person or entity holding such securities but are not deemed outstanding for purposes of computing the percentage beneficially owned by any other person or entity.

Subject to the paragraphs above, the percentage ownership of outstanding shares is based on the 36,398,349 shares of Common Stock outstanding as of December 31, 2019.

Except as otherwise indicated below, each individual or entity shown in the table has furnished information with respect to beneficial ownership and the address of each executive officer and director listed below is c/o Cerence Inc., 15 Wayside Road, Burlington, MA 01803.

| Name and Address of Beneficial Owner: | Number of Shares Beneficially Owned | Percent of Class |
|---|---|---|
| 5% Shareholders: | | |
| Ameriprise Financial, Inc.(1) | 3,824,304 | 10.51% |
| Vanguard Group, Inc.(2) | 3,272,946 | 8.99% |
| ClearBridge Investments, LLC(3) | 2,973,497 | 8.17% |
| Victory Capital Management Inc.(4) | 1,969,450 | 5.41% |
| **Directors and Named Executive Officers:** | | |
| Sanjay Dhawan(5) | 39,886 | * |
| Mark Gallenberger | 0 | * |
| Stefan Ortmanns | 2,112 | * |
| Arun Sarin | 0 | * |
| Thomas Beaudoin | 1,524 | * |
| Marianne Budnik | 0 | * |
| Sanjay Jha | 0 | * |
| Kristi Ann Matus | 0 | * |
| Alfred Nietzel | 0 | * |
| Directors, nominees and executive officers as a group (10 persons) | 46,921* | * |

\* Represents beneficial ownership of less than one percent of our outstanding common stock.

(1) This information regarding the beneficial ownership of Ameriprise Financial, Inc. ("AFI") is based on a Schedule 13G filed by such shareholder, Columbia Management Investment Advisers, LLC ("CMI") and Columbia Seligman Communications & Information Fund on November 11, 2019 reporting beneficial ownership beneficially as of October 31, 2019. The entities reported the following beneficial ownership: (i) 3,824,163 shares beneficially owned by AFI, with shared voting power over 3,759,435 shares and shared dipositive power over all of the shares, (ii) 3,823,304 shares beneficially owned by CMI, with shared voting power over 3,759,435 shares and shared dispositive power over all of the shares, and (iii) 2,522,490 shares beneficially owned by Columbia Seligman Communications & Information Fund, with sole voting power and shared dispositive power over all of the shares. CMIA and AFI do not directly own any shares of shares of Common Stock. CMIA is the investment

29

Table of Contents

adviser to each account that holds shares of Common Stock listed herein. AFI is the parent holding company of CMIA. CMIA and AFI do not directly own any shares of Common Stock. As the investment adviser to the accounts, CMIA may be deemed to beneficially own the shares reported herein by the accounts. As the parent holding company of CMIA, AFI may be deemed to beneficially own the shares reported herein by the accounts. Each of CMIA and AFI disclaims beneficial ownership of any shares reported herein. The address for CMIA is 225 Franklin Street, Boston, MA 02110. The address for AFI is 145 Ameriprise Financial Center, Minneapolis, MN 55474.

(2)  This information regarding the beneficial ownership of Vanguard Group, Inc. is based on a Schedule 13G/A filed by such shareholder on February 11, 2019 reporting beneficial ownership of 26,183,574 shares of Nuance common stock. The address of this shareholder is 100 Vanguard Blvd., Malvern, PA 19355.

(3)  This information regarding the beneficial ownership of ClearBridge Investments, LLC is based on a Schedule 13G/A filed by such shareholder on February 14, 2019 reporting beneficial ownership of 23,787,982 shares of Nuance common stock. The address of this shareholder is 620 8th Avenue, New York, NY 10018.

(4)  This information regarding the beneficial ownership of Victory Capital Management Inc. is based on a Schedule 13G filed by such shareholder on February 1, 2019 reporting beneficial ownership of 15,755,601 shares of Nuance common stock. The address of this shareholder is 4900 Tiedman Rd., 4th Floor, Brooklyn, OH 44144.

