# EXHIBIT 52

*(Cerence Form 2Q2022 10-Q,
dated May 10, 2022)*

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

## FORM 10-Q

(Mark One)

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2022

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 001-39030

# CERENCE INC.

(Exact name of registrant as specified in its charter)

| Delaware | 83-4177087 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 1 Burlington Woods Drive, Suite 301A Burlington, Massachusetts | 01803 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

(857) 362-7300
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | CRNC | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of May 2, 2022, the registrant had 39,305,377 shares of common stock, $0.01 par value per share, outstanding.

Table of Contents

| | | Page |
|---|---|---|
| PART I. | FINANCIAL INFORMATION | 3 |
| Item 1. | Condensed Consolidated Financial Statements (Unaudited) | 3 |
| | Condensed Consolidated Statements of Operations for the Three and Six Months Ended March 31, 2022 and 2021 | 3 |
| | Condensed Consolidated Statements of Comprehensive (Loss) Income for the Three and Six Months Ended March 31, 2022 and 2021 | 4 |
| | Condensed Consolidated Balance Sheets as of March 31, 2022 and September 30, 2021 | 5 |
| | Consolidated Statements of Stockholders' Equity for the Three and Six Months Ended March 31, 2022 and 2021 | 6 |
| | Condensed Consolidated Statements of Cash Flows for the Six Months Ended March 31, 2022 and 2021 | 8 |
| | Notes to Condensed Consolidated Financial Statements | 9 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 42 |
| Item 4. | Controls and Procedures | 44 |
| PART II. | OTHER INFORMATION | 45 |
| Item 1. | Legal Proceedings | 45 |
| Item 1A. | Risk Factors | 45 |
| Item 6. | Exhibits | 47 |
| Signatures | | 48 |

i

CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS

This Quarterly Report on Form 10-Q ("Form 10-Q"), filed by Cerence Inc. together with its consolidated subsidiaries, "Cerence," the "Company," "we," "us" or "our" unless the context indicates otherwise, contains "forward-looking statements" that involve risks and uncertainties. These statements can be identified by the fact that they do not relate strictly to historical or current facts, but rather are based on current expectations, estimates, assumptions and projections about our industry and our business and financial results. Forward-looking statements often include words such as "anticipates," "estimates," "expects," "projects," "forecasts," "intends," "plans," "continues," "believes," "may," "will," "goals" and words and terms of similar substance in connection with discussions of future operating or financial performance. As with any projection or forecast, forward-looking statements are inherently susceptible to uncertainty and changes in circumstances. Our actual results may vary materially from those expressed or implied in our forward-looking statements. Accordingly, undue reliance should not be placed on any forward-looking statement made by us or on our behalf. Although we believe that the forward-looking statements contained in this Form 10-Q are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those in such forward-looking statements, including but not limited to:

- the duration and severity of the COVID-19 pandemic and its impact on our business and financial performance, including the impact of new variants such as Omicron;

- the transition in our chief executive officer and other senior management positions;

- adverse conditions in the automotive industry or the global economy more generally, including, without limitation, as a result of the COVID-19 pandemic, the conflict between Russia and Ukraine, and inflation and rising interest rates;

- the continuation of the semiconductor shortage being experienced by the automotive industry;

- the highly competitive and rapidly changing market in which we operate;

- our employees are represented by workers councils or unions or are subject to local laws that are less favorable to employers than the laws of the U.S.;

- our fluctuations in our financial and operating results;

- escalating pricing pressures from our customers;

- our failure to win, renew or implement service contracts;

- the cancellation or postponement of service contracts after a design win;

- the loss of business from any of our largest customers;

- inability to recruit and retain qualified personnel;

- cybersecurity and data privacy incidents that damage client relations;

- interruptions or delays in our services or services from data center hosting facilities or public clouds;

- economic, political, regulatory, foreign exchange and other risks of international operations;

- unforeseen U.S. and foreign tax liabilities;

- impairment of our goodwill and other intangible assets;

- the failure to protect our intellectual property or allegations that we have infringed the intellectual property of others;

- defects in our software products that result in lost revenue, expensive corrections or claims against us;

- our inability to quickly respond to changes in technology and to develop our intellectual property into commercially viable products;

- our strategy to increase cloud services and ability to successfully introduce new products, applications or services;

- a significant interruption in the supply or maintenance of our third-party hardware, software, services or data;

- restrictions on our current and future operations under the terms of our debt and the use of cash to service our debt; and

- certain factors discussed elsewhere in this Form 10-Q.

These and other factors are more fully discussed in Part I, Item 1A of our Annual Report on Form 10-K for the fiscal year ended September 30, 2021 and elsewhere in this Form 10-Q, including Part II, "Item 1A, Risk Factors". These risks could cause actual results to differ materially from those implied by forward-looking statements in this Form 10-Q. Even if our results of operations, financial condition and liquidity and the development of the industry in which we operate are consistent with the forward-looking statements contained in this Form 10-Q, those results or developments may not be indicative of results or developments in subsequent periods.

Any forward-looking statements made by us in this Form 10-Q speak only as of the date on which they are made. We are under no obligation to, and expressly disclaim any obligation to, update or alter our forward-looking statements, whether as a result of new information, subsequent events or otherwise, except as required by law.

2

PART I-FINANCIAL INFORMATION

Item 1. Condensed Consolidated Financial Statements.

CERENCE INC.
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except per share data)
(unaudited)

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Revenues: | | | | |
| License | $ 46,308 | $ 54,371 | $ 93,158 | $ 100,785 |
| Connected services | 19,326 | 27,736 | 47,485 | 53,666 |
| Professional services | 20,646 | 16,555 | 40,063 | 37,854 |
| Total revenues | 86,280 | 98,662 | 180,706 | 192,305 |
| Cost of revenues: | | | | |
| License | 386 | 1,181 | 1,107 | 1,855 |
| Connected services | 5,651 | 6,839 | 11,375 | 13,852 |
| Professional services | 17,372 | 16,325 | 33,275 | 33,647 |
| Amortization of intangible assets | 897 | 1,879 | 2,776 | 3,758 |
| Total cost of revenues | 24,306 | 26,224 | 48,533 | 53,112 |
| Gross profit | 61,974 | 72,438 | 132,173 | 139,193 |
| Operating expenses: | | | | |
| Research and development | 29,976 | 28,864 | 55,768 | 52,995 |
| Sales and marketing | 8,309 | 9,555 | 14,188 | 18,563 |
| General and administrative | 13,800 | 12,956 | 21,327 | 25,390 |
| Amortization of intangible assets | 3,135 | 3,183 | 6,289 | 6,341 |
| Restructuring and other costs, net | 474 | 537 | 5,389 | 1,017 |
| Total operating expenses | 55,694 | 55,095 | 102,961 | 104,306 |
| Income from operations | 6,280 | 17,343 | 29,212 | 34,887 |
| Interest income | 83 | 16 | 173 | 34 |
| Interest expense | (3,360) | (3,476) | (6,787) | (7,275) |
| Other income (expense), net | (34) | 3,496 | (286) | 1,259 |
| Income before income taxes | 2,969 | 17,379 | 22,312 | 28,905 |
| Provision for (benefit from) income taxes | 3,445 | 6,216 | 3,744 | (3,199) |
| Net (loss) income | $ (476) | $ 11,163 | $ 18,568 | $ 32,104 |
| Net (loss) income per share: | | | | |
| Basic | $ (0.01) | $ 0.30 | $ 0.48 | $ 0.85 |
| Diluted | $ (0.01) | $ 0.28 | $ 0.47 | $ 0.82 |
| Weighted-average common share outstanding: | | | | |
| Basic | 39,189 | 37,743 | 39,013 | 37,583 |
| Diluted | 39,189 | 39,177 | 39,586 | 43,730 |

Refer to accompanying Notes to the unaudited condensed consolidated financial statements.

3

CERENCE INC.
CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) INCOME
(In thousands)
(unaudited)

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Net (loss) income | $ (476) | $ 11,163 | $ 18,568 | $ 32,104 |
| Other comprehensive (loss) income: | | | | |
| Foreign currency translation adjustments | (5,295) | (12,321) | (10,684) | 1,849 |
| Pension adjustments, net | 61 | 104 | 134 | 74 |
| Net unrealized loss on available-for-sale securities | (132) | - | (167) | - |
| Total other comprehensive (loss) income | (5,366) | (12,217) | (10,717) | 1,923 |
| Comprehensive (loss) income | $ (5,842) | $ (1,054) | $ 7,851 | $ 34,027 |

Refer to accompanying Notes to the unaudited condensed consolidated financial statements.

4

CERENCE INC.
CONDENSED CONSOLIDATED BALANCE SHEETS
(In thousands, except per share amounts)

| | March 31, 2022 (Unaudited) | September 30, 2021 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 111,819 | $ 128,428 |
| Marketable securities | 29,810 | 30,435 |
| Accounts receivable, net of allowances of $178 and $395 | 48,029 | 45,560 |
| Deferred costs | 7,418 | 6,095 |
| Prepaid expenses and other current assets | 68,924 | 76,530 |
| Total current assets | 266,000 | 287,048 |
| Long-term marketable securities | 4,457 | 7,339 |
| Property and equipment, net | 37,184 | 31,505 |
| Deferred costs | 26,511 | 31,702 |
| Operating lease right of use assets | 18,654 | 14,901 |
| Goodwill | 1,123,561 | 1,128,511 |
| Intangible assets, net | 15,947 | 25,348 |
| Deferred tax assets | 155,763 | 159,293 |
| Other assets | 54,450 | 20,081 |
| Total assets | $ 1,702,527 | $ 1,705,728 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 18,165 | $ 11,636 |
| Deferred revenue | 78,895 | 78,394 |
| Short-term operating lease liabilities | 5,844 | 4,562 |
| Short-term debt | 7,813 | 6,250 |
| Accrued expenses and other current liabilities | 45,768 | 64,467 |
| Total current liabilities | 156,485 | 165,309 |
| Long-term debt | 263,000 | 265,093 |
| Deferred revenue, net of current portion | 182,823 | 198,343 |
| Long-term operating lease liabilities | 14,749 | 12,216 |
| Other liabilities | 29,284 | 32,822 |
| Total liabilities | 646,341 | 673,783 |
| Commitments and contingencies (Note 12) | | |
| Stockholders' Equity: | | |
| Common stock, $0.01 par value, 560,000 shares authorized; 39,305 and 38,025 shares issued and outstanding, respectively | 393 | 381 |
| Accumulated other comprehensive (loss) income | (9,083) | 1,634 |
| Additional paid-in capital | 1,018,731 | 1,002,353 |
| Retained earnings | 46,145 | 27,577 |
| Total stockholders' equity | 1,056,186 | 1,031,945 |
| Total liabilities and stockholders' equity | $ 1,702,527 | $ 1,705,728 |

Refer to accompanying Notes to the unaudited condensed consolidated financial statements.

5

CERENCE INC.
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(In thousands)
(unaudited)

Three Months Ended March 31, 2022

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at December 31, 2021 | 39,162 | $ 392 | $ 1,006,205 | $ 46,621 | $ (3,717) | $ 1,049,501 |
| Net loss | - | - | - | (476) | - | (476) |
| Other comprehensive loss | - | - | - | - | (5,366) | (5,366) |
| Issuance of common stock | 144 | 1 | 2,700 | - | - | 2,701 |
| Stock withheld to cover tax withholdings requirements upon stock vesting | (1) | - | (1,538) | - | - | (1,538) |
| Stock-based compensation | - | - | 11,364 | - | - | 11,364 |
| Balance at March 31, 2022 | 39,305 | $ 393 | $ 1,018,731 | $ 46,145 | $ (9,083) | $ 1,056,186 |

Three Months Ended March 31, 2021

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at December 31, 2020 | 37,685 | $ 378 | $ 974,866 | $ 2,625 | $ 17,851 | $ 995,720 |
| Net income | - | - | - | 11,163 | - | 11,163 |
| Other comprehensive loss | - | - | - | - | (12,217) | (12,217) |
| Issuance of common stock | 114 | 1 | 1,381 | - | - | 1,382 |
| Stock withheld to cover tax withholdings requirements upon stock vesting | (19) | - | (1,942) | - | - | (1,942) |
| Stock-based compensation | - | - | 9,335 | - | - | 9,335 |
| Balance at March 31, 2021 | 37,780 | $ 379 | $ 983,640 | $ 13,788 | $ 5,634 | $ 1,003,441 |

6

CERENCE INC.
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (Cont.)
(In thousands)
(unaudited)

Six Months Ended March 31, 2022

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at September 30, 2021 | 38,025 | $ 381 | $ 1,002,353 | $ 27,577 | $ 1,634 | $ 1,031,945 |
| Net income | - | - | - | 18,568 | - | 18,568 |
| Other comprehensive loss | - | - | - | - | (10,717) | (10,717) |
| Issuance of common stock | 1,425 | 13 | 34,827 | - | - | 34,840 |
| Stock withheld to cover tax withholdings requirements upon stock vesting | (145) | (1) | (47,825) | - | - | (47,826) |
| Stock-based compensation | - | - | 29,376 | - | - | 29,376 |
| Balance at March 31, 2022 | 39,305 | $ 393 | $ 1,018,731 | $ 46,145 | $ (9,083) | $ 1,056,186 |

Six Months Ended March 31, 2021

| | Common Stock | | Additional Paid-In Capital | (Accumulated Deficit) Retained Earnings | Accumulated Other Comprehensive Income | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at September 30, 2020 | 36,842 | $ 369 | $ 974,307 | $ (18,316) | $ 3,711 | $ 960,071 |
| Net income | - | - | - | 32,104 | - | 32,104 |
| Other comprehensive income | - | - | - | - | 1,923 | 1,923 |
| Issuance of common stock | 1,390 | 14 | 5,031 | - | - | 5,045 |
| Stock withheld to cover tax withholdings requirements upon stock vesting | (452) | (4) | (32,196) | - | - | (32,200) |
| Stock-based compensation | - | - | 36,498 | - | - | 36,498 |
| Balance at March 31, 2021 | 37,780 | $ 379 | $ 983,640 | $ 13,788 | $ 5,634 | $ 1,003,441 |

Refer to accompanying Notes to the unaudited condensed consolidated financial statements.

7

CERENCE INC.
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)
(unaudited)

|  | Six Months Ended March 31, | |
|  | 2022 | 2021 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net income | $ 18,568 | $ 32,104 |
| Adjustments to reconcile net income to net cash provided by operations: | | |
| Depreciation and amortization | 13,574 | 14,947 |
| Benefit from credit loss reserve | (418) | (261) |
| Stock-based compensation | 16,767 | 27,469 |
| Non-cash interest expense | 2,595 | 2,454 |
| Deferred tax benefit | (2,162) | (7,653) |
| Other | 2,504 | (1,481) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (3,557) | (8,206) |
| Prepaid expenses and other assets | (36,354) | (7,608) |
| Deferred costs | 2,896 | 3,835 |
| Accounts payable | 6,293 | (4,129) |
| Accrued expenses and other liabilities | (2,115) | (2,970) |
| Deferred revenue | (11,848) | (21,492) |
| Net cash provided by operating activities | 6,743 | 27,009 |
| Cash flows from investing activities: | | |
| Capital expenditures | (9,985) | (5,181) |
| Purchases of marketable securities | (13,115) | (9,067) |
| Sale and maturities of marketable securities | 16,453 | 2,700 |
| Payments for equity investments | (584) | (2,563) |
| Other investing activities | 1,266 | 264 |
| Net cash used in investing activities | (5,965) | (13,847) |
| Cash flows from financing activities: | | |
| Payments for long-term debt issuance costs | - | (520) |
| Principal payments of long-term debt | (3,126) | (3,126) |
| Common stock repurchases for tax withholdings for net settlement of equity awards | (46,423) | (32,200) |
| Principal payment of lease liabilities arising from a finance lease | (246) | (238) |
| Proceeds from the issuance of common stock | 33,459 | 5,045 |
| Net cash used in financing activities | (16,336) | (31,039) |
| Effects of exchange rate changes on cash and cash equivalents | (1,051) | 1,356 |
| Net change in cash and cash equivalents | (16,609) | (16,521) |
| Cash and cash equivalents at beginning of period | 128,428 | 136,067 |
| Cash and cash equivalents at end of period | $ 111,819 | $ 119,546 |
| Supplemental information: | | |
| Cash paid for income taxes | $ 6,594 | $ 1,446 |
| Cash paid for interest | $ 4,151 | $ 5,403 |

Refer to accompanying Notes to the unaudited condensed consolidated financial statements.

8

CERENCE INC.
Notes to Condensed Consolidated Financial Statements

Note 1. Business Overview

Business

Cerence Inc. (referred to in this Quarterly Report on Form 10-Q as "we," "our," "us," "ourselves," the "Company" or "Cerence") is a global, premier provider of AI-powered assistants and innovations for connected and autonomous vehicles. Our customers include all major automobile original equipment manufacturers ("OEMs"), or their tier 1 suppliers worldwide. We deliver our solutions on a white-label basis, enabling our customers to deliver customized virtual assistants with unique, branded personalities and ultimately strengthening the bond between automobile brands and end users. We generate revenue primarily by selling software licenses and cloud-connected services. In addition, we generate professional services revenue from our work with OEMs and suppliers during the design, development and deployment phases of the vehicle model lifecycle and through maintenance and enhancement projects.

COVID-19 Update

In March 2020, the World Health Organization characterized COVID-19 as a pandemic. In an effort to contain COVID-19 or slow its spread, governments around the world have enacted various measures, some of which have been subsequently rescinded, modified or reinstated, including orders to close all businesses not deemed "essential," isolate residents to their homes or places of residence, and practice social distancing.

We have taken numerous steps in our approach to addressing the COVID-19 pandemic, as described in our Annual Report on Form 10-K for the fiscal year ended September 30, 2021. We continue to closely monitor ongoing developments in connection with the COVID-19 pandemic and its impact on our business.

The full extent to which the ongoing COVID-19 pandemic adversely affects our financial performance will depend on future developments, many of which are outside of our control, are highly uncertain and cannot be predicted, including, but not limited to: the duration and scope of the pandemic; its severity; the emergence of new variants of the virus, such as Omicron; the development and availability of effective treatments and vaccines; the speed at which vaccines are administered; and how quickly and to what extent normal economic and operating conditions can resume.

The COVID-19 pandemic has resulted in, and may continue to result in, additional governmental restrictions and regulations, which has adversely affected, and may continue to adversely affect our business and financial results. For example, pandemic related lockdowns were experienced in China throughout March 2022, which resulted in loss of automotive production. We have seen, and anticipate that we will continue to see, supply chain challenges in the automotive industry related to semiconductor devices that are used in automobiles. The current macroeconomic conditions have also increased competition for qualified employees in our industry, particularly for members of our professional service teams, and we, along with automotive OEMs, face significant competition in hiring and retaining them. In addition, a recession, depression or other sustained adverse market impact resulting from COVID-19 could materially and adversely affect our business, our access to needed capital and liquidity, and the value of our common stock. Even after the COVID-19 pandemic has lessened or subsided, we may continue to experience adverse impacts on our business and financial performance as a result of its global economic impact.

Note 2. Significant Accounting Policies

Principles of Consolidation

The accompanying unaudited condensed consolidated financial statements include the accounts of the Company, as well as those of our wholly owned subsidiaries. All significant intercompany transactions and balances are eliminated in consolidation.

9

Basis of Presentation

The accompanying unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnote disclosures required by GAAP for complete financial statements.

The condensed consolidated financial statements reflect all adjustments considered necessary for a fair presentation of the consolidated results of operations and financial position for the interim periods presented. All such adjustments are of a normal recurring nature. The results of operations for the three and six months ended March 31, 2022 are not necessarily indicative of the results to be expected for any other interim period or for the fiscal year ending September 30, 2022. These unaudited interim condensed consolidated financial statements should be read in conjunction with the audited consolidated and combined financial statements and notes contained in our Annual Report on Form 10-K for the fiscal year ended September 30, 2021.

Use of Estimates

The financial statements are prepared in accordance with GAAP, which requires management to make estimates and assumptions. These estimates, judgments and assumptions can affect the reported amounts in the financial statements and the footnotes thereto. Actual results could differ materially from these estimates.

On an ongoing basis, we evaluate our estimates, assumptions and judgments. Significant estimates inherent to the preparation of financial statements include: revenue recognition; allowance for credit losses; accounting for deferred costs; accounting for internally developed software; the valuation of goodwill and intangible assets; accounting for business combinations; accounting for stock-based compensation; accounting for income taxes; accounting for leases; accounting for convertible debt; and loss contingencies. We base our estimates on historical experience, market participant fair value considerations, projected future cash flows, and various other factors that are believed to be reasonable under the circumstances. Actual amounts could differ significantly from these estimates.

Concentration of Risk

Financial instruments that potentially subject us to significant concentrations of credit risk primarily consist of trade accounts receivable. We perform ongoing credit evaluations of our customers' financial condition and limit the amount of credit extended when deemed appropriate. One customer accounted for 11.6% of our Accounts receivable, net balance at March 31, 2022. One customer accounted for 12.1% of our Accounts receivable, net balance at September 30, 2021.

Allowance for Credit Losses

We are exposed to credit losses primarily through our sales of software licenses and services to customers. We determine credit ratings for each customer in our portfolio based upon public information and information obtained directly from our customers. A credit limit for each customer is established and in certain cases we may require collateral or prepayment to mitigate credit risk. Our expected loss methodology is developed using historical collection experience, current customer credit information, current and future economic and market conditions and a review of the current status of the customer's account balances. We monitor our ongoing credit exposure through reviews of customer balances against contract terms and due dates, current economic conditions, and dispute resolution. Estimated credit losses are written off in the period in which the financial asset is no longer collectible.

The change in the allowance for credit losses for the six months ended March 31, 2022 is as follows (dollars in thousands):

|  | Allowance for Credit Losses |
|---|---|
| Balance as of September 30, 2021 | $ 879 |
| Credit loss provision | (431) |
| Write-offs, net of recoveries | 14 |
| Foreign exchange impact on ending balance | (42) |
| Balance as of March 31, 2022 | $ 420 |

Recently Issued Accounting Pronouncements to be Adopted

In March 2020, the FASB issued ASU No. 2020-04, Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting, ("ASU 2020-04"). This update provides optional guidance for a limited period of time to ease the potential burden in accounting for (or recognizing the effects of) contract modifications on financial reporting, caused by reference rate reform. ASU 2020-04 is effective for all entities as of March 12, 2020 through December 31, 2022. We are currently evaluating the impact of the adoption of this standard on our consolidated financial statements.

In August 2020, the FASB issued ASU No. 2020-06, Debt - Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and

10

Contracts in an Entity's Own Equity, ("ASU 2020-06"). ASU 2020-06 simplifies the accounting for debt with conversion options, revises the criteria for applying the derivatives scope exception for contracts in an entity's own equity, and improves the consistency for the calculation of earnings per share. The guidance is effective for annual reporting periods and interim periods within those annual reporting periods beginning after December 15, 2021, our fiscal year 2023. Early adoption is permitted for annual periods and interim periods within those annual periods beginning after December 15, 2020, our fiscal year 2022. We are currently evaluating the impact of the adoption of this standard on our consolidated financial statements.

Note 3. Revenue Recognition

We primarily derive revenue from the following sources: (1) royalty-based software license arrangements, (2) connected services, and (3) professional services. Revenue is reported net of applicable sales and use tax, value-added tax and other transaction taxes imposed on the related transaction including mandatory government charges that are passed through to our customers. We account for a contract when both parties have approved and committed to the contract, the rights of the parties are identified, payment terms are identified, the contract has commercial substance and collectability of consideration is probable.

Our arrangements with customers may contain multiple products and services. We account for individual products and services separately if they are distinct-that is, if a product or service is separately identifiable from other items in the contract and if a customer can benefit from it on its own or with other resources that are readily available to the customer.

We currently recognize revenue after applying the following five steps:

- identification of the contract, or contracts, with a customer;
- identification of the performance obligations in the contract, including whether they are distinct within the context of the contract;
- determination of the transaction price, including the constraint on variable consideration;
- allocation of the transaction price to the performance obligations in the contract; and
- recognition of revenue when, or as, performance obligations are satisfied.

We allocate the transaction price of the arrangement based on the relative estimated standalone selling price ("SSP") of each distinct performance obligation. In determining SSP, we maximize observable inputs, when possible. Since prices vary from customer to customer based on customer relationship, volume discount and contract type, in instances where the SSP is not directly observable, we estimate SSP by considering a number of data points, including cost of developing and supplying each performance obligation; types of offerings; and gross margin objectives and pricing practices, such as contractually stated prices, discounts offered, and applicable price lists.

We only include estimated amounts in the transaction price to the extent it is probable that a significant reversal of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is resolved. We reduce transaction prices for estimated returns and other allowances that represent variable consideration under Accounting Standards Codification ("ASC") 606, which we estimate based on historical return experience and other relevant factors, and record a corresponding refund liability as a component of accrued expenses and other current liabilities. Other forms of contingent revenue or variable consideration are infrequent.

Revenue is recognized when control of these products or services are transferred to our customers, in an amount that reflects the consideration we expect to be entitled to in exchange for those products or services.

We assess the timing of the transfer of products or services to the customer as compared to the timing of payments to determine whether a significant financing component exists. In accordance with the practical expedient in ASC 606-10-32-18, we do not assess the existence of a significant financing component when the difference between payment and transfer of deliverables is a year or less. If the difference in timing arises for reasons other than the provision of finance to either the customer or us, no financing component is deemed to exist. The primary purpose of our invoicing terms is to provide customers with simplified and predictable ways of purchasing our services, not to receive or provide financing from or to customers. We do not consider set-up fees nor other upfront fees paid by our customers to represent a financing component.

Reimbursements for out-of-pocket costs generally include, but are not limited to, costs related to transportation, lodging and meals. Revenue from reimbursed out-of-pocket costs is accounted for as variable consideration.

(a) Performance Obligations

<u>Licenses</u>

11

Embedded software and technology licenses operate without access to the external networks and information. Embedded licenses sold with non-distinct professional services to customize and/or integrate the underlying software and technology are accounted for as a combined performance obligation. Revenue from the combined performance obligation is recognized over time based upon the progress towards completion of the project, which is measured based on the labor hours already incurred to date as compared to the total estimated labor hours.

Revenue from distinct embedded software and technology licenses, which do not require professional services to customize and/or integrate the software license, is recognized at the point in time when the software and technology is made available to the customer and control is transferred. For income statement presentation purposes, we separate distinct embedded license revenue from professional services revenue based on their relative SSPs.

