# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CITY OF MIAMI FIRE FIGHTERS' AND
POLICE OFFICERS' RETIREMENT TRUST,
Individually and on Behalf of All Others Similarly
Situated,

          Plaintiff,

vs.

CERENCE INC., SANJAY DHAWAN, and
MARK J. GALLENBERGER,

          Defendants.

) 
) 
) 
) 
) Civil Action
) 
) No. 1:22-cv-10321-ADB
) 
) **PLAINTIFF'S OPPOSITION TO THE**
) **DEFENDANTS' MOTION TO DISMISS**
) **AMENDED COMPLAINT**
) 
) Oral Argument Requested
)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

I.    SUMMARY OF DEFENDANTS' FRAUD ...................................................................... 4

    A.    Defendants Tout Cerence's "Sustainable" Growth and Assure Investors
    That They Are Reducing Reliance on Less Desirable Prepaid Contracts .............. 4

    B.    Unbeknownst to Investors, Defendants Engaged in a Scheme to Disguise
    Cerence's Dwindling Growth by Converting Existing Variable Contracts
    to Heavily Discounted Prepaid Deals in Order to Pull Revenue Forward.............. 5

    C.    Cerence's New Form of Revenue Acceleration: "Minimum
    Commitments" ........................................................................................................ 5

    D.    The Truth is Revealed ............................................................................................. 6

II.    ARGUMENT .................................................................................................................... 8

    A.    Defendants' Materially False and Misleading Statements and Omissions
    Regarding Their Undisclosed Revenue Acceleration Scheme Are
    Actionable ............................................................................................................... 8

        1.    Defendants' False Statements and Omissions Were Material .................. 11

        2.    Defendants' Statements Are Not Protected by the PSLRA Safe
        Harbor ........................................................................................................ 12

    B.    The AC Adequately Alleges Scienter .................................................................... 14

        1.    The Individual Defendants Directed the Scheme .................................... 14

        2.    Defendants' Scheme Had No Legitimate Business Purpose, Further
        Supporting Scienter .................................................................................. 16

        3.    Defendants' Post-Class Period Admissions Support Scienter .................. 18

        4.    Defendants' Financial Motive Supports Scienter ..................................... 18

        5.    The AC's Other Allegations Also Support Scienter ................................. 19

CONCLUSION........................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ......................................................................................... 14, 18

*Basic Inc. v. Levinson*,
485 U.S. 224 (U.S. 1988) ................................................................................................. 12

*Blue v. Doral Fin. Corp.*,
123 F. Supp. 3d 236 (D.P.R. 2015) ................................................................................. 15

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) ................................................................... 12, 13, 14

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ...................................................... 14, 18

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................................. 13

*City of Miami FireFighters' & Police Officers' Retirement Trust v. CVS Health Corp.*,
2022 WL 3570838 (1st Cir. Aug. 18, 2022) ................................................................... 10

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014) ............................................................................. 16, 20

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ............................................................................................ 11

*George v. China Auto. Sys., Inc.*,
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ................................................................... 19

*Godinez v. Alere Inc.*,
272 F. Supp. 3d 201 (D. Mass. 2017) ............................................................................. 15

*Harrington v. Tetraphase Pharms. Inc.*,
2017 WL 1946305 (D. Mass. May 9, 2017) .................................................................... 20

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................................. 10

*In re Ariad Pharm., Inc.*,
98 F. Supp. 3d 147 (D. Mass. 2015) ................................................................................ 11

*In re Biogen Inc. Sec. Litig.*,
  857 F.3d 34 (1st Cir. 2017) ................................................................................. 8

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ................................................................................. 14

*In re Fibrogen, Inc.*,
  2022 WL 2793032 (N.D. Cal. July 15, 2022) ...................................................... 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  618 F. Supp. 2d 311 (S.D.N.Y. 2009) .................................................................. 11

*In re Genta, Inc., Sec. Litig.*,
  2005 WL 2416970 (D.N.J. Sept. 30, 2005) .......................................................... 16

*In re Lehman Bros. Sec. & Erisa Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y 2011) ................................................................... 16

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  2011 WL 1330847 (S.D.N.Y. Mar. 30, 2011) ..................................................... 13

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014) .................................................................... 20

*In re Plantonics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ............................................... *passim*

*In re Psychemedics Corp. Sec. Litig.*,
  2017 WL 5159212 (D. Mass. Nov. 7, 2017) ........................................................ 19

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ............................................................................. 12

*In re Sci. Atlanta, Inc. Sec. Litig.*,
  754 F. Supp. 2d 1339 (N.D. Ga. 2010) ................................................................ 17

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
  604 F. Supp. 2d 332 (D. Mass. 2009) .................................................................. 12

*In re Stone & Webster, Inc., Securities Litigation*,
  414 F.3d 187 (1st Cir. 2005) ............................................................................... 13

*In re SupportSoft, Inc. Sec. Litig.*,
  2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) ................................................. 8, 17

*In re Under Armour Sec. Litig.*,
  540 F. Supp. 3d 513 (D. Md. 2021) ................................................................. 13

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ....................................................................... 19

*Karth v. Keryx Biopharmaceuticals, Inc.*,
  6 F.4th 123 (1st Cir. 2021)............................................................................... 8

*Kirby v. Cullinet Software, Inc.*,
  721 F. Supp. 1444 (D. Mass. 1989) ................................................................ 14

*Levy v. Gutierrez*,
  2017 WL 2191592 (D.N.H. May 4, 2017)................................................. 16, 19

*Lucia v. Prospect St. High Income Portfolio*,
  36 F.3d 170 (1st Cir. 1994).............................................................................. 11

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ........................................................................... 12

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).............................................................................................. 8

*Metzler Asset Mgmt. v. Kingsley*,
  305 F. Supp. 3d 181 (D. Mass. 2018) .............................................................. 20

*Miller v. Sonus Networks, Inc.*,
  2022 WL 11804021 (D. Mass. Oct. 20, 2022)................................................... 11

*Murphy v. Precision Castparts Corp.*,
  2017 WL 3084274 (D. Or. June 27, 2017) ....................................................... 15

*Padilla v. Cmty. Health Sys., Inc.*,
  2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) ............................................... 15

*Police & Fire Ret. Sys. of the City of Detroit v. Crane*,
  87 F. Supp. 3d 1075 (N.D. Cal. 2015) .............................................................. 11

