UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CITY OF MIAMI FIRE FIGHTERS' AND     :
POLICE OFFICERS' RETIREMENT TRUST,
individually and on behalf of all others     :
similarly situated,

                       :

           Plaintiff,          Civil Action
                       :    No. 22-10321-ADB

      v.

                       :    **LEAVE TO FILE**
CERENCE INC., SANJAY DHAWAN, and      **GRANTED ON MAY 26, 2022**
MARK J. GALLENBERGER,            :    **(ECF NO. 26)**

           Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

Dated: November 23, 2022
       Boston, Massachusetts

James R. Carroll
Kurt Wm. Hemr
Amy-Lee Goodman
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800

Counsel for Defendants
Cerence Inc., Sanjay Dhawan, and
Mark J. Gallenberger

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ............................................................................................................................2

I.      PLAINTIFF'S CONCLUSORY PLEADING FAILS TO ALLEGE
        FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER .................................2

        A.      Because Cerence Repeatedly Informed Investors That Fixed Contract
                Revenue Was Unpredictable, And Disclosed Its Fixed Contract Revenue
                In Every Quarter, The Court Cannot Draw A Strong Inference Of Scienter ...........2

        B.      Plaintiff's Reliance On Its Putative Confidential Witness Is Unavailing ................3

        C.      No Plausible Allegation Of Insider Trading Has Been Presented Here ..................4

        D.      Plaintiff's Other Contentions Do Not Support Any Inference Of Scienter .............5

II.     PLAINTIFF HAS NOT ALLEGED
        AN ACTIONABLE MISREPRESENTATION ...............................................................8

        A.      Cerence's Forward-Looking Statements Concerning The Volume
                Of Fixed License Agreements Fall Within The PSLRA Safe Harbor ....................9

        B.      General Statements Of Optimism
                About Cerence's Future Are Not Actionable........................................................10

CONCLUSION........................................................................................................................10

i

# TABLE OF AUTHORITIES

(Securities cases are identified herein in citations after
the initial citation by the name of the corporate defendant.)

**CASES**                                                                      **PAGE(S)**

*In re Alstom SA*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................... 8

*In re Ariad Pharmaceuticals, Inc. Securities Litigation*,
    98 F. Supp. 3d 147 (D. Mass. 2015), *aff'd in part, rev'd in part,*
    842 F.3d 744 (1st Cir. 2016)............................................................................ 8

*Blue v. Doral Financial Corp.*,
    123 F. Supp. 3d 236 (D.P.R. 2015)..................................................................... 8

*Brumbaugh v. Wave Systems Corp.*,
    416 F. Supp. 2d 239 (D. Mass. 2006) ................................................................. 10

*Carpenters Pension Trust Fund for Northern California v. Allstate Corp.*,
    No. 16 C 10510, 2018 WL 1071442 (N.D. Ill. Feb. 27, 2018)........................................... 7

*City of Austin Police Retirement System v. Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. 2013)................................................................... 9

*Collier v. ModusLink Global Solutions, Inc.,*
    9 F. Supp. 3d 61 (D. Mass. 2014) ..................................................................... 4

*Coyne v. Metabolix, Inc.*,
    943 F. Supp. 2d 259 (D. Mass. 2013) .................................................................. 10

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015)........................................................................ 4, 5

*In re The First Marblehead Corp. Securities Litigation*,
    639 F. Supp. 2d 145 (D. Mass. 2009) .................................................................. 5

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
    618 F. Supp. 2d 311 (S.D.N.Y. 2009)................................................................... 9

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000).......................................................................... 8

*Indiana Public Retirement System v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ....................................................................... 5

*In re iRobot Corp. Securities Litigation*,
　　527 F. Supp. 3d 124 (D. Mass. 2021) ................................................................................. 7

*Levy v. Gutierrez*,
　　No. 14-CV-443-JL, 2017 WL 2191592 (D.N.H. May 4, 2017) .................................... 4, 5

*Lucia v. Prospect St. High Income Portfolio, Inc.*,
　　36 F.3d 170 (1st Cir. 1994) ......................................................................................... 9

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
　　437 F.3d 588 (7th Cir. 2006), *vacated and remanded*,
　　551 U.S. 308 (2007) ..................................................................................................... 10