(5)  Includes 39,866 unsettled time-based restricted stock units scheduled for issuance within sixty days of December 31, 2019. Mr. Dhawan does not have voting rights with respect to the shares underlying the restricted stock units prior to the date on which such shares are delivered to him.

## SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Exchange Act requires our executive officers and directors, and persons who own more than ten percent of a registered class of our equity securities, to file reports of ownership and changes in ownership with the SEC and Nasdaq. Our officers and directors and greater than ten percent beneficial owners are required by SEC regulations to furnish us with copies of all Section 16(a) forms they file. To our knowledge, based solely on our review of the copies of such reports furnished to us and written representations from our executive officers and directors that no other reports were required during the fiscal year ended September 30, 2019, all Section 16(a) filing requirements applicable to our executive officers, directors and greater than ten percent beneficial owners were satisfied on a timely basis.

Table of Contents

**ADDITIONAL INFORMATION**

**Other Matters**

Management knows of no business or nominations that will be presented for consideration at the 2020 Annual Meeting other than as stated in the Notice of the 2020 Annual Meeting of Shareholders. If, however, other matters are properly brought before the meeting, it is the intention of the persons named in the accompanying form of proxy to vote the shares represented thereby on such matters in accordance with their best judgment.

**Householding**

Some banks, brokers and other nominee record holders may participate in the practice of "householding" proxy statements and their accompanying documents. This means that only one copy of our annual report or proxy statement is sent to multiple shareholders in your household. We will promptly deliver a separate copy of these documents without charge to you upon written request to Cerence Inc., 15 Wayside Road, Burlington, Massachusetts 01803 or upon telephonic request to 857-362-7300, Attn: Investor Relations. If you want to receive separate copies of our proxy statement in the future, or if you are receiving multiple copies and would like to receive only one copy per household, you should contact your bank, broker or other nominee record holder, or you may contact us at the above address and phone number.

**Annual Report on Form 10-K**

We filed our Annual Report on Form 10-K for fiscal year 2019 with the SEC on December 19, 2019. We will mail without charge, upon written request, a copy of our Annual Report on Form 10-K for fiscal year 2019, excluding exhibits. Please send a written request to Cerence Inc., 15 Wayside Road, Burlington, MA 01804, Attention: Investor Relations, or access the report under "Financial Information" in the Investors section of our website, www.cerence.com. The Annual Report is not incorporated into this Proxy Statement and is not considered proxy-soliciting material.

**Incorporation by Reference**

The information contained in this Proxy Statement under the caption "Audit Committee Report" shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor will such information be incorporated by reference into any future filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference in such filing.

31

Table of Contents



**ANNUAL MEETING OF CERENCE INC.**

**Date:** Thursday, February 20, 2020
**Time:** 11:00 a.m. (Eastern Time)
**Place:** www.proxydocs.com/CRNC

**Please make your marks like this:** ☒ **Use dark black pencil or pen only**

The Board of Directors Recommends a Vote **FOR** the nominees listed in Proposal 1 and for Proposal 2.

**1:** To elect two Class I directors named below to hold office until the 2021 Annual Meeting of Stockholders.

**Nominees:**
01 Thomas Beaudoin
02 Marianne Budnik

| Vote For<br>All Nominees | Withhold Vote From<br>All Nominees | Vote For<br>All Except |
|:---:|:---:|:---:|
| ☐ | ☐ | ☐ |

**INSTRUCTIONS:** To withhold authority to vote for any nominee, mark the "Exception" box above and write the number(s) of the nominee you do not support in the space provided to the right.

|  | For | Against | Abstain |
|---|:---:|:---:|:---:|
| **2:** To ratify the appointment of BDO USA LLP as the Company's independent registered public accounting firm for the fiscal year ending September 30, 2020. | ☐ | ☐ | ☐ |

**TO ATTEND The Annual Meeting of Cerence Inc**
**Please visit www.proxydocs.com/CRNC**
**To Register for the Virtual Meeting**

**Authorized Signatures - This section must be completed for your Instructions to be executed.**

| Please Sign Here | Please Date Above |
|---|---|
| Please Sign Here | Please Date Above |

Please sign exactly as your name(s) appears on your stock certificate. If held in joint tenancy, all persons should sign. Trustees, administrators, etc., should include title and authority. Corporations should provide full name of corporation and title of authorized officer signing the proxy.