Revenue from embedded software and technology licenses sold on a royalty basis, where the license of non-exclusive intellectual property is the predominant item to which the royalty relates, is recognized in the period the usage occurs in accordance with ASC 606-10-55-65(A).

For royalty arrangements that include fixed consideration related to minimum purchase commitment deals, the fixed consideration is recognized when the software is made available to the customer.

Connected Services

Connected services, which allow our customers to use the hosted software over the contract period without taking possession of the software, are provided on a usage basis as consumed or on a fixed fee subscription basis. Subscription basis revenue represents a single promise to stand-ready to provide access to our connected services. Our connected services contract terms generally range from one to five years.

As each day of providing services is substantially the same and the customer simultaneously receives and consumes the benefits as access is provided, we have determined that our connected services arrangements are a single performance obligation comprised of a series of distinct services. These services include variable consideration, typically a function of usage. We recognize revenue as each distinct service period is performed (i.e., recognized as incurred).

Our connected service arrangements generally include services to develop, customize, and stand-up applications for each customer. In determining whether these services are distinct, we consider dependence of the cloud service on the up-front development and stand-up, as well as availability of the services from other vendors. We have concluded that the up-front development, stand-up and customization services are not distinct performance obligations, and as such, revenue for these activities is recognized over the period during which the cloud-connected services are provided, and is included within connected services revenue. There can be instances where the customer purchases a software license that allows them to take possession of the software to enable hosting by the customer or a third-party. For such arrangements, the performance obligation of the license is completed at a point in time once the customer takes possession of the software.

Professional Services

Revenue from distinct professional services, including training, is recognized over time based upon the progress towards completion of the project, which is measured based on the labor hours already incurred to date as compared to the total estimated labor hours.

(b) Significant Judgments

Determining whether products and services are considered distinct performance obligations that should be accounted for separately versus together may require significant judgment. Our license contracts often include professional services to customize and/or integrate the licenses into the customer's environment. Judgment is required to determine whether the license is considered distinct and accounted for separately, or not distinct and accounted for together with professional services. Furthermore, hybrid contracts that contain both embedded and connected license and professional services are analyzed to determine if the products and services are distinct or have stand-alone functionality to determine the revenue treatment.

We allocate the transaction price of the arrangement based on the relative estimated standalone selling price ("SSP") of each distinct performance obligation. Judgment is required to determine the SSP for each distinct performance obligation. In determining SSP, we maximize observable inputs, when possible. Since our prices vary from customer to customer based on customer relationship, volume discount and contract type, there are in instances where the SSP is not directly observable. In such instances, we estimate SSP by considering a number of data points, including cost of developing and supplying each performance obligation; types of offerings; and gross margin objectives and pricing practices, such as contractually stated prices, discounts offered, and applicable price lists. These factors may vary over time, depending upon the unique facts and circumstances related to each deliverable. We review the SSP for each distinct performance obligation on a periodic basis, or when the underlying factors are deemed to have changed, and make updates when appropriate.

12

(c) Disaggregated Revenue

Revenues, classified by the major geographic region in which our customers are located, for the three and six months ended March 31, 2022 and 2021 (dollars in thousands):

| | Three Months Ended March 31, | | | | Six Months Ended March 31, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2022 | | 2021 | |
| Revenues: | | | | | | | | |
| United States | $ | 21,955 | $ | 36,781 | $ | 57,084 | $ | 68,875 |
| Other Americas | | 35 | | 25 | | 37 | | 68 |
| Germany | | 23,131 | | 24,667 | | 42,640 | | 56,711 |
| Other Europe, Middle East and Africa | | 2,567 | | 13,196 | | 6,530 | | 16,665 |
| Japan | | 25,413 | | 13,779 | | 51,489 | | 26,452 |
| Other Asia-Pacific | | 13,179 | | 10,214 | | 22,926 | | 23,534 |
| Total net revenues | $ | 86,280 | $ | 98,662 | $ | 180,706 | $ | 192,305 |

Revenues within the United States, Germany, and Japan accounted for more than 10% of revenue, respectively, for all periods presented.

Revenues relating to two customers accounted for $21.9 million, or 25.4%, and $10.2 million, or 11.8%, of revenues for the three months ended March 31, 2022. Revenues relating to two customers accounted for $46.2 million, or 25.5%, and $28.1 million, or 15.6%, of revenues for the six months ended March 31, 2022. During the three and six months ended March 31, 2022, certain existing variable long-term contracts with our largest customer were converted into minimum purchase commitment deals. The estimated future revenue related to these long-term contracts was previously included in our variable backlog, which includes estimated future revenue from variable forecasted royalties related to our embedded and connected businesses. These minimum purchase commitment deals accounted for $19.9 million and $40.1 million of revenue for the three and six months ended March 31, 2022, respectively. The cash associated with these deals is expected to be collected over the distribution period, which could be up to five years.

Revenues relating to two customers accounted for $17.4 million, or 17.7%, and $17.3 million, or 17.5%, of revenues for the three months ended March 31, 2021. Revenues relating to two customers accounted for $35.2 million, or 18.3%, and $24.8 million, or 12.9%, of revenues for the six months ended March 31, 2021.

(d) Contract Acquisition Costs

In conjunction with the adoption of ASC 606, we are required to capitalize certain contract acquisition costs. The capitalized costs primarily relate to paid commissions. In accordance with the practical expedient in ASC 606-10-10-4, we apply a portfolio approach to estimate contract acquisition costs for groups of customer contracts. We elect to apply the practical expedient in ASC 340-40-25-4 and will expense contract acquisition costs as incurred where the expected period of benefit is one year or less. Contract acquisition costs are deferred and amortized on a straight-line basis over the period of benefit, which we have estimated to be, on average, between one and eight years. The period of benefit was determined based on an average customer contract term, expected contract renewals, changes in technology and our ability to retain customers, including canceled contracts. We assess the amortization term for all major transactions based on specific facts and circumstances. Contract acquisition costs are classified as current or noncurrent assets based on when the expense will be recognized. The current and noncurrent portions of contract acquisition costs are included in Prepaid expenses and other current assets and Other assets, respectively. As of March 31, 2022 and September 30, 2021, we had $7.6 million and $6.9 million of contract acquisition costs, respectively. We had amortization expense of $0.5 million and $0.4 million related to these costs during the three months ended March 31, 2022 and 2021, respectively, and $1.1 million and $0.8 million for the six months ended March 31, 2022 and 2021, respectively. There was no impairment related to contract acquisition costs.

(e) Capitalized Contract Costs

We capitalize incremental costs incurred to fulfill our contracts that (i) relate directly to the contract, (ii) are expected to generate resources that will be used to satisfy our performance obligation under the contract, and (iii) are expected to be recovered through revenue generated under the contract. Our capitalized costs consist primarily of setup costs, such as costs to standup, customize and develop applications for each customer, which are incurred to satisfy our stand-ready obligation to provide access to our connected offerings. These contract costs are expensed to cost of revenue as we satisfy our stand-ready obligation over the contract term which we estimate to be between one and eight years, on average. The contract term was determined based on an average customer contract term, expected contract renewals, changes in technology, and our ability to retain customers, including canceled contracts. We classify these costs as current or noncurrent based on the timing of when we expect to recognize the expense. The current and noncurrent portions of capitalized contract fulfillment costs are presented as Deferred costs.

13

We had amortization expense of $2.7 million and $3.1 million related to these costs during the three months ended March 31, 2022 and 2021, respectively, and $5.5 million and $7.4 million for the six months ended March 31, 2022 and 2021, respectively. There was no impairment related to contract costs capitalized.

(f) Trade Accounts Receivable and Contract Balances

We classify our right to consideration in exchange for deliverables as either a receivable or a contract asset. A receivable is a right to consideration that is unconditional (i.e., only the passage of time is required before payment is due). We present such receivables in Accounts receivable, net at their net estimated realizable value. We maintain an allowance for credit losses to provide for the estimated amount of receivables and contract assets that may not be collected.

Our contract assets and liabilities are reported in a net position on a contract-by-contract basis at the end of each reporting period.

Contract assets include unbilled amounts from long-term contracts when revenue recognized exceeds the amount billed to the customer, and right to payment is not solely subject to the passage of time. The current and noncurrent portions of contract assets are included in Prepaid expenses and other current assets and Other assets, respectively. The table below shows significant changes in contract assets (dollars in thousands):

|  | Contract assets |
|---|---|
| Balance as of September 30, 2021 | $ 59,143 |
| Revenues recognized but not billed | 63,284 |
| Amounts reclassified to accounts receivable, net | (30,844) |
| Foreign exchange impact on ending balance | (5,942) |
| Balance as of March 31, 2022 | $ 85,641 |

Our contract liabilities, which we present as Deferred revenue, consist of advance payments and billings in excess of revenues recognized. We classify deferred revenue as current or noncurrent based on when we expect to recognize the revenues. The table below shows significant changes in deferred revenue (dollars in thousands):

|  | Deferred revenue |
|---|---|
| Balance as of September 30, 2021 | $ 276,737 |
| Amounts billed but not recognized | 50,996 |
| Revenue recognized | (62,557) |
| Foreign exchange impact on ending balance | (3,458) |
| Balance as of March 31, 2022 | $ 261,718 |

(g) Remaining Performance Obligations

The following table includes estimated revenue expected to be recognized in the future related to performance obligations that are unsatisfied or partially unsatisfied at March 31, 2022 (dollars in thousands):

|  | Within One Year | Two to Five Years | Greater than Five Years | Total |
|---|---|---|---|---|
| Total revenue | $ 144,805 | $ 156,100 | $ 22,954 | $ 323,859 |

The table above includes fixed backlogs and does not include variable backlogs derived from contingent usage-based activities, such as royalties and usage-based connected services.

14

Note 4. Earnings Per Share

Basic earnings per share is computed by dividing net (loss) income by the weighted-average number of shares of common stock outstanding during the period. Diluted earnings per share is computed by dividing net income by the weighted-average number of shares of common stock outstanding during the period, increased to include the number of shares of common stock that would have been outstanding had potential dilutive shares of common stock been issued. The dilutive effect of restricted stock units is reflected in diluted net income per share by applying the treasury stock method.

The dilutive effect of the Notes (as defined in Note 14) is reflected in net income per share by application of the "if-converted" method. The "if-converted" method is only assumed in periods where such application would be dilutive. In applying the "if-converted" method for diluted net income per share, we would assume conversion of the Notes at a ratio of 26.7271 shares of our common stock per $1,000 principal amount of the Notes. Assumed converted shares of our common stock are weighted for the period the Notes were outstanding.

The following table presents the reconciliation of the numerator and denominator for calculating net (loss) income per share:

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| in thousands, except per share data | 2022 | 2021 | 2022 | 2021 |
| **Numerator:** | | | | |
| Net (loss) income - basic and diluted | $ (476) | $ 11,163 | $ 18,568 | $ 32,104 |
| Interest on Convertible Senior Notes, net of tax | - | - | - | 3,614 |
| Net (loss) income - diluted | $ (476) | $ 11,163 | $ 18,568 | $ 35,718 |
| **Denominator:** | | | | |
| Weighted average common shares outstanding - basic | 39,189 | 37,743 | 39,013 | 37,583 |
| Dilutive effect of restricted stock awards | - | 1,434 | 573 | 1,470 |
| Dilutive effect of the Convertible Senior Notes | - | - | - | 4,677 |
| Weighted average common shares outstanding - diluted | 39,189 | 39,177 | 39,586 | 43,730 |
| **Net (loss) income per common share:** | | | | |
| Basic | $ (0.01) | $ 0.30 | $ 0.48 | $ 0.85 |
| Diluted | $ (0.01) | $ 0.28 | $ 0.47 | $ 0.82 |

We exclude weighted-average potential shares from the calculations of diluted net (loss) income per share during the applicable periods when their inclusion is anti-dilutive. The following table sets forth potential shares that were considered anti-dilutive during the three and six months ended March 31, 2022 and 2021.

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| in thousands | 2022 | 2021 | 2022 | 2021 |
| Restricted stock unit awards | 292 | - | - | - |
| Conversion option of our Convertible Senior Notes | 4,677 | 4,677 | 4,677 | - |

Note 5. Fair Value Measurements

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Valuation techniques must maximize the use of observable inputs and minimize the use of unobservable inputs. When determining fair value measurements for assets and liabilities recorded at fair value, we consider the principal or most advantageous market in which we would transact and consider assumptions that market participants would use in pricing the asset or liability.

The classification of a financial asset or liability within the hierarchy is based upon the lowest level input that is significant to the fair value measurement as of the measurement date as follows:

- Level 1 - Inputs are unadjusted quoted prices in active markets for identical assets or liabilities.
- Level 2 - Inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration, for substantially the full term of the assets or liabilities.

15

- Level 3 - Unobservable inputs that are supported by little or no market activity.

The following table presents information about our financial assets that are measured at fair value and indicates the fair value hierarchy of the valuation inputs used (dollars in thousands) as of:

| | March 31, 2022 | | |
| | Fair Value | Cash and Cash Equivalents | Marketable Securities |
|---|---|---|---|
| Level 1: | | | |
| Money market funds [a] | $ 67,558 | $ 67,558 | $ - |
| Level 2: | | | |
| Time deposits, $1,191 at cost [a] | 1,191 | 1,191 | - |
| Commercial paper, $19,371 at cost [b] | 19,373 | - | 19,373 |
| Corporate bonds, $15,074 at cost [b] | 14,894 | - | 14,894 |
| Debt securities, $2,000 at cost [c] | 2,000 | - | - |
| Total assets | $ 105,016 | $ 68,749 | $ 34,267 |

| | September 30, 2021 | | |
| | Fair Value | Cash and Cash Equivalents | Marketable Securities |
|---|---|---|---|
| Level 1: | | | |
| Money market funds [a] | $ 75,873 | $ 75,873 | $ - |
| Level 2: | | | |
| Time deposits, $2,965 at cost [a] | 2,965 | 2,965 | - |
| Commercial paper, $18,080 at cost [b] | 18,080 | - | 18,080 |
| Corporate bonds, $19,704 at cost [b] | 19,694 | - | 19,694 |
| Debt securities, $2,000 at cost [c] | 2,000 | - | - |
| Total assets | $ 118,612 | $ 78,838 | $ 37,774 |

[a] Money market funds and other highly liquid investments with original maturities of 90 days or less are included within Cash and cash equivalents in the Condensed Consolidated Balance Sheets.

[b] Commercial paper and corporate bonds with original maturities greater than 90 days are included within Marketable securities in the Condensed Consolidated Balance Sheets and classified as current or noncurrent based upon whether the maturity of the financial asset is less than or greater than 12 months.

[c] Debt Securities are included within Prepaid and other current assets in the Condensed Consolidated Balance Sheets and classified as current given the maturity of the financial asset is less than 12 months.

During the three and six months ended March 31, 2022, we recorded unrealized losses related to our marketable securities of $ 0.1 million and $0.2 million, respectively, within Accumulated other comprehensive income. During the three and six months ended March 31, 2021, we recorded an immaterial amount of unrealized losses related to our marketable securities within Accumulated other comprehensive income.

The carrying amounts of certain financial instruments, including cash held in banks, accounts receivable, and accounts payable, approximate fair value due to their short-term maturities and are excluded from the fair value tables above.

Derivative financial instruments are recognized at fair value and are classified within Level 2 of the fair value hierarchy. See Note 6 - Derivative Financial Instruments for additional details.

Long-term debt

The estimated fair value of our Long-term debt is determined by Level 2 inputs and is based on observable market data including prices for similar instruments. As of March 31, 2022 and September 30, 2021, the estimated fair value of our Notes was $228.8 million and $469.0 million, respectively. The Notes are recorded at face value less unamortized debt discount and transaction costs on our Condensed Consolidated Balance Sheets. The carrying amount of the Senior Credit Facilities (as defined in Note 14) approximates fair value given the underlying interest rate applied to such amounts outstanding is currently set to the prevailing market rate.

Equity securities

We have non-controlling equity investments in privately held companies. We evaluated the equity investments under the voting model and concluded consolidation was not applicable. We accounted for the investments by electing the measurement alternative for investments without readily determinable fair values and for which we do not have the ability to exercise significant

16

influence. The non-marketable equity securities are carried at cost less any impairment, plus or minus adjustments resulting from observable price changes in orderly transactions for the identical or a similar investment of the same issuer, which is recorded within the Condensed Consolidated Statements of Operations. We hold $3.2 million of investments without readily determinable fair values as of March 31, 2022. The investments are included within Other assets on the Condensed Consolidated Balance Sheets. There have been no adjustments to the carrying value of the investments resulting from impairments or observable price changes.

Note 6. Derivative Financial Instruments

We operate internationally and, in the normal course of business, are exposed to fluctuations in foreign currency exchange rates related to third-party vendor and intercompany payments for goods and services within our non-U.S. subsidiaries. We use foreign exchange forward contracts that are not designated as hedges to manage currency risk. The contracts can have maturities up to three years. At March 31, 2022, the total notional amount of forward contracts was $

70.9 million. At March 31, 2022, the weighted-average remaining maturity of these instruments was approximately 12.0 months.

The following table summarizes the fair value and presentation in the Condensed Consolidated Balance Sheet for derivative instruments as of March 31, 2022 and September 30, 2021 (dollars in thousands):

| Derivatives not designated as hedges | Classification | Fair Value | | | |
|---|---|---|---|---|---|
| | | March 31, 2022 | | September 30, 2021 | |
| Foreign currency forward contracts | Prepaid expenses and other current assets | $ | 1,993 | $ | 1,235 |
| Foreign currency forward contracts | Other assets | | 636 | | 365 |
| Foreign currency forward contracts | Accrued expenses and other current liabilities | | 93 | | 131 |
| Foreign currency forward contracts | Other liabilities | $ | 96 | $ | 148 |

The following tables display a summary of the income (loss) related to foreign currency forward contracts for the three and six months ended March 31, 2022 and 2021 (dollars in thousand):

| Derivatives not designated as hedges | Classification | Gain recognized in earnings | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Three Months Ended March 31, | | | | Six Months Ended March 31, | | | |
| | | 2022 | | 2021 | | 2022 | | 2021 | |
| Foreign currency forward contracts | Other income (expense), net | $ | 1,347 | $ | 1,384 | $ | 2,464 | $ | 1,770 |

Note 7. Goodwill and Other Intangible Assets

(a) Goodwill

We believe our Chief Executive Officer ("CEO") is our chief operating decision maker ("CODM"). Our CEO approves all major decisions, including reorganizations and new business initiatives. Our CODM reviews routine consolidated operating information and makes decisions on the allocation of resources at this level, as such, we have concluded that we have one operating segment.

All goodwill is assigned to one or more reporting units. A reporting unit represents an operating segment or a component within an operating segment for which discrete financial information is available and is regularly reviewed by segment management for performance assessment and resource allocation. Upon consideration of our components, we have concluded that our goodwill is associated with one reporting unit.

On March 31, 2022, we concluded that no goodwill impairment indicators were present. We will continue to monitor the impacts of the COVID-19 pandemic on our reporting unit fair value. The full extent to which the ongoing COVID-19 pandemic could adversely affect our financial performance will depend on future developments, many of which are outside of our control.

The changes in the carrying amount of goodwill for the six months ended March 31, 2022 are as follows (dollars in thousands):

| | | Total |
|---|---|---|
| Balance as of September 30, 2021 | $ | 1,128,511 |
| Effect of foreign currency translation | | (4,950) |
| Balance as of March 31, 2022 | $ | 1,123,561 |

17

(b) Intangible Assets, Net

As of March 31, 2022, there were

no indicators of impairment present related to our long-lived asset group.

The following tables summarizes the gross carrying amounts and accumulated amortization of intangible assets by major class (dollars in thousands):

| | March 31, 2022 | | | |
| --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Weighted Average Remaining Life (Years) |
| Customer relationships | $ 109,202 | $ (93,979) | $ 15,223 | $ 1.9 |
| Technology and patents | $ 90,332 | $ (89,608) | $ 724 | $ 1.7 |
| Total | $ 199,534 | $ (183,587) | $ 15,947 | |

| | September 30, 2021 | | | |
| --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Weighted Average Remaining Life (Years) |
| Customer relationships | $ 110,485 | $ (88,638) | $ 21,847 | 2.2 |
| Technology and patents | 90,738 | (87,237) | 3,501 | 0.9 |
| Total | $ 201,223 | $ (175,875) | $ 25,348 | |

Amortization expense related to intangible assets in the aggregate was $4.0 million and $5.1 million for the three months ended March 31, 2022 and 2021, respectively, and $9.1 million and $10.1 million for the six months ended March 31, 2022 and 2021, respectively. We expect amortization of intangible assets to be approximately $5.5 million for the remainder of fiscal year 2022.

Note 8. Leases

We have entered into a number of facility and equipment leases which qualify as operating leases under GAAP. We also have a limited number of equipment leases that qualify as finance leases. We determine if contracts with vendors represent a lease or have a lease component under GAAP at contract inception. Our leases have remaining terms ranging from less than one year to seven years.

Some of our leases include options to extend or terminate the lease prior to the end of the agreed upon lease term. For purposes of calculating lease liabilities, lease terms include options to extend or terminate the lease when it is reasonably certain that we will exercise such options.

Operating lease right of use assets and liabilities are recognized based on the present value of the future minimum lease payments over the lease term at the lease commencement date. As our leases generally do not provide an implicit rate, we use an estimated incremental borrowing rate in determining the present value of future payments. The incremental borrowing rate represents an estimate of the interest rate we would incur at lease commencement to borrow an amount equal to the lease payments on a collateralized basis over the term of a lease within a particular location and currency environment.

The following table presents certain information related to lease term and incremental borrowing rates for leases as of March 31, 2022 and September 30, 2021:

| | March 31, 2022 | September 30, 2021 |
| --- | --- | --- |
| Weighted-average remaining lease term (in months): | | |
| Operating leases | 50.2 | 52.2 |
| Finance leases | 41.6 | 47.1 |
| Weighted-average discount rate: | | |
| Operating leases | 3.9% | 5.1% |
| Finance leases | 4.4% | 4.4% |

Lease costs for minimum lease payments is recognized on a straight-line basis over the lease term. For operating leases, costs are included within Cost of revenues, Research and development, Sales and marketing, and General and administrative lines on the Condensed Consolidated Statements of Operations. For financing leases, amortization of the finance right of use assets is included within Research and development, Sales and marketing, and General and administrative lines on the Condensed Consolidated Statements of Operations, and interest expense is included within Interest expense.

18

The following table presents lease expense for the three and six months ended March 31, 2022 and 2021 (dollars in thousands):

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| Finance lease costs: | | | | |
| Amortization of right of use asset | $ 109 | $ 73 | $ 218 | $ 214 |
| Interest on lease liability | 13 | 17 | 27 | 32 |
| Operating lease cost | 1,949 | 1,869 | 3,507 | 3,940 |
| Variable lease cost | 812 | 292 | 1,689 | 470 |
| Sublease income | (47) | (51) | (95) | (104) |
| Total lease cost | $ 2,836 | $ 2,200 | $ 5,346 | $ 4,552 |

For operating leases, the related cash payments are included in the operating cash flows on the Condensed Consolidated Statements of Cash Flows. For the three months ended March 31, 2022 and 2021, cash payments related to operating leases were $1.8 million and $1.9 million, respectively, and $3.4 million and $4.1 million for the six months ended March 31, 2022 and 2021, respectively. For financing leases, the related cash payments for the principal portion of the lease liability are included in the financing cash flows on the Condensed Consolidated Statement of Cash Flows and the related cash payments for the interest portion of the lease liability are included within the operating section of the Condensed Consolidated Statement of Cash Flows. For the three and six months ended March 31, 2022, cash payments related to financing leases were $0.1 million and $0.3 million, respectively, of which an immaterial amount related to the interest portion of the lease liability. For the three and six months ended March 2021, cash payments related to finance leases were $0.1 million and $0.2 million, of which an immaterial amount related to the interest portion of the lease liability. For the three months ended March 31, 2022 and 2021, right of use assets obtained in exchange for lease obligations were $3.9 million and $0.5 million, respectively, and $7.0 million and $2.5 million for the six months ended March 31, 2022 and 2021, respectively.

The table below reconciles the undiscounted future minimum lease payments under non-cancelable leases to the total lease liabilities recognized on the Condensed Consolidated Balance Sheet as of March 31, 2022 (dollars in thousands):

| Year Ending September 30, | Operating Leases | Financing Leases | Total |
|---|---|---|---|
| 2022 | $ 3,525 | $ 208 | $ 3,733 |
| 2023 | 5,855 | 469 | 6,324 |
| 2024 | 5,091 | 417 | 5,508 |
| 2025 | 3,326 | 362 | 3,688 |
| 2026 | 1,892 | 52 | 1,944 |
| Thereafter | 2,470 | - | 2,470 |
| Total future minimum lease payments | $ 22,159 | $ 1,508 | $ 23,667 |
| Less effects of discounting | (1,566) | (89) | (1,655) |
| Total lease liabilities | $ 20,593 | $ 1,419 | $ 22,012 |
| Reported as of March 31, 2022 | | | |
| Short-term lease liabilities | $ 5,844 | $ 425 | $ 6,269 |
| Long-term lease liabilities | 14,749 | 994 | 15,743 |
| Total lease liabilities | $ 20,593 | $ 1,419 | $ 22,012 |

## Note 9. Accrued Expenses and Other Liabilities

Accrued expenses and other current liabilities consisted of the following (dollars in thousands):

| | March 31, 2022 | September 30, 2021 |
|---|---|---|
| Compensation | $ 23,206 | $ 39,536 |
| Sales and other taxes payable | 4,362 | 8,574 |
| Professional fees | 4,121 | 3,604 |
| Cost of revenue related liabilities | 3,398 | 4,634 |
| Interest payable | 1,883 | 1,919 |
| Other | 8,798 | 6,200 |
| Total | $ 45,768 | $ 64,467 |

19

Note 10. Restructuring and Other Costs, Net

Restructuring and other costs, net includes restructuring expenses as well as other charges that are unusual in nature, are the result of unplanned events, and arise outside of the ordinary course of our business.