*Saunwin Int'l Equities Fund v. Donville Kent Asset Mgmt.*,
  2018 WL 3543533 (D. Mass. July 20, 2018)..................................................... 14

*Shemian v. Researchin Motion Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ................................................... 16

*Simon v. Abiomed, Inc.*,
   37 F. Supp. 3d 499 (D. Mass. 2014) ....................................................................................... 19

*Smith & Wesson Holding Corp. Sec. Litig.*,
   669 F.3d 68 (1st Cir. 2012) .................................................................................................... 9

*Stumpf v. Garvey*,
   2005 WL 2127674 (D.N.H. Sept. 2, 2005) ............................................................................ 11

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ........................................................................................ 15

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
   2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ........................................................................ 18

*Wietschner v. Monterey Pasta Co.*,
   294 F. Supp. 2d 1102 (N.D. Cal. 2003) ................................................................................. 19

*Willis v. Big Lots, Inc.*,
   2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) ....................................................................... 20

*Wilson v. LSB Industries, Inc.*,
   2017 WL 7052046 (S.D.N.Y., 2017) ...................................................................................... 13

## STATUTES

15 U.S.C. 78t(a) ............................................................................................................................ 20

15 U.S.C. 78u-4(b)(1) ..................................................................................................................... 8

## REGULATIONS

17 C.F.R. § 240.10b-5..................................................................................................................... 8

## PRELIMINARY STATEMENT[1]

Cerence derives most of its revenue from licensing voice-recognition software to car manufacturers ("OEMs"). From its inception as a public company in October 2019, Cerence and its senior officers touted the Company's historical double-digit growth rate as the "key takeaway" for investors from "the Cerence story," emphasizing that this "very good growth trajectory" differentiated the Company in "an auto industry that has low-single-digit growth rates." ¶¶34, 36.

As of the outset of the Class Period in November 2020, Cerence sold its software through "variable" and "prepay" contracts. Under a variable contract, an OEM paid Cerence for each vehicle produced with Cerence's software, and Cerence recognized the resulting revenue as the licenses were consumed. In prepay contracts, however, the OEM bought software licenses in bulk with cash, at a substantial discount, and Cerence recognized the revenue for the entire contract up front. Because prepaid deals reduced future demand for Cerence licenses by cannibalizing future revenue growth and profit in exchange for a short-term revenue boost, it was extraordinarily important for Cerence to limit the amount of prepaid contracts it entered into. ¶¶37-40.

Accordingly, throughout the Class Period, Defendants expressly promised investors that they were strategically reducing their reliance on prepay contracts, for example, insisting that the Company was "biased toward reducing prepays." ¶47. Defendants assured investors that at worst, prepays would be held within the Company's "historical range" of "low-40s to low-50s [million]" annually and that the Company's strong "pipeline" or "backlog" of variable contracts would drive the Company's sustainable growth. ¶¶45-47. Analysts took comfort in Defendants' assurances, and in turn, Cerence's stock price skyrocketed, reaching a Class Period high of $133.43 on

---

[1] All defined terms have the same meaning as in Plaintiff's Amended Class Action Complaint, ECF No. 37 (July 26, 2022) (the "AC"). Cites to "¶_" are to paragraphs of the AC. "MTD" refers to Defendants' Memorandum of Law in Support of their Motion to Dismiss, ECF No. 40 (Sept. 9, 2022). All emphasis is added and all internal quotation marks and citations are omitted. Exhibit 1 attached hereto provides Plaintiff's response to Defendants' chart purporting to summarize why their statements are not actionable.

February 12, 2021, double the Company's stock price on the day before the Class Period. ¶¶8, 53.

Defendants' statements were false. Cerence's growth was anemic, and to mask the Company's deteriorating financial condition, the Defendants directed a scheme to dramatically *increase* the number of prepay contracts for the sole purpose of temporarily inflating Cerence's revenue and meeting its guidance. As confirmed by a high-ranking former sales manager, FE1, and as later *admitted* by the Company's subsequent CEO, the Individual Defendants *deliberately pressured* their global sales personnel to oversell prepay contracts, and even to convert *existing* variable contracts into highly deleterious prepay contracts at "steep discounts." ¶¶65-78, 113.

As the Company's business continued to deteriorate, unbeknownst to investors, Defendants devised an even more brazen scheme whereby Cerence offered customers so-called "minimum commitment" contracts. In these contracts, customers paid Cerence *nothing* for up to 5 years, but Cerence *immediately* recognized all of the revenue. The sole purpose of this scheme—which crippled the Company's long-term growth—was to inflate short-term revenue to create the illusion of strong financial performance. As a direct result of this scheme, Defendants reaped nearly $30 million in lucrative incentive bonus payouts that were directly tied to Cerence meeting its revenue guidance, and then proceeded to dump roughly $30 million worth of Cerence stock—in Dhawan's case, more than 40% of his holdings. ¶¶79-86, 124-32.

The truth began to emerge on November 22, 2021, when the Company was forced to admit that its "fixed" license revenue had skyrocketed to an all-time high of $71 million—far above the "historical range" Defendants had claimed they were adhering to. On this news, the Company's stock price plummeted from $104.06 to $82.59 per share—a decline of more than 20% in a single day—and analysts expressed alarm at the "gigantic contribution in Pre-paid licenses," commenting that the Company was "pulling forward revenue" by relying on these deals. Defendants, however, continued to mislead investors, falsely referring to these fixed contracts as "prepaid" contracts

2

when, unbeknownst to investors, *nearly all of their fixed license revenue* was coming from highly damaging minimum commitment contracts in which <u>nothing</u> was prepaid. ¶¶87-96.