*In re Merrill Lynch Auction Rate Securities Litigation*,
　　No. 09 MD 2030(LAP), 2011 WL 1330847 (S.D.N.Y Mar. 30, 2011) ............................ 9

*Metzler Asset Management GmbH v. Kingsley*,
　　305 F. Supp. 3d 181 (D. Mass. 2018), *aff'd*, 928 F.3d 151 (1st Cir. 2019) ....................... 7

*Miller v. Sonus Networks, Inc.*,
　　No. CV 18-12344-GAO, 2022 WL 11804021 (D. Mass. Oct. 20, 2022) .......................... 9

*Murphy v. Precision Castparts Corp.*,
　　No. 3:16-CV-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017), *report and
　　recommendation adopted*, No. 3:16-CV-00521-SB, 2017 WL 3610523 (D. Or. Aug. 22,
　　2017) ........................................................................................................................... 7

*New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
　　537 F.3d 35 (1st Cir. 2008) ......................................................................................... 5

*In re OSG Securities Litigation*,
　　12 F. Supp. 3d 622 (S.D.N.Y. 2014) ............................................................................ 7

*In re Plantronics, Inc. Securities Litigation*,
　　No. 19-CV-07481-JST, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ................... 6, 9, 10

*Padilla v. Community Health Systems, Inc.*,
　　No. 3:19-cv-00461, 2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) .............................. 4

*Police & Fire Retirement System of the City of Detroit v. Crane*,
　　87 F. Supp. 3d 1075 (N.D. Cal. 2015) ........................................................................... 9

*In re Quality Systems, Inc. Securities Litigation*,
　　865 F.3d 1130 (9th Cir. 2017) ...................................................................................... 10

iii

*Shemian v. Research In Motion Ltd.*,
No. 11 CIV. 4068(RJS), 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F.
App'x 32 (2d Cir. 2014) .................................................................................................. 4

*Simon v. Abiomed, Inc.*,
37 F. Supp. 3d 499 (D. Mass. 2014), *aff'd sub nom. Fire & Police Pension Ass'n of
Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015) ................................................... 5

*In re Smith & Wesson Holding Corp. Securities Litigation*,
604 F. Supp. 2d 332 (D. Mass. 2009) ............................................................................ 7

*Sousa v. Sonus Networks, Inc.*,
261 F. Supp. 3d 112 (D. Mass. 2017) ............................................................................ 8

*Stumpf v. Garvey*,
No. 02-MDL-1335-PB, 2005 WL 212767 (D.N.H. Sept. 2, 2005) ................................. 10

*In re SupportSoft, Inc. Securities Litigation*,
No. C 04-5222 SI, 2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) .................................... 9

*In re Under Armour Securities Litigation*,
540 F. Supp. 3d 513 (D. Md. 2021) ............................................................................... 10

*Washtenaw County Employees Retirement System v. Celera Corp.*,
No. 5:10-CV-02604 EJD, 2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) .......................... 7

*Willis v. Big Lots, Inc.*,
No. 2:12-CV-604, 2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) .....................................7

**PRELIMINARY STATEMENT**

Plaintiff argues that "throughout the Class Period, Defendants expressly promised investors that they were strategically reducing their reliance on prepay contracts." (Opp.[1] 1.) That contention is conclusively refuted by the very disclosures on which the Amended Complaint relies, which demonstrate that Defendants repeatedly cautioned investors that the company's volume of fixed or "prepay" contracts would be "lumpy" and "difficult to predict." (*See* Part I.A *infra*.)  It is further refuted by the fact that Cerence voluntarily disclosed its fixed license contract revenue in every quarter. (*Id.*)  Those disclosures — none of which are alleged to be inaccurate — require dismissal of the Amended Complaint:

*First*, there is no basis for this Court to draw a "strong inference" that any putative misstatements or omissions were made with scienter.  It is absurd to suggest that Defendants intended to deceive investors about the company's fixed contract business when the company voluntarily and accurately disclosed its fixed contract revenue every quarter, and warned that future fixed contract revenue would be "difficult to predict."  Nor does Plaintiff's grab bag of other allegations offer any basis for a strong inference of scienter. (*See* Part I *infra*.)