↑  Please separate carefully at the perforation and return just this portion in the envelope provided.  ↑



**Annual Meeting of Cerence Inc.**
**to be held on Thursday, February 20, 2020**
**for Holders as of December 23, 2019**
**This proxy is being solicited on behalf of the Board of Directors**

**VOTE BY:**

 **INTERNET**

Go To
**www.proxypush.com/CRNC**
• Cast your vote online.
• Have your Proxy Card/Voting Instruction Form ready.
• View Meeting Documents.

**OR**

**TELEPHONE**

Call
**866-390-5267**
• Use any touch-tone telephone.
• Have your Proxy Card/Voting Instruction Form ready.
• Follow the simple recorded instructions.

 **MAIL**

**OR**
• Mark, sign and date your Proxy Card/Voting Instruction Form.
• Detach your Proxy Card/Voting Instruction Form.
• Return your Proxy Card/Voting Instruction Form in the postage-paid envelope provided.

The undersigned hereby appoints Leanne Fitzgerald, General Counsel and Mark Gallenberger, Chief Financial Officer, and each of them, as the true and lawful attorneys of the undersigned, with full power of substitution and revocation, and authorizes them, and each of them, to vote all the shares of capital stock of Cerence Inc. which the undersigned is entitled to vote at said meeting and any adjournment thereof upon the matters specified and upon such other matters as may be properly brought before the meeting or any adjournment thereof, conferring authority upon such true and lawful attorneys to vote in their discretion on such other matters as may properly come before the meeting and revoking any proxy heretofore given.

THE SHARES REPRESENTED BY THIS PROXY WILL BE VOTED AS DIRECTED, OR IF NO DIRECTION IS GIVEN, SHARES WILL BE VOTED FOR ALL LISTED NOMINEES AND THE RATIFICATION OF BDO USA LLP AS THE COMPANY'S INDEPENDENT REGISTERED ACCOUNTING FIRM FOR THE YEAR ENDING SEPTEMBER 30, 2020, AND IN THE DISCRETION OF THE NAMED PROXYHOLDERS ON ANY OTHER MATTER THAT MAY COME PROPERLY BEFORE THE MEETING.

**PROXY TABULATOR FOR**

**CERENCE INC.**
**c/o MEDIANT COMMUNICATIONS**
**P.O. BOX 8016**
**CARY, NC 27512-9903**

**Table of Contents**

↑  Please separate carefully at the perforation and return just this portion in the envelope provided.  ↑



**Proxy for Annual Meeting of Stockholders to be held on Thursday, February 20, 2020**

**This proxy is being solicited on behalf of the Board of Directors**

**Please vote, date and sign this Proxy on the other side and return it in the enclosed envelope.**

The Stockholder signing on the reverse side (the "undersigned"), having received the combined Proxy Statement and Form 10-K Annual Report, hereby appoint(s) Leanne Fitzgerald, General Counsel and Mark Gallenberger, Chief Financial Officer, and each of them, Proxies of the undersigned (with full power of substitution) to attend the Annual Meeting of Cerence Inc. (the "Company") to be held on Thursday, February 20, 2020, and all adjournments and postponements thereof (the "Meeting"), and to vote all shares of Common Stock of the Company that the undersigned would be entitled to vote, if personally present, in regard to all matters that may properly come before the Meeting.

The undersigned hereby confer(s) upon the Proxies, and each of them, discretionary authority to consider and act upon such business, matters or proposals as may properly come before the Meeting. **The Proxy, when properly executed, will be voted in the manner specified herein. If no specification is made, the Proxies intend to vote FOR proposal 1 and FOR proposal 2.**