The following table sets forth accrual activity relating to restructuring reserves for the six months ended March 31, 2022 (dollars in thousands):

| | Personnel | Facilities | Restructuring Subtotal | Other | Total |
|---|---|---|---|---|---|
| Balance at September 30, 2021 | $ 1,620 | $ 1,881 | $ 3,501 | $ 1,534 | $ 5,035 |
| Restructuring and other costs, net | 250 | 367 | 617 | 4,772 | 5,389 |
| Non-cash adjustments | - | (393) | (393) | (4,000) | (4,393) |
| Cash (payments) receipts | (1,219) | (64) | (1,283) | (1,504) | (2,787) |
| Foreign exchange impact on ending balance | - | 15 | 15 | - | 15 |
| Balance at March 31, 2022 | $ 651 | $ 1,806 | $ 2,457 | $ 802 | $ 3,259 |

The following table sets forth restructuring and other costs, net recognized for the three and six months ended March 31, 2022 and 2021 (dollars in thousands):

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Personnel | $ 13 | $ 45 | $ 250 | $ 381 |
| Facilities | 170 | 447 | 367 | 565 |
| Restructuring subtotal | 183 | 492 | 617 | 946 |
| Other | 291 | 45 | 4,772 | 71 |
| Restructuring and other costs, net | $ 474 | $ 537 | $ 5,389 | $ 1,017 |

Fiscal Year 2022

For the three months ended March 31, 2022, we recorded restructuring and other charges, net of $ 0.5 million, which included $0.3 million related to one-time charges and a $0.2 million charges resulting from the closure of facilities that will no longer be utilized.

For the six months ended March 31, 2022, we recorded restructuring and other charges, net of $5.4 million, which included $4.0 million, net of $5.0 million in forfeitures, in stock-based compensation due to the resignation of our former CEO and the resulting modification of certain stock-based awards, $0.3 million severance charge related to the elimination of personnel, and $0.4 million charge resulting from the closure of facilities that will no longer be utilized.

Fiscal Year 2021

For the three months ended March 31, 2021, we recorded restructuring and other charges, net of $0.5 million, which included a $0.4 million charge resulting from the closure of facilities that will no longer be utilized.

For the six months ended March 31, 2021, we recorded restructuring and other charges, net of $1.0 million, which included a $0.4 million severance charge related to the elimination of personnel and a $0.6 million charge resulting from the closure of facilities that will no longer be utilized.

Note 11. Stockholders' Equity

On October 2, 2019, we registered the issuance of 6,350,000 shares of Common Stock, par value $0.01 per share ("Common Stock"), consisting of 5,300,000 shares of Common Stock reserved for issuance upon the exercise of options granted, or in respect of awards granted, under the Cerence 2019 Equity Incentive Plan, ("Equity Incentive Plan"), and 1,050,000 shares of Common Stock that are reserved for issuance under the Cerence 2019 Employee Stock Purchase Plan. The Equity Incentive Plan provides for the grant of incentive stock options, stock awards, stock units, stock appreciation rights, and certain other stock-based awards. The shares available for issuance will automatically increase on January 1st of each year, by the lesser of (A) three percent (3%) of the number of shares of Common Stock outstanding as of the close of business on the immediately preceding December 31st; and (B) the number of shares of Common Stock determined by the Board on or prior to such date for such year.

Restricted Units

Information with respect to our non-vested restricted stock units for the six months ended March 31, 2022 was as follows:

| | | | Non-Vested Restricted Stock Units | | | |
|---|---|---|---|---|---|---|
| | Time-Based Shares | Performance-Based Shares | Total Shares | Weighted-Average Grant-Date Fair Value | Weighted-Average Remaining Contractual Term (years) | Aggregate Intrinsic Value (in thousands) |
| Non-vested at September 30, 2021 | 1,420,532 | 654,619 | 2,075,151 | $ 44.20 | | |
| Granted | 593,686 | 301,239 | 894,925 | $ 75.72 | | |
| Vested | (917,483) | (474,681) | (1,392,164) | $ 59.71 | | |
| Forfeited | (71,666) | (95,588) | (167,254) | $ 55.93 | | |
| Non-vested at March 31, 2022 | 1,025,069 | 385,589 | 1,410,658 | $ 64.64 | | |
| Expected to vest | | | 1,410,658 | $ 64.64 | 1.12 | $ 50,911 |

Stock-based Compensation

Stock-based compensation was included in the following captions in our Condensed Consolidated Statements of Operations for the three and six months ended March 31, 2022 and 2021 (in thousands):

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Cost of connected services | $ 197 | $ 481 | $ 343 | $ 772 |
| Cost of professional services | 1,373 | 1,164 | 2,319 | 2,465 |
| Research and development | 4,146 | 4,465 | 6,141 | 8,603 |
| Sales and marketing | 1,422 | 2,938 | 844 | 5,577 |
| General and administrative | 3,788 | 5,096 | 3,120 | 10,052 |
| Restructuring and other costs, net | - | - | 4,000 | - |
| | $ 10,926 | $ 14,144 | $ 16,767 | $ 27,469 |

For the six months ended March 31, 2022, we decreased stock-based compensation expense relating to our performance-based restricted stock units. Compensation cost for our performance-based restricted stock units is recognized based on the number of units expected to vest upon the achievement of the performance conditions. During the three months ended December 31, 2021, we recorded $4.0 million, net of $5.0 million in forfeitures, in stock-based compensation due to the resignation of our former CEO and the resulting modification of certain stock-based awards in Restructuring and other costs, net. During the three months ended March 31, 2022, we recorded $2.4 million, net of $0.2 million in forfeitures, in stock-based compensation due to the retirement of our former CFO and resignation of our former General Counsel and the resulting modification of certain stock-based awards.

Note 12. Commitments and Contingencies

Litigation and Other Claims

Similar to many companies in the software industry, we are involved in a variety of claims, demands, suits, investigations and proceedings that arise from time to time relating to matters incidental to the ordinary course of our business, including at times actions with respect to contracts, intellectual property, employment, benefits and securities matters. At each balance sheet date, we evaluate contingent liabilities associated with these matters in accordance with ASC 450 "Contingencies." If the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, we accrue a liability for the estimated loss. Significant judgments are required for the determination of probability and the range of the outcomes, and estimates are based only on the best information available at the time. Due to the inherent uncertainties involved in claims and legal proceedings and in estimating losses that may arise, actual outcomes may differ from our estimates. Contingencies deemed not probable or for which losses were not estimable in one period may become probable, or losses may become estimable in later periods, which may have a material impact on our results of operations and financial position. As of March 31, 2022, accrued losses were not material to our condensed consolidated financial statements, and we do not expect any pending matter to have a material impact on our condensed consolidated financial statements.

21

On February 25, 2022, a purported shareholder class action captioned as City Of Miami Fire Fighters' And Police Officers' Retirement Trust v. Cerence Inc. et al. was filed in the United States District Court for the District of Massachusetts, naming the Company and two of its former officers as defendants. The plaintiff claims to be suing on behalf of anyone who purchased the Company's common stock between February 8, 2021 and February 4, 2022. The lawsuit alleges that material misrepresentations and/or omissions of material fact regarding the Company's operations, financial performance and prospects were made in the Company's public disclosures during the period from February 8, 2021 to February 4, 2022, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder. The plaintiff seeks unspecified monetary damages on behalf of the putative class and an award of costs and expenses, including attorney's fees. We intend to continue to defend the remaining claims vigorously. Given the uncertainty of litigation, the preliminary stage of the case, and the legal standards that must be met for, among other things, class certification and success on the merits, we cannot estimate the reasonably possible loss or range of loss that may result from this action.

Guarantees and Other

We include indemnification provisions in the contracts we enter with customers and business partners. Generally, these provisions require us to defend claims arising out of our products' infringement of third-party intellectual property rights, breach of contractual obligations and/or unlawful or otherwise culpable conduct. The indemnity obligations generally cover damages, costs and attorneys' fees arising out of such claims. In most, but not all cases, our total liability under such provisions is limited to either the value of the contract or a specified, agreed-upon amount. In some cases, our total liability under such provisions is unlimited. In many, but not all cases, the term of the indemnity provision is perpetual. While the maximum potential amount of future payments we could be required to make under all the indemnification provisions is unlimited, we believe the estimated fair value of these provisions is minimal due to the low frequency with which these provisions have been triggered.

We indemnify our directors and officers to the fullest extent permitted by Delaware law, which provides among other things, indemnification to directors and officers for expenses, judgments, fines, penalties and settlement amounts incurred by such persons in their capacity as a director or officer of the Company, regardless of whether the individual is serving in any such capacity at the time the liability or expense is incurred. Additionally, in connection with certain acquisitions, we agreed to indemnify the former officers and members of the boards of directors of those companies, on similar terms as described above, for a period of six years from the acquisition date. In certain cases, we purchase director and officer insurance policies related to these obligations, which fully cover the six-year period. To the extent that we do not purchase a director and officer insurance policy for the full period of any contractual indemnification, and such directors and officers do not have coverage under separate insurance policies, we would be required to pay for costs incurred, if any, as described above.

As of March 31, 2022, we have a $
1.7 million letter of credit that is used as a security deposit in connection with our leased Bellevue, Washington office space. In the event of default on the underlying lease, the landlord would be eligible to draw against the letter of credit. The letter of credit is subject to aggregate reductions, provided that we are not in default under the underlying lease. We also have letters of credit in connection with security deposits for other facility leases totaling $0.6 million in the aggregate. These letters of credit have various terms and expire during fiscal year 2022 and beyond, while some of the letters of credit may automatically renew based on the terms of the underlying agreements.

Note 13. Income Taxes

The components of income before income taxes are as follows (dollars in thousands):

| | Three Months Ended March 31, | | | | Six Months Ended March 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2022 | | 2021 |
| Domestic | $ | (3,009) | $ | 10,930 | $ | 14,199 | $ | 14,244 |
| Foreign | | 5,978 | | 6,449 | | 8,113 | | 14,661 |
| Income before income taxes | $ | 2,969 | $ | 17,379 | $ | 22,312 | $ | 28,905 |

The components of the provision for (benefit from) income taxes are as follows (dollars in thousands):

| | Three Months Ended March 31, | | | | Six Months Ended March 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2022 | | 2021 |
| Domestic | $ | 233 | $ | 4,191 | $ | 1,670 | $ | 3,753 |
| Foreign | | 3,212 | | 2,025 | | 2,074 | | (6,952) |
| Provision for (benefit from) income taxes | $ | 3,445 | $ | 6,216 | $ | 3,744 | $ | (3,199) |
| Effective income tax rate | | 116.0% | | 35.8% | | 16.8% | | (11.1)% |

22

The effective tax rates for the periods presented are based upon estimated income for the fiscal year and the statutory tax rates enacted in the jurisdictions in which we operate. For all periods presented, the effective tax rate differs from the 21.0% statutory U.S. tax rate due to the impact of the nondeductible stock-based compensation and our mix of jurisdictional earnings and related differences in foreign statutory tax rates.

Our effective tax rate for the three months ended March 31, 2022 was 116.0% compared to 35.8% for the three months ended March 31, 2021. Consequently, our provision for income taxes for the three months ended March 31, 2022 was $3.4 million, a net decrease of $2.8 million from a provision for income taxes of $6.2 million for the three months ended March 31, 2021. This difference was attributable to our composition of jurisdiction earnings and U.S. inclusions of foreign taxable income as a result of 2017 tax law changes.

Our effective tax rate for the six months ended March 31, 2022 was 16.8% compared to negative 11.1% for the six months ended March 31, 2021. Consequently, our provision for income taxes for the six months ended March 31, 2022 was $3.7 million, a net increase of $6.9 million from a benefit from income taxes of $3.2 million for the six months ended March 31, 2021. This difference was attributable to our composition of jurisdiction earnings, U.S. inclusions of foreign taxable income as a result of 2017 tax law changes, and a $15.8 million tax benefit recorded as a result of an increase to the enacted Netherlands tax rate in the first quarter of fiscal 2021 partially offset by a $3.5 million tax benefit recorded as result of an increase to the enacted Netherlands tax rate in the first quarter of fiscal 2022.

Deferred tax assets and liabilities are measured using the statutory tax rates and laws expected to apply to taxable income in the years in which the temporary differences are expected to reverse. Valuation allowances are provided against net deferred tax assets if, based upon the available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income and the timing of the temporary differences becoming deductible. Management considers, among other available information, scheduled reversals of deferred tax liabilities, projected future taxable income, limitations of availability of net operating loss carryforwards, and other matters in making this assessment.

Note 14. Long-Term Debt

Long-term debt consisted of the following (in thousands):

|  | March 31, 2022 | September 30, 2021 |
|---|---|---|
| 3.00% Convertible Senior Notes due 2025, net of unamortized discount of $13,176 and $15,019, respectively, and deferred issuance costs of $3,313 and $3,776, respectively. Effective interest rate 6.29%. | $ 158,511 | $ 156,205 |
| Senior Credit Facilities, net of unamortized discount of $1,571 and $1,829, respectively, and deferred issuance costs of $190 and $221, respectively. Effective interest rate 3.25% and 2.86%, respectively. | 112,302 | 115,138 |
| Total debt | $ 270,813 | $ 271,343 |
| Less: current portion | (7,813) | (6,250) |
| Total long-term debt | $ 263,000 | $ 265,093 |

The following table summarizes the maturities of our borrowing obligations as of March 31, 2022 (in thousands):

| Fiscal Year | Convertible Senior Notes | Senior Facilities | Total |
|---|---|---|---|
| 2022 | $ - | $ 3,125 | $ 3,125 |
| 2023 | - | 10,938 | 10,938 |
| 2024 | - | 12,500 | 12,500 |
| 2025 | 175,000 | 87,500 | 262,500 |
| Total before unamortized discount and issuance costs and current portion | $ 175,000 | $ 114,063 | $ 289,063 |
| Less: unamortized discount and issuance costs | (16,489) | (1,761) | (18,250) |
| Less: current portion of long-term debt | - | (7,813) | (7,813) |
| Total long-term debt | $ 158,511 | $ 104,489 | $ 263,000 |

3.00% Senior Convertible Notes due 2025

On June 2, 2020, we issued $175.0 million in aggregate principal amount of 3.00% Convertible Senior Notes due 2025 (the "Notes"), including the initial purchasers' exercise in full of their option to purchase an additional $25.0 million principal amount of the Notes, between us and U.S. Bank National Association, as trustee (the "Trustee"), in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended. The net proceeds from the issuance of the Notes were $169.8 million after deducting transaction costs.

23

The Notes are senior, unsecured obligations and will accrue interest payable semiannually in arrears on June 1 and December 1 of each year at a rate of 3.00% per year. The Notes will mature on June 1, 2025, unless earlier converted, redeemed, or repurchased. The Notes are convertible into cash, shares of our common stock or a combination of cash and shares of our common stock, at our election. As of March 31, 2022, the if-converted value of the Notes is $6.2 million less than its principal amount.

The conversion rate will initially be 26.7271 shares of our common stock per $1,000 principal amount of Notes (equivalent to an initial conversion price of approximately $37.42 per share of our common stock).

As of March 31, 2022, the carrying amount of the equity component, net of taxes and transaction costs was $14.4 million.

The interest expense recognized related to the Notes for the three and six months ended March 31, 2022 and 2021 was as follows (dollars in thousands):

| | Three Months Ended March 31, | | | | Six Months Ended March 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2022 | | 2021 | | 2022 | | 2021 | |
| Contractual interest expense | $ | 1,294 | $ | 1,294 | $ | 2,616 | $ | 2,616 |
| Amortization of debt discount | | 919 | | 863 | | 1,843 | | 1,731 |
| Amortization of issuance costs | | 231 | | 217 | | 463 | | 435 |
| Total interest expense related to the Notes | $ | 2,444 | $ | 2,374 | $ | 4,922 | $ | 4,782 |

The conditional conversion feature of the Notes was triggered during the three and six months ended March 31, 2022. As of March 31, 2022, the Notes were not convertible. As of this Quarterly Report, no Notes have been converted by the holders. Whether any of the Notes will be convertible in future quarters will depend on the satisfaction of one or more of the conversion conditions in the future. If one or more holders elect to convert their Notes at a time when any such Notes are convertible, unless we elect to satisfy our conversion obligation by delivering solely shares of our common stock (other than paying cash in lieu of delivering any fractional share), we would be required to settle a portion or all of our conversion obligation through the payment of cash, which could adversely affect our liquidity.

Senior Credit Facilities

On June 12, 2020 (the "Financing Closing Date"), we entered into a Credit Agreement, by and among the Borrower, the lenders and issuing banks party thereto and Wells Fargo Bank, N.A., as administrative agent (the "Credit Agreement"), consisting of a four-year senior secured term loan facility in the aggregate principal amount of $125.0 million (the "Term Loan Facility"). The net proceeds from the issuance of the Term Loan Facility were $123.0 million. We also entered into a senior secured first-lien revolving credit facility in an aggregate principal amount of $50.0 million (the "Revolving Facility" and, together with the Term Loan Facility, the "Senior Credit Facilities"), which may be drawn on in the event that our working capital and other cash needs are not supported by our operating cash flow. As of March 31, 2022, there were no amounts outstanding under the Revolving Facility.

On December 17, 2020 (the "Amendment No. 1 Effective Date"), we entered into Amendment No. 1 to the Credit Agreement (the "Amendment"). The Amendment extended the scheduled maturity date of the revolving credit and term facilities from June 12, 2024 to April 1, 2025.

The Amendment, among other things, revised certain interest rates in the Credit Agreement. Following delivery of a compliance certificate for the first full fiscal quarter after the Amendment No. 1 Effective Date, the applicable margins for the revolving credit and term facilities is subject to a pricing grid based upon the net total leverage ratio as follows (i) if the net total leverage ratio is greater than 3.00 to 1.00, the applicable margin is LIBOR plus 3.00% or ABR plus 2.00%; (ii) if the net total leverage ratio is less than or equal to 3.00 to 1.00 but greater than 2.50 to 1.00, the applicable margin is LIBOR plus 2.75% or ABR plus 1.75%; (iii) if the net total leverage ratio is less than or equal to 2.50 to 1.00 but greater than 2.00 to 1.00, the applicable margin is LIBOR plus 2.50% or ABR plus 1.50%; (iv) if the net total leverage ratio is less than or equal to 2.00 to 1.00 but greater than 1.50 to 1.00, the applicable margin is LIBOR plus 2.25% or ABR plus 1.25%; and (v) if the net total leverage ratio is less than or equal to 1.50 to 1.00, the applicable margin is LIBOR plus 2.20% or ABR plus 1.00%. As a result of the Amendment, the applicable LIBOR floor was reduced from 0.50% to 0.00%. From the Amendment No. 1 Effective Date until the fiscal quarter ended December 31, 2020, the interest rate was LIBOR plus 2.50%. For the three months ended March 31, 2021, the interest rate was LIBOR plus 2.25%. For the three and six months ended March 31, 2022, the interest rate was LIBOR plus 2.25%. Total interest expense relating to the Senior Credit Facilities for the three months ended March 31, 2022 and 2021 was $0.9 million and $1.0 million, respectively, and $

1.8 million and $2.4 million for the six months ended March 31, 2022 and 2021, respectively. Amounts reflect the coupon and accretion of the discount.

In addition, the quarterly commitment fee required to be paid based on the unused portion of the revolving facility is subject to a pricing grid based upon the net total leverage ratio as follows (i) if the net total leverage ratio is greater than 3.00 to 1.00, the unused line fee is 0.500%; (ii) if the net total leverage ratio is less than or equal to 3.00 to 1.00 but greater than 2.50 to 1.00, the unused line fee is 0.450%; (iii) if the net total leverage ratio is less than or equal to 2.50 to 1.00 but greater than 2.00 to 1.00, the unused line fee is 0.400%; (iv) if the net total leverage ratio is less than or equal to 2.00 to 1.00 but greater than 1.50 to 1.00, the unused line fee is 0.350%; and (v) if the net total leverage ratio is less than or equal to 1.50 to 1.00, the unused line fee is 0.300%.

24

Through the fiscal quarter ending December 31, 2022, we are obligated to make quarterly principal payments in an aggregate amount equal to 1.25% of the original principal amount of the Term Loan Facility. From the fiscal quarter ending March 31, 2023 and for each fiscal quarter thereafter, we are obligated to make quarterly principal payments in an aggregate amount equal to 2.50% of the original principal amount of the Term Loan Facility, with the balance payable at the maturity date thereof.

The Credit Agreement contains certain affirmative and negative covenants customary for financings of this type that, among other things, limit our and our subsidiaries' ability to incur additional indebtedness or liens, to dispose of assets, to make certain fundamental changes, to designate subsidiaries as unrestricted, to make certain investments, to prepay certain indebtedness and to pay dividends, or to make other distributions or redemptions/repurchases, in respect of our and our subsidiaries' equity interests. In addition, the Credit Agreement contains financial covenants, each tested quarterly, (1) a net secured leveraged ratio of not greater than 3.25 to 1.00; (2) a net total leverage ratio of not greater than 4.25 to 1.00; and (3) minimum liquidity of at least $75 million. The Credit Agreement also contains events of default customary for financings of this type, including certain customary change of control events. As of March 31, 2022, we were in compliance with all Credit Agreement covenants.

25

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.

You should read the following discussion and analysis of our financial condition and results of operations together with our Unaudited Condensed Consolidated Financial Statements, and the related notes thereto, appearing elsewhere in this Quarterly Report on Form 10-Q ("Quarterly Report"), and our consolidated and combined financial statements and the related notes and other financial information included in our Annual Report on Form 10-K for the fiscal year ended September 30, 2021, filed with the Securities and Exchange Commission ("SEC") on November 23, 2021. Some of the information contained in this discussion and analysis or elsewhere in this Quarterly Report, including information with respect to our plans and strategy for our business, our performance and future success, our liquidity and capital resources, the impact of the COVID-19 pandemic on our business, results of operations and financial condition, macroeconomic conditions, the semiconductor shortage, and trends in the global auto industry, includes forward-looking statements that involve risks and uncertainties. See "Cautionary Statement Concerning Forward-Looking Statements." You should review the "Risk Factors" section in Part I, Item 1A of our Annual Report on Form 10-K for the fiscal year ended September 30, 2021, as updated by Part II, Item 1A of this Quarterly Report, for a discussion of important factors that could cause actual results to differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis. Note that the results of operations for the three and six months ended March 31, 2022 are not necessarily indicative of what our operating results for the full fiscal year will be. In this Item, "we," "us," "our," "Cerence" and the "Company" refer to Cerence Inc. and its consolidated subsidiaries, collectively.

Overview

Cerence builds AI powered virtual assistants for the mobility/transportation market. Our primary target is the automobile market, but our solutions can apply to all forms of transportation, including, but not limited to, two-wheel vehicles, planes, tractors, cruise ships and elevators. Our solutions power natural conversational and intuitive interactions between automobiles, drivers and passengers, and the broader digital world. We possess one of the world's most popular software platforms for building automotive virtual assistants. Our customers include all major original equipment manufacturers ("OEMs") or their tier 1 suppliers worldwide. We deliver our solutions on a white-label basis, enabling our customers to deliver customized virtual assistants with unique, branded personalities and ultimately strengthening the bond between automobile brands and end users. Our vision is to enable a more enjoyable, safer journey for everyone.

Our principal offering is our software platform, which our customers use to build virtual assistants that can communicate, find information and take action across an expanding variety of categories. Our software platform has a hybrid architecture combining edge software components with cloud-connected components. Edge software components are installed on a vehicle's head unit and can operate without access to external networks and information. Cloud-connected components are comprised of certain speech and natural language understanding related technologies, AI-enabled personalization and context-based response frameworks, and content integration platform.

We generate revenue primarily by selling software licenses and cloud-connected services. Our edge software components are typically sold under a traditional per unit perpetual software license model, in which a per unit fee is charged on a variable basis for each software instance installed on an automotive head unit. We typically license cloud-connected software components in the form of a service to the vehicle end user, which is paid for in advance. In addition, we generate professional services revenue from our work with our customers during the design, development and deployment phases of the vehicle model lifecycle and through maintenance and enhancement projects. We have existing relationships with all major OEMs or their tier 1 suppliers, and while our customer contracts vary, they generally represent multi-year engagements, giving us some level of visibility into future revenue.

Impact of COVID-19 on our Business

The COVID-19 pandemic has resulted in, and may continue to result in, additional governmental restrictions and regulations, which has adversely affected, and may continue to adversely affect our business and financial results. For example, pandemic related lockdowns were experienced in China throughout March 2022, which resulted in loss of automotive production. We have seen, and anticipate that we will continue to see, supply chain challenges in the automotive industry related to semiconductor devices that are used in automobiles. The current macroeconomic conditions have also increased competition for qualified employees in our industry, particularly for members of our professional service teams, and we, along with automotive OEMs, face significant competition in hiring and retaining them. In addition, a recession, depression or other sustained adverse market impact resulting from COVID-19 could materially and adversely affect our business, our access to needed capital and liquidity, and the value of our common stock. Even after the COVID-19 pandemic has lessened or subsided, we may continue to experience adverse impacts on our business and financial performance as a result of its global economic impact.

As the full impact of the COVID-19 pandemic on our business continues to develop, we are closely monitoring the global situation. We are unable at this time to predict the full impact of COVID-19 on our operations, liquidity, and financial results, and, depending on the magnitude and duration of the COVID-19 pandemic, such impact may be material. Accordingly, current results and financial condition discussed herein may not be indicative of future operating results and trends. While we are unable to accurately predict the full impact that COVID-19 will have on our results from operations, financial condition, liquidity and cash flows due to numerous uncertainties, including the duration and severity of the pandemic and containment measures, these measures have impacted, and may continue to impact, our business, as well as our customers and consumers. For further discussion of the business risks associated with COVID-19, see Item 1A, Risk Factors, within our Annual Report on Form 10-K for the fiscal year ended September 30, 2021, as updated by Part II, Item 1A of this Quarterly Report.

Basis of Presentation

The financial information presented in the accompanying unaudited condensed consolidated financial statements has been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") and in accordance with rules and regulations of the SEC regarding interim financial reporting. Accordingly, the financial statements do not include all of the information and footnotes required by U.S. GAAP for complete financial statements.

The condensed consolidated balance sheet data as of September 30, 2021 was derived from audited financial statements, but does not include all disclosures required by U.S. GAAP. In the opinion of management, the accompanying unaudited condensed consolidated financial statements reflect all adjustments, consisting primarily of normal recurring accruals, necessary for a fair presentation of our financial position and results of operations. The operating results for the three and six months ended March 31, 2022 are not necessarily indicative of the results expected for the full fiscal year ending September 30, 2022.

The accompanying unaudited condensed consolidated financial statements include the accounts of the Company, as well as those of its wholly owned subsidiaries. All significant intercompany transactions and balances are eliminated in consolidation.

Key Metrics

In evaluating our financial condition and operating performance, we focus on revenue, operating margins, and cash flow from operations.