Then, just a few weeks later, Defendant Dhawan abruptly resigned as CEO, and Cerence's stock price fell another 11%, from $78.08 to $69.20 per share. And finally, under the leadership of its new CEO, Stefan Ortmanns, Cerence was forced to come clean. On February 7, 2022, Ortmanns revealed that, for the past two years, the Company had sold fixed license contracts well beyond consumer demand, pulled forward tens of millions of dollars in revenue, and harmed the Company's pipeline of future business, causing the Company to completely withdraw its 2024 guidance. Gallenberger further stunned investors by disclosing that virtually all of the Company's fixed license revenue for the previous quarter was attributable to minimum commitment deals, which involved no prepayment whatsoever and had a disastrous impact on the Company's business. ¶¶102-06, 119. On this news, Cerence's stock price cratered, falling another 31% in a single trading day. Analysts excoriated the Company for its "non disclosed components to revenue," which had eradicated the Company's "credibility," and for the fact that fixed contracts "were being leveraged <u>much more aggressively [than disclosed] to drive short-term growth at the expense of long-term stability</u>." Gallenberger "retired" the same day. ¶¶97-123.

Faced with these damning facts, Defendants implausibly argue that their contract scheme did not "necessarily harm[] the company." MTD at 8 n.5. Defendants' contention is meritless in light of Ortmanns' admissions to the contrary. Defendants' other arguments fare no better. Defendants argue that many of their statements were not false or misleading. But Defendants repeatedly assured investors that they were strategically reducing their reliance on prepays, and that Cerence's revenue growth was purely a result of legitimate factors such as "very healthy" demand and "great adoption of our products and services," when in fact the opposite was true. ¶¶44-46. These statements are directly contradicted by FE1's report and ultimately, Ortmanns,

3

who explicitly admitted they were false by confirming that Cerence had achieved its results only because it "accelerat[ed] [its] backlog." ¶113.  Moreover, while Defendants argue that their financial reporting was technically accurate, courts have repeatedly rejected the argument that "accurate financial reporting" alone immunizes Defendants' statements where an undisclosed revenue acceleration scheme has "created an inaccurate impression as to the financial health of the Company." *Plantronics*, 2022 WL 3653333, at *11–13 (N.D. Cal. Aug. 17, 2022).

As to scienter, the Individual Defendants knew that their statements were false, as they personally directed their sales personnel to oversell fixed contracts, and even to convert existing, higher profit variable contracts into less profitable fixed contracts.  Scienter is bolstered by Defendants' enormous financial benefits from the fraud, including a $26 million windfall bonus for Dhawan as a *direct result* of his sales practices, and Dhawan's sale of more than 40% of his stock holdings during the Class Period.  Defendants' motion should be denied.

## I.   SUMMARY OF DEFENDANTS' FRAUD

### A.   Defendants Tout Cerence's "Sustainable" Growth and Assure Investors That They Are Reducing Reliance on Less Desirable Prepaid Contracts

At the outset of the Class Period, Defendants reassured investors that Cerence remained on a high-growth trajectory despite an automobile industry slowdown. Defendants touted the Company's "record revenue, gross margin and record EBITDA," which Defendants insisted were due to factors such as "very healthy" demand, "great adoption of our products and services," and "strong backlog." ¶¶43-46.  To assuage analyst concerns about an uptick in revenue from prepaid contracts (reported quarterly as a dollar amount without any further information), Defendants affirmed that they were "biased towards reducing prepays." ¶47. Defendants made similar reassurances throughout the Class Period.  For example, on February 8, 2021, Defendants reported "Record" F1Q21 results, and Defendant Gallenberger emphasized that the Company had achieved these results while *moving away* from prepays, insisting that Defendants "expect[ed] prepays to

4

be down this year" and that Cerence would stay in its "historical" range of "low-40s to low-50s [millions]" of prepaid license revenue for 2021. ¶¶50-51.   For much of the Class Period, Defendants also concealed that they were entering into vast amounts of "minimum commitment" deals, in which nothing was "prepaid," to boost Cerence's otherwise anemic business.  ¶¶79-82.

> **B.**     **Unbeknownst to Investors, Defendants Engaged in a Scheme to Disguise Cerence's Dwindling Growth by Converting Existing Variable Contracts to Heavily Discounted Prepaid Deals in Order to Pull Revenue Forward**

As variable revenue deteriorated in step with the automobile production slowdown, the only lever that would allow Defendants to meet their "record" revenue and incentive compensation targets was prepays, which they knew would have a long-term negative impact. ¶¶83-86.  While the Individual Defendants publicly insisted that, pursuant to their corporate strategy, they were reducing Cerence's reliance on such deals, behind the scenes, they instructed their sales force to do exactly the opposite.  FE1 reported that Dhawan "strongly pushed the prepayment deals" beginning in January 2020 and ordered sales personnel from "all over the world," including FE1, to do more prepaid deals.  Dhawan even emailed and called sales personnel about converting specific customers to prepaid contracts and along with Gallenberger, personally approved any such deals over $1 million. ¶¶70-74, 83.  Compounding matters, the Individual Defendants directed sales personnel to "convert" *existing* variable license contracts—whose future revenues already had been recorded in Cerence's backlog—to prepays, thus cannibalizing tens of millions of dollars of future revenue at a discount. ¶75.  FE1 received this directive from Dhawan himself. ¶74.

> **C.**     **Cerence's New Form of Revenue Acceleration: "Minimum Commitments"**

As both the automobile production slowdown and oversold prepays were negatively impacting variable revenue, Defendants needed a new lever to achieve their "record" revenue and incentive compensation targets.  In or about June 2021, Cerence secretly began offering customers new "minimum commitment" deals. ¶¶80-81.  Like prepays, minimum commitments allowed the

5

Company to *immediately* recognize all revenue from the lifetime of the deal up front. But unlike prepaid deals, minimum commitment deals *did not* require OEMs to make *any* payments up front. These new contracts were even more detrimental to Cerence than prepaid deals, as Cerence still had to provide significant, locked-in discounts without receiving any cash up front, while cannibalizing *up to 5 years'* worth of future revenue. ¶¶67-68. FE1 explained that "[Dhawan] and [Jungheim] pushed us to propose" the new and undisclosed minimum commitment deals, and that the "order from Sanjay" to do these deals came repeatedly in calls and emails between Dhawan and sales managers (including FE1). ¶¶71, 80, 212. FE1 explained that minimum commitment deals allowed Defendants to "hide" the "big gap" between "Goal and Real" performance. ¶78.