*Second*, Plaintiff has not pled (and cannot plead) a viable claim based on any forward-looking statements about the future volume of fixed contracts.  Investors were expressly informed that the company could not reliably predict that figure.  Plaintiff's alternative theory that Cerence failed to disclose a scheme to increase its use of fixed contracts is not supported by any well-pleaded facts indicating that such a scheme ever existed.  Plaintiff's failure to plead an actionable misrepresentation thus requires dismissal of its claims. (*See* Part II *infra*.)

Accordingly, the Amended Complaint should be dismissed with prejudice.

---

[1]    Capitalized terms have the meanings ascribed to them in Defendants' moving brief (ECF No. 40) ("Mov. Br.").  Plaintiff's Opposition (ECF No. 47) is cited as "Opposition" or  "Opp."

**ARGUMENT**

I.   **PLAINTIFF'S CONCLUSORY PLEADING FAILS TO ALLEGE
     FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER**

   A.   **Because Cerence Repeatedly Informed Investors That Fixed Contract
        Revenue Was Unpredictable, And Disclosed Its Fixed Contract Revenue
        In Every Quarter, The Court Cannot Draw A Strong Inference Of Scienter**

Plaintiff's contention that Defendants "*expressly promised* investors that they

were strategically reducing their reliance on prepay contracts" (Opp. 1 (emphasis added)) is an

egregious misrepresentation of the disclosure record on which the Amended Complaint purports

to rely.  Before and during the putative Class Period, Cerence continuously advised investors that

the company's fixed contract revenue would be "lumpy" and "difficult to predict":

| | | |
|---|---|---|
| | *February 11, 2020* | "Prepays, as you know, they can be lumpy." (App'x Ex. 7, at 9) |
| | *May 7, 2020* | "So as it relates to prepays, they can be lumpy from 1 quarter to the next, as you can see the large increase from Q1 to Q2."  (App'x Ex. 9, at 9) |
| | *August 4, 2020* | "We had initially targeted about $40 million of prepays for the whole fiscal year but it's difficult to predict because they can be lumpy." (App'x Ex. 12, at 10) |
| *Putative Class Period* | *November 16, 2020* | "If you recall, in the past, I have said that we're sort of biased towards reducing prepays. However, that's not always inside our control because we have our customers' demand as well. And so that sometimes ebbs and flows."  (App'x Ex. 15, at 10) |
| | *February 8, 2021* | "So prepays can be lumpy. It's more concentrated. So as we've seen in the past, they can go up and down and so forth."  (App'x Ex. 23, at 11) |
| | *May 10, 2021* | "So we do have the fixed portion of our license as well. So those can be lumpy, those can vary from 1 quarter to the next." (App'x Ex. 28, at 9)  "But it's difficult to give guidance on that line item. . . . It's difficult to predict."  (*Id.* at 12) |

2

| | |
|---|---|
| *November 22, 2021* | "Our fixed contract license grew 31%. The amount of fixed contracts are difficult to predict." (App'x Ex. 37, at 7) |

Plaintiff's further contention that "[t]he truth began to emerge on November 22, 2021" (Opp. 2) is also utter nonsense. Plaintiff does not dispute — and cannot dispute — that Cerence accurately disclosed its fixed license revenue in each and every quarter, a disclosure which Cerence was *not* obligated to make under GAAP accounting rules. (*See* Opp. 10.) It was therefore no secret that the company continued to rely on fixed contracts. Indeed, in three of the five quarters reported during the putative Class Period, fixed contract revenue *increased*:

**Fixed Contract Revenue and Share of Total License Revenue, 4Q2020–2Q2022 ($m)**

| | *Putative Class Period* | | | | | |
|---|---|---|---|---|---|---|
| **4Q2020** | **1Q2021** | **2Q2021** | **3Q2021** | **4Q2021** | **1Q2022** | **2Q2022** |
| 16.5 | 10.1 | 17.3 ↑ | 18.2 ↑ | 25.4 ↑ | 20.1 | 25.6 |
| *35.6%* | *21.8%* | *31.8%* | *36.4%* | *49.4%* | *42.9%* | *55.3%* |

(*See* App'x Exs. 14, 22, 27, 31, 36, 43, 49; *see also* Mov. Br. 5 (complete chart).)