For the three months ended March 31, 2022 as compared to the three months ended March 31, 2021:

- Total revenue decreased by $12.4 million, or 12.5%, to $86.3 million from $98.7 million.
- Operating margin decreased 10.3 percentage points to 7.3% from 17.6%.
- Cash provided by operating activities was $1.6 million, a decrease of $14.6 million from cash provided by operating activities of $16.2 million.

For the six months ended March 31, 2022 as compared to the six months ended March 31, 2021:

- Total revenue decreased by $11.6 million, or 6.0%, to $180.7 million from $192.3 million.
- Operating margin decreased 1.9 percentage points to 16.2% from 18.1%.
- Cash provided by operating activities was $6.7 million, a decrease of $20.3 million from cash provided by operating activities of $27.0 million.

Operating Results

The following table shows the Condensed Consolidated Statement of Operations for the three and six months ended March 31, 2022 and 2021 (dollars in thousands):

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
| | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|
| **Revenue:** | | | | |
| License | $ 46,308 | $ 54,371 | $ 93,158 | $ 100,785 |
| Connected services | 19,326 | 27,736 | 47,485 | 53,666 |
| Professional services | 20,646 | 16,555 | 40,063 | 37,854 |
| Total revenues | 86,280 | 98,662 | 180,706 | 192,305 |
| **Cost of revenue:** | | | | |
| License | 386 | 1,181 | 1,107 | 1,855 |
| Connected services | 5,651 | 6,839 | 11,375 | 13,852 |
| Professional services | 17,372 | 16,325 | 33,275 | 33,647 |
| Amortization of intangible assets | 897 | 1,879 | 2,776 | 3,758 |
| Total cost of revenues | 24,306 | 26,224 | 48,533 | 53,112 |
| Gross profit | 61,974 | 72,438 | 132,173 | 139,193 |
| **Operating expenses:** | | | | |
| Research and development | 29,976 | 28,864 | 55,768 | 52,995 |
| Sales and marketing | 8,309 | 9,555 | 14,188 | 18,563 |
| General and administrative | 13,800 | 12,956 | 21,327 | 25,390 |
| Amortization of intangible assets | 3,135 | 3,183 | 6,289 | 6,341 |
| Restructuring and other costs, net | 474 | 537 | 5,389 | 1,017 |
| Total operating expenses | 55,694 | 55,095 | 102,961 | 104,306 |
| Income from operations | 6,280 | 17,343 | 29,212 | 34,887 |
| Interest income | 83 | 16 | 173 | 34 |
| Interest expense | (3,360) | (3,476) | (6,787) | (7,275) |
| Other income (expense), net | (34) | 3,496 | (286) | 1,259 |
| Income before income taxes | 2,969 | 17,379 | 22,312 | 28,905 |
| Provision for (benefit from) income taxes | 3,445 | 6,216 | 3,744 | (3,199) |
| Net (loss) income | $ (476) | $ 11,163 | $ 18,568 | $ 32,104 |

Our revenue consists primarily of license revenue, connected services revenue and revenue from professional services. License revenue primarily consists of license royalties associated with our edge software components. Our edge software components are typically sold under a traditional per unit perpetual software license model, in which a per unit fee is charged for each software instance installed on an automotive head unit. Our contracts contain variable, fixed prepaid or fixed minimum purchase commitment components. Revenue is recognized and cash is collected for variable contracts over the license distribution period. The fixed contracts typically provide the customer with a price discount and can include the conversion of a variable contract that is already in our variable backlog. Revenue for fixed contracts is recognized when the software is made available to the customer, which has typically occurred at the time the contract is signed. Cash is typically expected to be collected for a fixed prepaid deal at the inception of the contract. Cash is expected to be collected for a fixed minimum commitment deal over the license distribution period. See Note 3 to the accompanying unaudited condensed consolidated financial statements for further discussion of our revenue, deferred revenue performance obligations and the timing of revenue recognition. Costs of license revenue primarily consists of third-party royalty expenses for certain external technologies we leverage.

Connected services revenue primarily represents the subscription fee that provides access to our connected services components, including the customization and construction of our connected services solutions. We also derive revenue within our connected services business from usage contracts and there can be instances where a customer purchases a software license that allows them to take possession of the software to enable hosting by the customer or a third-party. Subscription and usage contracts typically have a term of one to five years. Subscription revenue is recognized over the subscription period and cash is expected to be collected at the start of the subscription period. Usage based revenue is recognized and cash is collected as the service is used. If the customer takes possession of the software to have it hosted by the customer or a third-party, revenue is recognized, and cash is collected at the time the license is delivered. See Note 3 to the accompanying unaudited condensed consolidated financial statements for further discussion of our revenue, deferred revenue performance obligations and the timing of revenue recognition. Cost of connected service revenue primarily consists of labor costs of software delivery services, infrastructure, and communications fees that support our connected services solutions.

Professional services revenue is primarily comprised of porting, integrating, and customizing our embedded solutions, with costs primarily consisting of compensation for services personnel, contractors and overhead.

Our operating expenses include R&D, sales and marketing and general and administrative expenses. R&D expenses primarily consist of salaries, benefits, and overhead relating to research and engineering staff. Sales and marketing expenses includes salaries, benefits, and commissions related to our sales, product marketing, product management, and business unit management teams. General and administrative expenses primarily consist of personnel costs for administration, finance, human resources, general management, fees for external professional advisers including accountants and attorneys, and provisions for credit losses.

Amortization of acquired patents and core technology are included within cost of revenues whereas the amortization of other intangible assets, such as acquired customer relationships, trade names and trademarks, are included within operating expenses. Customer relationships are amortized over their estimated economic lives based on the pattern of economic benefits expected to be generated from the use of the asset. Other identifiable intangible assets are amortized on a straight-line basis over their estimated useful lives.

Restructuring and other costs, net include restructuring expenses as well as other charges that are unusual in nature, are the result of unplanned events, and arise outside the ordinary course of our business.

Total other expense, net consists primarily of foreign exchange gains (losses), losses on the extinguishment of debt and interest expense related to the Notes, the Senior Credit Facilities, and the Credit Agreement, dated October 1, 2019, by and among the Company, the lenders and issuing banks party thereto and Barclays Bank PLC, as administrative agent, which we repaid using proceeds from the issuance of the Notes.

**Three Months Ended March 31, 2022 Compared with Three Months Ended March 31, 2021**

### Total Revenues

The following table shows total revenues by product type, including the corresponding percentage change, for the three months ended March 31, 2022 and 2021 (dollars in thousands):

| | Three Months Ended March 31, | | | | % Change |
| | 2022 | % of Total | 2021 | % of Total | 2022 vs. 2021 |
|---|---|---|---|---|---|
| License | $ 46,308 | 53.7% | $ 54,371 | 55.1% | (14.8)% |
| Connected services | 19,326 | 22.4% | 27,736 | 28.1% | (30.3)% |
| Professional services | 20,646 | 23.9% | 16,555 | 16.8% | 24.7% |
| Total revenues | $ 86,280 | | $ 98,662 | | (12.5)% |

Total revenues for the three months ended March 31, 2022 were $86.3 million, an decrease of $12.4 million, or 12.5%, from $98.7 million for the three months ended March 31, 2021. The decrease in revenues was driven by decreases in licensing revenues and decreased demand for our connected services. Our license revenue is highly dependent on vehicle production. Over the course of the past year, third-party light vehicle production forecasts for calendar year 2022 have decreased in response to the ongoing semiconductor shortage, conflict between Russia and Ukraine, and the growing effects of lockdowns in mainland China driven by COVID-19. While we cannot predict the full impact we will have from the forecasted decline in production, we do expect to be negatively impacted for the remainder of the fiscal year.

### License Revenue

License revenue for the three months ended March 31, 2022 was $46.3 million, a decrease of $8.1 million, or 14.8%, from $54.4 million for the three months ended March 31, 2021. Variable license revenue decreased by $16.9 million primarily due to a lower volume of licensing royalties. This decrease, which was due in part to consumption of fixed license contracts, was partially offset by an $8.4 million increase in minimum purchase commitment and prepaid deals with customers. During the three months ended March 31, 2022, an existing variable long-term contract with our largest customer was converted into a minimum purchase commitment deal that accounted for $19.9 million of revenue in the current quarter. The cash associated with this deal is expected to be collected over the distribution period, which could be up to five years. The estimated future revenue related to this long-term contract was previously included in our variable backlog. As a percentage of total revenues, license revenue decreased 1.4 percentage points from 55.1% for the three months ended March 31, 2021 to 53.7% for the three months ended March 31, 2022.

### Connected Services Revenue

Connected services revenue for the three months ended March 31, 2022 was $19.3 million, a decrease of $8.4 million, or 30.3%, from $27.7 million for the three months ended March 31, 2021. This decrease was primarily driven by the winding down of a legacy contract acquired by Nuance Communications, Inc. ("Nuance") through a 2013 acquisition. As a percentage of total revenues, connected services revenue decreased by 5.7 percentage point from 28.1% for the three months ended March 31, 2021 to 22.4% for the three months ended March 31, 2022.

### Professional Services Revenue

Professional service revenue for the three months ended March 31, 2022 was $20.6 million, an increase of $4.0 million, or 24.7%, from $16.6 million for the three months ended March 31, 2021. This increase was primarily driven by our continued focus on integration and customization services related to our edge software and timing of services rendered. As a percentage of total revenues, professional services revenue increased by 7.1 percentage points from 16.8% for the three months ended March 31, 2021 to 23.9% for the three months ended March 31, 2022.

## Six Months Ended March 31, 2022 Compared with Six Months Ended March 31, 2021

### Total Revenues

The following table shows total revenues by product type, including the corresponding percentage change, for the six months ended March 31, 2022 and 2021 (dollars in thousands):

|  | Six Months Ended March 31, | | | | % Change |
|---|---|---|---|---|---|
|  | 2022 | % of Total | 2021 | % of Total | 2022 vs. 2021 |
| License | $ 93,158 | 51.6% | $ 100,785 | 52.4% | (7.6)% |
| Connected services | 47,485 | 26.3% | 53,666 | 27.9% | (11.5)% |
| Professional services | 40,063 | 22.1% | 37,854 | 19.7% | 5.8% |
| Total revenues | $ 180,706 | | $ 192,305 | | (6.0)% |

30

Total revenues for the six months ended March 31, 2022 were $180.7 million, an decrease of $11.6 million, or 6.0%, from $192.3 million for the six months ended March 31, 2021. The decrease in revenues was driven by decreases in licensing revenues and decreased demand for our connected services. Our license revenue is highly dependent on vehicle production. Over the course of the past year, third-party light vehicle production forecasts for calendar year 2022 have decreased in response to the ongoing semiconductor shortage, conflict between Russia and Ukraine, and the growing effects of lockdowns in mainland China driven by COVID-19. While we cannot predict the full impact we will have from the forecasted decline in production, we do expect to be negatively impacted for the remainder of the fiscal year.

License Revenue

License revenue for the six months ended March 31, 2022 was $93.2 million, a decrease of $7.6 million, or 7.6%, from $100.8 million for the six months ended March 31, 2021. Variable license revenue decreased by $31.7 million primarily due to a lower volume of licensing royalties. This decrease, which was due in part to consumption of fixed license contracts, was partially offset by an $18.4 million increase in minimum purchase commitment and prepaid deals and $5.2 million from a one-time volume commitment deal with a fitness customer. During the six months ended March 31, 2022, certain existing variable long-term contracts with our largest customer were converted into minimum purchase commitment deals that accounted for $40.1 million of revenue during such six-month period. The cash associated with these deals is expected to be collected over the distribution period, which could be up to five years. The estimated future revenue related to these long-term contracts was previously included in our variable backlog. As a percentage of total revenues, license revenue decreased by 0.8 percentage points from 52.4% for the six months ended March 31, 2021 to 51.6% for the six months ended March 31, 2022.

Connected Services Revenue

Connected services revenue for the six months ended March 31, 2022 was $47.5 million, a decrease of $6.2 million, or 11.5% from $53.7 million for the six months ended March 31, 2021. This decrease was primarily driven by the winding down of a legacy contract acquired by Nuance through a 2013 acquisition. As a percentage of total revenues, connected services revenue decreased by 1.6 percentage points from 27.9% for the six months ended March 31, 2021 to 26.3% for the six months ended March 31, 2022.

Professional Services Revenue

Professional service revenue for the six months ended March 31, 2022 was $40.1 million, an increase of $2.2 million, or 5.8%, from $37.9 million for the six months ended March 31, 2021. This increase was primarily driven by our continued focus on integration and customization services related to our edge software and timing of services rendered. As a percentage of total revenues, professional services revenue increased by 2.4 percentage points from 19.7% for the six months ended March 31, 2021 to 22.1% for the six months ended March 31, 2022.

Three Months Ended March 31, 2022 Compared with Three Months Ended March 31, 2021

Total Cost of Revenues and Gross Profits

The following table shows total cost of revenues by product type and the corresponding percentage change (dollars in thousands):

| | Three Months Ended March 31, | | % Change |
| | 2022 | 2021 | 2022 vs. 2021 |
|---|---|---|---|
| License | $ 386 | $ 1,181 | (67.3)% |
| Connected services | 5,651 | 6,839 | (17.4)% |
| Professional services | 17,372 | 16,325 | 6.4% |
| Amortization of intangibles | 897 | 1,879 | (52.3)% |
| Total cost of revenues | $ 24,306 | $ 26,224 | (7.3)% |

The following table shows total gross profit by product type and the corresponding percentage change (dollars in thousands):

| | Three Months Ended March 31, | | % Change |
| | 2022 | 2021 | 2022 vs. 2021 |
|---|---|---|---|
| License | $ 45,922 | $ 53,190 | (13.7)% |
| Connected services | 13,675 | 20,897 | (34.6)% |
| Professional services | 3,274 | 230 | 1323.5% |
| Amortization of intangibles | (897) | (1,879) | 52.3% |

| | | | | |
|---|---|---|---|---|
| Total gross profit | $ | 61,974 | $ | 72,438 | (14.4)% |

Total cost of revenues for the three months ended March 31, 2022 were $24.3 million, a decrease of $1.9 million, or 7.3%, from $26.2 million for the three months ended March 31, 2021.

We experienced a decrease in total gross profit of $10.4 million, or 14.4%, from $72.4 million for the three months ended March 31, 2021 to $62.0 million for the three months ended March 31, 2022. The decrease was primarily driven by a decline in license and connected services revenues.

### Cost of License Revenue

Cost of license revenue for the three months ended March 31, 2022 and 2021 was $0.4 million, a decrease of $0.8 million, or 67.3%, from $1.2 million for the three months ended March 31, 2021. Cost of license revenues decreased due to third-party royalty expenses associated with external technologies we leverage in our edge software components. As a percentage of total cost of revenues, cost of license revenue decreased by 2.9 percentage points from 4.5% for the three months ended March 31, 2021 to 1.6% for the three months ended March 31, 2022.

License gross profit decreased by $7.3 million, or 13.7%, for the three months ended March 31, 2022 when compared to the three months ended March 31, 2021, primarily due to decreases in license revenues.

### Cost of Connected Services Revenue

Cost of connected services revenue for the three months ended March 31, 2022 was $5.7 million, a decrease of $1.1 million, or 17.4%, from $6.8 million for the three months ended March 31, 2021. Cost of connected services revenue decreased primarily due to a $0.4 million decrease in salary-related expenditures, $0.4 million decrease in amortization of costs previously deferred, and $0.3 million decrease in stock-based compensation. The decrease was partially offset by a $0.5 million increase in our cloud infrastructure costs. As a percentage of total cost of revenues, cost of connected service revenue decreased by 2.9 percentage points from 26.1% for the three months ended March 31, 2021 to 23.2% for the three months ended March 31, 2022.

Connected services gross profit decreased $7.2 million, or 34.6%, from $20.9 million for the three months ended March 31, 2021 to $13.7 million for the three months ended March 31, 2022, driven by decreases in connected services revenue due to the winding down of a legacy contract.

### Cost of Professional Services Revenue

Cost of professional services revenue for the three months ended March 31, 2022 was $17.4 million, an increase of $1.1 million, or 6.4%, from $16.3 million for the three months ended March 31, 2021. Cost of professional services revenue increased primarily due to a $2.4 million increase in third-party contractor costs, $0.2 million increase in stock-based compensation costs, $0.2 million increase in salary-related expenditures and $0.2 million increase in amortization of costs previously deferred. The increase was partially offset by $2.1 million lower internal allocated costs. As a percentage of total cost of revenues, cost of professional services revenue increased by 9.2 percentage points from 62.3% for the three months ended March 31, 2021 to 71.5% for the three months ended March 31, 2022.

Professional services gross profit increased $3.1 million, or 1323.5%, from $0.2 million for the three months ended March 31, 2021 to $3.3 million for the three months ended March 31, 2022, which was due to an increase in professional services revenues and cost savings initiatives implemented during the first half of fiscal year 2022.

Six Months Ended March 31, 2022 Compared with Six Months Ended March 31, 2021

### Total Cost of Revenues and Gross Profits

The following table shows total cost of revenues by product type and the corresponding percentage change (dollars in thousands):

| | | Six Months Ended March 31, | | | % Change |
|---|---|---|---|---|---|
| | | 2022 | | 2021 | 2022 vs. 2021 |
| License | $ | 1,107 | $ | 1,855 | (40.3)% |
| Connected services | | 11,375 | | 13,852 | (17.9)% |
| Professional services | | 33,275 | | 33,647 | (1.1)% |
| Amortization of intangibles | | 2,776 | | 3,758 | (26.1)% |
| Total cost of revenues | $ | 48,533 | $ | 53,112 | (8.6)% |

The following table shows total gross profit by product type and the corresponding percentage change (dollars in thousands):

|  | Six Months Ended March 31, | | | | % Change |
|  | 2022 | | 2021 | | 2022 vs. 2021 |
|---|---|---|---|---|---|
| License | $ | 92,051 | $ | 98,930 | (7.0)% |
| Connected services |  | 36,110 |  | 39,814 | (9.3)% |
| Professional services |  | 6,788 |  | 4,207 | 61.4% |
| Amortization of intangibles |  | (2,776) |  | (3,758) | 26.1% |
| Total gross profit | $ | 132,173 | $ | 139,193 | (5.0)% |

Total cost of revenues for the six months ended March 31, 2022 were $48.5 million, a decrease of $4.6 million, or 8.6%, from $53.1 million for the six months ended March 31, 2021.

We experienced a decrease in total gross profit of $7.0 million, or 5.0%, from $139.2 million for the six months ended March 31, 2021 to $132.2 million for the six months ended March 31, 2022. The decrease was primarily driven by a decline in license and connected services revenues.

Cost of License Revenue

Cost of license revenue for the six months ended March 31, 2022 was $1.1 million, a decrease of $0.8 million, or 40.3%, from $1.9 million for the six months ended March 31, 2021. Cost of license revenues decreased due to third-party royalty expenses associated with external technologies we leverage in our edge software components. As a percentage of total cost of revenues, cost of license revenue decreased by 1.2 percentage points from 3.5% for the six months ended March 31, 2021 to 2.3% for the six months ended March 31, 2022.

License gross profit decreased by $6.9 million, or 7.0%, for the six months ended March 31, 2022 when compared to the six months ended March 31, 2021, primarily due to decreases in license revenues.

Cost of Connected Services Revenue

Cost of connected services revenue for the six months ended March 31, 2022 was $11.4 million, a decrease of $2.5 million, or 17.9%, from $13.9 million for the six months ended March 31, 2021. Cost of connected services revenue decreased primarily due to a $1.1 million decrease in internal allocated costs, $1.0 million decrease in salary-related expenditures, $0.4 million decrease in stock-based compensation, $0.2 million decrease in third-party contractor costs and $0.2 million decrease in depreciation costs, offset by $0.8 million increase in our cloud infrastructure costs. As a percentage of total cost of revenues, cost of connected service revenue decreased by 2.7 percentage points from 26.1% for the six months ended March 31, 2021 to 23.4% for the six months ended March 31, 2022.

Connected services gross profit decreased $3.7 million, or 9.3%, from $39.8 million for the six months ended March 31, 2021 to $36.1 million for the six months ended March 31, 2022, driven by declines in connected services revenue.

Cost of Professional Services Revenue

Cost of professional services revenue for the six months ended March 31, 2022 was $33.3 million, a decrease of $0.3 million, or 1.1%, from $33.6 million for the six months ended March 31, 2021. Cost of professional services revenue decreased primarily due to a $3.7 million decrease in internal allocated labor, $1.0 million decrease in amortization of costs previously deferred, and $0.1 million decrease in stock-based compensation costs. The decrease was partially offset by a $4.3 million increase in third-party contractor costs and $0.4 million increase in salary-related expenditures. As a percentage of total cost of revenues, cost of professional services revenue increased by 5.2 percentage points from 63.4% for the six months ended March 31, 2021 to 68.6% for the six months ended March 31, 2022.

Professional services gross profit increased $2.6 million, or 61.4%, from $4.2 million for the six months ended March 31, 2021 to $6.8 million for the six months ended March 31, 2022, which was due to an increase in professional services revenues and cost savings initiatives implemented during the first half of fiscal year 2022.

Operating Expenses

33

The tables below show each component of operating expense. Total other income (expense), net and provision for (benefit from) income taxes are non-operating expenses and presented in a similar format (dollars in thousands).

### R&D Expenses

Three Months Ended March 31, 2022 Compared with Three Months Ended March 31, 2021

|  | Three Months Ended March 31, | | % Change |
|---|---|---|---|
|  | 2022 | 2021 | 2022 vs. 2021 |
| Research and development | $ 29,976 | $ 28,864 | 3.9% |

Historically, R&D expenses are our largest operating expense as we continue to build on our existing software platforms and develop new technologies. R&D expenses for the three months ended March 31, 2022 were $30.0 million, an increase of $1.1 million, or 3.9%, from $28.9 million for the three months ended March 31, 2021. The increase in R&D expenses was primarily attributable to a $2.2 million reduction in labor allocated to support our customer projects. The increase was partially offset by a $0.8 million increase in capitalized costs associated with internally developed software and $0.6 million decrease in salary-related expenditures. As a percentage of total operating expenses, R&D expenses increased by 1.4 percentage points from 52.4% for the three months ended March 31, 2021 to 53.8% for the three months ended March 31, 2022.

Six Months Ended March 31, 2022 Compared with Six Months Ended March 31, 2021

|  | Six Months Ended March 31, | | % Change |
|---|---|---|---|
|  | 2022 | 2021 | 2022 vs. 2021 |
| Research and development | $ 55,768 | $ 52,995 | 5.2% |

Historically, R&D expenses are our largest operating expense as we continue to build on our existing software platforms and develop new technologies. R&D expenses for the six months ended March 31, 2022 were $55.8 million, an increase of $2.8 million, or 5.2%, from $53.0 million for the six months ended March 31, 2021. The increase in R&D expenses was primarily attributable to a $4.6 million reduction in labor allocated to support our customer projects, $0.8 million increase in salary-related expenditures, $0.4 million increase in hardware and software costs, and $0.3 million increase in third party contractor costs. The increase was partially offset by a $2.5 million decrease in stock-based compensation costs and $1.8 million increase in capitalized costs associated with internally developed software. As a percentage of total operating expenses, R&D expenses increased by 3.4 percentage points from 50.8% for the six months ended March 31, 2021 to 54.2% for the six months ended March 31, 2022.

### Sales & Marketing Expenses

Three Months Ended March 31, 2022 Compared with Three Months Ended March 31, 2021

|  | Three Months Ended March 31, | | % Change |
|---|---|---|---|
|  | 2022 | 2021 | 2022 vs. 2021 |
| Sales and marketing | $ 8,309 | $ 9,555 | (13.0)% |

Sales and marketing expenses for the three months ended March 31, 2022 were $8.3 million, a decrease of $1.3 million, or 13.0%, from $9.6 million for the three months ended March 31, 2021. The decrease in sales and marketing expenses was primarily attributable to a $1.5 million decrease in stock-based compensation and $0.2 million decrease in salary-related expenses partially offset by an increase of $0.3 million related to travel-related expenditures. As a percentage of total operating expenses, sales and marketing expenses decreased by 2.4 percentage points from 17.3% for the three months ended March 31, 2021 to 14.9% for the three months ended March 31, 2022.

Six Months Ended March 31, 2022 Compared with Six Months Ended March 31, 2021

|  | Six Months Ended March 31, | | % Change |
|---|---|---|---|
|  | 2022 | 2021 | 2022 vs. 2021 |
| Sales and marketing | $ 14,188 | $ 18,563 | (23.6)% |

Sales and marketing expenses for the six months ended March 31, 2022 were $14.2 million, a decrease of $4.4 million, or 23.6%, from $18.6 million for the six months ended March 31, 2021. The decrease in sales and marketing expenses was primarily attributable to a $4.7 million decrease in stock-based compensation and $0.6 million decrease in salary-related expenses partially offset by an increase of $0.5 million in travel-related expenditures, and $0.3 million related to commission expense. As a percentage of total operating expenses, sales and marketing expenses decreased by 4.0 percentage points from 17.8% for the six months ended March 31, 2021 to 13.8% for the six months ended March 31, 2022.

### General & Administrative Expenses

Three Months Ended March 31, 2022 Compared with Three Months Ended March 31, 2021

| | Three Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 vs. 2021 |
| General and administrative | $ 13,800 | $ 12,956 | 6.5% |

General and administrative expenses for the three months ended March 31, 2022 were $13.8 million, an increase of $0.8 million, or 6.5%, from $13.0 million for the three months ended March 31, 2021. The increase in general and administrative expenses was primarily attributable to $2.2 million increase in third-party professional services. The increase was partially offset by $1.3 million decrease in stock-based compensation costs. As a percentage of total operating expenses, general and administrative expenses increased by 1.3 percentage points from 23.5% for the three months ended March 31, 2021 to 24.8% for the three months ended March 31, 2022.

Six Months Ended March 31, 2022 Compared with Six Months Ended March 31, 2021

| | Six Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 vs. 2021 |
| General and administrative | $ 21,327 | $ 25,390 | (16.0)% |

General and administrative expenses for the six months ended March 31, 2022 were $21.3 million, a decrease of $4.1 million, or 16.0%, from $25.4 million for the six months ended March 31, 2021. The decrease in general and administrative expenses was primarily attributable to $6.9 decrease in stock-based compensation costs. The decrease was partially offset by a $2.0 million increase in third-party professional services and $0.9 million increase in salary-related expenditures. As a percentage of total operating expenses, general and administrative expenses decreased by 3.6 percentage points from 24.3% for the six months ended March 31, 2021 to 20.7% for the six months ended March 31, 2022.