### D.      The Truth is Revealed

Defendants' scheme began to unravel on November 22, 2021, when Cerence announced financial results for F4Q21, revealing that "fixed" deals had ballooned to $71 million, vastly exceeding the sustainable range that Defendants continually reiterated throughout the Class Period. ¶198. Analysts raised concerns regarding "prepaid" deals, resulting in a 20% stock price decline and erasing more than $800 million in stockholder value. ¶200. Tellingly, despite how material the novel minimum commitment deals were, the *only* "disclosure" of them came in a footnote to the F4Q21 earnings presentation, cryptically stating, "Fixed license revenue includes prepaid and minimum commitment deals." Defendants did not disclose their amount or key terms, even though almost 90% of "fixed" deals in the quarter were minimum commitments. Further obfuscating the truth, Gallenberger stated that the $71 million in revenue was "prepays" when, in truth, virtually all of that revenue came from minimum commitments, which involved *no* prepayment. ¶¶91-96. Then, on December 15, 2021, Dhawan resigned as CEO, effective immediately, to be replaced by Ortmanns. Analysts connected the change in leadership to the poor F4Q21 results, stated that the unexpected resignation harmed Cerence's credibility, and questioned the veracity of Cerence's

recently issued and reaffirmed guidance.  Cerence's stock price fell by 11% in response. ¶¶97-99.

On the last day of the Class Period, after the Individual Defendants secured their payday, Ortmanns finally disclosed the truth: for two years, Defendants had accelerated revenue from clients through overreliance on harmful prepay and even more harmful minimum commitment deals, with catastrophic consequences for Cerence's long-term growth prospects. Because of the impact of these oversold fixed contracts, which were "creating *a significant headwind* to our variable license revenue growth [as] those fixed licenses need to be consumed," Ortmanns was forced to lower FY2022 guidance by 9% and *completely withdraw* FY2024 guidance.  Ortmanns also announced Defendant Gallenberger's sudden "retirement." ¶¶100-10.

Cerence's stock plummeted by 30% in response to these revelations, and analysts excoriated management for concealing this material information. ¶110.  Evercore noted that the "minimum commitment[s]" had "*not been fully addressed*," and Needham emphasized that this was "*the first time I've [heard] about fixed commitment or minimum commitments versus prepays*." ¶¶105-06.  Raymond James likewise reported that "[t]he ugly part of the print has been the amount of *previously non disclosed components to revenue* that are apparently more one-off in nature." ¶108.  Craig-Hallum stated that "[a]t the heart of the surprises," was the fact that "*[p]re-pays were being leveraged much more aggressively to drive short-term growth at the expense of long-term stability*." ¶109.

Ortmanns has since publicly blamed Dhawan for the fixed license debacle, admitting that the "emphasis" on and approval of fixed deals "goes up to the CEO."  And in a further attempt to regain lost credibility, Ortmanns has *suspended* all new fixed deals, admitted that Cerence will not be able to sustain fixed sales of $40 million or more *until 2025*, Ex. 2 at 2-3, and disclosed that it will now take between *6-10 quarters* for an OEM to consume a fixed license contract, compared to the usual 4-6 quarters, directly contradicting Defendants' prior statements. ¶¶111-23.

## II.    <u>ARGUMENT</u>

To establish a Section 10(b) claim, a plaintiff is required to plead six elements: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017).  Defendants challenge only two elements of Plaintiff's Section 10(b) claim for some statements: material misrepresentation or omission and scienter.[2]

### A.    **Defendants' Materially False and Misleading Statements and Omissions Regarding Their Undisclosed Revenue Acceleration Scheme Are Actionable**

Under Rule 10b-5, a duty to disclose arises if the disclosure is "necessary in order to make the statements made . . . not misleading . . . ." 17 C.F.R. § 240.10b-5; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (same).  The AC adequately alleges falsity because it "specif[ies] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); ¶¶133-96.

Throughout the Class Period, Defendants made positive statements about the strength of the Company's business and growth prospects, its business strategy, and its use of prepay contracts.  Defendants' statements were materially false and misleading because Defendants were actively engaged in an undisclosed scheme to accelerate revenues at the expense of future growth by promoting heavily discounted fixed contracts, even converting existing variable contracts in order to do so.  *In re SupportSoft, Inc. Sec. Litig.*, 2005 WL 3113082, at *1 (N.D. Cal. Nov. 21, 2005) (positive statements about business misleading in light of undisclosed practice of "switching existing customers from ratable to perpetual licenses [to] . . . increas[e] present revenue").  For

---

[2] Defendants concede, at minimum, the falsity of their statements about "sustainable growth," the reasons for the increase in fixed revenues, and 2024 guidance. *See* Ex. 1 at ¶¶168, 185, 189. *See Karth v. Keryx Biopharms., Inc.*, 6 F.4th 123, 133-34 n.12 (1st Cir. 2021) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Defendants also advance argument in their chart which is unsupported by any effort at developed argumentation in their motion to dismiss brief. *See, e.g.,* Ex. 1 at ¶159.

example, Defendants repeatedly assured investors they were "***biased towards reducing prepays***" (Ex. 1 at ¶¶137, 154-55, 161, 171, 185-86, 187) when, in fact, they were aggressively pushing prepays. Defendants also blatantly mischaracterized Cerence's minimum commitment deals—in which no money was due for years—as "prepaid" deals, (*id.* ¶¶178, 193), while concealing all information about the new contracts' nature, terms, and deleterious effect on Cerence's business.

Moreover, Defendants misleadingly attributed revenue growth from their scheme to nonexistent market demand and falsely characterized the Company's "pipeline" as strong and growth as "sustainable," when, in fact, they were cannibalizing and materially impairing both. *Id.* ¶¶139, 144, 146, 148-49, 164, 168, 182-83; *see Smith & Wesson Holding Corp. Sec. Litig.,* 669 F. 3d 68, 74 (1st Cir. 2012) (technically accurate "strong sales numbers" misleading if "cheerleading commentary . . . *implie[s]* . . . that they reflected strong demand"); *Plantronics*, 2022 WL 3653333, at *13 (statements "misleading for failure to mention the undisclosed sales practice while attributing positive revenue results to organic consumer demand"). The AC adequately alleges that Defendants misrepresented market demand at the time of sales by pleading specific facts supporting an inference of artificial demand, including unusual sales tactics and transactions (i.e., minimum commitments and conversions), a decrease in sales in subsequent quarters, and a build-up of inventory (elongated consumption time). *Id* at *11.