That record of disclosure renders any inference of scienter impossible. How could Defendants possibly intend to mislead investors into believing that the company's reliance on fixed contracts was certain to decrease when Cerence *repeatedly* told investors that fixed contract revenue was unpredictable and the company *voluntarily* disclosed its fixed contract revenue in every quarter? The Opposition provides no answer. Similarly, Plaintiff does not address any of the cases cited by Cerence holding that such voluntary disclosures undermine any inference of scienter. (*See* Opp. 17; Mov. Br. 16-17.)

B.       **Plaintiff's Reliance On Its Putative Confidential Witness Is Unavailing**

Plaintiff's efforts to resuscitate its putative confidential witness — "FE1," a former Cerence sales manager based in Asia — are unsuccessful. The Amended Complaint

directly attributes just a small amount of text to FE1, from which Plaintiff draws hyperbolic and unsupported inferences.  But it is evident that FE1 has no insight into Defendants' thinking:  the Opposition does not dispute that FE1 never spoke directly with Mr. Gallenberger.  As for Mr. Dhawan, Plaintiff emphasizes FE1's "*direct* communications" with him (Opp. 16), but few of those are actually alleged.  (*See* Am. Compl. ¶ 74.)  Rather, FE1 recounts second-hand Mr. Dhawan's communications with another sales executive to whom FE1 did not directly report.[2] That absence of direct communication undermines any inference of scienter.  *Shemian v. Rsch. In Motion Ltd.*, No. 11 CIV. 4068(RJS), 2013 WL 1285779, at *15 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).[3]  In any event, FE1's complaints that he was asked to sell certain fixed license contracts to Asian customers — who preferred such contracts (Am. Compl. ¶ 71 n.2) — provide no insight into Mr. Dhawan's views of the overall composition of Cerence's sales or whether investors were accurately informed on that subject.  FE1 left Cerence in September 2021, months before the end of the putative Class Period, and thus has zero "firsthand knowledge of the state of mind of [Cerence's] management during that period."  *See Fire and Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015).

> **C.**     **No Plausible Allegation Of Insider Trading Has Been Presented Here**

The Opposition omits any discussion of Mr. Gallenberger's trading, *all* of which

---

[2]     *See* Am. Compl. ¶ 72 ("Jungheim typically would communicate Dhawan's orders"); *id.* ¶ 73 ( "Dhawan usually went through Jungheim"); *id.* ¶ 74 ("Jungheim, who often referenced conversations he had with Dhawan . . . ").

[3]     Plaintiff's reliance on *Levy v. Gutierrez*, No. 14-CV-443-JL, 2017 WL 2191592, at *13 (D.N.H. May 4, 2017) is misplaced:  there, a witness was allegedly privy to the confidential negotiations about the agreement at the center of the alleged fraud and directly implored the defendants not to enter into the agreement.  *See also Collier v. ModusLink Global Sols., Inc.,* 9 F. Supp. 3d 61, 70-72 (D. Mass. 2014) (similarly).  In *Padilla v. Community Health Systems, Inc.*, No. 3:19-CV-00461, 2022 WL 3452318, at *36 (M.D. Tenn. Aug. 17, 2022), other allegations of the complaint corroborated the statements attributed to five confidential witnesses: not so here.

4

took place pursuant to a Rule 10b5-1 plan adopted prior to the putative Class Period.  (*See* Mov. Br. Ex. D.)  Yet, the Opposition reasserts that "the Individual Defendants took advantage of their fraud by selling massive amounts of their stock." (Opp. 19.)  There is no basis for that allegation.

Nor was there anything suspicious about Mr. Dhawan's trading.  Mr. Dhawan sold at regular intervals before and after the purported Class Period, typically pursuant to a Rule 10b5-1 trading plan.  (*See* Mov. Br. Ex. C.)  Trades at the beginning of the class period were made pursuant to a plan adopted before the class period began; later trades were made pursuant to a plan adopted almost a year before the disclosure marking the end of the putative Class Period.  (*Id.*)  That does not suggest a rush to sell before a fraud is revealed:  rather, it "defeats any inference of scienter." *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164 (D. Mass. 2009) (rejecting inference of scienter in view of distance between stock sales and alleged adverse disclosures); *see also Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 524 (D. Mass. 2014), *aff'd sub nom. Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015) (rejecting inference of scienter based on insider sales that "were not temporally close to any disclosures of adverse information")  (*See* Opp. 19; Mov. Br. 14.) [4]

In any event, the Court could not reasonably draw a strong inference of scienter solely from one executive's trading, and indeed courts have routinely declined to do so.  *E.g.*, *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 56 (1st Cir. 2008).