### Amortization of Intangible Assets

Three Months Ended March 31, 2022 Compared with Three Months Ended March 31, 2021

| | Three Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 vs. 2021 |
| Cost of revenues | $ 897 | $ 1,879 | (52.3)% |
| Operating expense | 3,135 | 3,183 | (1.5)% |
| Total amortization | $ 4,032 | $ 5,062 | (20.3)% |

35

Intangible asset amortization for the three months ended March 31, 2022 was $4.0 million, a decrease of $1.1 million, or 20.3%, from $5.1 million for the three months ended March 31, 2021. The decrease in amortization relates to certain intangible assets having been fully amortized during fiscal 2021. Amortization expense for acquired technology and patents is included in the cost of revenues in the accompanying Condensed Consolidated Statements of Operations. Amortization expense for customer relationships is included in operating expenses in the accompanying Condensed Consolidated Statements of Operations.

As a percentage of total cost of revenues, intangible asset amortization within cost of revenues decreased by 3.5 percentage points from 7.2% for the three months ended March 31, 2021 to 3.7% for the three months ended March 31, 2022. As a percentage of total operating expenses, intangible asset amortization expenses within operating expenses decreased by 0.2 percentage points from 5.8% for the three months ended March 31, 2021 as compared to 5.6% for the three months ended March 31, 2022.

Six Months Ended March 31, 2022 Compared with Six Months Ended March 31, 2021

| | Six Months Ended March 31, | | % Change |
| | 2022 | 2021 | 2022 vs. 2021 |
|---|---|---|---|
| Cost of revenues | $ 2,776 | $ 3,758 | (26.1)% |
| Operating expense | 6,289 | 6,341 | (0.8)% |
| Total amortization | $ 9,065 | $ 10,099 | (10.2)% |

36

Intangible asset amortization for the six months ended March 31, 2022 was $9.1 million, a decrease of $1.0 million, or 10.2%, from $10.1 million for the six months ended March 31, 2021. The decrease in amortization relates to certain intangible assets having been fully amortized during fiscal 2021. Amortization expense for acquired technology and patents is included in the cost of revenues in the accompanying Condensed Consolidated Statements of Operations. Amortization expense for customer relationships is included in operating expenses in the accompanying Condensed Consolidated Statements of Operations.

As a percentage of total cost of revenues, intangible asset amortization within cost of revenues decreased by 1.4 percentage points from 7.1% for the six months ended March 31, 2021 to 5.7% for the six months ended March 31, 2022. As a percentage of total operating expenses, intangible asset amortization expenses within operating expenses remained flat at 6.1% for the six months ended March 31, 2022 and 2021.

### Restructuring and Other Costs, Net

Three Months Ended March 31, 2022 Compared with Three Months Ended March 31, 2021

| | Three Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 vs. 2021 |
| Restructuring and other costs, net | $ 474 | $ 537 | (11.7)% |

Restructuring and other costs, net for the three months ended March 31, 2022 and 2021 remained flat at $0.5 million. For the three months ended March 31, 2022, we recorded restructuring and other charges, net of $0.5 million, which included $0.3 million related to one-time charges and a $0.2 million charge resulting from the closure of facilities that will no longer be utilized. As a percentage of total operating expenses, restructuring and other costs, net decreased by 0.1 percentage points from 1.0% for the three months ended March 31, 2021 to 0.9% for the three months ended March 31, 2022.

Six Months Ended March 31, 2022 Compared with Six Months Ended March 31, 2021

| | Six Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 vs. 2021 |
| Restructuring and other costs, net | $ 5,389 | $ 1,017 | 429.9% |

Restructuring and other costs, net for the six months ended March 31, 2022 were $5.4 million, an increase of $4.4 million, or 429.9%, from $1.0 million for the six months ended March 31, 2021. The increase in restructuring and other costs, net was primarily driven by $4.0 million, net of $5.0 million in forfeitures, in stock-based compensation due to the resignation of our former CEO and the resulting modification of certain stock-based awards, $0.3 million severance charge related to the elimination of personnel, and $0.4 million charge resulting from the closure of facilities that will no longer be utilized. As a percentage of total operating expenses, restructuring and other costs, net increased by 4.2 percentage points from 1.0% for the six months ended March 31, 2021 to 5.2% for the six months ended March 31, 2022.

### Total Other Expense, Net

Three Months Ended March 31, 2022 Compared with Three Months Ended March 31, 2021

| | Three Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 vs. 2021 |
| Interest income | $ 83 | $ 16 | 418.8% |
| Interest expense | (3,360) | (3,476) | (3.3)% |
| Other income (expense), net | (34) | 3,496 | (101.0)% |
| Total other income (expense), net | $ (3,311) | $ 36 | (9297.2)% |

Total other expense, net for the three months ended March 31, 2022 was expense of $3.3 million, a decrease of $3.3 million from $36 thousand of income for the three months ended March 31, 2021. The change in other income (expense), net was primarily driven by foreign exchange losses. For further information, see "Liquidity and Capital Resources" below.

Six Months Ended March 31, 2022 Compared with Six Months Ended March 31, 2021

| | Six Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 vs. 2021 |

| | | | | |
|---|---|---|---|---|
| Interest income | $ | 173 | $ 34 | 408.8% |
| Interest expense | | (6,787) | (7,275) | (6.7)% |
| Other income (expense), net | | (286) | 1,259 | (122.7)% |
| Total other expense, net | $ | (6,900) | $ (5,982) | 15.3% |

Total other expense, net for the six months ended March 31, 2022 was expense of $6.9 million, a decrease of $0.9 million from $6.0 million of expense for the six months ended March 31, 2021. The decrease in interest expense was primarily attributable to a lower applicable interest rate on Term Loan Facility. The change in other income (expense), net was primarily driven by foreign exchange gains offset by $1.3 million of expense related to a decrease in an asset corresponding with the release of indemnified pre-spin-off liabilities for uncertain tax positions. For further information, see "Liquidity and Capital Resources" below.

### Provision For (Benefit From) Income Taxes

Three Months Ended March 31, 2022 Compared with Three Months Ended March 31, 2021

| | Three Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 vs. 2021 |
| Provision for income taxes | $ 3,445 | $ 6,216 | (44.6)% |
| Effective income tax rate % | 116.0% | 35.8% | |

Our effective income tax rate for the three months ended March 31, 2022 was 116.0%, compared to 35.8% for the three months ended March 31, 2021. Consequently, our provision for income taxes for the three months ended March 31, 2022 was $3.4 million, a net change of $2.8 million from a provision for income taxes of $6.2 million for the three months ended March 31, 2021. This difference was attributable to our composition of jurisdiction earnings and U.S. inclusions of foreign taxable income as a result of 2017 tax law changes.

Six Months Ended March 31, 2022 Compared with Six Months Ended March 31, 2021

| | Six Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | 2022 vs. 2021 |
| Provision for (benefit from) income taxes | $ 3,744 | $ (3,199) | (217.0)% |
| Effective income tax rate% | 16.8% | (11.1)% | |

Our effective income tax rate for the six months ended March 31, 2022 was 16.8%, compared to negative 11.1% for the six months ended March 31, 2021. Consequently, our provision for income taxes for the six months ended March 31, 2022 was $3.7 million, a net change of $6.9 million from a benefit from income taxes of $3.2 million for the six months ended March 31, 2021. This difference was attributable to our composition of jurisdiction earnings, U.S. inclusions of foreign taxable income as a result of 2017 tax law changes, and a $15.8 million tax benefit recorded as a result of a decrease to the enacted Netherlands tax rate in the first quarter of fiscal 2021, partially offset by a $3.5 million tax benefit recorded as result of a decrease to the enacted Netherlands tax rate in the first quarter of fiscal 2022.

### Liquidity and Capital Resources

#### Financial Condition

As of March 31, 2022, we had $146.1 million in cash, cash equivalents, and marketable securities. Cash equivalents include highly liquid investments that are readily convertible to known amounts of cash and have original maturities of three months or less. Marketable securities include commercial paper and corporate bonds. As of March 31, 2022, our net working capital, excluding deferred revenue and deferred costs, was $181.0 million. This balance is representative of the short-term net cash inflows based on the working capital at that date.

During the three and six months ended March 31, 2022, we converted existing variable long-term contracts into minimum purchase commitment deals with our largest customer. These minimum commitment deals accounted for $19.9 million and $40.1 million of revenue, respectively. The cash associated with these deals is expected to be collected over the distribution period, which could be up to five years. The estimated future revenue related to these long-term contracts was previously included in our variable backlog.

#### Sources and Material Cash Requirements

38

Our principal sources of liquidity are our cash, cash equivalents, and marketable securities, as well as the cash flows we generated from our operations. The primary uses of cash include costs of revenues, funding of R&D activities, capital expenditures and debt obligations.

Our ability to fund future operating needs will depend on our ability to generate positive cash flows from operations and finance additional funding in the capital markets as needed. Based on our history of generating positive cash flows and the $146.1 million of cash, cash equivalents, and marketable securities as of March 31, 2022, we believe that we will be able to meet our liquidity needs over the next 12 months. We believe that we will meet longer-term expected future cash requirements and obligations, through a combination of cash flows from operating activities, available cash balances, and available credit via our Revolving Facility.

The following table presents our material cash requirements for future periods (dollars in thousands):

| | Material Cash Requirements Due by Period | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2022 | 2023 - 2024 | 2025 - 2026 | Thereafter | Total |
| Notes | $ - | $ - | $ 175,000 | $ - | $ 175,000 |
| Interest payable on the Notes (a) | 2,631 | 10,507 | 3,507 | - | 16,645 |
| Senior Credit Facilities | 3,125 | 23,438 | 87,500 | - | 114,063 |
| Interest payable on Senior Credit Facilities (b) | 1,551 | 5,513 | 1,174 | - | 8,238 |
| Operating leases | 3,525 | 10,946 | 5,218 | 2,470 | 22,159 |
| Operating leases under restructuring (c) | (20) | 30 | 402 | 201 | 613 |
| Financing leases | 208 | 886 | 414 | - | 1,508 |
| Total material cash requirements | $ 11,020 | $ 51,320 | $ 273,215 | $ 2,671 | $ 338,226 |

(a)  Interest per annum is due and payable semiannually and is determined based on the outstanding principal as of March 31, 2022.
(b)  Interest per annum is due and payable monthly and is determined based on the outstanding principal as of March 31, 2022.
(c)  Contractual lease commitments are shown net of sublease income related to certain facilities. As of March 31, 2022, we anticipate sublease income of $2.0 million through fiscal year 2024.

As the impact of the COVID-19 pandemic on the economy and our operations evolves, we will continue to assess our liquidity needs. Should we need to secure additional sources of liquidity, we believe that we could finance our needs through the issuance of equity securities or debt offerings. However, we cannot guarantee that we will be able to obtain financing through the issuance of equity securities or debt offerings on acceptable terms. The COVID-19 pandemic has negatively impacted the global economy and created significant volatility and disruption of financial markets. An extended period of economic disruption could materially affect our business, results of operations, ability to meet debt covenants, access to sources of liquidity and financial condition.

3.00% Senior Convertible Notes due 2025

On June 2, 2020, we issued $175.0 million in aggregate principal amount of Notes, including the initial purchasers' exercise in full of their option to purchase an additional $25.0 million principal amount of the Notes, between the Company and the Trustee, in a private offering to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended. The net proceeds from the issuance of the Notes were $169.8 million after deducting transaction costs.

The Notes are senior, unsecured obligations and will accrue interest payable semiannually in arrears on June 1 and December 1 of each year at a rate of 3.00% per year. The Notes will mature on June 1, 2025, unless earlier converted, redeemed, or repurchased. The Notes are convertible into cash, shares of our common stock or a combination of cash and shares of our common stock, at our election.

The conversion rate will initially be 26.7271 shares of our common stock per $1,000 principal amount of Notes (equivalent to an initial conversion price of approximately $37.42 per share of our common stock).

The interest expense recognized related to the Notes for the three and six months ended March 31, 2022 and 2021 was as follows (dollars in thousands):

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| Contractual interest expense | $ 1,294 | $ 1,294 | $ 2,616 | $ 2,616 |
| Amortization of debt discount | 919 | 863 | 1,843 | 1,731 |
| Amortization of issuance costs | 231 | 217 | 463 | 435 |
| Total interest expense related to the Notes | $ 2,444 | $ 2,374 | $ 4,922 | $ 4,782 |

39

The conditional conversion feature of the Notes was triggered in the three and six months ended March 31, 2022, with no Notes being converted. As of March 31, 2022, the Notes were not convertible. As of this Quarterly Report, no Notes have been converted by the holders. Whether any of the Notes will be convertible in future quarters will depend on the satisfaction of one or more of the conversion conditions in the future. If one or more holders elect to convert their Notes at a time when any such Notes are convertible, unless we elect to satisfy our conversion obligation by delivering solely shares of our common stock (other than paying cash in lieu of delivering any fractional share), we would be required to settle a portion or all of our conversion obligation through the payment of cash, which could adversely affect our liquidity.

Senior Credit Facilities

On June 12, 2020, we entered into a Term Loan Facility. The net proceeds from the issuance of the Term Loan Facility were $123.0 million. We also entered the Revolving Facility, which shall be drawn on in the event that our working capital and other cash needs are not supported by our operating cash flow. As of March 31, 2022, there were no amounts outstanding under the Revolving Facility.

On December 17, 2020 (the "Amendment No. 1 Effective Date"), we entered into Amendment No. 1 to the Credit Agreement (the "Amendment"). The Amendment extended the scheduled maturity date of the revolving credit and term facilities from June 12, 2024 to April 1, 2025.

The Amendment revised certain interest rates in the Credit Agreement. Following delivery of a compliance certificate for the first full fiscal quarter after the Amendment No. 1 Effective Date, the applicable margins for the revolving credit and term facilities is subject to a pricing grid based upon the net total leverage ratio as follows: (i) if the net total leverage ratio is greater than 3.00 to 1.00, the applicable margin is LIBOR plus 3.00% or ABR plus 2.00%; (ii) if the net total leverage ratio is less than or equal to 3.00 to 1.00 but greater than 2.50 to 1.00, the applicable margin is LIBOR plus 2.75% or ABR plus 1.75%; (iii) if the net total leverage ratio is less than or equal to 2.50 to 1.00 but greater than 2.00 to 1.00, the applicable margin is LIBOR plus 2.50% or ABR plus 1.50%; (iv) if the net total leverage ratio is less than or equal to 2.00 to 1.00 but greater than 1.50 to 1.00, the applicable margin is LIBOR plus 2.25% or ABR plus 1.25%; and (v) if the net total leverage ratio is less than or equal to 1.50 to 1.00, the applicable margin is LIBOR plus 2.20% or ABR plus 1.00%. As a result of the Amendment, the applicable LIBOR floor was reduced from 0.50% to 0.00%.

From the Amendment No. 1 Effective Date until the fiscal quarter ended March 31, 2021, the interest rate was LIBOR plus 2.50%. For the three months ended March 31, 2021, the interest rate was LIBOR plus 2.25%. For the three and six months ended March 31, 2022, the interest rate was LIBOR plus 2.25%. Total interest expense relating to the Senior Credit Facilities for the three months ended March 31, 2022 and 2021 was $0.9 million and $1.0 million, respectively, and $1.8 million and $2.4 million for the six months ended March 31, 2022 and 2021, respectively. Amounts reflect the coupon and accretion of the discount.

In addition, the quarterly commitment fee required to be paid based on the unused portion of the Revolving Facility is subject to a pricing grid based upon the net total leverage ratio as follows (i) if the net total leverage ratio is greater than 3.00 to 1.00, the unused line fee is 0.500%; (ii) if the net total leverage ratio is less than or equal to 3.00 to 1.00 but greater than 2.50 to 1.00, the unused line fee is 0.450%; (iii) if the net total leverage ratio is less than or equal to 2.50 to 1.00 but greater than 2.00 to 1.00, the unused line fee is 0.400%; (iv) if the net total leverage ratio is less than or equal to 2.00 to 1.00 but greater than 1.50 to 1.00, the unused line fee is 0.350%; and (v) if the net total leverage ratio is less than or equal to 1.50 to 1.00, the unused line fee is 0.300%.

Through the fiscal quarter ending December 31, 2022, we are obligated to make quarterly principal payments in an aggregate amount equal to 1.25% of the original principal amount of the Term Loan Facility. From the fiscal quarter ending March 31, 2023 and for each fiscal quarter thereafter, we are obligated to make quarterly principal payments in an aggregate amount equal to 2.50% of the original principal amount of the Term Loan Facility, with the balance payable at the maturity date thereof.

The Credit Agreement contains certain affirmative and negative covenants customary for financings of this type that, among other things, limit our and our subsidiaries' ability to incur additional indebtedness or liens, to dispose of assets, to make certain fundamental changes, to designate subsidiaries as unrestricted, to make certain investments, to prepay certain indebtedness and to pay dividends, or to make other distributions or redemptions/repurchases, in respect of our and our subsidiaries' equity interests. In addition, the Credit Agreement contains financial covenants, each tested quarterly, (1) a net secured leveraged ratio of not greater than 3.25 to 1.00; (2) a net total leverage ratio of not greater than 4.25 to 1.00; and (3) minimum liquidity of at least $75 million. The Credit Agreement also contains events of default customary for financings of this type, including certain customary change of control events. As of March 31, 2022, we were in compliance with all Credit Agreement covenants.

Cash Flows

Cash flows from operating, investing and financing activities for the six months ended March 31, 2022 and 2021, as reflected in the unaudited Condensed Consolidated Statements of Cash Flows included in Item 1 of this Form 10-Q, are summarized in the following table (dollars in thousands):

| | Six Months Ended March 31, | | % Change |
| | 2022 | 2021 | 2022 vs. 2021 |
|---|---|---|---|
| Net cash provided by operating activities | $ 6,743 | $ 27,009 | (75.0)% |
| Net cash used in investing activities | (5,965) | (13,847) | (56.9)% |
| Net cash used in financing activities | (16,336) | (31,039) | (47.4)% |
| Effect of foreign currency exchange rates on cash and cash equivalents | (1,051) | 1,356 | (177.5)% |
| Net changes in cash and cash equivalents | $ (16,609) | $ (16,521) | 0.5% |

### Net Cash Provided by Operating Activities

Net cash provided by operating activities for the six months ended March 31, 2022 was $6.7 million, a net decrease of $20.3 million, or 75.0%, from net cash provided by operating activities of $27.0 million for the six months ended March 31, 2021. The net decrease in cash provided by operating activities was primarily due to:

- A decrease of $16.2 million from income before non-cash charges;

- A decrease of $13.8 million due to unfavorable changes in working capital primarily related to cash outflows from prepaid expenses and other assets; and

- An increase of $9.6 million from changes in deferred revenue.

Deferred revenue represents a significant portion of our net cash provided by operating activities and, depending on the nature of our contracts with customers, this balance can fluctuate significantly from period to period. Fluctuations in deferred revenue are not a reliable indicator of future performance and the related revenue associated with these contractual commitments. We expect our deferred revenue balances to decrease in the future, including due to a wind-down of a legacy connected service relationship with a major OEM, since the majority of cash from the contract has been collected. We do not expect any changes in deferred revenue to affect our ability to meet our obligations.

### Net Cash Used in Investing Activities

Net cash used in investing activities for the six months ended March 31, 2022 was $6.0 million, a net change of $7.8 million, or 56.9%, from $13.8 million cash used in investing activities for the six months ended March 31, 2021. The change in cash flows were driven by:

- An increase of $9.7 million net cash inflow related to marketable securities;

- A decrease of $2.0 million related to payments for equity investments; and

- An increase of $4.8 million in capital expenditures.

### Net Cash Used in Financing Activities

Net cash used in financing activities for the six months ended March 31, 2022 was $16.3 million, a net change of $14.7 million, from cash used in financing activities of $31.0 million for the six months ended March 31, 2021. The change in cash flows were primarily due to:

- An increase of $14.2 million in payments of tax related withholdings due to the net settlement of equity awards; and

- An increase of $28.4 million in proceeds from the issuance of our common stock.

### Critical Accounting Policies, Judgments and Estimates

Our condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires us to make estimates and assumptions that have a material impact on the reported amounts of assets and liabilities and the disclosures of contingent assets and liabilities as of the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. We base our estimates and judgments on historical experience and various other factors we believe to be reasonable under the circumstances, the results of which form the basis for judgments about the carrying values of assets and liabilities and the amounts of revenues and expenses. Actual results may differ from these estimates.

41

We believe that our critical accounting policies and estimates are those related to revenue recognition; allowance for credit losses; accounting for deferred costs; accounting for internally developed software; the valuation of goodwill and intangible assets; accounting for business combinations; accounting for stock-based compensation; accounting for income taxes; accounting for leases; accounting for convertible debt; and loss contingencies. We believe these policies and estimates are critical because they most significantly affect the portrayal of our financial condition and results of operations and involve our most complex and subjective estimates and judgments. A discussion of our critical accounting policies and estimates may be found in our Annual Report on Form 10-K for the fiscal year ended September 30, 2021 in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," under the heading "Critical Accounting Policies, Judgments and Estimates" and below.

### Revenue Recognition

We primarily derive revenue from the following sources: (1) royalty-based software license arrangements, (2) connected services, and (3) professional services. Revenue is reported net of applicable sales and use tax, value-added tax and other transaction taxes imposed on the related transaction including mandatory government charges that are passed through to our customers. We account for a contract when both parties have approved and committed to the contract, the rights of the parties are identified, payment terms are identified, the contract has commercial substance and collectability of consideration is probable.

Our arrangements with customers may contain multiple products and services. We account for individual products and services separately if they are distinct-that is, if a product or service is separately identifiable from other items in the contract and if a customer can benefit from it on its own or with other resources that are readily available to the customer.

See Note 3 to the accompanying unaudited condensed consolidated financial statements for further discussion of our revenue, deferred revenue performance obligations and the timing of revenue recognition.

### Goodwill

Goodwill is reported at the reporting unit level. Upon consideration of the discrete financial information reviewed by our CODM, we have concluded that our goodwill is associated with one reporting unit.

Goodwill is not amortized but tested annually for impairment or when interim indicators of impairment are present. The test for goodwill impairment involves an assessment of impairment indicators. If indicators are present, a quantitative test of impairment is performed. During the quantitative test, the fair value of the reporting unit is compared to its carrying value. If the fair value of the reporting unit is less than the carrying value, the difference represents an impairment. If the fair value of the reporting unit is greater than the carrying value, no impairment is recognized.

On March 31, 2022, we concluded that no goodwill impairment indicators were present.

See Note 7 to the accompanying unaudited condensed consolidated financial statements for further discussion of our goodwill.

### Recently Adopted Accounting Pronouncements and Recent Accounting Pronouncements To Be Adopted

Refer to Note 2 to the accompanying unaudited condensed consolidated financial statements for a description of certain issued accounting standards that have been recently adopted and are expected to be adopted by us and may impact our results of operations in future reporting periods.

### Item 3. Quantitative and Qualitative Disclosures About Market Risk.

We are exposed to market risk from changes in foreign currency exchange rates and interest rates which could affect our operating results, financial position and cash flows. We manage our exposure to these market risks through our regular operating and financing activities, and through the use of derivative financial instruments.

### Exchange Rate Sensitivity

We are exposed to changes in foreign currency exchange rates. Any foreign currency transaction, defined as a transaction denominated in a currency other than the local functional currency, will be reported in the functional currency at the applicable exchange rate in effect at the time of the transaction. A change in the value of the functional currency compared to the foreign currency of the transaction will have either a positive or negative impact on our financial position and results of operations.

Assets and liabilities of our foreign entities are translated into U.S. dollars at exchange rates in effect at the balance sheet date and income and expense items are translated at average rates for the applicable period. Therefore, the change in the value of the U.S. dollar compared to foreign currencies will have either a positive or negative effect on our financial position and results of operations. Historically, our primary exposure has been related to transactions denominated in the Canadian dollar, Chinese yuan, Euro, and Japanese yen.

We use foreign currency forward contracts to hedge the foreign currency exchange risk associated with forecasted foreign denominated payments related to our ongoing business. The aggregate notional amount of our outstanding foreign currency forward contracts was $70.9 million at March 31, 2022. Foreign currency forward contracts are sensitive to changes in foreign currency exchange rates. A 10% unfavorable exchange rate movement in our portfolio of foreign currency contracts would have resulted in unrealized losses of $6.2 million at March 31, 2022. Such losses would be offset by corresponding gains in the remeasurement of the underlying transactions being hedged. We believe these foreign currency forward exchange contracts and the offsetting underlying commitments, when taken together, do not create material market risk.

Interest Rate Sensitivity

We are exposed to interest rate risk as a result of our cash and cash equivalents and indebtedness related to the Senior Credit Facilities.

At March 31, 2022, we held approximately $111.8 million of cash and cash equivalents consisting of cash and highly liquid investments, including money-market funds and time deposits. Assuming a 1% increase in interest rates, our interest income on our money-market funds and time deposits would increase by $0.7 million per annum, based on March 31, 2022 reported balances.

The borrowings under our Senior Credit Facilities are subject to interest rates based on LIBOR. As of March 31, 2022, assuming a 1% increase in interest rates and our Revolving Facility being fully drawn, our interest expense on our Senior Credit Facilities would increase by approximately $1.6 million per annum.

43

Item 4. Controls and Procedures.

Evaluation of disclosure controls and procedures. Under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report. Based on this evaluation, our management, including our Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were effective as of March 31, 2022 to ensure that all material information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to them as appropriate to allow timely decisions regarding required disclosure and that all such information is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

Changes in internal control over financial reporting. There were no changes in our internal control over financial reporting that occurred during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Limitations of the effectiveness of internal control. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the internal control system are met. Because of the inherent limitations of any internal control system, no evaluation of controls can provide absolute assurance that all control issues, if any, within a company have been detected.

PART II-OTHER INFORMATION

Item 1. Legal Proceedings.

City of Miami Fire Fighters' and Police Officers' Retirement Trust

On February 25, 2022, a purported shareholder class action captioned as City Of Miami Fire Fighters' And Police Officers' Retirement Trust v. Cerence Inc. et al. was filed in the United States District Court for the District of Massachusetts, naming the Company and two of its former officers as defendants. The plaintiff claims to be suing on behalf of anyone who purchased the Company's common stock between February 8, 2021 and February 4, 2022. The lawsuit alleges that material misrepresentations and/or omissions of material fact regarding the Company's operations, financial performance and prospects were made in the Company's public disclosures during the period from February 8, 2021 to February 4, 2022, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder. The plaintiff seeks unspecified monetary damages on behalf of the putative class and an award of costs and expenses, including attorney's fees. We intend to continue to defend the remaining claims vigorously. Given the uncertainty of litigation, the preliminary stage of the case, and the legal standards that must be met for, among other things, class certification and success on the merits, we cannot estimate the reasonably possible loss or range of loss that may result from this action.