Further, as CEO Ortmanns later *admitted*, Defendants knowingly issued and then reaffirmed unachievable guidance and objectively misstated the impact of oversold fixed contracts. Ex. 1 ¶172. Defendants expressly stated that prepays had been "***built into the forecast***" when issuing guidance on August 24, 2021, despite knowing that the Company then was selling minimum commitments that were cannibalizing up to five years of revenue. *See* ¶¶171, 204; Ex. 1 ¶189 (falsely claiming "nothing had changed" with respect to prepays, despite knowing that fixed deals would not be consumed for 2 years, and thus would have an impact until ***at least*** fiscal 2024).

9

Unable to avoid these glaring facts, Defendants argue that their contemporaneous disclosure of the *dollar amount* of fixed deals in each quarter and their purported "disclosure" of minimum commitment contracts in a footnote immunizes their conduct.  MTD at 18.  This argument is nonsense.  Although the Company reported its fixed license revenue, Defendants concealed numerous material facts about that revenue, including, (1) Defendants were actively working to increase prepays to achieve their revenue and incentive compensation targets; (2) Defendants were cannibalizing future revenue by converting *existing* variable contracts into prepays; (3) the extremely long "consumption rate" on these fixed contracts was *at least* 4-6 quarters; (4) the steep discount Cerence provided on these contracts—"mid-teen" percent; and (5) the range of $40-50 million for prepays was, in reality, extremely detrimental to the Company's financial condition. ¶¶4, 65-78, 113, 116, Ex. 2 at 2-3. Moreover, the notion that Defendants "disclosed" minimum commitment deals by mentioning them in a footnote is meritless. Defendants disclosed nothing about the nature, terms or material negative impact of these deals. *In re Alstom SA*, 406 F. Supp. 2d 433, 453 & n.11 (S.D.N.Y. 2005) ("vaguely worded footnotes" lacked "critical underlying information," making it "virtually impossible to discern what exactly the company is alluding to").[3]  Indeed, in August 2021, while Defendants were doing vast amounts of "minimum commitment" deals that materially harmed the Company, they assured investors that the Company's results reflected Cerence's "multifaceted growth strategy to deliver sustainable growth." Ex. 1 ¶168.

These facts establish that Defendants affirmatively mischaracterized minimum commitments as prepays, concealed their key terms, and hid the fact that they constituted almost

---

[3] *City of Miami Fire Fighters' & Police Officers' Retirement Trust v. CVS Health Corp.* (MTD at 18) is inapposite, as the AC details the "concrete and inaccurate conclusions" invited by Defendants' statements. 2022 WL 3570838, at *6 (1st Cir. Aug. 18, 2022).

90% of the Company's fixed license revenue—$22.1 million out of $25.6 million—in F4Q2021, and 100% in F1Q2022. Indeed, the stunned analyst reaction eviscerates any argument that Defendants disclosed all material facts. ¶¶100-123; *In re Ariad Pharm.*, Inc., 98 F. Supp. 3d 147, 162 (D. Mass. 2015) (market "surprise" supported materiality). At best, Defendants' argument amounts to a premature "truth on the market" affirmative defense, which is "intensely fact-specific" and cannot be accepted as a matter of law, especially in light of the analyst reaction detailed in the AC. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Similarly, although Defendants argue that they are absolved of liability because Cerence's financial results were technically accurate, courts across the country routinely find actionable statements based on similar undisclosed revenue acceleration schemes, even where no GAAP violation or false financial statements have been alleged.[4] Defendants' remaining arguments—that their statements were immaterial and/or protected by the PSLRA safe-harbor—fare no better.

### 1. Defendants' False Statements and Omissions Were Material

Statements and omissions are material where they form "a significant part of the mix of information considered in evaluating . . . an investment." *Carbonite*, 22 F.4th 1, 8 (1st Cir. 2021). Undisclosed revenue acceleration schemes, like here, are material as "reasonable investors would obviously [] want[] to know" that Defendants were manipulating their customer contracts for the sole purpose of "closing the gap between . . . actual and desired revenue." *Crane*, 87 F. Supp. 3d 1082, 1085; *Stumpf v. Garvey*, 2005 WL 2127674, at *1, *8 (D.N.H. Sep. 2, 2005) (statements that "demand was increasing" in market "already saturated with unused capacity" were material).

---

[4] *Plantronics*, 2022 WL 3653333, at *13; *Police & Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1083 (N.D. Cal. 2015) (undisclosed conversion of client contracts misleading); *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 618 F. Supp. 2d 311, 323 (S.D.N.Y. 2009); *Lucia v. Prospect St. High Income Portfolio*, 36 F.3d 170, 175 (1st Cir. 1994) (disclosure required is measured "not by literal truth, but by the ability of the material to accurately inform rather than mislead . . . ."); *Miller v. Sonus Networks, Inc.*, 2022 WL 11804021 (D. Mass. Oct. 20, 2022), at *1, 4 (denying motion to dismiss despite accurate financial statements where Defendants "pulled forward" revenue in order to achieve forecasts).

11

Defendants nonetheless argue that their false and misleading statements were merely "vaguely optimistic" and thus "immaterial." But statements of corporate optimism are inactionable only when they are "so vague, so general, or so loosely optimistic that a reasonable investor would find [them] unimportant." *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009); *Brumbaugh v. Wave Sys. Corp.,* 416 F. Supp. 2d 239, 250 n.11 (D. Mass. 2006). Here, Defendants' statements were *highly specific*, providing precise consumption timelines, quantifying "prepay" revenues (which were actually from minimum commitments) and insisting that the Company would remain within its historical prepay revenue range when the opposite was true. *See, e.g.*, Ex. 1 ¶¶187, 178, 137, 143, 148, 154-55, 171, 186. Further, many of Defendants' statements were in direct response to analyst questions about the subject. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (statement that product would "maintain its growth rate" material as response to analyst question).

Moreover, even "general statements of optimism, when taken in context" are actionable when, as here, "those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017). Here, where Defendants failed to disclose their scheme to accelerate revenue through overreliance on fixed contracts, their statements "gave investors an inaccurate impression of the causes for the revenue results" and were thus not puffery. *Plantronics,* 2022 WL 3653333, at *16. Ultimately, materiality is a question best left to the trier of fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (U.S. 1988).