  **D.**  **Plaintiff's Other Contentions Do Not Support Any Inference Of Scienter**

Plaintiff incorrectly characterizes post-Class Period statements by Cerence's

---

[4] Plaintiff relies on cases considering trading patterns not presented here.  *See Levy*, 2017 WL 2191592, at \*14 (defendants sold large portions of their stock "while having sold none of their shares during the preceding 11 month . . . 'period'"); *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1267 (10th Cir. 2022) (one defendant sold nearly half his holdings and the other sold almost all his holdings during the class period).

5

management as "admit[ing]" wrongdoing by Defendants (*e.g.*, Opp. 2, 4, 9) or "blam[ing]" Defendants (*id.* at 7), but those statements actually show that the company has been consistent in its disclosures throughout.  In particular, Plaintiff cannot plausibly allege that Cerence's fixed license sales had "no legitimate business purpose" (Opp. 16), when the post-Class Period discussion that Plaintiff annexes to its Opposition explains the benefits of such contracts:[5]

> *[Thomas Beaudoin, Cerence CFO]:* "We've worked with a certain set of customers for years, at least going back to 2008 when I first got involved with the business. And they will come back to us and say, hey, we want to buy an inventory of licenses. We know the product's doing well. We've got really good line of sight to our production. And we'd like to buy an inventory of products.

> "***And we will do that for a couple of benefits to Cerence.*** One, we get the cash up front, and they get a discount. . . . And then, over the last couple of years, I think some of it driven by what was going on in auto production and the pandemic and the shutdowns in factories and the chip supply. We got additional request to do these types of licensing agreements.

> "The other form that this takes is in a minimum commitment. So, if a customer will give us a minimum commitment for a number of years, those are slightly different. Those are a lower discount, and we get the cash when the car is produced."

(Opp. Ex. 2, at 2 (emphasis added).)  Mr. Beaudoin went on to note that a countervailing concern is that "you end up with very lumpy [revenue] growth" (*id.*), a point that Cerence had expressly made to investors on numerous occasions before and during the putative Class Period. Balancing that concern with the necessity of meeting customer demand is a matter of business judgment, and Mr. Beaudoin accordingly noted that the company's one-quarter suspension of such contracts "provides us with some room to continue to work with these types of customers that want to contract this way."  (*Id.*)  That discussion does not support Plaintiff's claim that

---

[5]    Plaintiff's cases in which post-class period admissions were held to have supported scienter are inapposite:  here, Cerence's post-Class Period statements are consistent with its previous disclosures.  *See, e.g.*, *In re Plantronics, Inc. Sec. Litig.*, No. 19-CV-07481-JST, 2022 WL 3653333, at *11 (N.D. Cal. Aug. 17, 2022) (scienter supported when admissions revealed that company had migrated to previously undisclosed sales practice solely to increase revenue).

Cerence's fixed contracts lacked any business purpose: indeed, it conclusively refutes it, and makes a non-culpable explanation for Defendants' disclosures all the more compelling.[6]

Courts in this Circuit have summarily rejected allegations that ordinary compensation packages like those here support an inference of scienter. *See Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 220 (D. Mass. 2018), *aff'd*, 928 F.3d 151 (1st Cir. 2019) (declining to hold that compensation supported an inference of scienter where the complaint "does not allege that Biogen's revenue *reporting* was false or misleading in any way"); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 344 (D. Mass. 2009) ("That the executives may have gained some compensation is not enough, since stock-based compensation is a common feature of pay packages . . ." (citation omitted)).[7]

Plaintiff's fact-free insinuations about Mr. Dhawan's resignation and Mr. Gallenberger's retirement (Opp. 19-20) are baseless.  There is nothing "inherently suspicious" about resigning to accept a position as CEO of another company.  *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 140 (D. Mass 2021) (Mov. Br. 16).  Nor does Mr. Gallenberger's retirement (and assumption of an advisory position with Cerence) suggest wrongdoing.[8]

---

[6]    Plaintiff's citations involve cases presenting different facts.  *See Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, No. 16 C 10510, 2018 WL 1071442, at *5-6 (N.D. Ill. Feb. 27, 2018) (scienter pleaded where CEO who ordered lowering of underwriting standards attributed increase in claim frequency to "external factors"); *Murphy v. Precision Castparts Corp.*, No. 3:16-CV-00521-SB, 2017 WL 3084274, at *4 (D. Or. June 27, 2017), *report and recommendation adopted*, No. 3:16-CV-00521-SB, 2017 WL 3610523 (D. Or. Aug. 22, 2017) (executives' knowledge of reasons for drops in demand inferred from position).