Other Legal Proceedings

From time to time, we may become a party to other legal proceedings, including, without limitation, product liability claims, employment matters, commercial disputes, governmental inquiries and investigations (which may in some cases involve our entering into settlement arrangements or consent decrees), and other matters arising out of the ordinary course of our business. While the results of any legal proceeding cannot be predicted with certainty, in our opinion none of our pending matters are currently anticipated to have a material adverse effect on our consolidated financial position, liquidity or results of operations.

Item 1A. Risk Factors.

In addition to the other information set forth in this Quarterly Report, you should carefully consider the factors discussed in Part I, "Item 1A. Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended September 30, 2021, which could materially affect our business, financial condition or future results of operations. The risks described in our Annual Report on Form 10-K for the fiscal year ended September 30, 2021 are not the only risks facing our Company. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition and/or operating results. There are no material changes to the risk factors described in our Annual Report on Form 10-K for the fiscal year ended September 30, 2021, other than the risks described below.

The transition in our chief executive officer position will be critical to our success and our business could be negatively impacted if we do not successfully manage this transition.

On December 15, 2021, Stefan Ortmanns succeeded Sanjay Dhawan, as CEO and as a member of the Company's board of directors. The departure of key leadership personnel, such as a CEO, can take significant knowledge and experience from the Company. While this loss of knowledge and experience can be mitigated through a successful transition, there can be no assurance that we will be successful in such efforts. Further, if the Company's new CEO formulates different or changed views, the future strategy and plans of the Company may differ materially from those of the past. If the Company does not successfully manage this transition, it could be viewed negatively by our customers, employees or investors and could have an adverse impact on our business and strategic direction.

Pandemics or disease outbreaks, such as COVID-19, have disrupted, and may continue to disrupt, our business, which could adversely affect our financial performance.

Our business depends on, and is directly affected by, the output and sales of the global automotive industry and the use of automobiles by consumers. Pandemics or disease outbreaks, such as COVID-19, have disrupted, and may continue to disrupt, global automotive industry customer sales and production volumes. Vehicle production initially decreased significantly in China, which was first affected by COVID-19, then Europe and also the United States. Subsequent events resulted in the shutdown of manufacturing operations in China, Europe and the United States, and even though manufacturing operations have resumed, the capacity of such global manufacturing operations remains uncertain. More recently, we have seen, and anticipate that we will continue to see, supply chain challenges in the automotive industry related to semiconductor devices that are used in automobiles. As a result, we have experienced, and may continue to experience, difficulties in entering into new contracts with our customers, a decline in revenues resulting from the decrease in the production and sale of automobiles by our customers, the use of automobiles, increased difficulties in collecting payment obligations from our customers and the possibility customers will stall or not continue existing projects. These all may be further exacerbated by the global economic downturn resulting from the pandemic which could further decrease consumer demand for vehicles or result in the financial distress of one or more of our customers.

45

As the COVID-19 pandemic continues, given the elevated number of COVID-19 cases throughout the world as a result of the highly transmissible Delta and Omicron variants, our business operations could be further disrupted or delayed. The pandemic has already resulted in, and may continue to result in, work stoppages, slowdowns and delays, travel restrictions, and other factors that cause a decrease in the production and sale of automobiles by our customers. The production of automobiles with our products has been and may continue to be adversely affected with production delays and our ability to provide engineering support and implement design changes for customers may be impacted by restrictions on travel and quarantine policies put in place by businesses and governments.

The full extent to which the ongoing COVID-19 pandemic adversely affects our financial performance will depend on future developments, many of which are outside of our control, are highly uncertain and cannot be predicted, including, but not limited to, the duration and spread of the COVID-19, including variants such as Delta and Omicron, its severity, the effectiveness of actions to treat or contain the virus and its impact and how quickly and to what extent normal economic and operating conditions can resume. The COVID-19 pandemic could also result in additional governmental restrictions and regulations, which could adversely affect our business and financial results. In addition, a recession, depression or other sustained adverse market impact resulting from COVID-19 could materially and adversely affect our business, our access to needed capital and liquidity, and the value of our common stock. Even after the COVID-19 pandemic has lessened or subsided, we may continue to experience adverse impacts on our business and financial performance as a result of its global economic impact.

46

Item 6. Exhibits.

The exhibits listed on the Exhibit Index are filed as part of this Quarterly Report on Form 10-Q.

EXHIBIT INDEX

| Exhibit Index # | Exhibit Description | Filed Herewith | Incorporated by Reference | | | |
|---|---|---|---|---|---|---|
| | | | Form | File No. | Exhibit | Filing Date |
| 10.1† | Offer Letter, dated March 11, 2022, by and between Cerence Inc. and Marc Montagner | X | | | | |
| 10.2† | Change of Control and Severance Agreement, effective as of April 4, 2022, by and between Cerence Inc. and Marc Montagner | X | | | | |
| 10.3† | Transitional Services and Retirement Agreement, dated February 4, 2022, by and between Cerence Inc. and Mark Gallenberger | X | | | | |
| 10.4† | Transitional Services Agreement, dated February 2, 2022, by and between Cerence Inc. and Leanne Fitzgerald | X | | | | |
| 31.1 | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | X | | | | |
| 31.2 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | X | | | | |
| 32.1 | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | X | | | | |
| 32.2 | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | X | | | | |
| 101.INS | Inline XBRL Instance Document | X | | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | X | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | X | | | | |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | X | | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | X | | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | X | | | | |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL with applicable taxonomy extension information contained in Exhibits 101.*) | X | | | | |

†        Management contract or compensatory plan or arrangement

47

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Cerence Inc.

Date: May 10, 2022                                    By:    _____/s/ Stefan Ortmanns_____
                                                            Stefan Ortmanns
                                                            Chief Executive Officer
                                                            (Principal Executive Officer)

Date: May 10, 2022                                    By:    _____/s/ Thomas L. Beaudoin_____
                                                            Thomas L. Beaudoin
                                                            Executive Vice President and Chief Financial Officer
                                                            (Principal Financial and Accounting Officer)

48

Exhibit 10.1

Cerence Inc.
1 Burlington Woods
3rd floor, Suite # 301A
Burlington, MA 01803
USA
cerence.com



March 11, 2022
Marc Montagner
43 Chestnut Street
Boston MA 02108
Dear Marc:

Congratulations! It is with great pleasure that I confirm Cerence Operating Company's ("Cerence" or the "Company") offer of employment for the position of Executive Vice President - Chief Financial Officer. In this position, you will report to Stefan Ortmanns, the Company's Chief Executive Officer. Your work location will be 1 Burlington Woods, Burlington, MA.

Subject to the terms and conditions stated in the letter below, Cerence is pleased to offer you a compensation and benefits package with the following elements:

Base Salary and Employment Status

Your starting annual base salary for this exempt level position will be at the rate of $17,307.69, paid on a bi-weekly basis, which annualizes to $450,000.

Bonus Program

In addition to your base salary, you will be eligible to participate in the Cerence Short Term Incentive Plan ("STIP"), with a target STIP award of 75% of your base salary. The STIP coincides with Cerence's fiscal year, which is October 1st through September 30th. Payments will be made in the form of restricted stock units and/or cash. Your actual STIP award will not be prorated for fiscal year 2022. Eligibility to participate and any payment under the STIP will be at the Company's discretion, and the Company has the right to vary, suspend, revoke, or replace the STIP at any time.

Long Term Incentive Plan ("LTIP")

The Compensation Committee of the Board of Directors of Cerence has approved the following awards, effective as of, and contingent upon your commencement of employment with Cerence:

A number of restricted stock units under the Cerence 2019 Equity Incentive Plan (the "Plan") having an aggregate target value of $4,300,000. The number of restricted stock units will be calculated based on the average closing price of Cerence common stock over the trailing 20 trading days ending on the date of grant. The restricted stock units will be 75% in the form of time-based restricted stock units ("RSUs") and 25% in the form of performance-based restricted stock units ("PSUs"), as follows in (a) and (b) below:

A. 2/3rd of the RSUs will be subject to the terms and conditions for time-based restricted stock units under the Plan, all as reflected in the applicable RSU agreement and will vest as follows: one-third will vest on each of October 1, 2022, October 1, 2023, and October 1, 2024, subject to your continued service with Cerence through each vesting date.

B. 1/3rd of the RSUs will be subject to the terms and conditions for time-based restricted stock units under the Plan, all as reflected in the applicable RSU agreement and will vest as follows: 100% will cliff vest on April 4, 2025, subject to your continued service with Cerence through each vesting date.

C. PSUs: The PSUs will be subject to the terms and conditions for performance-based restricted stock units under the Plan, all as reflected in the applicable PSU agreement. The PSUs will be earned based on Company performance upon the completion of each of fiscal year 2022, 2023 and 2024 and any earned PSUs vest in full upon the completion of fiscal year 2024, subject to your continued service with Cerence though such date.

You will also be eligible for an annual LTIP award in November 2022 with a target value of $2,750,000.

Please note that any equity awards granted to you are subject to the terms of the Plan (or any successor plan) and the applicable grant agreement.

Benefits

Cerence offers affordable health care, income protection, and benefits that provide peace of mind now and in the future. If you are regularly scheduled to work thirty (30) hours or more per week, you are eligible for benefits on day one. The benefit programs you are eligible for as a Cerence employee will be provided during the New Hire On-boarding process.

Paid Time-Off

Cerence provides 12 days off for holidays throughout the calendar year. Additionally, you will be entitled to four (4) weeks' paid time off, which is accrued on a bi-weekly basis commencing on your first day of employment.

Background Check

Your employment is contingent upon satisfactory completion of a background check, which includes, at a minimum, a review of criminal records, and verification of your education. You will be contacted via email by Cerence's vendor during the onboarding process to complete the process.

Change of Control and Severance Agreement

The Compensation Committee has approved the terms of the enclosed Change in Control and Severance Agreement (the "Severance Agreement"), which shall become effective upon the Effective Date, as defined in the Severance Agreement.

2

<u>Taxes</u>

All forms of compensation are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law. You are encouraged to obtain your own tax advice regarding your compensation from the Company. You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities.

<u>Terms and Conditions</u>

Your employment with Cerence will be "at will", meaning that either you or Cerence will be entitled to terminate your employment at any time and for any reason, with or without cause, subject to the terms of the Severance Agreement, if applicable.  Any contrary representations which may have been made to you are superseded by this offer. This Offer Letter ("Offer") and any other agreement referenced herein, along with the Confidential Information, Inventions and Non-Competition Agreement ("CIIN"), which you are required to sign as a condition of employment, are the full and complete agreement between you and Cerence. Although your job duties, title, compensation, and benefits, as well as Cerence personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of Cerence.

This Offer is contingent upon your satisfying the conditions of hire, including the following:

- Completing and signing an Employment Application in full
- Completing the Employment Eligibility Verification; presenting proof of eligibility to work in the United States
- Executing the Cerence standard Confidential Information, Inventions and Noncompetition Agreement - received upon start
- Passing a Background Check

Finally, this Offer is conditioned on your not being subject to any confidentiality or non-competition agreement or any other similar type of restriction that would affect your ability to devote full time and attention to your work at Cerence. If you have previously entered into such an agreement, please provide me with a copy as soon as possible. You're accepting this Offer and not presenting me with a copy of an agreement containing a confidentiality or non-competition agreement or any other similar type of restriction indicates that no such agreement exists.

This letter, together with any other agreement referenced herein, sets forth the entire agreement and understanding between you and the Company relating to your employment and supersedes all prior agreements, understandings and discussions.

Marc, please confirm your acceptance of our Offer by signing this Offer Letter, indicating your anticipated start date and returning it via DocuSign.

If you have further questions regarding our offer, please contact me at (781) 265-8590. On behalf of the Company, I wish you a long and rewarding career with Cerence.

3

Sincerely,
/s/ Sachin Sahney
Sachin Sahney
SVP Chief Human Resources Officer

I ACCEPT THE OFFER OF EMPLOYMENT AS STATED ABOVE:
/s/ Marc Montagner _____ _ March 14, 2022_____
Signature                              Date of Acceptance
_____A    p    r    i    l      4  ,
2022_____
Tentative Start Date

4

Exhibit 10.2

## CERENCE INC.
## CHANGE OF CONTROL AND SEVERANCE AGREEMENT

This Change of Control and Severance Agreement (the "Agreement") is made and entered into by and between Marc Montagner ("Executive") and Cerence Inc., a Delaware corporation (the "Company"), effective as of the later of (i) the latest date on the signature page of this Agreement and (ii) the date Executive's employment with the Company commences (the "Effective Date").

### RECITALS

1.          The Compensation Committee (the "Committee") of the Board of Directors of the Company (the "Board") has determined that it is in the best interests of the Company and its shareholders to assure that the Company will have the continued dedication and objectivity of Executive, notwithstanding the possibility, threat, or occurrence of a Change of Control.

2.          The Committee believes that it is imperative to provide Executive with severance benefits upon Executive's termination of employment under certain circumstances to provide Executive with enhanced financial security, incentive and encouragement to remain with the Company.

3.          Certain capitalized terms used in the Agreement and not otherwise defined are defined in Section 7 below.

### AGREEMENT

NOW, THEREFORE, in consideration of Executive's continued employment and the mutual covenants contained herein, the parties hereto agree as follows:

1.          Term of Agreement.  Subject to the provisions for earlier termination set forth herein, the term of the Executive's employment hereunder shall commence as of the Effective Date and shall continue through the third anniversary of the Effective Date (the "Initial Term"). The Initial Term will automatically renew for additional, successive one (1) year periods (each, a "Renewal Term") unless either party provides written notice of such party's intent not to continue this Agreement no less than ninety (90) days prior to the expiration of the Initial Term or the Renewal Term, as applicable (the Initial Term together with any Renewal Terms, if applicable, shall be referred to herein as the "Term"). The Company and the Executive agree that if the Company adopts an executive severance and change of control plan (a "Severance Plan") with economic terms that are at least as favorable as the terms in this Agreement, this Executive will waive his rights under this Agreement in exchange for participating in the Severance Plan and the Term of this Agreement will end.

2.          At-Will Employment.  The Company and Executive acknowledge that Executive's employment is and will continue to be at-will, as defined under applicable law, except as otherwise specifically provided under the terms of a written employment agreement between the Company and Executive.

3.      Severance Benefits.

(a)                    Termination Other than During Change of Control Period. If Executive's employment with the Company and its subsidiaries is terminated by the Company other than for Cause and for a reason other than due to Executive's death or Disability (as defined in Section 3(e) below), and such termination occurs outside the Change of Control Period, then, subject to Section 4 and the other provisions of this Agreement, Executive will receive from the Company:

(i)                    Base Salary Severance.  A cash severance payment equal to one hundred percent (100%) of Executive's annual base salary as in effect immediately prior to the termination date, which shall be paid out in substantially equal installments in accordance with the Company's payroll practice over 12 months.

(ii)                   Target Bonus Severance.  A lump sum cash severance payment equal to one hundred (100%) of Executive's target bonus and a prorated percentage of Executive's target bonus as in effect for the fiscal year that includes the termination date.  For purposes of the preceding sentence, proration will be determined by dividing the number of days during the fiscal year for which Executive remained an employee of the Company, by three hundred and sixty-five (365).  If Executive's target bonus for the fiscal year including the termination date has not been set as of the termination date, Executive instead will receive a prorated percentage of the target bonus for the immediately preceding fiscal year.

(iii)                  Time-Based Equity Awards.  Vesting of the portion of each (if any) of Executive's outstanding and unvested equity awards covering shares of the Company's common stock that are subject solely to time-based vesting (excluding any awards subject to performance- based vesting) (such awards "Time-Based Awards") that are scheduled to vest during the twelve (12)-month period following Executive's termination date.

(iv)                  Performance-Based Equity Awards. Vesting of the earned portion of any of Executive's outstanding and unvested equity awards subject to performance-based vesting (excluding any Time-Based Awards) (such awards, "Performance-Based Awards") for which the performance period is complete as of the termination date.

(v)                   Continued Employee Benefits.  Continuation coverage under the terms of the Company medical benefit plan pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), for Executive and/or Executive's eligible dependents, subject to Executive timely electing COBRA coverage.  Until the earliest of (A) twelve (12) months from the date of Executive's termination, (B) Executive's eligibility for group medical plan benefits under any other employer's group medical plan, or (C) the cessation of Executive's continuation rights under COBRA, the Company will pay directly on Executive's behalf the monthly COBRA premiums (at the coverage levels in effect for active employees of the Company). For the avoidance of doubt, the direct payment of any COBRA premiums will be reported as taxable income and subject to any applicable tax withholdings. Notwithstanding the foregoing, if the Company determines in its sole discretion that it cannot provide the foregoing benefit without potentially violating, or being subject to an excise tax under, applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company will in lieu thereof provide payroll payments of the applicable premium amounts directly to Executive

2

for the time period specified above. Such payments shall be paid on the Company's regular payroll dates. For the avoidance of doubt, the taxable payment in lieu of COBRA reimbursements may be used for any purpose, including, but not limited to, continuation coverage under COBRA, and will be subject to all applicable tax withholdings.

(b)                              Termination Following a Change of Control.  If during the Change of Control Period (i) Executive's employment with the Company and its subsidiaries is terminated by the Company other than for Cause and for a reason other than due to Executive's death or Disability or (ii) Executive resigns for Good Reason, then, subject to Section 4 and the other provisions of this Agreement, Executive will receive from the Company:

(i)                              Base Salary Severance.  A lump sum cash severance payment equal to one hundred and fifty percent (150%) of Executive's annual base salary as in effect immediately prior to the termination date (or, if greater, as in effect immediately prior to the Change of Control).

(ii)                              Target Bonus Severance.  A lump sum cash severance payment equal to one hundred and fifty percent (150%) of Executive's target bonus for the year in which Executive's termination occurs (or, if greater, as in effect immediately prior to the Change of Control) and a prorated percentage of Executive's target bonus as in effect for the fiscal year that includes the termination date (or, if greater, as in effect immediately prior to the Change of Control). For purposes of the preceding sentence, proration will be determined by dividing the number of days during the fiscal year for which Executive remained an employee of the Company, by three hundred and sixty-five (365).

(iii)                              Continued Employee Benefits.  Continuation coverage under the terms of the Company medical benefit plan pursuant to COBRA for Executive and/or Executive's eligible dependents, subject to Executive timely electing COBRA coverage.  Until the earliest of

(A) eighteen (18) months from the date of Executive's termination, (B) Executive's eligibility for group medical plan benefits under any other employer's group medical plan, or (C) the cessation of Executive's continuation rights under COBRA, the Company will pay directly on Executive's behalf the monthly COBRA premiums (at the coverage levels in effect for active employees of the Company). For the avoidance of doubt, the direct payment of any COBRA premiums will be reported as taxable income and subject to any applicable tax withholdings. Notwithstanding the preceding provision, if the Company determines in its sole discretion that it cannot provide the foregoing benefit without potentially violating, or being subject to an excise tax under, applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company will in lieu thereof provide payroll payments of the applicable premium amounts directly to Executive for the time period specified above.  Such payments shall be paid on the Company's regular payroll dates.  For the avoidance of doubt, the taxable payment in lieu of COBRA reimbursements may be used for any purpose, including, but not limited to, continuation coverage under COBRA, and will be subject to all applicable tax withholdings.

(iv)                              Vesting of Time-Based Equity Awards.  One hundred percent (100%) of Executive's outstanding and unvested Time-Based Awards will become vested in full.

(v)                              Vesting of Performance-Based Equity Awards.  Executive's outstanding and unvested Performance-Based Awards shall become vested based on actual

3

performance through Executive's termination date, if measurable, and based upon target performance if performance is not measurable as of Executive's termination date.

(vi)                                          Except as provided in Sections 3(a)(iv) and 3(b)(v), all Performance-Based Awards remain subject to the terms of the Company's 2019 Equity Incentive Plan or any successor thereto and the applicable award agreement.

(c)                                 Voluntary Resignation; Termination for Cause. If Executive's employment with the Company and its subsidiaries terminates in a voluntary resignation (other than for Good Reason during the Change of Control Period), or if Executive's employment is terminated for Cause, then Executive shall not be entitled to receive severance or other benefits except as otherwise provided by applicable law.

(d)                                 Termination for Death or Disability.  Except as otherwise provided in the award agreement for any Time-Based Award, if Executive's employment with the Company and its subsidiaries terminates on account of Executive's death or absence from work due to a disability for a period in excess of one hundred and eighty (180) days in any twelve (12)-month period that qualifies for benefits under the Company's long-term disability program ("Disability"), one hundred percent (100%) of Executive's outstanding and unvested Time-Based Awards will become vested provided; however, with respect to that certain Time-Based Equity Award granted to Executive on April 4, 2022 (the "New Hire RSU Award"), only the portion of the New Hire RSU Award that is scheduled to vest during the twelve (12)-month period following Executive's termination date shall vest upon Executive's death or Disability.  In the case of a termination for Disability, vesting under this Section 3(e) will be subject to Executive's compliance with Section 4 and the other provisions of this Agreement.

(e)                                 Accrued Amounts.  Without regard to the reason for, or the timing of, Executive's termination of employment, the Company shall pay Executive: (i) any unpaid base salary due for periods prior to the date of termination, (ii) accrued and unused vacation, as required under the applicable Company policy, and (iii) all expenses incurred by Executive in connection with the business of the Company prior to the date of termination in accordance with the Company's business expense reimbursement policy.  These payments shall be made promptly upon termination and within the period of time mandated by law.

(f)                                 Exclusive Remedy.  In the event of termination of Executive's employment as set forth in Section 3 of this Agreement during the Term, the provisions of Section 3 are intended to be and are exclusive and in lieu of any other rights or remedies to which Executive or the Company may otherwise be entitled, whether at law, tort or contract, in equity, or under this Agreement (other than the payment of accrued but unpaid wages, as required by law, or any unreimbursed reimbursable expenses).  During the Term of this Agreement, Executive will be entitled to no benefits, compensation or other payments or rights upon termination of employment, including under any offer letter or other agreement with the Company, other than those benefits expressly set forth in Section 3 of this Agreement.

(g)                                 Transfer between Company and any Subsidiary.  For purposes of this Section 3, if Executive's employment relationship with the Company or any parent or subsidiary of the Company ceases, Executive will not, solely by virtue thereof, be determined to have been

4

terminated without Cause for purposes of this Agreement if Executive continues to remain employed by the Company or any subsidiary of the Company immediately thereafter (e.g., upon transfer of Executive's employment from the Company to a Company subsidiary or from a Company subsidiary to the Company).

4.    Conditions to Receipt of Severance

(a)    Release of Claims Agreement.  The receipt of any severance payments or benefits in Section 3 pursuant to this Agreement is subject to Executive signing and not revoking a separation agreement that includes without limitation, if requested by the Company, a non- competition covenant that applies for up to twelve (12) months following Executive's termination of employment, a non-solicitation covenant that applies for up to twelve (12) months following Executive's termination of employment, non-disparagement and reasonable post-termination cooperation obligations of Executive and a release of claims, all in the form provided by the Company, which must become effective and irrevocable no later than the sixtieth (60th) day following Executive's termination of employment (the "Release Deadline").  If such separation agreement does not become effective and irrevocable by the Release Deadline, Executive will forfeit any right to severance payments or benefits under this Agreement.  Any cash severance payments or benefits otherwise payable to Executive in a lump sum or otherwise between the termination date and the Release Deadline will be paid on or within fifteen (15) days (or such earlier date for such payment to qualify as a short-term deferral for purposes of Section 409A) following the Release Deadline, or, if later, such time as required by Section 5(a) and, notwithstanding anything to the contrary in the applicable equity plan or award agreement, to the extent permitted under Section 409A, any equity awards that become vested in connection with Executive's termination of employment under this Agreement shall not be settled or become exercisable, as applicable, until the separation agreement becomes effective in accordance with its terms. In no event will any severance payments or benefits be paid or provided until the separation agreement actually becomes effective and irrevocable and, if the separation agreement does not become effective in accordance with its terms on or prior to the Release Deadline, Executive's entitlement to any such severance payments and benefits under this Agreement shall be forfeited on the Release Deadline for no consideration payable to Executive.

(b)    Proprietary Information and Non-Competition Agreement.  Executive's receipt of any severance payments or benefits under Section 3 will be subject to Executive continuing to comply with the terms of any agreements between Executive and the Company concerning inventions, confidentiality, or restrictive covenants (the "Confidentiality Agreement").

5.    Section 409A.

(a)    Notwithstanding anything to the contrary in this Agreement, no Deferred Payments will be paid or otherwise provided until Executive has a "separation from service" within the meaning of Section 409A.  Similarly, no severance payable to Executive, if any, pursuant to this Agreement that otherwise would be exempt from Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(9) will be payable until Executive has a "separation from service" within the meaning of Section 409A.  In addition, if Executive is a "specified employee" within the meaning of Section 409A at the time of Executive's separation from service (other than due to death), then the Deferred Payments, if any, that are payable within the first six

5

(6) months following Executive's separation from service, will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of Executive's separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if Executive dies following Executive's separation from service, but before the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this paragraph will be payable in a lump sum as soon as administratively practicable after the date of Executive's death and all other Deferred Payments will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment and benefit payable under this Agreement is intended to constitute a separate payment under Section 1.409A-2(b)(2) of the Treasury Regulations.

(b)         Any amounts paid under this Agreement that satisfy the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations will not constitute Deferred Payments for purposes of this Agreement.

(c)         Any amounts paid under this Agreement that qualify as payments made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations that does not exceed the Section 409A Limit (as defined below) will not constitute Deferred Payments for purposes of this Agreement.

(d)         Payments under this Agreement are intended to comply with, or be exempt from, the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities or ambiguous terms herein will be interpreted to so comply. Specifically, the payments hereunder are intended to be exempt from the Requirements of Section 409A under the "short-term" deferral rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations or as payments made as a result of an involuntary separation from service, as applicable. The Company and Executive agree to work together in good faith to consider amendments to this Agreement and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition before actual payment to Executive under Section 409A. The Company makes no representation or warranty to Executive and in no event will the Company reimburse Executive or any other person for any taxes or other costs that may be imposed on Executive as a result of Section 409A or any other law.