### 2.  Defendants' Statements Are Not Protected by the PSLRA Safe Harbor

Defendants argue that a single generic risk warning concerning hypothetical "pricing pressures *from our customers*" immunizes their statements concerning limiting the use of fixed contracts. ¶¶137, 154-155, 161, 175, 186-187; MTD at 19. Not so. As an initial matter,

12

Defendants concede that many of their statements were not forward looking at all (Ex. 1 ¶¶139, 143, 159, 168, 178, 182, 183, 185, 189, 190, 191, 193, 196), were mixed statements of present fact (*id.* ¶¶137, 144, 148, 154, 161, 163-64, 170-71, 174-75), or contained omissions of present fact (*id.* ¶¶146, 151, 155, 186-87). *See Brumbaugh*, 416 F. Supp. 2d at 251 (no safe harbor for "statement [that] cannot be characterized as forward-looking"); *In re Stone & Webster, Inc., Securities Litigation*, 414 F.3d 187, 213 (1st Cir. 2005) ("The safe harbor . . . is intended to apply only to allegations of falsehood as to the forward-looking aspects"); *Wilson v. LSB Industries, Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y., 2017) (safe harbor does not protect material omissions). Indeed, in cases involving channel stuffing allegations remarkably similar to those here, courts have repeatedly held that even Defendants' arguably forward-looking statements are not protected by the safe harbor. *See, e.g.*, *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 523 (D. Md. 2021) (omission of channel stuffing scheme vitiated application of safe harbor).

Second, to the extent the challenged statements may contain a forward-looking aspect, the generic risk warning (like others impermissibly referenced only in Defendants' chart) is irrelevant. The AC establishes that *Defendants' affirmative efforts* to push fixed contracts arose from their **own** scheme to accelerate revenue, and not from "pricing pressure *from customers*." *See* Section I.B-C, *supra*; ¶¶70-74. Thus, Defendants' statements were not accompanied by meaningful cautionary language. *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 313 (S.D.N.Y. 2013) ("well-settled that cautionary language cannot protect against the omission of present fact."); *In re Merrill Lynch Auction Rate Sec. Litig.*, 2011 WL 1330847, at *8 (S.D.N.Y. Mar. 30, 2011) ("generic disclaimer" can't sanitize concealment of "specific increased risk").

Last, to the extent the challenged statements may contain a forward-looking aspect, Defendants indisputably had actual knowledge of the scheme they implemented, negating safe harbor protection. *See* Section II.B., *infra*.; *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d at 252

13

("allegations of actual knowledge are sufficient to preclude safe harbor access."); *Kirby v. Cullinet Software, Inc.*, 721 F. Supp. 1444, 1449 (D. Mass. 1989) ("materially misleading predictions made with scienter are actionable"). Thus, even if Defendants' statements were forward-looking, they were knowingly false. None of Defendants' statements are protected by the safe harbor.

### B. The AC Adequately Alleges Scienter

A complaint adequately alleges scienter if it raises a strong inference "either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Carbonite,* 22 F.4th at 8. The inference must be "cogent and at least as compelling as any opposing inference." *Id*. at 9. A tie goes to the plaintiff. *Saunwin Int'l Equities Fund LLC v. Donville Kent Asset Mgmt. Inc.*, 2018 WL 3543533, at *7 (D. Mass. July 20, 2018). The Court must "accept well-pleaded factual allegations in the [C]omplaint as true and . . . view all reasonable inferences in the plaintiff's favor." *Carbonite,* 22 F.4th at 6. "[T]he plaintiff may combine various facts and circumstances indicating fraudulent intent . . . to show a strong inference of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir. 2002) (the "resulting [scienter] portrait" can meet the "strong inference" requirement).

#### 1. The Individual Defendants Directed the Scheme

The Individual Defendants *personally directed* Cerence's scheme to pull forward revenue and hide its worsening financial condition. *See* Section I.B-C, *supra*. Ortmanns later <u>admitted</u> that the Individual Defendants had personally approved the Company's fixed license deals— saying, in direct response to an analyst question about "who approved fixed license deals" that "<u>it goes up to the CEO</u>." ¶112. Dhawan and Gallenberger's "direct involvement in and knowledge of [Cerence's] undisclosed plan" to pull forward revenue by converting variable deals into less favorable prepaids and minimum commitments strongly supports scienter. *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *5 (N.D. Ill. Feb. 27, 2018); *see also*

14

*Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at \*16 (D. Or. June 27, 2017) (CEO clearly "aware that [company] shipped excess product to customers because he directed the practice"); *Plantronics*, 2022 WL 3653333, at \*11 (knowingly realizing revenues in present quarter at the expense of future revenues supported scienter).[5]

Unable to refute these well-pled allegations, Defendants attempt to discredit FE1. First, Defendants argue that the AC's highly specific allegations drawn from FE1 are insufficient because too high a percentage of the AC's allegations are paraphrased, rather than directly quoted, from FE1. MTD at 11-12. But Defendants cite *no authority* whatsoever for this absurd proposition, and Plaintiff is aware of none. Rather, confidential witnesses, as here, need only be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 111 (D. Mass. 2014).[6]

Defendants' other arguments simply misconstrue the AC's allegations. For example, Defendants incorrectly claim that the AC merely alleges that Dhawan and Gallenberger "must have understood that their statements were deceptive" due to "their senior positions at Cerence and their knowledge of its business." MTD at 15. But Defendants "overlook[] that Plaintiff[] here do[es] not argue that [Dhawan and Gallenberger] must have known only because [of their positions], but rather, that [they] must have known . . . because [they were] personally involved [in the underlying conduct]," and because the underlying facts were "crucial to the success of the

---

[5] Defendants' authorities are inapposite, as they concern allegations that executives had scienter "solely" due to their positions. *See Blue v. Doral Fin. Corp.* 123 F. Supp. 3d 236, 269 (D.P.R. 2015) (distinguishing two of Defendants' cases and noting that they "rest **solely** on said [core operations] inferences").