[7]    The case on which Plaintiff relies presents substantially different facts.  *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, No. 5:10-CV-02604 EJD, 2012 WL 3835078, at *3-4 (N.D. Cal. Sept. 4, 2012) (drawing inference of scienter from executives' knowledge that company's "single largest source of cash income stopped sending payments").

[8]    Plaintiff's reliance on authority involving allegations not made here is misplaced.  *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 (S.D.N.Y. 2014) (defendants' resignations were in fact terminations); *Willis v. Big Lots, Inc.*, No. 2:12-CV-604, 2016 WL 8199124, at *34 (S.D. Ohio Jan. 21, 2016) (defendant resigned in wake of DOJ investigation).

Plaintiff argues that Mr. Dhawan and Mr. Gallenberger must have known of and approved certain fixed license agreements. But that does not support an inference that either of them believed that investors were being misled, given that the volume of those agreements was expressly disclosed. *E.g., Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 121 (D. Mass. 2017) (allegation "that defendants knew earlier what later turned out badly" insufficient to plead scienter (citation omitted)); *Blue v. Doral Fin. Corp.*, 123 F. Supp. 3d 236, 273 (D.P.R. 2015).

In short, Plaintiff has utterly failed to plead any basis to draw an inference of scienter, let alone a strong inference of scienter. The Amended Complaint should be dismissed.

## II.   PLAINTIFF HAS NOT ALLEGED AN ACTIONABLE MISREPRESENTATION

Plaintiff does not dispute — and cannot dispute — that Cerence voluntarily and accurately disclosed its fixed license revenue in each quarter.[9] Plaintiff complains that Defendants failed to disclose "material facts," including that $40 million in fixed license sales was "extremely detrimental" to the Company's position. (Opp. 10.) That hyperbolic claim is belied by the fact that Cerence's current CFO stated that the Company is striving to maintain fixed license sales at $40 million. (Opp. Ex. 2, at 2.) Such reporting undercuts any inference that the statements were misleading or false when made, particularly where — as here — no accounting errors are alleged. (Mov. Br. 18.) The cases Plaintiff cites are readily distinguishable

---

[9]   Plaintiff's characterization of Cerence's disclosures as a "truth on the market" defense — as in *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) — is incorrect: that defense arises when a misrepresentation is rendered immaterial by a correction, but here there was no misrepresentation in the first place. And unlike the vague disclosure in *In re Alstom SA*, 406 F. Supp. 2d 433, 452 (S.D.N.Y. 2005) where the company failed to disclose that the same individual who purchased particular ships was also the guarantor of substantial loans, Cerence disclosed the volume of fixed licensing revenue. Nor is *In re Ariad Pharmaceuticals, Inc.*, 98 F. Supp. 3d 147, 164 (D. Mass. 2015), *aff'd in part, rev'd in part,* 842 F.3d 744 (1st Cir. 2016) on point, where the First Circuit's decision did not rely on any market "surprise."

and otherwise do not support Plaintiff's argument.[10]

Defendants in no way concede the falsity of statements concerning "sustainable growth" or "reasons for the increases in fixed revenue, and 2024 guidance." (Opp. 8 n.2.) As Defendants argued in their Moving Brief, Plaintiff fails to plead particularized facts supporting an inference that there was a scheme to increase fixed license contracts. (Mov. Br. 9-12, 15-17.)