6.         Limitation on Payments. In the event that the severance and other benefits provided for in this Agreement or otherwise payable to Executive (i) constitute "parachute payments" within the meaning of Section 280G of the Code, and (ii) would be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), then Executive's benefits under this Agreement shall be either:

(a)         delivered in full, or

(b)         delivered as to such lesser extent which would result in no portion of such benefits being subject to the Excise Tax,

6

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the Excise Tax, results in the receipt by Executive on an after-tax basis, of the greatest amount of benefits, notwithstanding that all or some portion of such benefits may be taxable under Section 4999 of the Code. If a reduction in severance and other benefits constituting "parachute payments" is necessary so that benefits are delivered to a lesser extent, reduction will occur in the following order: (1) reduction of cash payments, (2) cancellation of equity awards granted within the twelve (12)-month period prior to a "change of control" (as determined under Code Section 280G) that are deemed to have been granted contingent upon the change of control (as determined under Code Section 280G), (3) cancellation of accelerated vesting of equity awards and (4) reduction of continued employee benefits. In the event that accelerated vesting of equity awards is to be cancelled, such vesting acceleration will be cancelled in the reverse chronological order of the award grant dates.

Unless the Company and Executive otherwise agree in writing, any determination required under this Section shall be made in writing by the Company's independent public accountants (the "Accountants"), whose determination shall be conclusive and binding upon Executive and the Company for all purposes. For purposes of making the calculations required by this Section, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Section 280G and 4999 of the Code. The Company and Executive shall furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section. The Company shall bear all costs the Accountants may reasonably incur in connection with any calculations contemplated by this Section.

7.          Definition of Terms. The following terms referred to in this Agreement will have the following meanings:

(a)                      Cause. "Cause" means (i) any act of dishonesty or fraud taken by Executive in connection with his or her responsibilities as an employee other than immaterial, inadvertent acts that, if capable of cure, are promptly remedied by Executive following notice by the Company, (ii) Executive's breach of the fiduciary duty or duty of loyalty owed to the Company, or material breach of the duty to protect the Company's confidential and proprietary information, (iii) Executive's commission of, conviction of or plea of guilty or nolo contendere to (A) any felony or to (B) a crime misdemeanor involving fraud, embezzlement, misappropriation of funds or any other act of moral turpitude, (iv) Executive's gross negligence or willful misconduct in the performance of his or her duties, (v) Executive's material breach of this Agreement or any other agreement with the Company or any material written policy of the Company; (vi) Executive's engagement in conduct or activities that result, or are reasonably likely to result, in negative publicity or public disrespect, contempt or ridicule of the Company that the Board reasonably believes will have a demonstrably injurious effect on the reputation or business of the Company or Executive's ability to perform his or her duties (but excluding conduct and activities undertaken in good faith by Executive in the ordinary course of performing his or her duties or promoting the Company); (vii) Executive's failure to abide by the lawful and reasonable directives of the Company (other than any failure to achieve a lawful and reasonable directive following the expenditure by Executive of commercially reasonable best efforts); or (viii) Executive's repeated failure to materially perform the primary duties of Executive's position.

7

Change of Control. "Change of Control" shall have the meaning specified in the Company's 2019 Equity Incentive Plan or any successor thereto.

(b)                Change of Control Period. "Change of Control Period" means the period beginning on a Change of Control and ending on the one-year anniversary of the Change of Control.

(c)        Code. "Code" means the Internal Revenue Code of 1986, as amended.

(d)                Deferred Payments. "Deferred Payments" means any severance pay or benefits to be paid or provided to Executive, if any, pursuant to this Agreement that, in each case, are or when considered together with any other severance payments or separation benefits are, deemed to be "non-qualified deferred compensation" within the meaning of Section 409A.

(e)                Exchange Act. "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(f)                Good Reason. "Good Reason" means Executive's termination of employment within thirty (30) days following the expiration of any Cure Period (discussed below) following the occurrence of one or more of the following, without Executive's express written consent: (i) a material reduction in Executive's duties, authority or responsibilities (other than during a period of Executive's incapacity due to physical or mental illness); (ii) a material reduction by the Company in the annual base compensation or target bonus opportunity (as a percentage of base salary) of Executive as in effect immediately prior to such reduction provided, however, that one or more reductions in base compensation or target bonus opportunity applicable to all executives generally that, cumulatively, total ten percent (10%) or less in base compensation and/or ten (10) percentage points or less in target bonus opportunity will not constitute a material reduction for purposes of this clause (ii); (iii) the relocation of Executive to a facility or a location more than fifty (50) miles from Executive's then present location; or (iv) a material breach by the Company of this Agreement or any equity award agreement between Company and Executive. In order for an event to qualify as Good Reason, Executive must not terminate employment with the Company without first providing the Company with written notice of the acts or omissions constituting the grounds for "Good Reason" within ninety (90) days of the initial existence of the grounds for "Good Reason" and the Company shall have failed to cure during a period of thirty (30) days following the date of such notice (the "Cure Period") and Executive shall terminate employment within sixty (60) days after the end of the Cure Period.

(g)                Section 409A. "Section 409A" means Section 409A of the Code and the final Treasury Regulations and any official Internal Revenue Service guidance promulgated thereunder.

(h)                Section 409A Limit. "Section 409A Limit" means two (2) times the lesser of: (i) Executive's annualized compensation based upon the annual rate of pay paid to Executive during Executive's taxable year preceding Executive's taxable year of Executive's termination of employment as determined under, and with such adjustments as are set forth in, Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (ii) the maximum amount that may be taken into account under a qualified plan

8

pursuant to Section 401(a)(17) of the Code for the year in which Executive's employment is terminated.

8.        Assignment. Neither Executive nor the Company may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, that the Company may assign its rights and obligations under this Agreement without Executive's consent to any affiliate or to any person or entity with whom the Company shall hereafter effect a reorganization, consolidate with, or merge into or to whom it transfers all or substantially all of its properties or assets; provided further that if Executive remains employed or become employed by the Company, the purchaser or any of their affiliates in connection with any such transaction, then Executive shall not be entitled to any payments, benefits or vesting pursuant to this Agreement, except as expressly provided in Sections 3(a) and 3(b).  This Agreement shall inure to the benefit of and be binding upon Executive and the Company, and each of Executive's and the Company's respective successors, executors, administrators, heirs and permitted assigns.

9.        Notice.

(a)        General.  Notices and all other communications contemplated by this Agreement will be in writing and will be deemed to have been duly given when personally delivered, when mailed by U.S. registered or certified mail, return receipt requested and postage prepaid, or when delivered by private courier service such as UPS or Federal Express that has tracking capability.  In the case of Executive, mailed notices will be addressed to him or her at the home address which he or she most recently communicated to the Company in writing.  In the case of the Company, mailed notices will be addressed to its corporate headquarters, and all notices will be directed to the Chief Executive Officer and General Counsel of the Company.

(b)        Notice of Termination.  Any termination by the Company for Cause or by Executive for Good Reason will be communicated by a notice of termination to the other party hereto given in accordance with Section 9(a) of this Agreement.  Such notice will indicate the specific termination provision in this Agreement relied upon, will set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination under the provision so indicated, and will specify the termination date (which will be not more than thirty (30) days after the giving of such notice or any shorter period required herein).

10.        Resignation.  Upon the termination of Executive's employment for any reason, Executive will be deemed to have resigned from all officer and/or director positions held at the Company and its affiliates voluntarily, without any further required action by Executive, as of the end of Executive's employment and Executive, at the Board's request, will execute any documents reasonably necessary to reflect Executive's resignation.

11.        Miscellaneous Provisions.

(a)        No Duty to Mitigate.  Executive will not be required to mitigate the amount of any payment contemplated by this Agreement (whether by seeking new employment or in any other manner), nor shall any such payment be reduced by any earnings that Executive may receive from any other source.

9

(b)                    Waiver.  No waiver by either party of any breach of, or of compliance with, any condition or provision of this Agreement by the other party will be considered a waiver of any other condition or provision or of the same condition or provision at another time.

(c)                    Headings.  All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

(d)                    Entire Agreement.  This Agreement and the Confidentiality Agreement constitute the entire agreement of the parties hereto with respect to the subject matter hereof and thereof.  This Agreement supersedes, replaces in their entirety and terminates any prior representations, understandings, undertakings or agreements between the Company and Executive, whether written or oral and whether expressed or implied, that provided any benefits to Executive upon termination of Executive's employment for any reason. Nothing in this Agreement shall result in a duplication of severance payments or benefits under any other plan, program or arrangement with the Company. No waiver, alteration, or modification of any of the provisions of this Agreement will be binding unless in writing and signed by duly authorized representatives of the parties hereto and which specifically mention this Agreement.  For the avoidance of doubt, it is the intention of the parties that the provisions of this Agreement providing for acceleration or other modification of the vesting provisions of equity awards are intended to supersede the vesting provisions of any equity awards that are outstanding during the term of this Agreement (except as otherwise explicitly provided in the applicable award agreement).

(e)                    Clawback Provisions. Notwithstanding any other provision in this Agreement to the contrary, Executive agrees that incentive-based compensation or other amounts paid to Executive pursuant to this Agreement or any other agreement or arrangement with Company will be subject to clawback under any Company clawback policy that is applicable to all senior executives of Company (including any such policy adopted by Company pursuant to applicable law, government regulation or stock exchange listing requirement).

(f)                    Governing Law.  This Agreement shall be governed by the laws of the Commonwealth of Massachusetts (without giving effect to the conflict of laws principles thereof), and the Company and Executive each consent to personal and exclusive jurisdiction and venue in the Commonwealth of Massachusetts.

(g)                    Severability.  The invalidity or unenforceability of any provision or provisions of this Agreement will not affect the validity or enforceability of any other provision hereof, which will remain in full force and effect.

(h)                    Withholding.                    All payments made pursuant to this Agreement will be subject to withholding of applicable income, employment and other taxes.

(i)                    Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

10

DocuSign Envelope ID: 43D029DE-3A48-417A-9DAA-D0F7E34EF714

IN WITNESS WHEREOF, each of the parties has executed this Change of Control and Severance Agreement, in the case of the Company by its duly authorized officer, as of the day and year set forth below.

COMPANY                              CERENCE INC.

By:        /s/ Sachin Sahney Sachin Sahney

Title: Chief Human Resources Officer

Date:        11-Mar-22

EXECUTIVE                                By:                                              /s/ Marc Montagner

                                   Marc Montagner

Title: Chief Financial Officer

Date:        11-Mar-22

Exhibit 10.3

TRANSITIONAL SERVICES AND RETIREMENT AGREEMENT

This Transitional Services and Retirement Agreement (this "Agreement") is entered into between Mark Gallenberger (the "Executive") and Cerence Inc., a Delaware corporation (the "Company," and together with the Executive, the "Parties").

WHEREAS, the Executive currently serves as the Company's Chief Financial Officer ("CFO");

WHEREAS, the Executive and the Company entered into the Change of Control and Severance Agreement dated December 19, 2019 ("Severance Agreement");

WHEREAS, the Executive has elected to retire from employment with the Company effective March 11, 2022 (the "Anticipated Retirement Date"), which is a voluntary resignation for purposes of the Severance Agreement and, therefore, the Executive is not entitled to severance pay, benefits or vesting pursuant to the Severance Agreement or otherwise;

WHEREAS, the Company's Board of Directors (the "Board") appreciates the Executive's past and anticipated future contributions and wishes to make this transition as smooth as possible;

WHEREAS, the Board has determined that it is in the best interest of the Company for the Executive to be available during the Advisory Period (as defined below) to provide transitional assistance to the Company; and

WHEREAS, the Executive and the Board wish to enter into this Agreement to set forth the terms of the Executive's continued services to the Company during the Advisory Period.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Transition; Period; Position; Duties.

        a.              Period. The Executive's employment with the Company will continue through the Separation Date (as defined below), at which time it will end. The time period between the date the Executive receives this Agreement and the Separation Date is the "Transition Period". The Transition Period will continue through the close of business on March 11, 2022 unless (i) the Executive's employment is terminated earlier (A) by the Company for Cause, (B) due to the Executive's death or Disability (all as defined in the Severance Agreement), or (C) by the Executive (such actual last day of employment, the "Separation Date").

        b.              Position. During the Transition Period, the Executive shall continue to serve as the Company's CFO, unless otherwise determined by the Board. Any change to the Executive's duties as set forth herein shall not constitute Good Reason as defined in and for purposes of the Severance Agreement, and the Executive hereby waives the application of Good Reason to his employment through the Separation Date.

c.    Duties. During the Transition Period, the Executive shall continue to report to the Company's Chief Executive Officer (the "CEO") and shall have the duties and responsibilities as reasonably determined by the CEO. The Executive will work cooperatively with the Company's senior leadership team and the finance team during the Transition Period.

2.    Compensation During the Transition Period.

a.    Salary. During the Transition Period, the Company will continue to pay the Executive at his current base salary rate (the "Base Salary"), payable in accordance with the Company's normal payroll practices, subject to tax withholding under applicable law.

b.    Expenses. The Executive shall be entitled to receive reimbursement for all reasonable business expenses incurred by him during the Transition Period in performing services hereunder, in accordance with the policies and procedures then in effect and established by the Company.

c.    Other Benefits. During the Transition Period, the Executive shall continue to be eligible to participate in or receive benefits under the Company's retirement, health, welfare and fringe benefit plans for employees in effect from time to time, subject to the terms and conditions of such plans.

3.    Ending of Employment Relationship.

a.    The Executive's employment will end on the Separation Date.

b.    On the Separation Date or promptly thereafter within the period of time mandated by law, the Executive will receive the Accrued Amounts set forth in Section 3(f) of the Severance Agreement: (i) any unpaid base salary due for periods prior to the Separation Date; (ii) accrued and unused vacation, as required under the applicable Company policy; and (iii) all expenses incurred by the Executive in connection with the business of the Company prior to the Separation Date in accordance with the Company's business expense reimbursement policy. Except as set forth in Section 4(d) below, the Executive will cease vesting in his outstanding, unvested equity awards on the Separation Date.

c.    On the Separation Date, or earlier if requested by the Board, the Executive will be deemed to have resigned from all officer and board member positions that the Executive holds with the Company or any of its respective subsidiaries and affiliates. Promptly following the Separation Date, the Company shall take all steps necessary or appropriate to remove the Executive from all such positions. During the Advisory Period, the Executive shall execute any documents in reasonable form as may be reasonably requested by the Company to confirm or effectuate any such resignations.

d.    If the Executive's employment ends prior to the Anticipated Retirement Date in accordance with this Agreement, the following terms shall apply: if the Company terminates the Executive's employment for Cause, or the Executive resigns, the Executive will receive the Accrued Amounts, cease vesting in his equity awards as of the Separation Date and

2

will not be eligible for the Advisory Period.  If the Executive's employment ends due to his death or Disability, the terms of the Employment Agreement will govern with respect to the ending of his employment and he will not be eligible for the Advisory Period. For purposes of clarity, these are the only reasons the Executive's employment can end before the Anticipated Retirement Date.

4.        Advisory Period.

a.                On the Separation Date, provided that the Executive (i) enters into, does not revoke and complies with this Agreement, and (ii) continues to comply with any agreement between the Executive and the Company concerning inventions, confidentiality or restrictive covenants ((i) and (ii) together, the "Conditions"), the Executive shall be retained by the Company as an independent contractor, with no break in service relationship solely for purposes of continued vesting in the Specified Equity Awards (as defined below). The Executive shall continue to serve as an independent contractor of the Company until November 15, 2022, unless the Executive sooner resigns or unless the Company sooner terminates the consulting arrangement for a material breach by the Executive of any of the Condition(s) (which termination by the Company shall be permitted only after the Executive is notified in writing of the alleged material breach and, if the breach is curable, the Executive receives a reasonable opportunity to cure such breach) (the period of independent contractor service under this Agreement being the "Advisory Period").

b.                During the Advisory Period, the Executive shall be available on an as-requested basis to assist with the transition, to provide advisory services with respect to financial matters (the "Services"). The Executive agrees that other than in the course of providing the Services, he will not use or disclose any confidential information of the Company or any third party to which the Company owes a duty of confidentiality. This confidentiality obligation is in addition to, and not in lieu of, the Confidentiality Agreement (as defined in the Severance Agreement) and any other ongoing confidentiality obligations the Executive has to Company. The Executive shall continue to be subject to the Company's Insider Trading Policy to the extent applicable.

c.                During the Advisory Period, the Executive shall no longer be an employee of the Company, but shall be retained as an independent contractor and shall have no authority to bind the Company. The Executive shall not be eligible to participate in any vacation, group medical or life insurance, disability, profit sharing or retirement benefits, or any other fringe benefits or benefit plans offered by Company to its employees (except that the last day of the Executive's participation in the Company's group medical plan will be March 31, 2022 and thereafter the Executive may elect continuation coverage as provided by applicable law, which will be entirely at his own expense). The Executive shall bear sole responsibility for all taxes, insurance and benefits relating to the provision of services under this Agreement during the Advisory Period and shall indemnify and hold the Company harmless from and against any liability with respect thereto (it being understood that the Company remains responsible for all such amounts that ordinarily are allocable to the employer with respect to the period of the Executive's employment with the Company (for example, but not by way of limitation, the employer portion of FICA)).

d.                As the sole consideration for the Services, during the Advisory Period, the Executive shall continue to vest in the following "Specified Equity Awards": the portion of any restricted stock units ("RSUs") and performance-based restricted stock units ("PSUs") held by the

3

Executive that are scheduled to vest on October 1, 2022 and November 15, 2022 if the Executive remains in a service relationship with the Company through the applicable vesting dates, with the performance metrics applicable to the PSUs held by the Executive to be determined based on actual achievement of target levels.  For the avoidance of doubt, the scheduled vesting dates and amounts of the Specified Equity Awards (listed by vesting date) are:

> October 1, 2022: 28,735 RSUs
>
> October 1, 2022: 3,469 RSUs
>
> November 15, 2022: 28,734 PSUs (this number assumes 100% target achieved, but number of shares that will actually vest on November 15 will be based on actual performance)
>
> November 15, 2022: 3,469 PSUs (this number assumes 100% target achieved, but number of shares that will actually vest on November 15 will be based on actual performance)

The Executive's Services will be a continued service relationship with the Company solely for purposes of the equity award agreements applicable to the Specified Equity Awards and the Company's 2019 Equity Incentive Plan (as may be amended form time to time, the "Plan", and, collectively along with all of Executive's applicable award agreements, the "Equity Documents"). Notwithstanding anything to the contrary in any equity award agreement, equity incentive plan or otherwise, any portion of any equity award held by the Executive and not included in the definition of Specified Equity Awards (including, without limitation, the Executive's RSUs and PSUs that are scheduled to vest after November 15, 2022) shall cease vesting on the Separation Date. Except as modified herein, the Equity Documents are in full force and effect.

The Executive acknowledges that without this Agreement, the Executive is otherwise not entitled to continue vesting in the Specified Equity Awards beyond the Separation Date. The Executive further acknowledges that he will not receive any additional equity awards or any other compensation during the Advisory Period.

5.  General Release of Claims.  In consideration for the opportunity to continue the Executive's employment during the Transition Period and the opportunity to continue his service relationship with the Company during the Advisory Period in order to continue vesting in the Specified Equity Awards, to which the Executive acknowledges he would otherwise not be entitled, the Executive voluntarily releases and forever discharges the Company, its affiliated and related entities, its and their respective predecessors, successors and assigns, its and their respective employee benefit plans and fiduciaries of such plans, and the current and former officers, directors, shareholders, employees, attorneys, accountants and agents of each of the foregoing in their official and personal capacities (collectively referred to as the "Releasees") generally from all claims, demands, debts, damages and liabilities of every name and nature, known or unknown ("Claims") that, as of the date when the Executive signs this Agreement, the Executive has, ever had, now claims to have or ever claimed to have had against any or all of the Releasees. This release includes, without limitation, all Claims:

- relating to the Executive's employment by and termination of employment with the Company;
- of wrongful discharge or violation of public policy;

4

- of breach of contract;
- of defamation or other torts;
- of retaliation or discrimination under federal, state or local law (including, without limitation, Claims of discrimination or retaliation under the Americans with Disabilities Act, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, M.G.L. c. 151B, and The Massachusetts Civil Rights Act);
- under any other federal or state statute (including, without limitation, Claims under the Worker Adjustment and Retraining Notification Act or the Fair Labor Standards Act);
- for wages, bonuses, incentive compensation, stock, stock options, vacation pay or any other compensation or benefits, whether under the Massachusetts Wage Act, M.G.L. c. 149, §§148-150C, or otherwise; and
- for damages or other remedies of any sort, including, without limitation, compensatory damages, punitive damages, injunctive relief and attorney's fees;

provided, however, that this release does not release Claims that cannot be released as a matter of law; Claims that arise after the date the Executive signs this Agreement, including Claims for breach of this Agreement (including, but not limited to, with respect to the Executive's rights under the Specified Equity Award); the Executive's rights to any vested and nonforfeitable balances in any retirement plan accounts; Claims related to the Company's failure to pay the employer portion of any taxes or to timely remit withholdings from the Executive to the relevant tax authority with respect to the period of Executive's employment with the Company; Claims for indemnification to the extent available under Delaware Law, the Company's certificate of incorporation, bylaws, or the Indemnification Agreement between the Executive and the Company dated November 24, 2019 (the "Indemnification Agreement") or claims for applicable liability insurance coverage, including directors and officers liability coverage (in each case, to the extent provided under such insurance or coverage). This release does not extend to any right the Executive may have to unemployment compensation benefits.

The Executive agrees not to accept damages of any nature, other equitable or legal remedies for the Executive's own benefit or attorney's fees or costs from any of the Releasees with respect to any Claim released by this Agreement. As a material inducement to the Company to enter into the Agreement, the Executive represents that he has not assigned any Claim to any third party.

6.        Restrictive Covenants.

a.        The Confidentiality Agreement, Section 6(b) of this Agreement and all the restrictive covenants contained in the Executive's applicable equity award agreements, the terms of which are incorporated by reference herein (the "Restrictive Covenants") shall remain in full force and effect in accordance with their terms, to the extent permitted by applicable law. The Executive acknowledges and agrees that the obligations under the Restrictive Covenants, including, without limitation, with respect to protection and non-disclosure of the Company's confidential information, shall apply during the Advisory Period. The Executive's obligations under the Restrictive Covenants together with the obligations under Sections 7 through 10 of this Agreement, shall be referred to as the "Continuing Obligations" and shall survive the termination of the Executive's employment and the Advisory Period.

5

b.        As a material term of this Agreement and in connection with the Executive's separation from employment, the Executive agrees that, during the one year period following the Separation Date, he shall not, directly or indirectly, whether as owner, partner, shareholder, director, manager, consultant, agent, employee, co-venturer or otherwise, anywhere in the world, engage or otherwise participate in any business that develops, manufactures or markets any products, or performs any services, that are competitive with any of the products or services of the Company or its subsidiaries at the time of termination of Executive's employment.  For the avoidance of doubt, nothing in this Section 6(b) restricts the Executive from being a member of the board of directors of Data I/O, which directorship predates the date of this Agreement and previously was approved by the Company.

7.        Return of Company Property.  The Executive confirms that on the Separation Date (or sooner or later as may be requested by the Company), the Executive shall return to the Company, without copying, altering or deleting any Company information, all Company property unless instructed to keep same, including, without limitation, computer equipment, software, keys and access cards, credit cards, files and any documents (including computerized data and any copies made of any computerized data or software) containing information concerning the Company, its business or its business relationships. Unless otherwise instructed by the Company, the Executive also commits to deleting and purging to the best of his ability any duplicates of files or documents that may contain Company information from any computer or other device that remains his property after the Separation Date, other than those files or documents that the Company directs the Executive to retain for purposes of the Advisory Period, which shall be deleted and purged to the best of his ability after the termination of the Advisory Period. In the event that the Executive discovers that he continues to retain any such property beyond the timeframes set forth in this Section 7, the Executive shall return it to the Company as soon as possible.

8.        Non-Disparagement.  Subject to Section 11, the Executive shall refrain from any disparagement, defamation, libel, or slander of any of the Company, its directors or its employees. The Executive shall direct any inquiries by potential future employers to the Company's Chief Executive Officer. The Company will instruct its senior executives and all members of its Board of Directors to refrain from any disparagement, defamation, libel, or slander of the Executive during their engagement with the Company. Truthful legal testimony or truthful rebuttal of false or misleading statements shall not violate this provision.

9.        Communications Regarding Separation.  The Company agrees to consult in good faith with the Executive on the text of the formal written announcement and securities filings concerning the Executive's transition and separation (collectively the "Company Announcement"), provided, however, that the Company will ultimately determine the text of the Company Announcement.  The Executive agrees that he will not (without the prior written approval of the CEO) communicate about his transition, retirement or separation with anyone until after the Company has made the initial Company Announcement; provided that the Executive may communicate with his tax advisors, attorneys, and family members about his transition, retirement and separation before the initial Company Announcement; provided further that the Executive first advises such persons not to reveal information about the Executive's transition, retirement and separation and each such person agrees. Further, no earlier than one business day prior to the initial Company Announcement (or earlier if agreed by the Company's CEO), the Executive may

6

communicate with his direct reports and other members of the Company's ELT about his transition, retirement and separation before the initial Company Announcement; provided further that the Executive first advises such persons not to reveal information about the Executive's transition and separation and each such person agrees. Once the Company has announced the Executive's transition, retirement and separation, the Executive agrees to limit any communications regarding his transition, retirement and separation to statements that are consistent with the Company Announcement.

10.        Future Cooperation.  The Executive agrees to cooperate reasonably with the Company and all of its affiliates (including its and their outside counsel) including in connection with (i) the contemplation, prosecution and defense of all phases of existing, past and future litigation about which the Company believes the Executive may have knowledge or information;

(ii) the investigation, whether internal or external, of any matters about which the Company believes the Executive may have knowledge or information; and (iii) responding to requests for information from regulatory agencies or other governmental authorities (together "Cooperation Services"). The Executive further agrees to make himself available to provide Cooperation Services at mutually convenient times during and outside of regular business hours as reasonably deemed necessary by the Company's counsel. The Company shall not utilize this Section 10 to require the Executive to make himself available to an extent that would interfere with full-time employment or other responsibilities that he may have. Cooperation Services include, without limitation, appearing without the necessity of a subpoena to testify truthfully in any legal proceedings in which the Company or an affiliate calls the Executive as a witness. The Company shall reimburse the Executive for any reasonable travel expenses that he incurs due to his performance of Cooperation Services, after receipt of appropriate documentation consistent with the Company's business expense reimbursement policy.