[6] A federal district court recently upheld FE allegations while specifically noting that they "paraphrase[] certain things a confidential witness allegedly stated, or otherwise make[] clear the substance of something [the] witness stated," rather than quote them. *Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at \*34, n. 43 (M.D. Tenn. Aug. 17, 2022). The Court here should similarly reject Defendants' efforts to discredit FE1. *See also Godinez v. Alere Inc.*, 272 F. Supp. 3d 201, 217 (D. Mass. 2017) ("In light of the surrounding allegations, at the motion to dismiss stage, the Court accepts as true the confidential witness statements.").

company's lead product." *In re Genta, Inc., Sec. Litig.*, 2005 WL 2416970, at *7 (D.N.J. Sept. 30, 2005). Defendants also attempt to minimize FE1 by mischaracterizing him as a "low-level employee," but this too fails. FE1 was one of four sales managers for Japan—a country comprising 30% of the Company's overall revenue (¶¶69, 71 n.2)—and significantly, described *direct* communications with Defendant Dhawan and other senior management about Dhawan's directive to promote both prepaid and minimum commitment contracts, including in other territories. *See Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 71–72 (D. Mass. 2014) (former employee "received directions" on undisclosed sales practice "directly from [the individual defendants]" who were "solely responsible for decisions" about those practices, supporting scienter.).

Finally, Defendants liken FE1's statements about Defendants' revenue practices to mere "opinions." But FE1 did not merely express an "opinion" about Defendants' practices; rather, he reported that the Individual Defendants personally directed sales personnel to convert existing variable contracts to prepaid and minimum commitment contracts while portraying the exact opposite to investors.[7] As such, "Defendants' retort—that this was just the opinion of a single employee—misses the mark." *Levy v. Gutierrez,* 2017 WL 2191592, at *13 (D.N.H. May 4, 2017) (witness privy to central facts and had direct communications with defendants about those facts).

### 2. Defendants' Scheme Had No Legitimate Business Purpose, Further Supporting Scienter

Defendants' scheme supports a strong inference of scienter, as it "lacked any business purpose" other than to inflate short-term revenue to meet targets. *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 294-96 (S.D.N.Y 2011) (transactions designed to temporarily meet balance sheet targets supported inference of scienter); *see also SupportSoft*, 2005 WL 3113082,

---

[7] *Shemian v. Research in Motion Ltd.* (MTD at 12), wherein "the informants never mentioned the Individual Defendants nor tied them personally to knowledge of the delays and product concerns," is thus inapposite. 2013 WL 1285779, at *15 (S.D.N.Y. Mar. 29, 2013).

at *6 (recontracting scheme suggested "conscious decision to conceal" poor business performance); *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1362 (N.D. Ga. 2010) (scienter where defendants knew that "channel stuffing activities [were] creating a damaging inventory correction in later quarters").

Defendants argue that a *nonculpable* inference is more compelling because Cerence "disclosed to the investing public its share of revenue from fixed contracts each quarter," and Defendants thus could not have believed they could "mislead investors about whether it was successful in limiting its use of those contracts." MTD at 10, 17.  But Defendants ignore the facts omitted from their opaque disclosures about "fixed contracts" that made those statements highly misleading, including that (1) "fixed" contracts increasingly consisted of undefined "minimum commitment" deals in which the Company received no cash at the outset; (2) the Company was *converting* its existing variable contracts to prepays and minimum commitments, cannibalizing future revenue; (3) rather than eschewing these practices, Defendants were actively promoting them throughout the Class Period; (4) the deals had terms as long as five years, meaning growth would be impacted at least into 2024; and (5) the sustainable range of fixed contracts the Company promised investors (as much as $55m) was blatantly false, as further confirmed by the fact that Cerence has now suspended all fixed contracts and represented that $40 million will only be sustainable by 2025.[8, 9]  With these facts conspicuously omitted from public statements (and later admitted by the Company's new CEO), an innocent inference is highly implausible.

---

[8] Defendants' assertion that Cerence used fixed contracts after Dhawan's departure is a non-sequitur and is irrelevant to whether Defendants knowingly misled investors about the use of those contracts during the Class Period.  MTD at 7.  Further, the factual assertion that the Company "continues" to use fixed contracts (MTD at 8 n.5) is incorrect, as Cerence has suspended the use of such contracts. Ex. 2 at 2-3.

[9] Defendants also assert that their conduct could be viewed as innocent because customers in Asia purportedly preferred fixed deals.  This argument raises fact issues that cannot be resolved as this stage of the litigation and ignores FE1's averments that the deals were driven by the Defendants, and that "Sanjay and Egon pushed us to propose" those deals even when the "customer hesitated" to do it. ¶215.

### 3. Defendants' Post-Class Period Admissions Support Scienter

CEO Ortmanns admitted that Cerence's revenue acceleration scheme had "caused" a year-over-year "variable license [revenue] decline." ¶102.   Gallenberger admitted that Defendants "knew about" the impact of fixed deals "when we were giving guidance in November." ¶107. Defendants admitted that fixed licensed revenue had largely come "from our backlog"—i.e., from cannibalizing existing variable contracts. ¶¶ 104, 118.   Defendants admitted, in response to questions about "who approved fixed license deals," that "it goes up to the CEO." ¶112.   Such admissions support scienter, as they "suggest[] that [Defendants' assurances] were incorrect when made." *Allstate*, 2018 WL 1071442, at *5-6 (CEO admitted during a post-class period earnings call that "reduced underwriting standards contributed to [] increased claims frequency, and that such an impact was expected"); *Plantronics*, 2022 WL 3653333, at *11, 18 (admissions two weeks after class period support inference of "knowingly adopted," "company-wide strategy").