**A.  Cerence's Forward-Looking Statements Concerning The Volume Of Fixed License Agreements Fall Within The PSLRA Safe Harbor**

Although Plaintiff complains that Cerence's cautionary language was not sufficiently meaningful, those disclosures were sufficient. The risk disclosures in the Company's public filings (*see* Mov. Br. Ex. B), including that "*[p]ricing pressures from our customers may adversely affect our business*," and Cerence may enter into agreements with "*annual price reduction commitments for long-term sales arrangements*" are precisely the sort of warnings deemed to be sufficient and not "generic warnings" as Plaintiff contends.[11] (Mov. Br. 19.) In

---

[10] By contrast, in *Plantronics*, 2022 WL 3653333, at *8, the defendant company substantially changed its sales practice without disclosing that: here, Cerence's practices were consistent throughout the Class Period. Also distinguishable are *Miller v. Sonus Networks, Inc.*, No. CV 18-12344-GAO, 2022 WL 11804021, at *1 (D. Mass. Oct. 20, 2022) (undisclosed change in method of forecasting future revenue was misleading); *Police & Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1082 (N.D. Cal. 2015) (recognizing revenue from prematurely cancelled contracts held misleading); *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 174 (1st Cir. 1994) (omission of bond performance comparison held misleading); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 323 (S.D.N.Y. 2009) (description of presales of network capacity held potentially misleading); *In re SupportSoft, Inc. Sec. Litig.*, No. C 04-5222 SI, 2005 WL 3113082, at *6 (N.D. Cal. Nov. 21, 2005) (conversion of license sales to disguise suffering business held misleading).

[11] Although these cautionary statements adequately capture longer-term sales contracts, the case that Plaintiff cites notes that a company need not point out every risk factor in its cautionary language for that language to suffice. *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 303 (S.D.N.Y. 2013) (cautionary language held "sufficiently comprehensive" even though defendant did not "specifically identify the [specific] risk factor that could delay or disrupt [defendant's] schedule"). *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030(LAP), 2011 WL 1330847, at *8 (S.D.N.Y. Mar. 30, 2011) is inapposite: Cerence is not relying upon a "generic disclaimer" and disclosed its volume of fixed contracts.

addition, Defendants repeatedly warned in earnings calls that fixed licenses can be "lumpy" and "difficult to predict." (*See* pp. 2-3 *supra*.) And contrary to Plaintiff's assertions, the safe harbor applies even to forward-looking statements that may reflect some present facts. *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 268 (D. Mass. 2013).[12]

### B.   General Statements Of Optimism About Cerence's Future Are Not Actionable

Courts in this District routinely hold vague language such as "strong," "bright future," and "progressing well" to be nonactionable corporate optimism.[13] (Mov. Br. 20.) Although the Plaintiff complains that these statements gave an "inaccurate impression" of the company's revenue stream, Plaintiff fails to provide any allegation that Defendants knew that the statements were false when made. (Opp. 12.) To the contrary, the discussion that Plaintiff annexed to its Opposition tends to support that optimism, as Cerence's current CFO maintains that Cerence has had "very strong bookings the last two years." (Opp. Ex. 2, at 3.)

### CONCLUSION

For the foregoing reasons, and for the reasons set forth in Defendants' prior memorandum, Defendants' motion to dismiss should be granted.

---

[12]   Plaintiff's citations stand for the unremarkable premise that the PSLRA safe harbor does not apply to false statements and must be accompanied by sufficient cautionary language. *See, e.g.*, *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 251 (D. Mass. 2006) ("forward-looking" statements not protected by "boilerplate" disclaimer). Nor is Plaintiff's citation to *In re Under Armour Securities Litigation*, 540 F. Supp. 3d 513, 523 (D. Md. 2021) informative here. That court held that the safe harbor did not apply where a company continued to report its financial results without disclosing its use of pull-forward sales, and relied heavily on an SEC order to find that the company had made material omissions — allegations not present here. *Id.*

[13]   *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130, 1144 (9th Cir. 2017) is inapposite because Plaintiff has not established that any statement by Defendants was misleading. *See also Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006), *vacated and remanded,* 551 U.S. 308 (2007) (same); *Brumbaugh*, 416 F. Supp. 2d at 250-51 (same); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *16 (same); *Stumpf v. Garvey*, No. 02-MDL-1335-PB, 2005 WL 2127674, at *8 (D.N.H. Sept. 2, 2005) (same).

Dated:  November 23, 2022
       Boston, Massachusetts

Respectfully submitted,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
Kurt Wm. Hemr (BBO #638742)
Amy-Lee Goodman (BBO #705403)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
kurt.hemr@skadden.com
amy-lee.goodman@skadden.com

Counsel for Defendants
Cerence Inc., Sanjay Dhawan, and
Mark J. Gallenberger

11