11.        Protected Disclosures.  Nothing contained in this Agreement limits the Executive's ability to file a charge or complaint with any federal, state or local governmental agency or commission (a "Government Agency"). In addition, nothing contained in this Agreement limits the Executive's ability to communicate with any Government Agency or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, nor does anything contained in this Agreement apply to truthful testimony in litigation. If the Executive files any charge or complaint with any Government Agency and if the Government Agency pursues any claim on the Executive's behalf, or if any other third party pursues any claim on the Executive's behalf, the Executive waives any right to monetary or other individualized relief (either individually or as part of any collective or class action); provided that nothing in this Agreement limits any right the Executive may have to receive a whistleblower award or bounty for information provided to the Securities and Exchange Commission.

12.        Legally Binding.  This Agreement is a legally binding document and the Executive's signature will commit the Executive to its terms. The Executive acknowledges that he has been advised to discuss all aspects of this Agreement with his attorney, that he has consulted with his attorney prior to signing this Agreement, that he has carefully read and fully understands all of the provisions of this Agreement and that the Executive is voluntarily entering into this Agreement.

7

13.    Tax Treatment.  The Company shall undertake to make deductions, withholdings and tax reports with respect to payments and benefits under this Agreement to the extent that it reasonably and in good faith determines that it is required to make such deductions, withholdings and tax reports. Nothing in this Agreement shall be construed to require the Company to make any payments to compensate the Executive for any adverse tax effect associated with any payments or benefits or for any deduction or withholding from any payment or benefit.

14.    Equitable Relief.  The Executive agrees that it may be difficult to measure any harm caused to the Company that might result from any breach by the Executive of the Continuing Obligations and that in any event money damages may be an inadequate remedy for any such breach. Accordingly, the Executive agrees that if he breaches, or proposes to breach, any portion of the Continuing Obligations, the Company shall be entitled, in addition to all other remedies it may have, to seek an injunction or other appropriate equitable relief to restrain any such breach, and to other damages as allowable by law.

15.    Enforceability.  If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement) shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

16.    Entire Agreement.  This Agreement, together with the exhibits attached hereto, constitutes the entire agreement between the Executive and the Company concerning the Executive's relationship with the Company and supersedes and replaces any and all prior agreements and understandings between the Parties concerning the Executive's relationship with the Company, including the offer letter by and between the Company and the Executive and the Severance Agreement (except to the extent certain definitions thereunder are used herein). Notwithstanding the foregoing, for the avoidance of doubt, this Agreement shall not supersede or replace the Confidentiality Agreement, the Equity Documents or the Indemnification Agreement, which shall remain in full force and effect, subject to the terms of this Agreement. This Agreement is binding on the Company's successors and assigns.

17.    Survival.  The provisions of this Agreement shall survive the termination of this Agreement and/or the termination of the Executive's employment to the extent necessary to effectuate the terms contained herein.

18.    Waiver.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party. The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

19.    Notices.  Any notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and (i) delivered in person, (ii) sent by a nationally recognized overnight courier service or by registered or certified mail, postage prepaid, return receipt requested, to the Executive at the last address the Executive has filed in writing with

8

the Company or, in the case of the Company, at its main offices, attention of the Board or (iii) sent by email to the Executive's Company email address or, in the case of the Company, to the CEO's email address.

20.        Amendment.  This Agreement may be amended or modified only by a written instrument signed by the Executive and by a duly authorized representative of the Company.

21.        Governing Law.  This is a Massachusetts contract and shall be construed under and be governed in all respects by the laws of the Commonwealth of Massachusetts, without giving effect to the conflict of laws principles of such Commonwealth. With respect to any disputes concerning federal law, such disputes shall be determined in accordance with the law as it would be interpreted and applied by the United States Court of Appeals for the First Circuit.

22.        Time for Consideration: Effective Date.  The Executive acknowledges that he has been given the opportunity to consider this Agreement for 21 days before executing it (the "Consideration Period"). To accept this Agreement, the Executive must return a signed, unmodified original or PDF copy of this Agreement so that it is received by the undersigned at or before the expiration of the Consideration Period. If the Executive signs this Agreement before the end of the Consideration Period, the Executive acknowledges that such decision was entirely voluntary and that the Executive had the opportunity to consider this Agreement for the entire Consideration Period. For the period of seven business days from the date when the Executive signs this Agreement, the Executive has the right to revoke this Agreement by written notice to the undersigned, provided that such notice is delivered so that it is received by the undersigned at or before the expiration of the seven business day revocation period. This Agreement shall not become effective or enforceable during the revocation period. This Agreement shall become effective on the first day following the expiration of the revocation period (the "Effective Date").

23.        Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute one and the same document. Electronic and pdf signatures shall be deemed to have the same legal effect as originals.

[Signature page follows.]

9

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have executed this Agreement effective as of the Effective Date.

CERENCE INC.

2/4/2022

By: /s/ Stefan Ortmanns

Stefan                                                                                                                                    Date

Ortmanns
Chief Executive Officer
EXECUTIVE

2/4/2022

/s/ Mark Gallenberger

Mark          Date
Gallenberger

Exhibit 10.4

### TRANSITIONAL SERVICES AGREEMENT

This Transitional Services Agreement (this "Agreement") is entered into between Leanne Fitzgerald (the "Executive") and Cerence Inc., a Delaware corporation (the "Company," and together with the Executive, the "Parties").

WHEREAS, the Executive currently serves as the Company's General Counsel and Secretary ("GC");

WHEREAS, the Executive and the Company entered into the Change of Control and Severance Agreement dated December 16, 2019 ("Severance Agreement");

WHEREAS, the Executive has elected to resign from employment with the Company effective February 3, 2022 (the "Separation Date") to pursue other opportunities, which is a voluntary resignation for purposes of the Severance Agreement and, therefore, the Executive is not entitled to severance pay, benefits or vesting pursuant to the Severance Agreement or otherwise;

WHEREAS, the Company's Board of Directors (the "Board") appreciates the Executive's past and anticipated future contributions and wishes to make this transition as smooth as possible;

WHEREAS, the Board has determined that it is in the best interest of the Company for the Executive to be available on an as requested basis during the Advisory Period (as defined below) to provide transitional assistance to the Company; and

WHEREAS, the Executive and the Board wish to enter into this Agreement to set forth the terms of the Executive's continued services to the Company during the Advisory Period.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  Transition: Period; Position; Duties.

a.  Period. The Executive's employment with the Company will continue through the Separation Date, at which time it will end. The time period between the date the Executive receives this Agreement and the Separation Date is the "Transition Period".

b.  Position. During the Transition Period, the Executive shall continue to serve as the Company's GC unless otherwise determined by the Board. Any change to the Executive's duties as set forth herein shall not constitute Good Reason as defined in and for purposes of the Severance Agreement, and the Executive hereby waives the application of Good Reason to her employment through the Separation Date.

c.  Duties. At all times during the Transition Period, the Executive shall continue to report to the Company's Chief Executive Officer (the "CEO") and shall have the duties

4863-6439-1179.8
ACTIVE/114335852.7

and responsibilities as reasonably determined by the CEO. The Executive will work cooperatively with the Company's senior leadership team and the legal team during the Transition Period.

2.    Compensation During the Transition Period.

a.    Salary. During the Transition Period, the Company will continue to pay the Executive at her current base salary rate (the "Base Salary"), payable in accordance with the Company's normal payroll practices, subject to tax withholding under applicable law.

b.    Expenses. The Executive shall be entitled to receive reimbursement for all reasonable business expenses incurred by her during the Transition Period in performing services hereunder, in accordance with the policies and procedures then in effect and established by the Company.

c.    Other Benefits. During the Transition Period, the Executive shall continue to be eligible to participate in or receive benefits under the Company's retirement, health, welfare and fringe benefit plans for employees in effect from time to time, subject to the terms and conditions of such plans.

3.    Ending of Employment Relationship.

a.    The Executive's employment will end on the Separation Date.

b.    On the Separation Date or promptly thereafter within the period of time mandated by law, the Executive will receive the Accrued Amounts set forth in Section 3(f) of the Severance Agreement: (i) any unpaid base salary due for periods prior to the Separation Date; (ii) accrued and unused vacation, as required under the applicable Company policy; and (iii) all expenses incurred by the Executive in connection with the business of the Company prior to the Separation Date in accordance with the Company's business expense reimbursement policy. Except as set forth in Section 4(d) below, the Executive will cease vesting in her outstanding, unvested equity awards on the Separation Date.

c.    On the Separation Date, or earlier if requested by the Board, the Executive will be deemed to have resigned from all officer and board member positions that the Executive holds with the Company or any of its respective subsidiaries and affiliates. Promptly following the Separation Date, the Company shall take all steps necessary or appropriate to remove the Executive from all such positions. During the Advisory Period, the Executive shall execute any documents in reasonable form as may be reasonably requested by the Company to confirm or effectuate any such resignations.

4.    Advisory Period.

a.    On the Separation Date, provided that the Executive (i) enters into, does not revoke and complies with this Agreement, and (ii) continues to comply with any agreement between the Executive and the Company concerning inventions, confidentiality or restrictive covenants ((i) and (ii) together, the "Conditions"), the Executive shall be retained by the Company as an independent contractor, with no break in service relationship solely for purposes of continued

2

vesting in the Specified Equity Awards (as defined below). The Executive shall continue to serve as an independent contractor of the Company until October 1, 2022, unless the Executive sooner resigns or unless the Company sooner terminates the consulting arrangement for a material breach by the Executive of any of the Condition(s) (which termination by the Company shall be permitted only after the Executive is notified in writing of the alleged material breach and, if the breach is curable, the Executive receives a reasonable opportunity to cure such breach) (the period of independent contractor service under this Agreement being the "Advisory Period").

b.                        During the Advisory Period, the Executive shall be available on an as- requested basis to assist with the transition, including with respect to providing advisory services related to legal matters (the "Services"). The Company shall not utilize this Section 4(b) to require the Executive to make herself available to an extent that would interfere with full-time employment or other responsibilities that she may have. The Executive agrees that other than in the course of providing the Services, she will not use or disclose any confidential information of the Company or any third party to which the Company owes a duty of confidentiality. This confidentiality obligation is in addition to, and not in lieu of, the Confidentiality Agreement (as defined in the Severance Agreement) and any other ongoing confidentiality obligations the Executive has to Company. The Executive shall continue to be subject to the Company's Insider Trading Policy to the extent applicable.

c.                        During the Advisory Period, the Executive shall no longer be an employee of the Company, but shall be retained as an independent contractor and shall have no authority to bind the Company. The Executive shall not be eligible to participate in any vacation, group medical or life insurance, disability, profit sharing or retirement benefits, or any other fringe benefits or benefit plans offered by Company to its employees (except that the last day of the Executive's participation in the Company's group medical plan will be February 28, 2022 and thereafter the Executive may elect continuation coverage as provided by applicable law, which will be entirely at her own expense). The Executive shall bear sole responsibility for all taxes, insurance and benefits relating to the provision of services under this Agreement during the Advisory Period and shall indemnify and hold the Company harmless from and against any liability with respect thereto (it being understood that the Company remains responsible for all such amounts that ordinarily are allocable to the employer with respect to the period of Executive's employment with the Company (for example, but not by way of limitation, the employer portion of FICA)).

d.                        As the sole consideration for the Services, during the Advisory Period, the Executive shall continue to vest in the restricted stock units ("RSUs") awarded to Executive on November 13, 2019 (10,642 Shares) that are scheduled to vest on October 1, 2022 if the Executive remains in a service relationship with the Company through the applicable vesting date (the "Specified Equity Award").

The Executive's Services will be a continued service relationship with the Company solely for purposes of the equity award agreements applicable to the Specified Equity Award and the Company's 2019 Equity Incentive Plan (as may be amended form time to time, the "Plan", and, collectively along with all of Executive's applicable award agreements, the "Equity Documents"). Notwithstanding anything to the contrary in any equity award agreement, equity incentive plan or otherwise, any equity award held by the Executive and not included in the definition of Specified Equity Award (including, without limitation, the Executive's RSUs and PSUs other than the

3

Specified Equity Award that are scheduled to vest on October 1, 2022 and all of the Executive's RSUs and PSUs that are scheduled to vest after October 1, 2022) shall cease vesting on the Separation Date. Except as modified herein, the Equity Documents are in full force and effect.

The Executive acknowledges that without this Agreement, the Executive is otherwise not entitled to continue vesting in the Specified Equity Awards beyond the Separation Date. The Executive further acknowledges that she will not receive any additional equity awards or any other compensation during the Advisory Period.

5.        General Release of Claims.  In consideration for the opportunity to continue the Executive's employment during the Transition Period and the opportunity to continue her service relationship with the Company during the Advisory Period in order to continue vesting in the Specified Equity Awards, to which the Executive acknowledges she would otherwise not be entitled, the Executive voluntarily releases and forever discharges the Company, its affiliated and related entities, its and their respective predecessors, successors and assigns, its and their respective employee benefit plans and fiduciaries of such plans, and the current and former officers, directors, shareholders, employees, attorneys, accountants and agents of each of the foregoing in their official and personal capacities (collectively referred to as the "Releasees") generally from all claims, demands, debts, damages and liabilities of every name and nature, known or unknown ("Claims") that, as of the date when the Executive signs this Agreement, the Executive has, ever had, now claims to have or ever claimed to have had against any or all of the Releasees. This release includes, without limitation, all Claims:

- relating to the Executive's employment by and termination of employment with the Company;
- of wrongful discharge or violation of public policy;
- of breach of contract;
- of defamation or other torts;
- of retaliation or discrimination under federal, state or local law (including, without limitation, Claims of discrimination or retaliation under the Americans with Disabilities Act, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, M.G.L. c. 151B, and The Massachusetts Civil Rights Act);
- under any other federal or state statute (including, without limitation, Claims under the Worker Adjustment and Retraining Notification Act or the Fair Labor Standards Act);
- for wages, bonuses, incentive compensation, stock, stock options, vacation pay or any other compensation or benefits, whether under the Massachusetts Wage Act, M.G.L. c. 149, §§148-150C, or otherwise; and
- for damages or other remedies of any sort, including, without limitation, compensatory damages, punitive damages, injunctive relief and attorney's fees;

provided, however, that this release does not release Claims that cannot be released as a matter of law; Claims that arise after the date the Executive signs this Agreement, including Claims for breach of this Agreement (including, but not limited to, with respect to the Executive's rights under the Specified Equity Award); the Executive's rights to any vested and nonforfeitable balances in any retirement plan accounts; Claims related to the Company's failure to pay the employer portion

4

of any taxes or to timely remit withholdings from the Executive to the relevant tax authority with respect to the period of the Executive's employment with the Company; Claims for indemnification to the extent available under Delaware Law, the Company's certificate of incorporation, bylaws, or the Indemnification Agreement between the Executive and the Company dated November 24, 2019 (the "Indemnification Agreement") or claims for applicable liability insurance coverage, including directors and officers liability coverage (in each case, to the extent provided under such insurance or coverage). This release does not extend to any right the Executive may have to unemployment compensation benefits. The Executive agrees not to accept damages of any nature, other equitable or legal remedies for the Executive's own benefit or attorney's fees or costs from any of the Releasees with respect to any Claim released by this Agreement. As a material inducement to the Company to enter into the Agreement, the Executive represents that she has not assigned any Claim to any third party.

      6.      Restrictive Covenants.

a.      The Confidentiality Agreement, Section 6(b) of this Agreement and all the restrictive covenants contained in the Executive's applicable equity award agreements, the terms of which are incorporated by reference herein (the "Restrictive Covenants") shall remain in full force and effect in accordance with their terms, to the extent permitted by applicable law. The Executive acknowledges and agrees that the obligations under the Restrictive Covenants, including, without limitation, with respect to protection and non-disclosure of the Company's confidential information, shall apply during the Advisory Period. The Executive's obligations under the Restrictive Covenants together with the obligations under Sections 7 through 10 of this Agreement, shall be referred to as the "Continuing Obligations" and shall survive the termination of the Executive's employment and the Advisory Period.

b.      As a material term of this Agreement and in connection with the Executive's separation from employment, the Executive agrees that, during the one year period following the Separation Date, she shall not, directly or indirectly, whether as owner, partner, shareholder, director, manager, consultant, agent, employee, co-venturer or otherwise, anywhere in the world, engage or otherwise participate in any business that develops, manufactures or markets any products, or performs any services, that are competitive with any of the products or services of the Company or its subsidiaries at the time of termination of Executive's employment. For the avoidance of doubt, nothing in this Section 6(b) restricts the Executive from being employed and acting as an officer and as general counsel at the organization that the Executive identified in writing to the Company's Chief Executive Officer prior to the date of this Agreement.

7.      Return of Company Property. The Executive confirms that on the Separation Date (or as may be requested by the Company), the Executive shall return to the Company pursuant to such reasonable procedures as the Company may specify, and without copying, altering or deleting any Company information, all Company property unless instructed to keep same, including, without limitation, computer equipment, software, keys and access cards, credit cards, files and any documents (including computerized data and any copies made of any computerized data or software) containing information concerning the Company, its business or its business relationships. Unless otherwise instructed by the Company, the Executive also commits to deleting and purging to the best of her ability any duplicates of files or documents that may contain

5

Company information from any computer or other device that remains her property after the Separation Date, other than those files or documents that the Company directs the Executive to retain for purposes of the Advisory Period, which shall be deleted and purged to the best of her ability after the termination of the Advisory Period. In the event that the Executive discovers that she continues to retain any such property beyond the timeframes set forth in this Section 7, the Executive shall return it to the Company as soon as possible. Notwithstanding the preceding, the Executive may retain her Company-issued phone, provided that the Executive cooperates fully with the Company's IT group to delete (to the reasonable satisfaction of the IT group) any Company confidential information from the phone, including, without limitation, any Company emails or documents or copies thereof. The IT group will assist the Executive in transferring the phone and number to the Executive's personal billing account.

8.           Non-Disparagement.  Subject to Section 11, the Executive shall refrain from any disparagement, defamation, libel, or slander of any of the Company, its directors or its employees. The Executive shall direct any inquiries by potential future employers to the Company's Chief Executive Officer. The Company will instruct its senior executives and all members of its Board of Directors to refrain from, any disparagement, defamation, libel, or slander of the Executive during their engagement with the Company. Truthful legal testimony or truthful rebuttal of false or misleading statements shall not violate this provision.

9.           Communications Regarding Separation.  The Company agrees to consult in good faith with the Executive on the text of the formal written announcement and securities filings concerning the Executive's transition and separation (collectively the "Company Announcement"), provided, however, that the Company will ultimately determine the text of the Company Announcement.  The Executive agrees that she will not (without the prior written approval of the Company) communicate about her transition or separation with anyone (other than the Company's CEO, CFO and directors) until after the Company has made the initial Company Announcement; provided that the Executive may communicate with her tax advisors, attorneys, and family members about her transition and separation before the initial Company Announcement; provided further that the Executive first advises such persons not to reveal information about the Executive's transition and separation and each such person agrees. Further, no earlier than one business day prior to the initial Company Announcement (or earlier if agreed by the Company's CEO), the Executive may communicate with her direct reports and other members of the Company's ELT about her transition, retirement and separation before the initial Company Announcement; provided further that the Executive first advises such persons not to reveal information about the Executive's transition and separation and each such person agrees. Once the Company has announced the Executive's transition and separation, the Executive agrees to limit any communications regarding her transition and separation to statements that are consistent with the Company Announcement.

10.          Future Cooperation.  The Executive agrees to cooperate reasonably with the Company and all of its affiliates (including its and their outside counsel) including in connection with (i) the contemplation, prosecution and defense of all phases of existing, past and future litigation about which the Company believes the Executive may have knowledge or information;
(ii) the investigation, whether internal or external, of any matters about which the Company believes the Executive may have knowledge or information; and (iii) responding to requests for information from regulatory agencies or other governmental authorities (together "Cooperation

6

Services"). The Executive further agrees to make herself available to provide Cooperation Services at mutually convenient times during and outside of regular business hours as reasonably deemed necessary by the Company's counsel. The Company shall not utilize this Section 10 to require the Executive to make herself available to an extent that would interfere with full-time employment or other responsibilities that she may have. Cooperation Services include, without limitation, appearing without the necessity of a subpoena to testify truthfully in any legal proceedings in which the Company or an affiliate calls the Executive as a witness. The Company shall reimburse the Executive for any reasonable travel expenses that she incurs due to her performance of Cooperation Services, after receipt of appropriate documentation consistent with the Company's business expense reimbursement policy.

11.           Protected Disclosures.  Nothing contained in this Agreement limits the Executive's ability to file a charge or complaint with any federal, state or local governmental agency or commission (a "Government Agency"). In addition, nothing contained in this Agreement limits the Executive's ability to communicate with any Government Agency or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, nor does anything contained in this Agreement apply to truthful testimony in litigation. If the Executive files any charge or complaint with any Government Agency and if the Government Agency pursues any claim on the Executive's behalf, or if any other third party pursues any claim on the Executive's behalf, the Executive waives any right to monetary or other individualized relief (either individually or as part of any collective or class action); provided that nothing in this Agreement limits any right the Executive may have to receive a whistleblower award or bounty for information provided to the Securities and Exchange Commission.

12.           Legally Binding.  This Agreement is a legally binding document and the Executive's signature will commit the Executive to its terms. The Executive acknowledges that she has been advised to discuss all aspects of this Agreement with her attorney, that she has consulted with her attorney prior to signing this Agreement, that she has carefully read and fully understands all of the provisions of this Agreement and that the Executive is voluntarily entering into this Agreement.

13.           Tax Treatment.  The Company shall undertake to make deductions, withholdings and tax reports with respect to payments and benefits under this Agreement to the extent that it reasonably and in good faith determines that it is required to make such deductions, withholdings and tax reports.  Nothing in this Agreement shall be construed to require the Company to make any payments to compensate the Executive for any adverse tax effect associated with any payments or benefits or for any deduction or withholding from any payment or benefit.

14.           Equitable Relief.  The Executive agrees that it may be difficult to measure any harm caused to the Company that might result from any breach by the Executive of the Continuing Obligations and that in any event money damages may be an inadequate remedy for any such breach. Accordingly, the Executive agrees that if she breaches, or proposes to breach, any portion of the Continuing Obligations, the Company shall be entitled, in addition to all other remedies it may have, to seek an injunction or other appropriate equitable relief to restrain any such breach, and to other damages as allowable by law.

7

15.	Enforceability.  If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement) shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

16.	Entire Agreement.  This Agreement, together with the exhibits attached hereto, constitutes the entire agreement between the Executive and the Company concerning the Executive's relationship with the Company and supersedes and replaces any and all prior agreements and understandings between the Parties concerning the Executive's relationship with the Company, including the offer letter by and between the Company and the Executive and the Severance Agreement (except to the extent certain definitions thereunder are used herein). Notwithstanding the foregoing, for the avoidance of doubt, this Agreement shall not supersede or replace the Confidentiality Agreement, the Equity Documents or the Indemnification Agreement, which shall remain in full force and effect, subject to the terms of this Agreement.  This Agreement is binding on the Company's successors and assigns.

17.	Survival.  The provisions of this Agreement shall survive the termination of this Agreement and/or the termination of the Executive's employment to the extent necessary to effectuate the terms contained herein.

18.	Waiver.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party. The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

19.	Notices.  Any notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and (i) delivered in person, (ii) sent by a nationally recognized overnight courier service or by registered or certified mail, postage prepaid, return receipt requested, to the Executive at the last address the Executive has filed in writing with the Company or, in the case of the Company, at its main offices, attention of the Board or (iii) sent by email to the Executive's Company email address or, in the case of the Company, to the CEO's email address.

20.	Amendment.  This Agreement may be amended or modified only by a written instrument signed by the Executive and by a duly authorized representative of the Company.

21.	Governing Law.  This is a Massachusetts contract and shall be construed under and be governed in all respects by the laws of the Commonwealth of Massachusetts, without giving effect to the conflict of laws principles of such Commonwealth, except as provided in the following sentence. The Indemnification Agreement shall be construed under and be governed in all respects by the laws of the state of Delaware, without giving effect to the conflict of laws principles of such state.  With respect to any disputes concerning federal law, such disputes shall be determined in accordance with the law as it would be interpreted and applied by the United States Court of Appeals for the First Circuit.

8

22.          Time for Consideration; Effective Date.  The Executive acknowledges that she was offered the opportunity to consider this Agreement for 21 days before executing it (the "Consideration Period"). To accept this Agreement, the Executive must return a signed, unmodified original or PDF copy of this Agreement so that it is received by the undersigned at or before the expiration of the Consideration Period. If the Executive signs this Agreement before the end of the Consideration Period, the Executive acknowledges that such decision was entirely voluntary and that the Executive had the opportunity to consider this Agreement for the entire Consideration Period. For the period of seven business days from the date when the Executive signs this Agreement, the Executive has the right to revoke this Agreement by written notice to the undersigned, provided that such notice is delivered so that it is received by the undersigned at or before the expiration of the seven business day revocation period. This Agreement shall not become effective or enforceable during the revocation period. This Agreement shall become effective on the first day following the expiration of the revocation period (the "Effective Date").

23.          Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute one and the same document. Electronic and pdf signatures shall be deemed to have the same legal effect as originals.

[Signature page follows.]

9

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have executed this Agreement effective as of the Effective Date.

CERENCE INC.

2/2/2022

By: /s/ Stefan Ortmanns

Stefan Ortmanns

Chief Executive Officer

EXECUTIVE

/s/ Leanne Fitzgerald                                                                    2/2/2022

Leanne Fitzgerald                                         Date

Exhibit 31.1

CERTIFICATION PURSUANT TO
RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Stefan Ortmanns, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Cerence Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2022                                        By:  _____/s/ Stefan Ortmanns_____
                                                                                  Stefan Ortmanns
                                                                            Chief Executive Officer
                                                                        (Principal Executive Officer)

Exhibit 31.2

CERTIFICATION PURSUANT TO
RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Thomas L. Beaudoin, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Cerence Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2022                    By:    _____
                                                   /s/ Thomas L. Beaudoin
                                                      Thomas L. Beaudoin
                                    Executive Vice President and Chief Financial Officer
                                                  (Principal Financial Officer)

Exhibit 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Cerence Inc. (the "Company") on Form 10-Q for the period ending March 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: May 10, 2022                                          By:  _____/s/ Stefan Ortmanns_____

                                                                            Stefan Ortmanns
                                                                            Chief Executive Officer
                                                                            (Principal Executive Officer)

Exhibit 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Cerence Inc. (the "Company") on Form 10-Q for the period ending March 31, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: May 10, 2022                                    By:    _____
                                                                    /s/ Thomas L. Beaudoin
                                                                    Thomas L. Beaudoin
                                                    Executive Vice President and Chief Financial Officer
                                                                (Principal Financial Officer)