### 4. Defendants' Financial Motive Supports Scienter

The AC also describes a clear motive for Dhawan and Gallenberger to engage in deceptive revenue acceleration: to achieve revenue targets and guidance that triggered lavish incentive bonus payments.  Dhawan received $27 million worth of shares and substantial cash bonuses as a direct result of Cerence meeting guidance throughout the Class Period—a result he *would not have achieved* but for Defendants' scheme. ¶¶124-32.  Gallenberger similarly was awarded millions of dollars in shares and cash bonuses.  These "financial incentives to exaggerate earnings . . . may be considered among other facts to show scienter." *Aldridge*, 284 F.3d at 83.  Moreover, Defendants' scheme allowed them to *just barely* meet their guidance targets (by less than 1%) every fiscal year and most fiscal quarters, ¶127, and thus, to *just barely* receive their near maximum payouts.  Courts have found similar facts "especially troubling" with respect to scienter. *Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *4 (N.D. Cal. Sep. 4, 2012) ("just barely" meeting

18

thresholds for incentive-based compensation supported scienter).[10]

The AC also alleges that the Individual Defendants took advantage of their fraud by selling massive amounts of their stock—much of which they had acquired by misleadingly representing the Company's revenues—at fraud-inflated prices.  Dhawan sold almost 248,000 shares, or 40% of his holdings,[11] for roughly $24 million—5.7 times the number of shares, and 9.6 times the resulting proceeds, as in the prior same-length period. *See, e.g.*, *Gutierrez*, 2017 WL 2191592 at *14 (sales of 50%, 12%, and 36%, respectively, of executive holdings supported scienter); *id.* (contrast in sales volume to "control period" of equal length supported scienter); *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1267 (10th Cir. 2022) (40% of holdings sold for $22 million supported scienter where sales in control period equaled just $4.5 million).  Moreover, the vast majority of Dhawan's sales were pursuant to a Rule 10b5-1 plan adopted ***during*** the Class Period, meaning that Defendants "may not invoke the plan['s] existence to disarm any inference of scienter." *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *10 (S.D.N.Y. Aug. 8, 2012). Defendants' outsized Class Period stock sales thus further support scienter.[12]

### 5.   The AC's Other Allegations Also Support Scienter

Dhawan's and Gallenberger's "abrupt resignation[s]" also "support scienter and may be considered together with other allegations, including statements by confidential witnesses and the compensation [they] received, because scienter is reviewed holistically." *In re Fibrogen, Inc., Secs. Litig.*, 2022 WL 2793032, at *25 (N.D. Cal. July 15, 2022); *see Collier,* 9 F. Supp. 3d at 76

---

[10] The argument that "incentive plans are commonplace" ignores the AC's allegations specifically tying Defendants' outsized bonus payouts directly to their scheme to pull forward revenue. *In re Psychemedics Corp. Sec. Litig.*, (MTD at 16) is thus inapposite.  2017 WL 5159212, at *7 (D. Mass. Nov. 7, 2017).

[11] Dhawan was required to hold at least 5 times his annual salary in stock.  As such, Dhawan's Class Period stock sales *as a percentage of holdings actually available for sale* are likely even higher than 40%.

[12] *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003), and *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 523 (D. Mass. 2014) (MTD at 13), merely stand for the proposition that a 10b5-1 plan *may* rebut an inference of scienter where, unlike here, other evidence renders the trading not suspicious.

(scienter supported by defendants' resignations).  Here, the "circumstances and timing" of Dhawan's resignation were suspicious[13]—coming mere *weeks* after the unexpected announcement of a massive spike in prepaid deals (which had triggered his own incentive payout), and less than two months before the final corrective disclosure.  Moreover, analysts understood the "abruptness" and "immediate transition" to be signs that Dhawan and Cerence had lost credibility, and that there was a need to "restore [investors'] confidence."[14]   Gallenberger's "resignation" was also suspiciously timed, as it was announced on the *same day* that Cerence's new CEO finally disclosed the full extent of Defendants' scheme.

Finally, the pervasiveness of the Company's promotion of fixed deals makes it nearly impossible that Defendants were not aware of them.  Indeed, by the end of fiscal year 2021, Cerence's fixed license deals had increased to $71 million—*41%* above the average historical amount; by Q4 2021, minimum commitment deals accounted for *87% of Cerence's total fixed revenues*; and by Q1 2022, that amount increased to *100%*. ¶82.  Defendants thus cannot plausibly claim they were unaware of this essential aspect of their business during the Class Period.[15] *See, e.g.*, *Carbonite*, 22 F.4th at 9–10 (importance of product supported management's scienter).

## **CONCLUSION**

Defendants' motion to dismiss should be denied.  If the Court grants Defendants' motion in whole or part, Plaintiff respectfully requests leave to amend.

---

[13] *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 (S.D.N.Y. 2014); *see also Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *34 (S.D. Ohio Jan. 21, 2016) (timing of executive's resignation supported scienter).

[14] Defendants' inapposite authority merely holds that executive resignations "*alone* cannot support an inference of scienter."  MTD at 16; *Metzler Asset Mgmt. v. Kingsley*, 305 F. Supp. 3d 181, 219 (D. Mass. 2018); *Harrington v. Tetraphase Pharms. Inc.*, 2017 WL 1946305, at *7 (D. Mass. May 9, 2017) (same).

[15] Because the AC pleads a primary violation of Section 10(b), Plaintiff's control person liability claim under Section 20(a) of the Exchange Act, 15 U.S.C. 78t(a), must be sustained.

Dated: October 24, 2022

Respectfully submitted,

/s/ *John Rizio-Hamilton*
Hannah G. Ross (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Michael M. Mathai (*pro hac vice*)
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400
hannah@blbglaw.com
johnr@blbglaw.com
michael.mathai@blbglaw.com

Jonathan D. Uslaner (*pro hac vice*)
Caitlin C. Bozman (*pro hac vice*)
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
(310) 819-3470
jonathanu@blbglaw.com
caitlin.bozman@blbglaw.com

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White III (BBO #648498)
SAXENA WHITE P.A.
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
(561) 394-3399
msaxena@saxenawhite.com
jwhite@saxenawhite.com

Steven B. Singer (*pro hac vice*)
Alec T. Coquin (*pro hac vice*)
Joshua H. Saltzman (*pro hac forthcoming*)
SAXENA WHITE P.A.
10 Bank Street, 8th Floor
White Plains, New York 10606
(914) 437-8551
ssinger@saxenawhite.com
acoquin@saxenawhite.com

*Lead Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi*

21

T. Christopher Donnelly (BBO #129930)
Peter E. Gelhaar (BBO #188310)
Peter K. Levitt (BBO #565761)
DONNELLY, CONROY
& GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880
tcd@dcglaw.com
peg@dcglaw.com
pkl@dcglaw.com

*Liaison Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi*

John L. Davidson (*pro hac vice*)
**DAVIDSON BOWIE, PLLC**
1062 Highland Colony Parkway
200 Concourse, Suite 275
Ridgeland, Mississippi 39157
(601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi*

22

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 24th day of October, 2022.

/s/ *T. Christopher Donnelly*
T. Christopher Donnelly