## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>CERENCE INC., SANJAY DHAWAN, and MARK J. GALLENBERGER,<br><br>        Defendants. | Civil Action No. 22-cv-10321-ADB |

## DEFENDANTS' ANSWER TO THE AMENDED COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendants Cerence Inc. ("Cerence" or the "Company"), Sanjay Dhawan, and Mark Gallenberger (together with Cerence, "Defendants"), by and through their attorneys, state the following in response to Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 37 (the "Amended Complaint").

## GENERAL DENIAL

Except as otherwise expressly admitted in the paragraphs below, Defendants deny each and every allegation in the Amended Complaint, and specifically deny any and all wrongdoing and/or liability to Lead Plaintiff and members of the purported class of persons on whose behalf this action is said to be brought. To the extent any allegation in the Amended Complaint is not specifically and expressly admitted, it is denied. To the extent the Amended Complaint contains allegations dismissed by the Court pursuant to the Court's Order Denying the Defendants' Motion to Dismiss, dated March 25, 2024 (the "3/25/2024 Order"), this Answer is not required to address those allegations and does not. To the extent the Amended Complaint asserts legal contentions,

such legal contentions require no response in this Answer, and this Answer contains no response to legal contentions. To the extent any response is required to the headings or other unnumbered paragraphs in the Amended Complaint, Defendants deny all allegations of wrongdoing and/or liability to Lead Plaintiff or the putative class members whom Lead Plaintiff purports to represent contained in those headings or other unnumbered paragraphs. Defendants reserve the right to seek to amend or supplement this Answer as may be necessary or appropriate.

## SPECIFIC RESPONSES TO PARAGRAPHS IN THE AMENDED COMPLAINT

**UNNUMBERED PARAGRAPHS ON PAGE 1 OF THE COMPLAINT:**

Lead Plaintiff Public Employees' Retirement System of Mississippi ("Lead Plaintiff"), by and through its counsel, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of itself and all persons or entities, except Defendants and other persons and entities excluded below, who purchased or otherwise acquired Cerence Inc. ("Cerence" or the "Company") securities between November 16, 2020 and February 4, 2022, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of (i) transcripts, press releases, news articles, and other public statements issued by or concerning Cerence; (ii) research reports issued by financial analysts concerning the Company; (iii) reports and other documents filed publicly by Cerence with the U.S. Securities and Exchange Commission ("SEC"); (iv) Cerence's corporate website; (v) interviews with former Cerence employees[1]; (vi) analyses of the price movements in Cerence's securities; and (vii) other publicly available information. Lead Plaintiff believes that substantial

---

[1] To aid in preserving former employees' anonymity, this complaint refers to all former employees using masculine pronouns, regardless of their gender.

additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**RESPONSE:**

Defendants state that the unnumbered paragraphs on page 1 of the Amended Complaint and footnote 1 are characterizations of the Amended Complaint to which no response is required. To the extent a response is required, Defendants deny the allegations in the unnumbered paragraphs on page 1 of the Amended Complaint and footnote 1.

### I.      INTRODUCTION

**COMPLAINT PARAGRAPH 1:**

1.      This action arises from Defendants' misstatements and omissions concerning their scheme to pull forward revenues from future quarters by entering into a plethora of transactions that Cerence has now admitted were not in the best interests of the Company and its shareholders, and which, in fact, had a devastating impact on the Company's financial condition and business. As Cerence has acknowledged, these deleterious deals were personally ordered and approved by the Company's two most senior officers – its former CEO Dhawan and former CFO Gallenberger. Dhawan and Gallenberger entered into these deals solely to allow Defendants to create the materially false impression that Cerence was meeting its aggressive revenue guidance through transactions that actually benefitted the Company, as well as to maintain their story that Cerence was a successful tech spin-off. In reality, and unbeknownst to shareholders, these deals did the exact opposite: rather than establish Cerence as a strong, successful company with a growing revenue stream, they harmed the company by cannibalizing its future business. Significantly, by artificially inflating the Company's short-term revenue, these deals also enabled Defendants to realize enormous amounts of performance-based executive compensation throughout the Class Period that was directly tied to Cerence's purported revenue growth, and to sell more than $25

million worth of their Cerence holdings at prices inflated by the fraud. Once Defendants' scheme began to unravel, Dhawan and Gallenberger suddenly and unexpectedly "resigned," the Company's new CEO soon was forced to acknowledge Defendants' machinations, analysts excoriated management for its lack of credibility, and Cerence's stock price collapsed, losing more than 58% of its value in just two and a half months as a result of the revelations of the fraud.

**RESPONSE 1**:

1.      Defendants state that paragraph 1 is a characterization of the Amended Complaint to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 1.

**COMPLAINT PARAGRAPH 2:**

2.      From Cerence's emergence as an independent public company in 2019, Defendants crafted a powerful revenue growth story as the primary reason for investors to purchase Cerence stock. For instance, during the Company's inaugural Analyst Day a few months before the start of the Class Period, Dhawan told investors that "We are very focused on growth," and Gallenberger stated that the Company's growth trajectory was "one of the key things that I want you to walk away from today with." Bolstering these representations, Defendants repeatedly issued aggressive guidance calling for Cerence's revenues to grow swiftly each year and to more than double by 2024.

**RESPONSE 2:**

2.      To the extent paragraph 2 characterizes the content of the transcript of Cerence's Analyst Day held on February 18, 2020, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 2 to the extent they

are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 2.

**COMPLAINT PARAGRAPH 3:**

3.      During the Class Period, Cerence made more than half of its revenue by selling software licenses to automobile manufacturers. The Company's licenses fell into two categories – variable and fixed. Variable license deals allowed Cerence customers to purchase licenses as they needed them over time. Variable customers submitted quarterly "royalty reports" to tell Cerence how many licenses the customer installed into newly manufactured vehicles, and the Company then invoiced the client based on those amounts and recorded the revenue in its financial statements in the following quarter. Cerence thus relied on variable license deals to generate a steady, predictable stream of revenue, which could last for as long as a decade.

**RESPONSE 3**:

3.      Defendants respectfully refer the Court to Cerence's Forms 10-K and 10-Q filed with the U.S. Securities and Exchange Commission ("SEC") during the purported Class Period for a description of the Company's business.  To the extent a further response is required, Defendants deny the allegations in paragraph 3.

**COMPLAINT PARAGRAPH 4:**

4.      Under a fixed license contract, by contrast, customers purchased a set amount of Cerence licenses in bulk in exchange for a discount, generally in the "mid-teens," according to the Company's current CFO, Thomas Beaudoin. Fixed customers typically paid the discounted amount up front and in full, and the Company immediately recorded that revenue in its financial statements. Such deals were known as "prepaid" deals, and it took, on average, approximately 18 months for the customer to consume the prepaid licenses.

**RESPONSE 4**:

4.     Defendants respectfully refer the Court to Cerence's Forms 10-K and 10-Q filed with the SEC during the purported Class Period for a description of the Company's business.  To the extent a further response is required, Defendants deny the allegations in paragraph 4.

**COMPLAINT PARAGRAPH 5:**

5.     Of these two types of license contracts, variable contracts were by far the most beneficial to Cerence, and were the deals that the Company repeatedly told investors during the Class Period that it was focused on pursuing. That was because, while fixed deals offered the benefit of cash up front, they also resulted in the customer having a bulk supply of licenses – meaning that the customer would not buy any new licenses until after they had used up that supply. Prepaid license deals thus reduced demand for Cerence licenses going forward, which dampened Cerence's revenue stream and its future financial performance. Consequently, Cerence's management publicly represented that they would need to limit fixed deals to a range of approximately $40 million to $50 million of the Company's annual revenues in order to keep the Company financially healthy.

**RESPONSE 5**:

5.     Defendants respectfully refer the Court to Cerence's Forms 10-K and 10-Q filed with the SEC during the purported Class Period for a description of the Company's business.  To the extent a further response is required, Defendants deny the allegations in paragraph 5.

**COMPLAINT PARAGRAPH 6:**

6.     Leading up to the Class Period, a semiconductor shortage curtailed auto production. This development raised investor concern over Cerence's financial performance and ability to weather the shortage successfully – and threatened the growth story that Defendants had put

forward as the Company's central investment thesis. In the face of these concerns, Defendants repeatedly announced "record" financial results and raised the Company's annual revenue guidance, demonstrating current and future financial health that was key to the value of Cerence securities.

**RESPONSE 6**:

6.      To the extent paragraph 6 characterizes the content of Cerence's SEC filings, press releases, and investor presentation transcripts, Defendants state that the SEC filings, press releases, and transcripts speak for themselves, refer the Court to the SEC filings, press releases, and transcripts for their content, and deny the allegations in paragraph 6 to the extent they are inconsistent with the content of the SEC filings, press releases, and transcripts.  Defendants deny the remaining allegations in paragraph 6.

**COMPLAINT PARAGRAPH 7:**

7.      Each quarter, analysts focused on whether the Company's revenue growth was sustainable. In response, Defendants assured analysts that the Company's revenues had resulted from their "strategy to deliver sustainable growth," which purportedly bolstered the Company's "long-term growth opportunities." Significantly, as part of this strategy, Defendants repeatedly stated that they were deemphasizing fixed license deals and that the Company's fixed license revenue was remaining within the healthy historical range of approximately $40 million to $50 million for the year.

**RESPONSE 7**:

7.      To the extent paragraph 7 characterizes the content of Cerence's SEC filings, press releases, and investor presentation transcripts, Defendants state that the SEC filings, press releases, and transcripts speak for themselves, refer the Court to the SEC filings, press releases, and

transcripts for their content, and deny the allegations in paragraph 7 to the extent they are inconsistent with the content of the SEC filings, press releases, and transcripts.  Defendants deny the remaining allegations in paragraph 7.

**COMPLAINT PARAGRAPH 8:**

8.      Propelled by the Company's "record" financial results, its purportedly sustainable growth, and Defendants' purported strategy of holding fixed license deals within the historical range, Cerence's stock price soared. Analysts raised estimates and reported that Cerence was "hammer[ing] home" strong results, had "an exceptionally deep pipeline" to support sustainable growth, would keep fixed license deals within the "range the company has posted over the last several years," and was "focus[ed] on driving more Variable versus Prepays." Within approximately three months of the start of the Class Period, Cerence's stock price rose to a Class Period high of $133.43 – up more than 100% from its closing price the day before the Class Period started.

**RESPONSE 8**:

8.      To the extent paragraph 8 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 8 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 8.

**COMPLAINT PARAGRAPH 9:**

9.      Unbeknownst to investors, however, Cerence's seemingly sterling financial performance was the product of deceptive business practices that were designed to artificially inflate the Company's short-term revenues and meet its guidance and that, in reality, were extremely damaging to the Company's financial condition. Although Defendants claimed to be

deemphasizing fixed deals and holding them within the Company's historical range, they were doing exactly the opposite. Dhawan personally pressured Cerence sales personnel to do fixed deals in far greater numbers than ever before so that Cerence could immediately book the revenue and achieve its aggressive guidance. Indeed, as one former senior sales executive at Cerence reported, Dhawan "strongly pushed the prepayment deals," "ordered sales personnel from all over the world to do prepaid deals," and "no one was able to escape from it."

**RESPONSE 9**:

9.      Defendants lack knowledge or information sufficient to form a belief about whether former senior sales executive ("FE1") made the statements attributed to FE1 in paragraph 9. Defendants deny the remaining allegations in paragraph 9.

**COMPLAINT PARAGRAPH 10:**

10.      Moreover, the Company's desire to book revenue at any cost to meet its guidance was so paramount that Dhawan specifically instructed sales personnel to convert existing variable contracts into fixed deals. Through these "conversions," Cerence not only pulled forward 6 to 10 quarters of future revenue from its existing variable contracts, but also discounted the price that the customer already had committed to pay – all so that Cerence could recognize the revenue earlier and create the false impression of strong, sustainable financial performance. As a former Cerence sales executive explained, Dhawan "required all Sales [teams] to convert all (typical) license contracts to Prepayment to get the cash" – and sales personnel were forced under "[Dhawan's] heavy pressure" to do such conversions, even though these prepayment deals "crashed the future opportunity" for revenue.

**RESPONSE 10**:

10.     Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 10.  Defendants deny the remaining allegations in paragraph 10.

**COMPLAINT PARAGRAPH 11:**

11.     By mid-2021, Defendants' scheme had begun to falter. Cerence had pulled forward so much revenue that its deep discounts were no longer enough to convince its customers to continue to do "prepaid" fixed license deals. Accordingly, and unbeknownst to investors, Dhawan personally instructed the Company's sales personnel to push the customer to do a new type of fixed license deal – one the Company called a "minimum commitment" deal.

**RESPONSE 11**:

11.     Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 11.  Defendants deny the remaining allegations in paragraph 11.

**COMPLAINT PARAGRAPH 12:**

12.     Minimum commitment deals provided virtually no economic benefits to the Company and, as the Company was forced to concede at the end of the Class Period, dramatically harmed its business. Indeed, while prepaid deals provided at least "some benefit" to the Company by allowing it to receive cash up front, the minimum commitment deals failed to provide even this benefit. To the contrary, through minimum commitment deals, Cerence gave customers a substantial discount on a package of licenses but received no cash up front. Instead, the customer agreed to buy a certain number of licenses within a set amount of time – up to five years – and to pay for the licenses only when they actually used them. Thus, for minimum commitment deals,

Cerence's customers received an attractive discount that was <u>locked-in for up to 5 years</u>, did not pay <u>anything</u> up front, and were not obligated to pay <u>anything</u> before the end of the deal's term. Defendants entered into these destructive transactions for one reason only: to allow the Company to "meet" its revenue guidance, even though Defendants knew the deals were harmful to its business. Indeed, Defendants recognized <u>100%</u> of the revenue from these deals immediately at the time of signing. Unbeknownst to investors, these deals allowed Defendants to accelerate <u>up to 5 years of revenue</u>, without actually receiving a penny.

**RESPONSE 12**:

12.     Defendants state that no response is required to the allegations in paragraph 12, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 12.

**COMPLAINT PARAGRAPH 13:**

13.     The minimum commitment transactions were highly material to the Company's shareholders, their assessment of Cerence's ostensible performance, and the value of its securities. They cannibalized the Company's sales pipeline at a discount, severely damaged Cerence's revenue stream and yielded no actual cash for several years. Yet remarkably, by the fourth quarter of 2021, "minimum commitment" deals had become <u>the</u> dominant vehicle through which defendants executed their fraudulent scheme, accounting for 87% of the Company's total fixed license revenue in that quarter (and 100% of fixed license revenue in the following quarter). Nevertheless, despite the clear importance of this information to investors, Defendants made no disclosure of either the nature of these deals or the extent to which they drove Cerence's supposedly "record" results until after the Class Period – and after investors had been saddled with outsized losses due to the misconduct described herein.

**RESPONSE 13**:

13.     Defendants state that no response is required to the allegations in paragraph 13, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 13.

**COMPLAINT PARAGRAPH 14:**

14.     Tellingly, while minimum commitment deals did not benefit Cerence, their benefit to the Executive Defendants was clear. Their incentive compensation for fiscal year 2021 depended significantly on Cerence's revenue performance. By accelerating this revenue, the Executive Defendants just barely met Cerence's 2021 revenue guidance, which in turn triggered enormous personal benefits. In fact, achieving the guidance allowed the Executive Defendants to receive a near-maximum payout opportunity – valued at nearly $27 million for Defendant Dhawan in fiscal year 2021. It also allowed Defendants to keep the Company's growth story intact during the chip shortage, which buoyed Cerence's stock price and allowed the Executive Defendants to unload tens of millions of dollars' worth of their Cerence holdings at inflated prices, in amounts that were dramatically out of proportion to their prior sales.

**RESPONSE 14**:

14.     Defendants deny the allegations in paragraph 14.

**COMPLAINT PARAGRAPH 15:**

15.     Defendants' scheme began to unravel on November 22, 2021. On that day, the Company announced its financial results for the fourth quarter and fiscal year 2021, and Defendants were forced to admit that Cerence's fixed license revenue had skyrocketed to $71 million – an all-time high for Cerence and vastly more than the historical range Defendants had assured investors they were adhering to. This disclosure stunned the market and raised serious

questions both about how Cerence had been able to meet its guidance, and its future prospects. As analysts observed, the "gigantic contribution in Pre-paid licenses" to Cerence's bottom-line "raise[d] concerns about [it] potentially pulling forward revenue." In response to these revelations, Cerence's stock price swiftly plummeted on extremely high volume of 3.2 million shares traded – falling from $104.06 to $82.59, a decline of more than 20% in a single trading day.

**RESPONSE 15**:

15.     Defendants admit that (1) Cerence's common stock closed at $104.06 per share on November 19, 2021; and (2) Cerence's common stock closed at $82.59 per share on November 22, 2021.  To the extent paragraph 15 characterizes the content of Cerence's press release dated November 22, 2021, the transcript of Cerence's earnings call held on November 22, 2021, and analyst reports, Defendants state that the press release, transcript, and analyst reports speak for themselves, refer the Court to the press release, transcript, and analyst reports for their content, and deny the allegations in paragraph 15 to the extent they are inconsistent with the content of the press release, transcript, and analyst reports.   Defendants deny the remaining allegations in paragraph 15.

**COMPLAINT PARAGRAPH 16:**

16.     Rather than tell investors the whole truth, however, Defendants continued to conceal critical facts about its "fixed license" revenue. For instance, notwithstanding the fact that minimum commitment deals accounted for <u>87%</u> of the Company's fixed license revenue for the fourth quarter, Defendants failed to provide any description or discussion whatsoever of these deals or their harmful impacts on Cerence. To the contrary, Defendants falsely stated that the Company's fixed license deals consisted of "pre-paid" contracts – when in fact the vast majority of them resulted in absolutely zero cash up front.

**RESPONSE 16**:

16.     Defendants state that no response is required to the allegations in paragraph 16, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 16.

**COMPLAINT PARAGRAPH 17:**

17.     With those facts still concealed, on December 15, 2021, Dhawan abruptly and unexpectedly "resigned." The disclosure of this unexpected news further rattled the market, causing the Company's stock price to tumble again. Cerence's stock price fell from $78.08 to $69.20, another 11% drop in one trading day. That same day, Cerence announced that Stefan Ortmanns – then-Executive Vice President and General Manager of the Company's Core Products business – would replace Dhawan effective immediately. Upon becoming CEO, Ortmanns began a detailed review of the Company's business practices and revenue guidance.

**RESPONSE 17**:

17.     Defendants admit that (1) Mr. Dhawan resigned as Cerence's President and Chief Executive Officer and a director of the Company on December 14, 2021, and that Dr. Ortmanns was appointed as Cerence's President and Chief Executive Officer and a director of the Company, effective December 15, 2021; (2) Cerence's common stock closed at $78.08 per share on December 14, 2021; and (3) Cerence's common stock closed at $69.20 per share on December 15, 2021.  To the extent paragraph 17 characterizes the content of Cerence's investor presentation transcripts, Defendants state that the transcripts speak for themselves, refer the Court to the transcripts for their content, and deny the allegations in paragraph 17 to the extent they are inconsistent with the content of the transcripts.  Defendants deny the remaining allegations in paragraph 17.

**COMPLAINT PARAGRAPH 18:**

18.     In short order, Ortmanns' review led to a series of disclosures that confirmed the misconduct described herein, stunned the market, and sent Cerence's stock into another nosedive. On February 7, 2022, the first trading day after the end of the Class Period, Ortmanns announced that his review of the Company's business had uncovered that, under Dhawan's leadership, Cerence sold fixed licenses that greatly exceeded customer demand, pulled forward revenue from future quarters, and greatly harmed the Company's business. As a result of the material negative impact of these practices on its revenue stream, Cerence withdrew its 2024 guidance completely, which it had affirmed just two months earlier.

**RESPONSE 18**:

18.     To the extent paragraph 18 characterizes the content of Cerence's SEC filings, press releases, and investor presentation transcripts, Defendants state that the SEC filings, press releases, and transcripts speak for themselves, refer the Court to the SEC filings, press releases, and transcripts for their content, and deny the allegations in paragraph 18 to the extent they are inconsistent with the content of the SEC filings, press releases, and transcripts.  Defendants deny the remaining allegations in paragraph 18.

**COMPLAINT PARAGRAPH 19:**

19.     Cerence further stunned investors by belatedly disclosing the Company's use of "minimum commitment" deals to boost reported revenues. Cerence revealed that its fixed license deals were a combination of prepaid deals and "minimum volume commitment contracts from our backlog and need to be consumed by customers in the future." Following this disclosure, analysts barraged Ortmanns and Gallenberger with questions about the Company's minimum commitment deals, desperately trying to understand what these deals were and how they impacted the

Company's business. In response to these questions, Ortmanns and Gallenberger finally explained how minimum commitment deals differed from prepays and admitted that <u>all of Cerence's fixed license deals for the prior quarter had been minimum commitment and not prepaid deals</u>.

**RESPONSE 19**:

19.     Defendants state that no response is required to the allegations in paragraph 19, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 19.

**COMPLAINT PARAGRAPH 20:**

20.     Analysts were astonished that Defendants had concealed this critical information from the market. They noted that this was the "first time" the facts about minimum commitment deals had been disclosed, pressing for more information about these deals, which had "not been fully addressed." Analysts wrote a series of scathing reports describing as "ugly" the "amount of previously non disclosed components to [Cerence's] revenue," observing that "guidance/reporting appear to have been very aggressive versus the realities of the business/marketplace," and pointedly noting that, "[a]t the heart of the surprises," was the fact that fixed license deals "were being leveraged much more aggressively to drive short-term growth at the expense of long-term stability."

**RESPONSE 20**:

20.     Defendants state that no response is required to the allegations in paragraph 20, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 20.

**COMPLAINT PARAGRAPH 21:**

21.    Following these disclosures, Cerence's stock price cratered yet again. Cerence's stock price declined from $63.58 to $43.61, falling by an additional 31% in a single trading day. Cerence's stock price has never recovered, and currently trades at approximately $25.71 per share, down more than 80% from its Class Period high.

**RESPONSE 21**:

21.    Defendants admit that (1) Cerence's common stock closed at $63.58 per share on February 4, 2022; and (2) Cerence's common stock closed at $43.61 per share on February 7, 2022.  Defendants deny the remaining allegations in paragraph 21.

**COMPLAINT PARAGRAPH 22:**

22.    Following the end of the Class Period, Cerence made a series of disclosures that essentially confirmed Plaintiffs' allegations. Among other things, the Company admitted that (i) Defendants Dhawan and Gallenberger had personally approved the damaging fixed license and minimum commitment deals; (ii) the deals had harmed the Company by "accelerating [] the backlog" and were "not a good thing"; (iii) it could take as long as two and a half years for Cerence's customers to consume the excess supply of licenses they had acquired during the Class Period, during which period of time it would be exceedingly difficult for the Company's licensing business to grow; (iv) the Company had erred in not explaining, during the Class Period, the nature of the minimum commitment deals, as well as the material difference between prepaid fixed license deals and minimum commitment deals; (v) without these deals, the Company would have missed its revenue guidance by tens of millions of dollars; and (vi) while the Company had repeatedly told investors it could manage in excess of $50 million in fixed license revenue without

harming its business, in reality fixed license sales above $45 million created significant "headwind" to revenue growth.

**RESPONSE 22**:

22.     To the extent paragraph 22 characterizes the content of Cerence's SEC filings, press releases, and investor presentation transcripts, Defendants state that the SEC filings, press releases, and transcripts speak for themselves, refer the Court to the SEC filings, press releases, and transcripts for their content, and deny the allegations in paragraph 22 to the extent they are inconsistent with the content of the SEC filings, press releases, and transcripts.  Defendants deny the remaining allegations in paragraph 22.

## II.     JURISDICTION AND VENUE

**COMPLAINT PARAGRAPH 23:**

23.     This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act.

**RESPONSE 23**:

23.     Defendants state that paragraph 23 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 23.

**COMPLAINT PARAGRAPH 24:**

24.     This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

**RESPONSE 24**:

24.     Defendants state that paragraph 24 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 24.

**COMPLAINT PARAGRAPH 25:**

25.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b) and (c). At all relevant times, Cerence had its principal executive offices located in this District and conducts substantial business here. In addition, many of the acts alleged herein occurred in this District.

**RESPONSE 25**:

25.     Defendants admit that Cerence's principal executive offices are located in Massachusetts.  Defendants state that the remaining allegations in paragraph 25 assert legal conclusions to which no response is required.  To the extent a further response is required, Defendants deny the remaining allegations in paragraph 25.

**COMPLAINT PARAGRAPH 26:**

26.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

**RESPONSE 26**:

26.     Defendants state that paragraph 26 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 26.

**III.     PARTIES**

**COMPLAINT PARAGRAPH 27:**

27.     Lead Plaintiff Public Employees' Retirement System of Mississippi is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi. Lead Plaintiff is responsible for the retirement income of employees of the State, including current and retired employees of the State's public-school districts, municipalities,

counties, community colleges, state universities, libraries, and water districts. Lead Plaintiff provides benefits to over 110,000 retirees and beneficiaries, manages over $35 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 340,000 current and former public employees. As set forth in the certification attached hereto, Lead Plaintiff purchased Cerence securities during the Class Period and suffered damages as a result of Defendants' violations of the federal securities law.

**RESPONSE 27:**

27.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27.  To the extent a further response is required, Defendants deny the allegations in paragraph 27.

**COMPLAINT PARAGRAPH 28:**

28.     Defendant Cerence is, and at all times herein mentioned was, a corporation organized and existing under the laws of Delaware, with its principal place of business in this District. Cerence's common stock trades on the NASDAQ under the ticker symbol "CRNC."

**RESPONSE 28:**

28.     Defendants admit that (1) Cerence is incorporated in Delaware; (2) Cerence's common stock trades on the Nasdaq Global Select Market under the trading symbol "CRNC"; and (3) Cerence's principal executive offices are located in Massachusetts.  Defendants deny the remaining allegations in paragraph 28.

**COMPLAINT PARAGRAPH 29:**

29.     Defendant Sanjay Dhawan ("Dhawan") was the President, CEO, and a member of the Board of Directors of Cerence. Dhawan joined Cerence's predecessor, Nuance, on June 7, 2019, and became the CEO and a member of the Board of Directors of Cerence upon completion

of the spinoff of Cerence on October 1, 2019. While at Cerence, Dhawan was responsible for the Company's day-to-day operations and financial performance. Dhawan personally reviewed and approved each contract for the sale of $1 million or more in licenses. Dhawan regularly spoke to investors and securities analysts regarding the Company's revenues, including from its fixed license deals. Defendant Dhawan made many of the misstatements and omissions alleged herein. Dhawan remained Cerence's CEO and a member of its Board of Directors until December 15, 2021, when the Company unexpectedly announced that Dhawan had suddenly resigned, and that Stefan Ortmanns would replace him as the Company's new CEO.

**RESPONSE 29**:

29.     Defendants admit that (1) Mr. Dhawan served as Cerence's President and Chief Executive Officer and a director of the Company from October 1, 2019 until December 14, 2021 and that Dr. Ortmanns was appointed as Cerence's President and Chief Executive Officer and a director of the Company, effective December 15, 2021; and (2) Mr. Dhawan previously served as an employee of Nuance Communications, Inc. ("Nuance").  Defendants state that the remaining allegations in paragraph 29 assert legal conclusions to which no response is required.  To the extent a further response is required, Defendants deny the remaining allegations in paragraph 29.

**COMPLAINT PARAGRAPH 30:**

30.     Defendant Mark Gallenberger ("Gallenberger") was, at all relevant times, the CFO of Cerence. Gallenberger joined Nuance on July 1, 2019, and became the CFO of Cerence upon completion of the spinoff of Cerence on October 1, 2019. As CFO, Gallenberger personally reviewed and approved each contract for the sale of $1 million or more in licenses. During the Class Period, Gallenberger regularly spoke to investors and securities analysts regarding the Company's revenues, including its fixed license revenues. Defendant Gallenberger made certain

of the misstatements and omissions alleged herein. On February 7, 2022, Cerence unexpectedly announced Gallenberger's termination.

**RESPONSE 30**:

30.     Defendants admit that (1) Mr. Gallenberger served as Cerence's Chief Financial Officer from October 1, 2019 until March 11, 2022; and (2) Mr. Gallenberger previously served as an employee of Nuance.  Defendants state that the remaining allegations in paragraph 30 assert legal conclusions to which no response is required.  To the extent a further response is required, Defendants deny the remaining allegations in paragraph 30.

**COMPLAINT PARAGRAPH 31:**

31.     Defendants Dhawan and Gallenberger are collectively referred to herein as the "Executive Defendants" and, together with Cerence, as the "Defendants." The Executive Defendants directly participated in the management of Cerence's operations, had direct and supervisory involvement in Cerence's day-to-day operations, and had the ability to control and did control financial reporting and Cerence's statements to investors. They both were involved in drafting, reviewing, publishing, and making the Company's statements to investors, including the false and misleading statements and omissions alleged herein.

**RESPONSE 31**:

31.     Defendants state that the first sentence of paragraph 31 is a characterization of the Amended Complaint to which no response is required.  Defendants further state that the remaining allegations in paragraph 31 assert legal conclusions to which no response is required.  To the extent a further response is required, Defendants deny the remaining allegations in paragraph 31.

## IV.    SUMMARY OF THE FRAUD

### A.  Background

**COMPLAINT PARAGRAPH 32:**

32.    Cerence became a standalone company on October 1, 2019, when it was spun off from Nuance Communications, Inc. Cerence promotes itself as an artificial-intelligence software company that operates almost exclusively in the automobile market. The Company sells voice-operated virtual assistant software to automobile manufacturers. Its customers install the Cerence software into automobiles' head units, also referred to as the "infotainment system." Cerence's customers include approximately 60 automobile manufacturers, including Toyota, BMW, Daimler, and Ford.

**RESPONSE 32**:

32.    Defendants respectfully refer the Court to Cerence's Forms 10-K and 10-Q filed with the SEC during the purported Class Period for a description of the Company's business.  To the extent a further response is required, Defendants deny the allegations in paragraph 32.

**COMPLAINT PARAGRAPH 33:**

33.    From the very outset of its time as a public company, Cerence sold itself as a tech spinoff rather than an automobile company, with a compelling revenue growth story. For example, on February 11, 2020, during the Company's earnings call for the first quarter of fiscal year 2021, its first quarter as a public company, Defendant Dhawan trumpeted the fact that Cerence had "delivered better than expected results on just about every financial metric" and "met our revenue and gross margin guidance and exceeded on other key financial metrics in the quarter," further explaining that "we are now laser-focused on profitably growing the business." Defendant Gallenberger likewise crowed that Cerence was "a company poised for strong revenue growth and profit performance for the fiscal year and beyond."

**RESPONSE 33**:

33.     To the extent paragraph 33 characterizes the content of the transcript of Cerence's earnings call held on February 11, 2020, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 33 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 33.

**COMPLAINT PARAGRAPH 34:**

34.     Similarly, Defendants touted Cerence's strong growth prospects during the Company's first-ever Analyst Day, held on February 18, 2020. During the presentation, Defendant Dhawan concluded his introductory remarks by stating, "We are very focused on growth." And during his own remarks, Defendant Gallenberger explained,

> [O]ne of the key takeaways that I want you to walk away from today with as it relates to Cerence is [how] the company historically has had a very good growth trajectory even in light of the fact that we're part of an auto industry that has low- single-digit growth rates. We've been growing 10%, 15%. And so, there's a secular tailwind that we have associated with the Cerence story. That's one of the key things that I want you to walk away from today with.

Gallenberger further highlighted as a "key takeaway" Cerence's "visibility" into future revenues – its ability to predict future revenues based on its "large amount of backlog." He also touted the Company's historical 12% growth rate "for the last several years," explaining that "we expect that trend to continue," and guided to $600 million in revenues – nearly double the $311 million in revenues reported for fiscal year 2019 just a few months prior – by 2024.

**RESPONSE 34**:

34.     To the extent paragraph 34 characterizes the content of the transcript of Cerence's Analyst Day held on February 18, 2020, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 34 to the extent

they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 34.

**COMPLAINT PARAGRAPH 35:**

35.    Analysts reacted positively to Defendants' story. For example, in a December 2019 report, issued within months of the IPO, analysts at Wedbush lauded the Company's "confidence… in its automotive opportunity over the next 12 to 18 months" and "ability to step up its growth rate over the next few years" in "cloud driven applications and speech based technology." Following Cerence's February 2020 Analyst Day, Wedbush noted that "Revenue Growth" was one of the Company's "three main focuses" and reported, "[W]e walk away from CRNC's analyst day with increased confidence in… management['s] ability to execute on the strategic plan." Similarly, in August 2020, after the Company announced results handily surpassing estimates despite coronavirus-related automotive production disruptions, analysts from Jefferies praised the Company's "[s]trong visibility to robust sales growth" and reiteration of 2024 targets.

**RESPONSE 35:**

35.    To the extent paragraph 35 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 35 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 35.

**COMPLAINT PARAGRAPH 36:**

36.    Most of the Company's revenue comes from its license business, through which the Company sells its software and voice-operated technology to automobile manufacturers. In

fiscal year 2021, Cerence reported $387.2 million in total revenue, which included $202.2 million in license revenue, representing more than 52% of the Company's total revenue.

**RESPONSE 36**:

36.     Defendants admit that (1) Cerence reported revenue of $387.2 million for fiscal year 2021; (2) Cerence reported license revenue of $202.2 million for fiscal year 2021; and (3) Cerence's license revenue primarily consists of license royalties associated with its edge software components, which are installed in automobiles. Defendants deny the remaining allegations in paragraph 36.

**COMPLAINT PARAGRAPH 37:**

37.     Cerence's license business consists of "variable" license deals and "fixed" license deals. The Company's variable license deals operate on a pay-as-you-go basis and, of the two types of license deals, are by far the Company's preferred method of generated revenue. The customer, an automobile manufacturer, does not pay money up front for the licenses. Instead, when a customer books a variable license deal, the deal is recorded in the Company's backlog. The customer does not apply or activate the license until it actually produces a vehicle into which the Company's software is installed. At the end of each quarter, the customers provide Cerence with royalty reports, which tell the Company how many cars the manufacturer produced and shipped with Cerence technology.

**RESPONSE 37**:

37.     Defendants respectfully refer the Court to Cerence's Forms 10-K and 10-Q filed with the SEC during the purported Class Period for a description of the Company's business.  To the extent a further response is required, Defendants deny the allegations in paragraph 37.

**COMPLAINT PARAGRAPH 38:**

38.     Cerence uses royalty reports for revenue recognition – the Company recognizes revenue resulting from variable license deals in the fiscal quarter during which the vehicle is produced (as disclosed by royalty reports) and receives cash payment from those deals in the quarter after the Company recognizes the revenue. In this way, after a variable license deal is in place, it generates stable quarterly revenue for the Company as its customers manufacture and ship vehicles. Once Cerence recognizes the revenue for a variable license deal, the deal is removed from the Company's backlog. These deals thus are an important barometer of Cerence's organic growth. As Gallenberger acknowledged, "[T]he variable component of the license revenue is a better indicator of the strength of [the Company's] embedded products in the market and demonstrates the continued penetration rate of this technology."

**RESPONSE 38**:

38.     Defendants respectfully refer the Court to Cerence's Forms 10-K and 10-Q filed with the SEC during the purported Class Period for a description of the Company's business.  To the extent paragraph 38 characterizes the content of a Cerence investor presentation transcript, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 38 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 38.

**COMPLAINT PARAGRAPH 39:**

39.     Fixed license deals, by contrast, involve an upfront purchase of a set number of licenses. For most of the Class Period, the Company offered only one type of fixed license deal – "prepaid deals" or "prepays." In prepaid deals, manufacturers purchase licenses for Cerence software in bulk at a discounted price, typically in the mid-teens. The manufacturer pays the full

value of the contract up front, and the Company recognizes as revenue the full, albeit discounted, value of the contract after the parties sign the agreement and Cerence receives payment.

**RESPONSE 39**:

39.    Defendants respectfully refer the Court to Cerence's Forms 10-K and 10-Q filed with the SEC during the purported Class Period for a description of the Company's business.  To the extent a further response is required, Defendants deny the allegations in paragraph 39.

**COMPLAINT PARAGRAPH 40:**

40.    Although prepays offer some benefit by providing the Company with a lump sum of cash up front, overreliance on prepays risks harm to future revenue and the Company's longer-term stability. As disclosed after the Class Period, prepays take between 6 and 10 quarters to be consumed by the customer. Thus, if the Company sells too many prepaid licenses, manufacturers will have an excess supply of licenses to work through and will not generate any new revenue for the Company until after they have used all of those licenses. In this way, prepaid deals are a drag on future revenue – and this effect is exacerbated by the discounted nature of the deals.

**RESPONSE 40**:

40.    Defendants respectfully refer the Court to Cerence's Forms 10-K and 10-Q filed with the SEC during the purported Class Period for a description of the Company's business.  To the extent a further response is required, Defendants deny the allegations in paragraph 40.

**COMPLAINT PARAGRAPH 40:**

41.    For this reason, Cerence repeatedly underscored to investors the importance of decreasing prepays, or at least holding them flat as compared to historical levels. For example, in the Company's very first quarter as a standalone company, Defendant Gallenberger stated that "the use of prepay contracts is something that we expect to hold flat or potentially reduce over time."

In subsequent quarters, Defendants consistently reiterated the importance of minimizing prepays, stating that "we are looking to limit the prepays," which "will result in stronger bottom line performance of the company."

**RESPONSE 41**:

41.     To the extent paragraph 41 characterizes the content of the transcript of Cerene's earnings call held on February 11, 2020, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 41 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 41.

**COMPLAINT PARAGRAPH 42:**

42.     Given the importance of minimizing prepaid deals to the Company's financial performance – and hence the value of its securities – analysts and investors were keenly interested in the Company's strategy with respect to fixed deals and the time it would take for such deals to renew. During earnings calls for each quarter, analysts routinely commented on and asked about the Company's use of and reliance on prepays. For example, after a quarter during which Cerene had reduced prepays, an analyst with Evercore observed that, "on the prepay strategy, we saw the benefit in the quarter" of reducing prepays. Defendants repeatedly assured analysts and investors that Cerence was committed to generating sustainable revenue and growth through variable licenses and minimizing its reliance on prepaid deals.

**RESPONSE 42**:

42.     To the extent paragraph 42 characterizes the content of Cerence's investor presentation transcripts and analyst reports, Defendants state that the transcripts and analyst reports speak for themselves, refer the Court to the transcripts and analyst reports for their content, and

deny the allegations in paragraph 42 to the extent they are inconsistent with the content of the transcripts and analyst reports. Defendants deny the remaining allegations in paragraph 42.

**B. As a Semiconductor Shortage Grips the Automobile Industry, Cerence Reports Record Revenues and Defendants Assure Investors that Cerence Is Achieving Sustainable Growth by Limiting Its Use of Fixed Licenses**

**COMPLAINT PARAGRAPH 43:**

43.    By the time the Class Period began on November 16, 2020, a global semiconductor shortage was curtailing the supply of chips and, in turn, the production and sale of vehicles. This threatened the growth story that Cerence had carefully crafted as the thesis for buying its stock, as analysts and investors were concerned about the impact of the chip shortage on Cerence's revenues. For instance, on February 8, 2021, an analyst at TD Ameritrade remarked that Cerence "clearly [is] a consumer of semiconductors" and "a big part of the supply chain."

**RESPONSE 43**:

43.    Defendants admit that, during the COVID-19 pandemic, there were supply chain challenges in the automotive industry related to semiconductor devices that are used in automobiles. To the extent paragraph 43 characterizes the content of an analyst report, Defendants state that the analyst report speaks for itself, refer the Court to the analyst report for its content, and deny the allegations in paragraph 43 to the extent they are inconsistent with the content of the analyst report. Defendants deny the remaining allegations in paragraph 43.

**COMPLAINT PARAGRAPH 44:**

44.    With investors keenly focused on whether Cerence could show revenue growth during the semiconductor shortage, Defendants reported extremely strong financial results and growth rates. Defendants assured investors that the Company's results were sustainable, and attributed Cerence's success to a variety of legitimate factors – including "very healthy" customer demand, "strong position in [Cerence's] core business," and strong "secular tailwinds that

[Cerence was] benefiting from." Not once did the Company disclose that, in truth, it achieved its "record" revenues by actively pursuing fixed license deals that actually harmed the Company by pulling forward future revenue to inflate quarterly results. To the contrary, to support their statements that Cerence's revenue growth was sustainable, Defendants reassured investors that Cerence was tightly controlling its reliance on fixed license deals, and at minimum holding them within the historical range.

**RESPONSE 44**:

44.    To the extent paragraph 44 characterizes the content of Cerence's SEC filings, press releases, and investor presentation transcripts cited in the Amended Complaint, Defendants state that the SEC filings, press releases, and transcripts speak for themselves, refer the Court to the SEC filings, press releases, and transcripts for their content, and deny the allegations in paragraph 44 to the extent they are inconsistent with the content of the SEC filings, press releases, and transcripts.  Defendants deny the remaining allegations in paragraph 44.

**COMPLAINT PARAGRAPH 45:**

45.    For example, on the first day of the Class Period, November 16, 2020, Cerence issued a press release announcing the Company's "Record Fourth Quarter and Fiscal Year 2020 Results." The press release touted the fact that Cerence's "Q4 revenue increased 21% from last quarter and up 10% from the prior year, setting new quarterly and full year records," and quoted Defendant Dhawan as stating,

> Our Q4 financial performance exceeded our expectations for every metric and delivered record revenue, record gross margin and record EBITDA... As we start the new fiscal year, we are expecting another year of growth supported by a strong backlog and a solid pipeline of new business opportunities. The company's competitive position remains strong as we rely on innovation and speed of execution to continue to drive our business forward.

**RESPONSE 45**:

45.     To the extent paragraph 45 characterizes the content of Cerence's press release dated November 16, 2020, Defendants state that the press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in paragraph 45 to the extent they are inconsistent with the content of the press release.  Defendants deny the remaining allegations in paragraph 45.

**COMPLAINT PARAGRAPH 46:**

46.     That same day, Cerence hosted its fourth-quarter 2020 earnings call. During the call, Dhawan again acclaimed the Company's financial results, stating,

> By all accounts, our fiscal fourth quarter was the best quarter in the company's history. We had record revenue, record gross margin, record EBITDA and record cash collections. The financial performance of the company was amazing with 10% revenue growth year-over-year and 22% revenue growth sequentially.

Dhawan explained that "[t]he outperformance was primarily driven by great adoption of our products and services by the auto OEMs, the strong recovery in the auto market, coupled with the prudent financial controls we have implemented in recent quarters."

**RESPONSE 46**:

46.     To the extent paragraph 46 characterizes the content of the transcript of Cerence's earnings call held on November 16, 2020, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 46 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 46.

**COMPLAINT PARAGRAPH 47:**

47.     However, analysts noticed that Cerence's prepay revenue had grown over the prior year and specifically questioned whether this would continue to have an impact on future results. During the call, an analyst from Needham & Company observed that "there was a 46% growth

year-over-year in prepay," and asked Defendant Gallenberger, "How do we think about prepay going into next year? This year, obviously because of COVID-19, there are extenuating circumstances, which changed buying patterns for customers. So how do we think about that revenue stream next year?" In RESPONSE, Gallenberger assured the market that the Company was endeavoring to reduce prepay revenue and that it would remain within the historical range in fiscal year 2021,

> [A]s it relates to prepays, last year, we did $54 million in fiscal year 2020. The year before was around $43 million. If you go back to FY 2018, it was around $53 million or $54 million. So we seem to be in this range of low-40s to low-50s. So going into fiscal year 2021, I certainly would expect us to be within that range. If you recall, in the past, I have said that we're sort of biased towards reducing prepays. However, that's not always inside our control because we have our customers' demand as well. And so that sometimes ebbs and flows. So I think going into FY 2021, my view is that it would be down from fiscal year 2020, but, certainly, I think it's going to still be within the range that we have seen over the last several years, which is low-40s to high – or low-40s to low-50s. So long winded question or answer to your question, but I think that's about the range that we're going to see for FY 2021.

**RESPONSE 47:**

47.     To the extent paragraph 47 characterizes the content of the transcript of Cerence's earnings call held on November 16, 2020, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 47 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 47.

**COMPLAINT PARAGRAPH 48:**

48.     Analysts cheered Cerence's strong results and credited the Company's assurances about prepay revenues. For example, analysts at Wedbush proclaimed that "Cerence delivered what we would characterize as another major Dustin Johnson-like beat and raise print with numbers handily beating Street expectations despite the soft but improving backdrop" – referencing golfer Dustin Johnson, who had just won one of professional golf's biggest

tournaments with an all-time record score the day before Cerence's results were released. Jefferies raised their price target, explaining that "CRNC posted a 4Q sales & EPS beat driven by outsized License growth & margin upside due to content gains & cost controls." And Craig-Hallum explained that "CRNC crushed the quarter, posting $90.9M in revenue versus our $76.6M estimate." Significantly, Craig-Hallum emphasized the importance of the Company's prepaid deals remaining in its stated range. Indeed, although it observed that "Prepay License revenue of $16.5M was ahead of [our estimate] and was up 46% y/y," and that "Prepay revenue was up 26% for the year compared to FY'19," Craig-Hallum noted that "it was still in the low 40s – low 50s range the company has posted over the last several years" and that "[t]he company expects Prepay revenue will be down in total dollars in FY'21, but will still [be] in the low 40s to low 50s range."

**RESPONSE 48**:

48.     To the extent paragraph 48 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 48 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 48.

**COMPLAINT PARAGRAPH 49:**

49.     Defendants' statements caused Cerence's stock price to pop. Cerence's stock price rose from a close of $65.97 on Friday, November 13, 2020, to close at $72.53 on Monday, November 16, 2020 – an increase of approximately 10% in a single trading day.

**RESPONSE 49**:

49.     Defendants admit that (1) Cerence's common stock closed at $65.97 per share on November 13, 2020; and (2) Cerence's common stock closed at $72.53 per share on November 16, 2020.  Defendants deny the remaining allegations in paragraph 49.

**COMPLAINT PARAGRAPH 50:**

50.    Cerence's strong reported results, and Defendants' assurances about limiting prepay revenue, continued. For instance, on February 8, 2021, Cerence issued a press release trumpeting the Company's "Record First Quarter 2021 Results," which Defendants attributed to "our strong competitive position enabled by our continued focus on innovation and speed of execution." During the earnings call held the same day, Dhawan assured analysts and investors that the Company's growth was sustainable and that its pipeline was strong, stating that the Company's "long-term growth opportunities remain bright." When asked how the Company achieved its first quarter financial results, Dhawan answered that the Company was "definitely getting great wins from the customers and also increasing the pipeline as well." Based on its first quarter results, Cerence increased its guidance for fiscal year 2021.

**RESPONSE 50**:

50.    Defendants state that no response is required to the allegations in paragraph 50, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 50.

**COMPLAINT PARAGRAPH 51:**

51.    To explain the Company's purported sustainable growth, Defendants assured analysts and investors that the Company was committed to deemphasizing prepays, just as they had done previously. Defendant Gallenberger stated,

> Last year, we did about $54 million in prepays and <u>we do expect prepays to be down this year</u>. Historically, we've been in that range of low-40s to low-50s, and I <u>think we're going to stay in that range</u>. So last year, we were at the higher end of that range. This year, I would estimate <u>we'll probably be around in the middle of that range</u>.

During the same call, Gallenberger reiterated that "<u>prepays we're planning to be lower this year</u>…"

**RESPONSE 51**:

51.     Defendants state that no response is required to the allegations in paragraph 51, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 51.

**COMPLAINT PARAGRAPH 52:**

52.     Analysts reacted enthusiastically to the Company's reported financial results and upward revenue guidance adjustment, particularly in light of Defendants' purported commitment to reduce reliance on prepays. Jefferies raised its estimates for fiscal year 2021 and noted Defendants' statements that Cerence would "return to more normalized levels [of prepays] in '21." Craig-Hallum likewise reported that "[t]he company noted again that they expect Prepay to be down y/y for FY'21 (was $54.2M in FY'20)."

**RESPONSE 52**:

52.     Defendants state that no response is required to the allegations in paragraph 52, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 52.

**COMPLAINT PARAGRAPH 53:**

53.     As the market digested the Company's announcement of its first quarter 2021 financial results and analysts' reactions, the price of Cerence's stock climbed. By February 12, 2021, four days after the first quarter earnings announcement, Cerence stock had reached its all-time high of $133.43 per share.

**RESPONSE 53**:

53.     Defendants state that no response is required to the allegations in paragraph 53, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is

required, Defendants deny the allegations in paragraph 53.

**COMPLAINT PARAGRAPH 54:**

54.     In subsequent quarters, Defendants persisted in keeping investors under the illusion that Cerence continued to achieve its "record" results and build a "strong pipeline" while holding prepays toward the lower end of its historical range. For instance, on May 10, 2021, Defendants announced that the Company's financial results from the second quarter of 2021 had exceeded its first quarter results and again raised the Company's full-year guidance. Dhawan attributed the Company's "revenue growth and strong profitability" to the fact that its "core license business, in particular, performed better than expected as the global auto recovery takes shape." During the earnings call that same day, Dhawan reported that the Company's "pipeline continue[d] to be strong and [its] win rate remains extremely high."

**RESPONSE 54**:

54.     To the extent paragraph 54 characterizes the content of Cerence's press release dated May 10, 2021 and the transcript of Cerence's earnings call held on May 10, 2021, Defendants state that the press release and transcript speaks for themselves, refer the Court to the press release and transcript for their content, and deny the allegations in paragraph 54 to the extent they are inconsistent with the content of the press release and the transcript.  Defendants deny the remaining allegations in paragraph 54.

**COMPLAINT PARAGRAPH 55:**

55.     Defendants also again assured investors that this growth was sustainable. Dhawan described Cerence as "operating from a position of real strength with… a significant growth opportunity on the horizon." Gallenberger further highlighted that the Company's "long-term

prospects remain bright and our focus on innovation and growth while at the same time crafting a profitable business model will benefit the company and our shareholders well into the future."

**RESPONSE 55**:

55.    To the extent paragraph 55 characterizes the content of the transcript of Cerence's earnings call held on May 10, 2021, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 55 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 55.

**COMPLAINT PARAGRAPH 56:**

56.    Analysts took comfort in the purported sustainability of the Company's business model. For example, on May 10, 2021, during an earnings call, an Evercore analyst asked Dhawan whether Cerence could "sustain that [] high-level of bookings for the year" 2021. In response, Dhawan touted the Company's purportedly sustainable business strategy that minimized prepays, explaining, "Yeah… We do have the pipeline to achieve that. So it's not just a pipe dream. It's supported by facts and a strong pipeline."

**RESPONSE 56**:

56.    To the extent paragraph 56 characterizes the content of the transcript of Cerence's earnings call held on May 10, 2021, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 56 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 56.

**COMPLAINT PARAGRAPH 57:**

57.    As they had in past quarters, analysts voiced particular interest in the Company's

stated commitment to minimizing reliance on prepay deals. For example, an analyst from RBC Capital pointed out during the May 10 earnings call that year-to-date, "the pre-pay line item" had increased to "mid-teens" and asked whether Defendants' statements in February about reducing prepays "still hold" or whether "anything change[d] there." In response, Gallenberger highlighted that the increase in prepays was "really driven by one customer that… accounted for over 50% of the entire fixed amount," and that otherwise, Cerence was "a little bit below the run rate" from the previous quarter. Gallenberger also represented that, through the first half of the fiscal year, Cerence was "sort of on that same run rate as last year," when the Company had booked $54 million in prepays.

**RESPONSE 57**:

57.     To the extent paragraph 57 characterizes the content of the transcript of Cerence's earnings call held on May 10, 2021, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 57 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 57.

**COMPLAINT PARAGRAPH 58:**

58.     Subsequent analyst reports also reflected analysts' strong interest in the Company's stated commitment to minimizing prepays. For instance, Craig-Hallum observed in its May 10 report that Cerence had "hammered home another strong quarter," but expressed concern about the fact that "prepays came in higher than expected," generating "revenue of $17.3M" – ahead of analysts' estimate of $12.0M and up 6% year-over-year. Nevertheless, Craig-Hallum remained optimistic about the Company's license revenue because the Company had represented that "Prepays will be approximately flat with FY'20 ($54.2M)" and that "[l]onger term, the company

continues to focus on driving more Variable versus Prepays." Craig-Hallum also took comfort in Defendants' reassurances that the Company had "an exceptionally deep pipeline" to support sustainable revenue growth. Based on Defendants' assurances about the Company's sustainable revenues and commitment to minimizing prepays, Jeffries likewise concluded, "Ultimately, we remain pos[itive] on CRNC's LT [long-term] growth thesis."

**RESPONSE 58**:

58.     To the extent paragraph 58 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 58 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 58.

**COMPLAINT PARAGRAPH 59:**

59.     On August 9, 2021, Defendants touted strong results for the third quarter of 2021 and, for the third time in six months, raised Cerence's full-year revenue guidance. This time, the Company also increased its revenue guidance for fiscal year 2024 by more than 16%, from $600 million to $700 million. Dhawan stated that "sustainable improvements," among other things, enabled the Company to increase its 2024 revenue guidance. During the earnings call, Dhawan trumpeted the Company's ability "to consistently deliver strong growth and profitability," asserting that the Company's "multifaceted growth strategy to deliver sustainable growth continues to play out."

**RESPONSE 59**:

59.     Defendants state that no response is required to the allegations in paragraph 59, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 59.

**COMPLAINT PARAGRAPH 60:**

60.     During the same earnings call, Gallenberger summarized the third quarter as "another quarter of excellent financial performance" and again impressed upon investors that the Company's revenue growth was sustainable, stating, "Our long-term prospects remain strong."

**RESPONSE 60**:

60.     Defendants state that no response is required to the allegations in paragraph 60, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 60.

**COMPLAINT PARAGRAPH 61:**

61.     Analysts reacted positively to the Company's third quarter earnings announcement. Analysts at Wedbush remarked that "Cerence delivered another robust quarter (despite chip shortage fears) as the company's execution strategy in the field is laying the groundwork for expanding growth and [revenue per vehicle] opportunities over the next 12 to 18 months." On license revenue, Wedbush noted the "54% y/y" increase and raised its price target for Cerence to reflect its "increased confidence in the CRNC roadmap… looking ahead."

**RESPONSE 61**:

61. Defendants state that no response is required to the allegations in paragraph 61, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 61.

**COMPLAINT PARAGRAPH 62:**

62.     The Company's stock price mirrored analysts' positive reactions. After the Company's earnings announcement, the price of Cerence stock rose by more than $9, from a close

of $105.46 on Friday, August 6, 2021 to a close of $114.55 on Monday, August 9, 2021, representing an approximately 9% increase.

**RESPONSE 62**:

62.     Defendants state that no response is required to the allegations in paragraph 62, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 62.

**COMPLAINT PARAGRAPH 63:**

63.     Thereafter, Cerence participated in a series of industry conferences, during which the Executive Defendants continued to tout the Company's purportedly strong core business and sustainable revenue growth. For instance, on August 24, 2021, during the Raymond James Diversified Industrials Conference, Gallenberger reiterated that the Company was committed "to keep that – those prepays, which we call fixed volume contracts within that historical range" of "around $40 million to $55 million per year." Gallenberger also stated that Defendants had based the Company's guidance on that assumption, confirming, "So that's what we've built into the forecast as well."

**RESPONSE 63**:

63.     Defendants state that no response is required to the allegations in paragraph 63, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 63.

> **C. Unknown to Investors, Defendants Concealed Lackluster Demand and Inflated Short-Term Revenue by Dramatically Increasing Fixed License Deals, Including Undisclosed "Minimum Commitment" Deals**

**COMPLAINT PARAGRAPH 64:**

64.     As discussed above, throughout the Class Period, Defendants repeatedly reassured investors that Cerence was reducing its reliance on fixed license deals or, at a minimum, holding

them within the historical range. In truth, they were not. In contrast to Defendants' numerous public representations, the Executive Defendants personally instructed sales force personnel to dramatically increase their sales of fixed licenses in order to: (i) perpetuate the perception of Cerence as a new and successful public tech company; (ii) achieve the Company's aggressive guidance in the face of the chip shortage; (iii) ensure that the Executive Defendants would receive the maximum possible payouts under the Company's performance-based incentive plans; and (iv) allow Defendants to unload millions of dollars of stock at inflated prices. Defendants' scheme succeeded insofar as it allowed Cerence to meet its guidance, and allowed the Executive Defendants to achieve their performance-based compensation targets during the Class Period, only because of the contribution of damaging fixed or minimum commitment deals.

**RESPONSE 64**:

64.     Defendants state that paragraph 64 is a characterization of the Amended Complaint to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 64.

**COMPLAINT PARAGRAPH 65:**

65.     While assuring investors that Cerence was reducing prepays, or holding them within the historical range, Defendants were doing exactly the opposite – they were directing the Company's sales personnel to sell record numbers of fixed licenses, which Defendants personally approved. As a result, the number of fixed license deals skyrocketed to its highest level in the Company's history, far surpassing its historical range.

**RESPONSE 65**:

65.     Defendants deny the allegations in paragraph 65.

**COMPLAINT PARAGRAPH 66:**

66.     Worse yet, Defendants also directed sales personnel to convert existing variable contracts to prepays so that the Company could recognize the revenue immediately to bolster Cerence's financial results at the expense of future growth, enabling the Executive Defendants to just barely meet their highest performance-based compensation metrics.

**RESPONSE 66**:

66.     Defendants deny the allegations in paragraph 66.

**COMPLAINT PARAGRAPH 67:**

67.     Finally, as the Company's competitive position continued to fray, and customers grew hesitant to accept even discounted prepay deals, Defendants directed sales personnel to offer a new type of fixed license deal called "minimum commitments." Much like the prepay deals, the minimum commitment deals were used by the Executive Defendants to just barely meet their highest performance-based compensation metrics.

**RESPONSE 67**:

67.     Defendants deny the allegations in paragraph 67.

**COMPLAINT PARAGRAPH 68:**

68.     As noted above, these new minimum commitment deals were the worst kind of deal for the Company because they cannibalized future revenue, and did so at a discount, yet yielded no cash up-front. Under these new minimum commitment deals, customers committed to purchasing a set number of licenses within a designated timeframe but, unlike conventional prepaid deals, paid zero cash up front. Even more troubling, Defendants booked all the revenue up front on these up-to-5-year contracts to prop up Cerence's revenues. Taken together, Defendants' scheme cannibalized years of the Company's future revenue at a discount, decimated its demand

and pipeline, and jeopardized its longer-term financial health without providing any cash up-front – all in order to create the materially false impression of strong financial performance and drive up the Company's stock price in the near term.

**RESPONSE 68**:

68.    Defendants state that no response is required to the allegations in paragraph 68, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 68.

       ii.    <u>Defendants Directed Cerence Sales Personnel to Increase Fixed License Deals</u>

**COMPLAINT PARAGRAPH 69:**

69.    FE1 worked for Nuance, and later Cerence, from May 2013 until September 2021. He was one of the Company's four Sales Managers in Japan and sold to Cerence clients within that market. His responsibilities as a Sales Manager included client outreach and contract procurement. He reported to Cerence Vice President Shojiro Kimura, who in turn, reported to Senior Vice President of Global Automotive Sales, Egon Jungheim, who worked closely with Dhawan.

**RESPONSE 69**:

69.    Defendants lack knowledge or information sufficient to form a belief as to the allegations in paragraph 69.

**COMPLAINT PARAGRAPH 70:**

70.    FE1 reported that Dhawan "strongly pushed the prepayment deals" and that Dhawan's pressure to convert typical license contracts to prepay contracts to get the cash up-front began in January 2020. FE1 further reported that the pressure from Dhawan continued every quarter until FE1 left the Company in September 2021.

**RESPONSE 70**:

70.     Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 70.  Defendants deny the remaining allegations in paragraph 70.

**COMPLAINT PARAGRAPH 71:**

71.     Dhawan aggressively pushed a strategy to increase short-term revenue and drive up the Company's stock price by ramping up fixed license sales. At Cerence, FE1 worked as a Sales Manager in Japan, which, as FE1 explained, was a large market for Cerence and included important clients, like Toyota.[2]  Dhawan's orders were not unique to Japan – FE1 also recalled that Dhawan had "ordered sales personnel from all over the world" to do prepaid deals, which Jungheim confirmed in conversations with FE1. As FE1 explained, "no one was able to escape from it."

**RESPONSE 71**:

71.     Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 71.  To the extent paragraph 71 and footnote 2 characterize the content of Cerence's investor presentation transcripts, Defendants state that the transcripts speak for themselves, refer the Court to transcripts for their content, and deny the allegations in paragraph 71 and footnote 2 to the extent they are inconsistent with the content of the transcripts.  Defendants deny the remaining allegations in paragraph 71 and footnote 2.

**COMPLAINT PARAGRAPH 72:**

72.     Beginning in early 2020, Defendant Dhawan started directing sales personnel to

---

[2] By the second quarter of 2022, nearly 30% of the Company's overall revenue came from Japan. Dhawan publicly recognized Japan's importance to Cerence, stating, among other things, that "Japanese [manufacturers] ship almost 50% of the volume of the world in two-wheelers, so that's a very important geography for us." As the Company's current CFO confirmed, fixed license contracts – both prepays and minimum commitments – are purchased by Cerence customers who are "predominantly in the Asia region – primarily in Japan and Korea."

sell more prepays, including by converting variable deals to prepays. Dhawan continued to pressure sales personnel to sell more prepays during every quarter up through September 2021, when FE1 resigned from Cerence. FE1 explained that Dhawan started applying a lot of pressure in the second month within each quarter. At that point, Jungheim typically would communicate Dhawan's orders to Cerence's sales personnel, telling them that they needed to push customers to buy prepays. FE1 recalled that either Dhawan or Jungheim would state that there was an existing contract and that they wanted it changed to a prepaid contract. FE1 recounted that when sales personnel were unable to do so, Dhawan would get very unhappy and say that "this could not be."

**RESPONSE 72**:

72.     Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 72.  Defendants deny the remaining allegations in paragraph 72.

**COMPLAINT PARAGRAPH 73:**

73.     FE1 confirmed that Jungheim and Dhawan spoke about prepays during Cerence internal teleconferences and phone calls, and also in internal Cerence emails. FE1 recalled that Dhawan usually went through Jungheim when applying pressure to increase sales of prepays, but other times, Dhawan directly pressured sales managers to push prepays by sending emails, some of which FE1 personally received.

**RESPONSE 73**:

73.     Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 73.  Defendants deny the remaining allegations in paragraph 73.

**COMPLAINT PARAGRAPH 74:**

74.     As time passed, Dhawan applied an increasing amount of pressure on Cerence's sales personnel to sell more prepays. After the second quarter of fiscal year 2020, the level of pressure to increase prepays became more intense. For instance, in the second quarter of 2020, FE1 began receiving calls and emails directly from Dhawan. FE1 also received calls and emails from Jungheim, who often referenced conversations that he had with Dhawan. Dhawan would tell Jungheim that the sales team was not selling enough prepays and would demand that Jungheim "do something about this." Jungheim forwarded these emails to sales personnel, including FE1. FE1 recalled that these calls and emails were frequent.

**RESPONSE 74**:

74.     Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 74.  Defendants deny the remaining allegations in paragraph 74.

   iii. <u>Defendants Directed Sales Personnel to Convert Existing Variable Deals to Fixed Deals</u>

**COMPLAINT PARAGRAPH 75:**

75.     In addition, Defendant Dhawan heavily pressured Cerence sales personnel to convert existing deals that already were in the variable backlog into fixed deals. This tactic, too, enabled Defendants to meet their public guidance and max out their performance-based compensation and stock grants. For these deals, the Company <u>did not</u> obtain any new business. Rather, the Company offered a bulk discount to clients that had existing variable license contracts in place, and in return, those clients agreed to purchase licenses in bulk and pay the cash up front at a discount. Although this strategy enabled Cerence to recognize revenue immediately, it reduced

the Company's revenue stream by discounting sales that already were in the backlog at a higher value, thereby cannibalizing future revenue.

**RESPONSE 75**:

75.   Defendants deny the allegations in paragraph 75.

**COMPLAINT PARAGRAPH 76:**

76.   This strategy was particularly troubling because the Company offered steep discounts for clients who converted from variable to prepay – meaning that by converting deals from "variable" to "fixed," Cerence sacrificed a portion of the value that it had secured through the original contract.

**RESPONSE 76**:

76.   Defendants admit that prepay contracts typically involved discounts relative to variable contracts.  Defendants deny the remaining allegations in paragraph 76.

**COMPLAINT PARAGRAPH 77:**

77.   FE1 explained that throughout Dhawan's "management era, he required all Sales [teams] to convert all (typical) license contracts to Prepayment to get the cash." Toward the end of each quarter, Dhawan would begin pressuring sales managers and ordering them to convert customers' contracts to prepay. Specifically, FE1 reported that, in the second month of each quarter, Dhawan added pressure on the sales managers and ordered them to convert customers' contracts over to prepay contracts. Despite knowing that prepays "crashed the future opportunity," FE1 explained that he and his colleagues felt that they were forced to do conversions because they "couldn't resist [Dhawan's] heavy pressure."

**RESPONSE 77**:

77.   Defendants lack knowledge or information sufficient to form a belief about whether

FE1 made the statements attributed to FE1 in paragraph 77.  Defendants deny the remaining allegations in paragraph 77.

**COMPLAINT PARAGRAPH 78:**

78.    FE1 described how the Cerence sales team "suffered a lot because of un-achievable goals" set by Dhawan and Gallenberger. FE1 explained that minimum commitment deals and conversions from variable to fixed allowed Dhawan and Gallenberger to "fill" or "hide" the "big gap" between "Goal and Real" performance.

**RESPONSE 78**:

78.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 78.  Defendants deny the remaining allegations in paragraph 78.

> iv.    When Customers Hesitated to Accept Pre-Paid Deals, Defendants Aggressively Pushed "Minimum Commitment" Deals

**COMPLAINT PARAGRAPH 79:**

79.    By the third quarter of 2021, Defendants' pull-forward scheme had begun to falter, and customers were balking at even discounted prepaid deals. Accordingly, Defendants offered customers a new type of fixed license deal – the "minimum commitment" deal. As noted above, these deals permitted Cerence's customers to secure a discount on licenses without paying any cash up front. Cerence clients that purchased minimum commitments often had up to five years to purchase a set number of licenses. Under these agreements, even if the client did not purchase even a single license until the last day of the commitment period, the client nevertheless satisfied its obligation and received a discount. Notwithstanding the fact that the customer paid nothing up front in a minimum commitment deal, Cerence booked all of the revenue due under these up-to-five-year minimum commitment deals up front, which allowed it to report immediate positive

financial results.

**RESPONSE 79**:

79.     Defendants state that no response is required to the allegations in paragraph 79, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 79.

**COMPLAINT PARAGRAPH 80:**

80.     When customers began to balk at prepaid deals, Defendants introduced the minimum commitment deal as an alternative – giving to reticent customers the tempting option to lock in a multi-year discount, in addition to paying <u>zero</u> cash up front and having the ability to wait up to <u>five years</u> to purchase even a single license under the contract. FE1 recounted that Dhawan first began discussing minimum commitment deals at the end of 2020 and that by mid-2021 (more specifically, before the fourth quarter of 2021), minimum commitments were being offered to customers. FE1 recalled that Dhawan was constantly pressuring salespeople to do minimum commitment deals. FE1 described how when the "customer hesitated" to enter into a prepaid deal, "Sanjay and Egon pushed us to propose" deals in which the customer would commit to a "total projected volume and amount" – i.e., minimum commitment deals. FE1 recalled Dhawan describing both minimum commitments and prepays as "not difficult" – in part because of the discounts that customers secured through these deals – but indicating that minimum commitments were "easier than the typical prepays." FE1 explained that minimum commitments were the deals that "Cerence pushed mainly."

**RESPONSE 80**:

80.     Defendants state that no response is required to the allegations in paragraph 80, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is

required, Defendants deny the allegations in paragraph 80.

**COMPLAINT PARAGRAPH 81:**

81.     Cerence sales personnel knew that minimum commitment deals were bad for the Company but continued to sell them, in part because of the culture of fear that Dhawan created within the Company. FE1 believed that minimum commitments "caused a serious unbalanced Book:Bill ratio," which resulted from the years-long "consumption period" associated with these deals. FE1 completed such deals anyway, however, because it allowed Cerence to receive the booking and that was the only way to avoid Dhawan becoming "too mad." FE1 described how "[e]very sales person knew about" fixed license sales harming future growth. FE1 specifically recalled doing a minimum commitment deal with one of his customers, Alpine, in the third quarter of 2021, which he recalled received signoff likely at the end of August 2021. FE1 explained that it took three months to negotiate new deals. As a result, the Company often recognized the revenue from these deals several months after a Cerence salesperson first offered the deal to the customer.

**RESPONSE 81**:

81.     Defendants state that no response is required to the allegations in paragraph 81, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 81.

**COMPLAINT PARAGRAPH 82:**

82.     Based on Defendant Dhawan's instructions to Cerence's sales personnel, the Company's fixed license deals – and, in particular, minimum commitment deals – skyrocketed. By the end of fiscal year 2021, Cerence's fixed license deals had exploded to $71 million – an increase of approximately 41% over the Company's average historical amount. In the fourth

quarter of 2021, minimum commitment deals accounted for <u>87%</u> of fixed license revenue, and in the first quarter of 2022, they accounted for <u>100%</u> of Cerence's total fixed revenues.

**RESPONSE 82**:

82.    Defendants admit that Cerence reported fixed license revenue of $71 million for fiscal year 2021.  Defendants deny the remaining allegations in paragraph 82.

v.    <u>Defendants Clearly Understood the Extent and Risks of Cerence's Prepaid and Minimum Commitment Deals</u>

**COMPLAINT PARAGRAPH 83:**

83.    In addition to directing corporate strategy as to prepaid and minimum commitment deals, Defendants approved all prepaid and minimum commitment deals over $1 million. FE1 reported that after the customer signed the contract, it was sent to Cerence headquarters. Dhawan and Gallenberger reviewed the contract, and then it was sent to Cerence's general counsel to sign. FE1 confirmed that Dhawan and Gallenberger needed to approve the contract before the general counsel could sign it.

**RESPONSE 83**:

83.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 83.  Defendants deny the remaining allegations in paragraph 83.

**COMPLAINT PARAGRAPH 84:**

84.    In addition, Cerence tracked consumption of prepaid licenses, so Defendants had information showing the huge backlog of prepaid sales, which they had created, and how that backlog was choking the Company's demand and revenue stream. FE1 reported that when the Company entered into a prepaid deal, the customer had to report the number of consumed licenses per quarter in a royalty report. The royalty report was sent to the Company at

royalty.reports@cerence.com or to the local salesperson. FE1 reported that typically, on the twentieth day of the first month of each quarter, customers would send the royalty report for the prior quarter, indicating the consumed-license numbers for the applicable quarter. FE1 reported that Cerence's royalty report team in Burlington (where Dhawan and Gallenberger were based) reviewed the reports.

**RESPONSE 84**:

84.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 84. Defendants deny the remaining allegations in paragraph 84.

**COMPLAINT PARAGRAPH 85:**

85.    Defendants also knew that Cerence's fixed license deals negatively impacted the Company's future revenues. FE1 reported that before the spinoff, the trend at Nuance was to reduce reliance on prepaid contracts and that Jungheim was trying to reduce reliance on prepaid contracts at Nuance. The risks of such deals also were widely known when Defendants did an about-face and began relying very heavily on prepaid deals at Cerence. FE1 reported that every salesperson at Cerence knew that the prepaid deals were harming the future growth of the Company. FE1 discussed this with others at Cerence, including Cerence's three other sales managers in Japan, because other sales employees were very unhappy about being forced to sell prepaid contracts.

**RESPONSE 85**:

85.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 85. Defendants deny the remaining allegations in paragraph 85.

**COMPLAINT PARAGRAPH 86:**

86.     Notwithstanding their knowledge of the Company's mushrooming prepaid and minimum commitment deals – and the risks associated with them – during the fourth quarter of fiscal year 2021, Defendants continued to mislead investors. Defendants attended numerous industry conferences and investor events, during which they reiterated that Cerence was deemphasizing fixed license deals, even though it was not. During these same investor conferences, Cerence made no disclosure of the Company's new source of revenues – minimum commitment deals – or their nature, instead falsely referring to these new arrangements as standard "prepay" deals. For instance, on August 24, 2021, during the Raymond James Diversified Industrials Conference, Gallenberger stated, "Prepays, historically, we typically see around $40 million to $55 million per year. And so we're going to see if we're going to keep that – those prepays, which we call fixed volume contracts within that historical range. So that's what we've built into the forecast as well." As investors would ultimately learn, the Company's minimum commitment deals were not "prepay" deals – in fact, the customers were not required to pay any amount for up to five years – and Cerence was not trying to minimize these deals.

**RESPONSE 86**:

86.     Defendants state that no response is required to the allegations in paragraph 86, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 86.

### D.  Investors Learn the Truth

        i.     Defendants Begin to Admit Their Scheme to Pull Forward Revenue

**COMPLAINT PARAGRAPH 87:**

87.     The spike in fixed deals – in particular, minimum commitment deals – and their impact on Cerence's backlog and revenue stream remained concealed from investors until these

facts were belatedly revealed through a series of partial corrective disclosures, which began on November 22, 2021. On that date, Cerence announced financial results for the fourth quarter and fiscal year 2021. Defendants revealed that the Company's fixed deals had ballooned to $71 million, vastly exceeding the approximately $40 to $55 million range that Defendants continually reiterated throughout the Class Period. Far from minimizing fixed license sales as they had claimed they were doing, Defendants drove up the Company's fixed license revenue from the midpoint of its historical range by 50%. The market thus began to understand that Defendants had only made their revenue guidance because they had entered into a grossly excessive amount of fixed deals – deals Defendants knew were harmful to the Company's financial condition.

**RESPONSE 87**:

87.   To the extent paragraph 87 characterizes the content of Cerence's press release dated November 22, 2021, Defendants state that the press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in paragraph 87 to the extent they are inconsistent with the content of the press release.  Defendants deny the remaining allegations in paragraph 87.

**COMPLAINT PARAGRAPH 88:**

88.   Defendants also began to acknowledge that the Company's pipeline was poor, and its revenue growth was, in fact, unsustainable. As Defendant Gallenberger himself admitted on November 22, 2021, although Cerence's past growth in fixed license sales was "good for short-term,… it also does create a little bit of a pressure on our next year and sometimes the year after growth because we have to consume – or the customer has to consume those licenses." Gallenberger further explained that the Company's fixed deals "put a little bit of a damp around growth rates for [2022] and possibly into fiscal 2023 as well, as those licenses get consumed." But

even Gallenberger's modest admission concerning prepays was misleading and concealed the full truth from investors, who would learn just three months later that those prepaid licenses would take between 6 and 10 quarters to consume and thus would impact growth rates well into fiscal year 2024.

**RESPONSE 88:**

88.     To the extent paragraph 88 characterizes the content of the transcript of Cerence's earnings call held on November 22, 2021, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 88 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 88.

**COMPLAINT PARAGRAPH 89:**

89.     In response to Cerence's November 22 disclosures, analysts expressed surprise and pointedly questioned whether Cerence had been pulling forward revenues from future quarters to boost its financial results. Craig-Hallum, for instance, observed following the November 22 disclosure that "[h]eadline numbers were largely as expected, but under the covers a number of key lines surprised." One such surprise resulted from the Company's announcement that "prepaid license was up 40% sequentially," which "raises concerns about potentially pulling forward revenue." Raymond James similarly expressed concerns about Cerence's reported prepays during the fourth quarter, concluding that the Company's "earnings quality was a bit in question given a gigantic contribution in Pre-paid licenses ($25.4m vs $16m estimate)."

**RESPONSE 89**:

89.     To the extent paragraph 89 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their

content, and deny the allegations in paragraph 89 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 89.

**COMPLAINT PARAGRAPH 90:**

90.     As a result of these disclosures, the Company's stock price swiftly plummeted. On trading of more than 3.2 million shares – or nearly six times the Class Period average – Cerence's stock price fell by more than 20% in a single day, declining from a closing price of $104.06 per share on November 19, 2021, to a closing price of $82.59 per share on November 22. This drop in the Company's stock price, which was the largest in its history, erased more than $800 million in stockholder value.

**RESPONSE 90**:

90.     Defendants admit that (1) Cerence's common stock closed at $104.06 per share on November 19, 2021; and (2) Cerence's common stock closed at $82.59 per share on November 22, 2021.  Defendants deny the remaining allegations in paragraph 90.

ii.     Defendants Continue to Fundamentally Misrepresent Fixed Deals, Claiming They Were Prepaid when Defendants Knew They Involved No Cash or Pre-Payment

**COMPLAINT PARAGRAPH 91:**

91.     Notwithstanding these disclosures, Defendants continued to conceal material facts and issued a series of misleading statements to assuage the market. For instance, although Defendants were forced to disclose the spike in prepaid deals, they concealed the fact that the vast majority – 87% – of the allegedly "prepaid" deals in the fourth quarter involved no payment or pre-payment at all. Rather, they were "minimum commitment" deals, in which the Company received no cash.

**RESPONSE 91**:

91.      Defendants state that no response is required to the allegations in paragraph 91, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 91.

**COMPLAINT PARAGRAPH 92:**

92.      Defendants' first (and at the time, only) reference to their minimum commitment deals appeared in an inconspicuous footnote buried at the bottom of two slides in an investor presentation. The footnote – highlighted in Figure 1 below – denoted only that an unspecified portion of the Company's fixed deals were "minimum commitments," stating, "Fixed license revenue includes prepaid and minimum commitment deals." As shown below, the line item for fixed license deals only disclosed the Company's aggregate fixed license revenue and, despite the obvious materiality of the minimum commitment deals, did not separately disclose the amount of revenue attributable to these deals. It also did not disclose, among other things, that minimum commitment deals were new to the Company's fixed license business; that 87% of the Company's fixed deals in the quarter were minimum commitments, not prepaids; or _any_ of the terms of the minimum commitment deals, which did not require any actual payment of cash for years and would cannibalize up to 5 years of revenue.

## Revenue Growth Powered by License and Pro Services

| | Q4FY21 | Q4FY20 | YoY Growth |
|---|---|---|---|
| **License:** | **$51.4M** | **$46.4M** | ↑ 11% |
| Variable | $26.0M | $29.9M | ↓ (13%) |
| Fixed[1] | $25.4M | $16.5M | ↑ 54% |
| **Connected Services:** | **$25.6M** | **$25.4M** | ↑ 1% |
| New | $9.5M $11.2M[2] | $9.5M | 0% 18%[2] |
| Legacy | $16.1M | $15.9M | ↑ 1% |
| **Professional Services** | **$21.1M** | **$19.4M** | ↑ 9% |
| **Total Revenue:** | **$98.1M** | **$91.2M** | ↑ 8% |

[1]*Fixed license revenue includes prepaid and minimum commitment deals.*
[2]*Excluding a one-time accounting adjustment of $1.7M to correct an amortization schedule, year-over-year growth would have been 18%*

Cerence®                    © 2021 Cerence Inc.                    13

*Figure 1 (highlight added)*

**RESPONSE 92**:

92.     Defendants state that no response is required to the allegations in paragraph 92 and Figure 1, which relate solely to claims dismissed by the 3/25/2024 Order. To the extent a response is required, Defendants deny the allegations in paragraph 92 and Figure 1.

**COMPLAINT PARAGRAPH 93:**

93.     Other than the above footnote, Defendants made <u>no</u> reference to minimum commitment deals in any of their statements to investors, including in any of Cerence's quarterly investor presentations, press releases announcing the Company's financial results, SEC filings, or earnings calls. Defendants instead chose to leave analysts and investors in the dark about what minimum commitments were and how much of them Cerence had sold.

**RESPONSE 93**:

93.     Defendants state that no response is required to the allegations in paragraph 93, which relate solely to claims dismissed by the 3/25/2024 Order. To the extent a response is

required, Defendants deny the allegations in paragraph 93.

**COMPLAINT PARAGRAPH 94:**

94.     Moreover – and significantly – Defendants affirmatively mischaracterized "minimum commitment" deals as "prepaid" deals throughout the Company's fourth quarter 2021 earnings call. For example, an analyst from Needham asked Defendants to clarify "how [to] think about the prepaid revenue" and the anticipated "extent of the drop-off in fiscal year 2022 for prepaid given it's so high" In the fourth quarter and fiscal year 2021. The analyst then asked, "[W]hat drove the above average growth <u>in prepay in the [fourth] quarter because it was quite significant</u>?" In his response to the analyst's question, Gallenberger falsely and misleadingly <u>agreed</u> with the Needham analyst's (incorrect) statement that there had been a "growth in prepay" during the quarter. In actuality – and as investors eventually would come to learn – prepays had declined by <u>more than 80%</u> during the quarter while minimum commitments had skyrocketed. Starting in the fourth quarter, Cerence had started relying almost exclusively on minimum commitments (for which Cerence received <u>zero</u> prepayment) to artificially inflate the Company's revenues.

**RESPONSE 94**:

94.     Defendants state that no response is required to the allegations in paragraph 94, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 94.

**COMPLAINT PARAGRAPH 95:**

95.     Defendants also affirmatively made reassuring statements during the fourth quarter earnings call, continuing to lead investors to believe that the Company was not driving revenues through its fixed license deals. Dhawan emphasized to investors that "<u>nothing has changed</u>" in

Cerence's business, notwithstanding that (undisclosed to investors at the time) much had changed – namely, the Company had introduced a new type of deal, the "minimum commitment deal," which drove 87% of its fixed revenues for the quarter (and was on its way to accounting for <u>100%</u> of it fixed revenues for Q1) and required no payment for years.

**RESPONSE 95**:

95.     Defendants state that no response is required to the allegations in paragraph 95, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 95.

**COMPLAINT PARAGRAPH 96:**

96.     Additionally, Gallenberger reassured investors that Cerence would achieve 2022 "revenue growth… in the range of plus 3% to plus 10%," based in part on "an expected decline in our fixed license revenue after our record setting amount of $71 million last year." Defendants also reaffirmed the Company's 2024 revenue guidance, explaining that its 2021 results did not affect those estimates. Gallenberger underscored that "the bookings that we're seeing today gives us that level of comfort that the revenue will come in into that 2024 target model."

**RESPONSE 96**:

96.     Defendants state that no response is required to the allegations in paragraph 96, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 96.

iii.    <u>Less than a Month after Announcing a Massive Spike in Prepaid Deals, Dhawan Abruptly "Resigns," Leading Investors to Question the Validity of Guidance</u>

**COMPLAINT PARAGRAPH 97:**

97.     As a result of these false and misleading statements, the price of the Company's stock remained relatively stable until December 15, 2021. On that day, the Company stunned

investors by unexpectedly announcing that Dhawan would resign from his position as CEO, effective immediately. Stefan Ortmanns – who had served in various senior management roles since joining Nuance in 2003 – would leave his role as Executive Vice President of Core Products to replace Dhawan as CEO of the Company.

**RESPONSE 97**:

97.    Defendants admit that Mr. Dhawan resigned as Cerence's President and Chief Executive Officer and a director of the Company on December 14, 2021, and that Dr. Ortmanns was appointed as Cerence's President and Chief Executive Officer and a director of the Company, effective December 15, 2021.  Defendants state that the remaining allegations in paragraph 97 assert legal conclusions to which no response is required.  To the extent a further response is required, Defendants deny the remaining allegations in paragraph 97.

**COMPLAINT PARAGRAPH 98:**

98.    Analysts connected the Company's unexpected change in leadership to the poor results announced on November 22 and stated that it harmed Cerence's credibility with investors. For example, Raymond James highlighted that "the abruptness of the announcement, immediate transition, and narrow search effort for the replacement create an uneasy environment," which would require new CEO Ortmanns "to re-engage with investors to restore confidence." Raymond James further expressed hesitation about Cerence's 2024 guidance in light of Dhawan's departure, explaining that the market would need to "see further tangible evidence that management's 2024 numbers are probable." RBC Capital similarly reported that Dhawan's resignation was "negative" and "surprising," explaining that, following the November 22 disclosures, it "thought that [Cerence] could be in a near-term penalty box (poor communication, steeper ramp to LT targets)

but that the [long-term] attractiveness of the asset was mostly unchanged" – but it no longer could maintain such an opinion after Dhawan's resignation.

**RESPONSE 98**:

98.     To the extent paragraph 98 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 98 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 98.

**COMPLAINT PARAGRAPH 99:**

99.     Following the Company's abrupt and unexpected announcement of Dhawan's "resignation," the price of Cerence stock again cratered. Cerence's stock price fell by more than 11%, declining from a closing price of $78.08 per share on December 14, 2021, to a closing price of $69.20 per share on December 15, 2021.

**RESPONSE 99**:

99.     Defendants admit that (1) Cerence's common stock closed at $78.08 per share on December 14, 2021; and (2) Cerence's common stock closed at $69.20 per share on December 15, 2021.  Defendants deny the remaining allegations in paragraph 99.

iv.     The Full Truth About the Disastrous Effects of Oversold Prepays and Minimum Commitment Deals is Finally Disclosed

**COMPLAINT PARAGRAPH 100:**

100.     Under Ortmanns' leadership, the Company finally was forced to come clean and belatedly disclosed the material facts that it previously had concealed. On February 7, 2022, immediately following the last day of the Class Period, the Company shared its financial results for the first quarter of 2022 and issued multiple disclosures that whipsawed the market. Cerence announced that it did $20.1 million in fixed deals during the first quarter of 2022, putting it on

pace to surpass a "$71 million record" high from the prior year. As of the first quarter of 2022, the Company's fixed license revenue had increased year-over-year by <u>almost 100%</u>, while its variable license revenue – i.e., its most important and valuable source of revenue – had declined year-over-year by <u>over 40%</u>.

**RESPONSE 100**:

100.    To the extent paragraph 100 characterizes the content of Cerence's press release dated February 7, 2022, Defendants state that the press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in paragraph 100 to the extent they are inconsistent with the content of the press release.  Defendants deny the remaining allegations in paragraph 100.

**COMPLAINT PARAGRAPH 101:**

101.    Along with its earnings announcement, the Company lowered its guidance for fiscal year 2022 by 9%, withdrew its guidance for fiscal year 2024, unexpectedly announced the "retirement" of Defendant Gallenberger, and for the first time disclosed the nature and impact of "minimum commitment" deals. In effect, Defendants revealed that demand for the Company's profitable variable contracts and for prepaid contracts had cratered and that, as a result, the Company had turned almost exclusively to minimum commitment deals, which were extremely detrimental to the Company's financial condition and future growth.

**RESPONSE 101**:

101.    To the extent paragraph 101 characterizes the content of Cerence's press release and SEC filings dated February 7, 2022, Defendants state that the press release and SEC filings speak for themselves, refer the Court to the press release and SEC filings for their content, and

deny the allegations in paragraph 101 to the extent they are inconsistent with the content of the press release and the SEC filings.  Defendants deny the remaining allegations in paragraph 101.

**COMPLAINT PARAGRAPH 102:**

102.    Ortmanns admitted that, while Dhawan was the CEO, the Company had pulled forward revenue through the Company's fixed license deals, which had a material negative impact on its revenue stream. As Ortmanns explained,

> [S]ince being appointed CEO, I have reviewed each business unit[']s plan, forecasts and assumptions. After my assessment, I believe the conversion from bookings to revenue will take longer than expected for [the Company's] new products… [W]e now believe it will take longer than originally expected to recognize revenue.

Cerence also highlighted that its past sales of fixed licenses had "caused" a year-over-year "variable license [revenue] decline," materially impairing the Company's most valuable stream of revenue. Based on these troubling facts, Ortmanns conceded that the Company needed now to define a "new vision and strategy for growth," which would require the Company to "set[] a stronger foundation for long-term sustainable growth."

**RESPONSE 102**:

102.    To the extent paragraph 102 characterizes the content of the transcript of Cerence's earnings call held on February 7, 2022, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 102 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 102.

**COMPLAINT PARAGRAPH 103:**

103.    During the earnings call, the Company also provided investors with the previously concealed information about its fixed license deals, finally bringing to light important information that Defendants had hidden from analysts and investors throughout the Class Period. First,

Gallenberger walked analysts through the full extent of the negative effects caused by the Company's overreliance on fixed license deals during 2021. As Gallenberger explained,

> We are starting to experience the impacts of the larger-than-planned fixed license deals that we did last year and the year before, <u>which is now creating a significant headwind to our variable license revenue growth</u>. The reason is because those fixed licenses need to be consumed and netted out against the gross number of licenses consumed by customers each quarter.

**RESPONSE 103**:

103.    To the extent paragraph 103 characterizes the content of the transcript of Cerence's earnings call held on February 7, 2022, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 103 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 103.

**COMPLAINT PARAGRAPH 104:**

104.    Cerence also provided new information about the "minimum commitment" deals. Gallenberger stated, "[O]ur fixed license revenue is a combination of prepaid contracts and <u>minimum volume commitment contracts from our backlog</u>." Then, when answering a question about the relationship between fixed and variable deals, Gallenberger clarified that "fixed licenses… are a combination of <u>minimum commitment deals in which the customer contractually commits to a certain volume</u> or there are prepaid deals where they by [sic] a number of licenses upfront."

**RESPONSE 104**:

104.    Defendants state that no response is required to the allegations in paragraph 104, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 104.

**COMPLAINT PARAGRAPH 105:**

105.    Analysts focused their questions during the earnings call on trying to understand what these newly disclosed "minimum commitment" deals were and how they impacted the Company's license revenue. For instance, a Needham analyst asked Gallenberger to disclose "[w]hat percentage of your fixed contract[s] were . . . minimum commitments relative to prepays," noting that this was "the first time I've [heard] about fixed commitment or minimum commitments versus prepays." In response, Gallenberger admitted, "[T]his past quarter, we had $20 million of fixed commitments, that was all minimum commitment deals." Seeking additional clarification, the same analyst asked, "So of the – so you did – $20 million were fixed commitments, all of them were fixed commitments, not – there were no prepays?" Gallenberger confirmed that Cerence had not done any prepays, stating, "Not in this quarter."

**RESPONSE 105**:

105.    Defendants state that no response is required to the allegations in paragraph 105, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 105.

**COMPLAINT PARAGRAPH 106:**

106.    An Evercore analyst likewise observed that "the fixed minimum contract has not been fully addressed." The same analyst asked for clarification as to whether minimum commitments were "one of the issues" prompting the Company to reduce its earning guidance and whether they accounted for any part of "the $30 million" that the Company had "pre-banked" by overselling licenses. In response, Ortmanns admitted, "I think I would say that that's part of the equation." To clarify Ortmanns' answer, the analyst asked whether the Company's minimum

commitments had created a headwind that was not attributable to the semiconductor shortage. Ortmanns confirmed that they had:

> Question – Chris McNally: Okay. So, maybe that's one of the reasons why, I guess we're all confused because, for point one, IHS [vehicle sales forecast], really hasn't revised, and if anything, it's been stable for the last couple months, but you're saying the mix is affecting the fixed minimum contract?

> Answer – Stefan Ortmanns: Exactly. Yeah.

**RESPONSE 106**:

106.    Defendants state that no response is required to the allegations in paragraph 106, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 106.

**COMPLAINT PARAGRAPH 107:**

107.    Analysts also drew the connection between Defendants' withdrawal of guidance and issues posed by Cerence's use of fixed deals. An analyst from Wells Fargo asked, "[O]n the fixed and variable issue, shouldn't that have been kind of anticipated in the original guidance, that this should have been kind of known about when you originally guided?" In response, Gallenberger admitted, "Yes, we knew about that, when we were giv[ing] guidance in November."

**RESPONSE 107**:

107.    To the extent paragraph 107 characterizes the content of the transcript of Cerence's earnings call held on February 7, 2022, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 107 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 107.

**COMPLAINT PARAGRAPH 108:**

108.    Subsequent analyst reports reiterated that the Company had blindsided the market

by disclosing information that Defendants had concealed during Dhawan's tenure as CEO. For instance, in a February 7 report titled "New CEO Rips the Band Aid Off Prior CEO's Guide," an analyst from Raymond James challenged as dishonest the Company's disclosures throughout the Class Period, stating,

> The ugly part of the print has been the amount of previously non disclosed components to revenue that are apparently more one-off in nature. The silver lining (if such a thing exists on gap downs like today's) is the new CEO cleared the decks and is "fire-hosing" the Street with incremental disclosure to rebuild credibility and reset expectations.

**RESPONSE 108**:

108.     To the extent paragraph 108 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 108 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 108.

**COMPLAINT PARAGRAPH 109:**

109.     An analyst at Craig-Hallum also questioned whether Defendants had been forthright, observing that "guidance/reporting appear to have been very aggressive versus the realities of the business/marketplace." That analyst highlighted that "this quarter was wildly confusing in light of prior communications as well as our understanding of the revenue categories/lines and how they were contracted and should behave." "At the heart of the surprises," the analyst observed, was the fact that "[p]re-pays were being leveraged much more aggressively to drive short-term growth at the expense of long-term stability." Evercore downgraded its rating of Cerence's stock, explaining "When the facts change, I change my mind." Based on the additional "info that has trickled out of CRNC," Evercore concluded the "Fixed License '20/21 Rev[enue]" had "pulled forward >$30MM" of future revenue.

**RESPONSE 109**:

109.    To the extent paragraph 109 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 109 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 109.

**COMPLAINT PARAGRAPH 110:**

110.    Following Cerence's jarring admissions, the Company's stock immediately nosedived again, falling by more than 30% in a single trading day. The Company's stock price declined from a closing price of $63.58 per share on February 4, 2022, to a closing price of $43.61 per share on February 7, 2022. At less than $44 per share, Cerence stock had reached its lowest price since the Company's first year as a standalone company.

**RESPONSE 110**:

110.    Defendants admit that (1) Cerence's common stock closed at $63.58 per share on February 4, 2022; and (2) Cerence's common stock closed at $43.61 per share on February 7, 2022.  Defendants deny the remaining allegations in paragraph 110.

v.    Post-Class Period Admissions Confirming Defendants' Scheme

**COMPLAINT PARAGRAPH 111:**

111.    After the Class Period, the Company's new CEO continued to issue disclosures that confirmed the extent of Defendants' fraud.

**RESPONSE 111**:

111.    Defendants deny the allegations in paragraph 111.

**COMPLAINT PARAGRAPH 112:**

112.    For instance, on March 2, 2022, the Company admitted that Dhawan and Gallenberger had personally approved the Company's fixed license deals. Analysts at the Cowen

Mobility Disruption conference sought to understand Cerence management's role in reviewing and approving fixed deals. In response, Ortmanns confirmed that Dhawan, the CEO at the time, approved fixed license deals:

> Question – Jeffrey Osborne: Just out of curiously, <u>do you give away carte blanche approval to your sales force to go out and sign fixed or is that something that Sanjay and Mark would have like a huddle on the side and approved in the past</u>? Any time you see something go from $40 million to $70 million in broad strokes over the course of two years, obviously, helps the cash. But I always thought I didn't perceive you as a company in a cash crunch that would sell a bunch of things at a discount. And so I'm just trying to get a sense from sort of a corporate perspective, why did you approve so many fixed deals anyways? There's also similar question from the investor asking basically w<u>ho approved fixed license deals</u>?

> Answer – Stefan Ortmanns: So, normally, <u>it goes up to the CEO</u> here right, so.

**RESPONSE 112**:

112.    To the extent paragraph 112 characterizes the content of the transcript of the Cowen Mobility Disruption Conference held on March 2, 2022, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 112 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 112.

**COMPLAINT PARAGRAPH 113:**

113.    On March 3, 2022, Cerence participated in the Berenberg Bank Industrial Technologies Conference. There, Ortmanns further highlighted the negative effect that the Company's inflated fixed license revenue had on its variable backlog. Ortmanns explained that, by increasing fixed license revenue, the Company had "<u>accelerat[ed] actually the backlog</u>, right," which he admitted was "<u>not a good thing</u>." As he explained, it "[n]evertheless [] happened over the last two years, right. So last year, I think it was $71 million and the year before it was $54 million." Further, when an analyst explained that "my understanding is that the decision to sort of

emphasize fixed contracts ultimately came down to the CEO position," Ortmanns did not deny it. Instead, he explained how he, as CEO, was "introduc[ing] a bit more discipline."

**RESPONSE 113**:

113.    To the extent paragraph 113 characterizes the content of the transcript of the Berenberg Bank Industrial Technologies Conference held on March 2, 2022, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 113 to the extent they are inconsistent with the content of the transcript. Defendants deny the remaining allegations in paragraph 113.

**COMPLAINT PARAGRAPH 114:**

114.    During the same conference, Richard Yerganian – Cerence's Senior Vice President of Investor Relations – fully explained that the Company treated prepays and minimum commitments identically in terms of revenue recognition – i.e., by recognizing all of the revenue up front – even though minimum commitments did not require the customer to pay <u>any</u> cash up front:

> [I]n the case of the fixed contracts, in those cases, we [recognize revenue for] the full value of that contract at the time it was signed. We also typically get the cash at that point in time, standard terms, for the fixed contract that is in the prepaid mode.
>
> So, there is another variation of a fixed contract, which is committed. The <u>committed contract revenue wise is treated the exact same way</u> [as prepaid]. The difference is that <u>we don't collect the cash until the car was actually produced</u>. They're committing to buying a certain number of licenses over a period of time. At the end of that period of time, if they haven't bought all the licenses at that point, they have to purchase the remainder of the unused licenses.

Yerganian's statements also confirmed that customers who purchased minimum commitments could wait until the end of the commitment period before purchasing even a single license.

**RESPONSE 114**:

114.    To the extent paragraph 114 characterizes the content of the transcript of the
Berenberg Bank Industrial Technologies Conference held on March 2, 2022, Defendants state that
the transcript speaks for itself, refer the Court to the transcript for its content, and deny the
allegations in paragraph 114 to the extent they are inconsistent with the content of the transcript.
Defendants deny the remaining allegations in paragraph 114.

**COMPLAINT PARAGRAPH 115:**

115.    On March 7, 2022, Cerence participated in the Raymond James Institutional
Investors Conference, which began with a Raymond James analyst highlighting that "[t]here's a
lot of things going on with [the Company's] stock, and with the story." Specifically, the analyst
noted, "I want to double click on license sales" because there is "a lot of investor confusion kind
of coming out of the last quarter."

**RESPONSE 115**:

115.    To the extent paragraph 115 characterizes the content of the transcript of the
Raymond James Investors Conference held on March 7, 2022, Defendants state that the transcript
speaks for itself, refer the Court to the transcript for its content, and deny the allegations in
paragraph 115 to the extent they are inconsistent with the content of the transcript.  Defendants
deny the remaining allegations in paragraph 115.

**COMPLAINT PARAGRAPH 116:**

116.    During the conference, the analyst asked for an explanation as to "what's going on"
with the Company's license business, noting that "some of the investors I talked to have a thesis
that your license business cannot grow for two years as you kind of sell through that $50 million"
in pulled-forward revenue. In response, Ortmanns acknowledged that "[i]t could [take] in between

6 to 10 quarters" for Cerence's customers to use up the excess supply of licenses that they had acquired during the Class Period, as compared to the usual 4 to 6 quarters. Yerganian then explained that, although the Company had previously told investors it could manage in excess of $50 million per year in fixed license revenue, in reality, fixed license sales above $45 million (i.e., the fixed licenses consumed by the Company's customers each year) harmed future growth, stating,

> [W]e're committed to eventually bring back that fixed license portion back into that $40 million to $50 million range because in that $40 million to $50 million range, it doesn't create any headwind to variable license growth in the following year because <u>you're consuming about $45 million and you're adding about $45 million, so it's a wash. It's when you get into above that range, where now it starts becoming that headwind</u>.

**RESPONSE 116**:

116.    To the extent paragraph 116 characterizes the content of the transcript of the Raymond James Investors Conference held on March 7, 2022, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 116 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 116.

**COMPLAINT PARAGRAPH 117:**

117.    Astonishingly, Ortmanns also admitted that Defendants' prior disclosures on minimum commitments had been inadequate, recognizing that "<u>we need to distinguish when it comes to fixed license deals</u>, right? <u>Two variants</u>. One is a kind of prepayment where we get also the cash up front, [a]nd the other one is a volume commitment from" a customer. In contrast to Ortmanns' March 7 statement, Defendants never – at any point during the Class Period – explained the difference between the "two variants" of fixed license deals. When concluding the Q&A with

Ortmanns, the Raymond James analyst "commend[ed] [Ortmanns] on the transparency you've committed since taking over as CEO," noting, "It's been helpful to me."

**RESPONSE 117**:

117.    Defendants state that no response is required to the allegations in paragraph 117, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 117.

**COMPLAINT PARAGRAPH 118:**

118.    On May 10, 2022, Cerence announced its results for the second quarter of fiscal year 2022. The Company's disclosures in connection with this earnings announcement further confirmed that the Class Period disclosures were incomplete and misleading. For instance, the Company's May 10, 2022 quarterly presentation confirmed that for "Minimum Commitment" deals, the Company received "no cash upfront," further demonstrating that Defendants' characterizations of minimum commitments as "prepaid" were misleading. The Company's Form 10Q quarterly report disclosed that the Company's "fixed contracts can include the conversion of a variable contract that is already in our variable backlog" – a fact that the Company kept well-hidden during the Class Period, even as it was actively doing such conversions.

**RESPONSE 118**:

118.    Defendants state that no response is required to the allegations in paragraph 118, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 118.

**COMPLAINT PARAGRAPH 119:**

119.    In the same presentation, the Company also finally disclosed the breakdown of its license revenues, including the split of its fixed license revenue between prepays and minimum

commitments – important facts that Defendants actively concealed during the Class Period. As shown below, that slide revealed to investors for the first time that minimum commitments comprised 87% of the Company's fixed license revenue in the fourth quarter of 2021 and 100% of the Company's fixed license revenue in the first quarter of 2022.

| In millions | Q2FY21 | Q3FY21 | Q4FY21 | Q1FY22 | Q2FY22 |
|---|---|---|---|---|---|
| **Total License:** | **$54.4** | **$50.0** | **$51.4** | **$46.8** | **$46.3** |
| Variable[1] | $37.1 | $31.8 | $20.8 | $21.5 | $20.2 |
| Total Fixed [2] | $17.3 | $18.2 | $25.4 | $20.1 | $25.6 |
| Prepaid (cash upfront) | $17.3 | $18.2 | $3.3 | - | $5.7 |
| Minimum Commitment (no cash upfront) | - | - | $22.1 | $20.1 | $19.9 |
| Other Markets [3] | - | - | $5.2 | $5.2 | $0.5 |
| **Connected Services:** | **$27.7** | **$30.2** | **$25.6** | **$28.2** | **$19.3** |
| Total New | $12.1 | $14.3 | $9.5 [4] | $12.2 | $11.0 |
| Subscription/Usage | $12.1 | $10.6 | $9.5 [4] | $11.3 | $11.0 |
| Customer Hosted [5] | - | $3.7 | - | $0.9 | - |
| Legacy [6] | $15.6 | $15.9 | $16.1 | $16.0 | $8.3 |
| **Professional Services** | **$16.6** | **$16.6** | **$21.1** | **$19.4** | **$20.7** |
| **Total Revenue:** | **$98.7** | **$96.8** | **$98.1** | **$94.4** | **$86.3** |

[1] Based on volume shipments of licenses
[2] Fixed license revenue includes prepaid and minimum commitment deals
[3] Non-automotive revenue
[4] Includes a negative one-time adjustment of $1.7M
[5] Customer Hosted is a software license that allows the customer to take possession of the softwa...
[6] Legacy contract is a connected services contract with Toyota acquired by Nuance through a 201...

*Figure 2 (highlighting added)*

**RESPONSE 119**:

119.    Defendants state that no response is required to the allegations in paragraph 119 and Figure 2, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 119 and Figure 2.

**COMPLAINT PARAGRAPH 120:**

120.    The Company's Form 10-Q for the second quarter 2022 included critical information about the Company's minimum commitment deals absent from the Company's prior

10-Q filings. It disclosed that "minimum purchase commitment deals accounted for $19.9 million and $40.1 million of revenue for the three and six months ended March 31, 2022, respectively. The cash associated with these deals is expected to be collected over the distribution period, which could be up to five years." It further disclosed how Cerence recognized revenue for these deals, stating, "For royalty arrangements that include fixed consideration related to minimum purchase commitment deals, the fixed consideration is recognized when the software is made available to the customer." These disclosures stood in stark contrast to the Company's 10-Q quarterly report for the first quarter of 2022, which contained none of this basic information.

**RESPONSE 120**:

120.    Defendants state that no response is required to the allegations in paragraph 120, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 120.

**COMPLAINT PARAGRAPH 121:**

121.    On June 7, 2022, Cerence participated in the 6th Annual Needham Automotive Tech Conference. Analysts again intently focused on minimum commitment deals and Ortmanns' decision to withdraw the 2024 guidance that Defendants previously had issued. During the conference, the Company's current CFO conceded the need for more transparency around "this new concept of a minimum commitment deal" than Defendants had provided, stating, "We'll continue to provide – well, hopefully, what you've seen is a little bit more transparency on the levels of these [minimum commitments] and the mix of those contracts on a go-forward basis." Beaudoin also expressly rejected Defendants' business practices, attributing the decision to withdraw the 2024 guidance to "the change in the CEO position between Sanjay Dhawan and

Stefan" Ortmanns, and assuring investors that current management was "reassessing some of the areas that the previous management was thinking about."

**RESPONSE 121**:

121.    To the extent paragraph 121 characterizes the content of the transcript of the 6th Annual Needham Automotive Tech Conference held on June 7, 2022, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 121 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 121.

**COMPLAINT PARAGRAPH 122:**

122.    During the same conference, Beaudoin was forced to admit to the effects of Defendants' pull-forward scheme. A Needham analyst shared that many of the questions that he had received from investors and other analysts "centered around the same kind of question" about how minimum commitments impacted the Company's future license revenue. In response to the analyst's question, Beaudoin explicitly acknowledged that conversions from variable to minimum commitments pulled forward revenue so that it could be recognized sooner:

> **Needham analyst**: Is it true that if your customer had not converted from a variable license model to a minimum volume contract, in each of those quarters [Q1 and Q2 of fiscal year 2022], then your revenue would have been between $35 and $40 million lower than you expected from the first half of your fiscal year?... Q1 Q2 minimum volume contracts – if they had not converted them into variable, would there have been a $35 million headwind to revenue?

> **Thomas Beaudoin**: Well yeah I mean clearly it's dropped down revenue, so it's taking it inside the quarter.

**RESPONSE 122**:

122.    Defendants state that no response is required to the allegations in paragraph 122, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 122.

**COMPLAINT PARAGRAPH 123:**

123.   Since the truth was revealed, Cerence has failed to reestablish credibility with analysts and investors, who continue to ask pointed questions about the impact of fixed deals on future revenue while waiting for Cerence to reissue its 2024 guidance. Investors' concerns have been amplified by the fact that Cerence is now on its fourth CFO since announcing Gallenberger's "retirement," suggesting that the Company's books raise troubling concerns. To date, the Company's stock price has not recovered. As of July 26, 2022, the Company's stock is trading at approximately $25.71, more than 80% below its Class Period high of $133.43.

**RESPONSE 123**:

123.   Defendants admit that Cerence's common stock closed at $25.71 per share on July 26, 2022.  Defendants deny the remaining allegations in paragraph 123.

> vi.   The Executive Defendants Took Full Advantage of Their Fraud, Collecting Millions of Dollars in Bonuses Tied Directly to Revenue Benchmarks, and Selling Tens of Millions of Dollars' Worth of Cerence Stock

**COMPLAINT PARAGRAPH 124:**

124.   Dhawan and Gallenberger profited handsomely from their scheme. The fraud enabled them to (i) collect huge bonuses because Cerence had purportedly "met" its guidance and reached certain revenue benchmarks, and (ii) sell massive amounts of Cerence stock at artificially inflated prices.

**RESPONSE 124**:

124.   Defendants deny the allegations in paragraph 124.

**COMPLAINT PARAGRAPH 125:**

125.   Defendants' pull-forward scheme enabled the Company to report that Cerence had met or exceeded its revenue guidance in every fiscal year during the Class Period (fiscal years 2020 and 2021) and the vast majority of fiscal quarters. Significantly, the pull forward scheme also

triggered compensation windfalls for the Executive Defendants based on Cerence's outsized revenue performance.

**RESPONSE 125**:

125.    Defendants deny the allegations in paragraph 125.

**COMPLAINT PARAGRAPH 126:**

126.    For example, for fiscal year 2021, Cerence had issued revenue guidance of $386 million to $390 million. Dhawan's and Gallenberger's cash and performance-share incentive compensation for fiscal-years 2020 and 2021 depended greatly on Cerence's 2021 revenue performance. Under Cerence's "Short Term Incentive Plan" and "Long Term Incentive Plan," if Cerence booked $385 million in revenues for fiscal year 2021, the Executive Defendants would achieve an enormous payout opportunity worth many millions of dollars in total.

**RESPONSE 126**:

126.    To the extent paragraph 126 characterizes the content of Cerence's SEC filings relating to the Company's revenue guidance and incentive compensation plans, Defendants state that the SEC filings speak for themselves, refer the Court to the SEC filings for their content, and deny the allegations in paragraph 126 to the extent they are inconsistent with the content of the SEC filings.  Defendants deny the remaining allegations in paragraph 126.

**COMPLAINT PARAGRAPH 127:**

127.    Due in significant part to the pull-forward scheme, Cerence booked $387.2 million in revenues in fiscal year 2021. Thus, Cerence met the bottom end of its guidance by less than 1%. Its revenue performance also just barely met the $385 million "maximum" performance goal set out in Cerence's executive compensation plans, and drove a substantial compensation windfall for Dhawan and Gallenberger. Under the Short Term Incentive Plan, pulling forward revenue and

meeting the threshold permitted Dhawan to achieve a 198% (out of a possible 200%) cash and stock payout associated with revenue performance. Under the Long Term Incentive Plan, meeting this threshold entitled Dhawan to receive 185.7% and 199.2%, out of a maximum of 200%, of his eligible 2020 and 2021 performance-based stock units. Consequently, Dhawan obtained a substantial cash bonus and also achieved a total award of 382,781 shares, which were valued, on vesting, at a staggering $26,919,174. If Defendants had not pulled forward revenues, Cerence would have missed its guidance, and failed to meet the Executive Defendants' compensation revenue target, which would have caused this award to be significantly reduced.

**RESPONSE 127**:

127.    To the extent paragraph 127 characterizes the content of Cerence's SEC filings relating to the Company's revenues and incentive compensation plans, Defendants state that the SEC filings speak for themselves, refer the Court to the SEC filings for their content, and deny the allegations in paragraph 127 to the extent they are inconsistent with the content of the SEC filings. Defendants deny the remaining allegations in paragraph 127.

**COMPLAINT PARAGRAPH 128:**

128.    Similarly, under the Short Term Incentive Plan, Cerence's meeting the $385 million revenue threshold entitled Gallenberger to achieve a 174% (out of a possible 175%) cash and stock payout associated with revenue performance. Under the Long Term Incentive Plan, he received 142.85% and 149.6%, out of a maximum of 150%, of his eligible 2020 and 2021 performance-based stock units. As a result, Gallenberger also obtained a substantial cash bonus and achieved a total award of 77,646 shares, which were valued, on vesting, at $4,501,014. Again, if Defendants had not pulled forward revenues, Cerence would have missed its guidance, and failed to meet the

Executive Defendants' compensation revenue target, which would have caused this award to be significantly reduced.

**RESPONSE 128**:

128.    To the extent paragraph 128 characterizes the content of Cerence's SEC filings relating to the Company's incentive compensation plans, Defendants state that the SEC filings speak for themselves, refer the Court to the SEC filings for their content, and deny the allegations in paragraph 128 to the extent they are inconsistent with the content of the SEC filings.  Defendants deny the remaining allegations in paragraph 128.

**COMPLAINT PARAGRAPH 129:**

129.    More broadly, but for the excessive contribution of prepays and minimum commitments, Cerence would have dramatically missed its guidance and/or street expectations repeatedly throughout the Class Period. Specifically,

- On November 16, 2020, Cerence reported that it had met its FY2020 revenue guidance of $321-$336 million on reported revenues of $329.6 million. However, meeting revenue guidance was fully attributable to a 24% increase in prepay contracts, which had increased to $54.1 million from $43.5 million in fiscal year 2019. The additional $10.6 million of prepay revenue, nearly all of it above the $45 million run rate subsequently disclosed by Defendants, allowed the Company to meet its FY20 revenue guidance.

- On February 8, 2021, Cerence reported results for Q1FY21, declaring that it had "exceeded company quarterly guidance." This guidance, issued on November 16, 2020, was for revenue of $85-$90 million. Cerence reported revenues of $95 million, fueled by $10.1 million in prepays, which were 42% higher when compared to Q1FY20.

- On May 10, 2021, Cerence reported results for Q2FY21, declaring yet again that it had "exceeded company quarterly guidance." This guidance, issued on February 8, 2021, was for revenue of $92 million to $95 million. Cerence reported revenues of $98.7 million, fueled by $17.3 million in prepays, which were 4% higher when compared to Q2FY20.

- On August 9, 2021, Cerence reported results for Q3FY21, declaring yet again that it had "exceeded company quarterly guidance." This guidance, issued on May 19, 2021, was for revenue of $94 million to $97 million. Cerence reported revenues of $96.8 million, fueled by $18.2 million in prepays, which were 28% higher when compared to Q3FY20.

- On November 22, 2021, Cerence reported results for Q4FY21 and FY21. Quarterly guidance, issued on August 9, 2021, was for revenue of $97 million to $101 million. Cerence reported revenues of $98.1 million, fueled by $25.4 million in prepays and minimum commitments, which were 54% higher when compared to Q4FY20.

**RESPONSE 129**:

129.    To the extent paragraph 129 characterizes the content of Cerence's press releases dated November 16, 2020, February 8, 2021, May 10, 2021, August 9, 2021, and November 22, 2021, Defendants state that the press releases speak for themselves, refer the Court to the press releases for their content, and deny the allegations in paragraph 129 to the extent they are inconsistent with the content of the press releases.  Defendants deny the remaining allegations in paragraph 129.

**COMPLAINT PARAGRAPH 130:**

130.    By repeatedly using the pull-forward scheme to meet guidance, the Executive Defendants also enriched themselves in other ways. By enabling Cerence to meet its aggressive guidance, the scheme inflated Cerence's stock price during the Class Period – and the Executive Defendants took full advantage of it by selling huge amounts of their personally held stock. Dhawan's trading was dramatically out of line with his trading in a control period just prior to the Class Period and of equal length. As reflected in the chart below, Dhawan sold approximately 248,000 shares of Cerence stock during the Class Period for proceeds of more than $24 million.[3] Through these sales, Dhawan sold 40.2% of the shares that he held <u>and</u> which vested since the start of the Class Period, which exceeded by more than <u>5.7 times</u> his sales during the control period and <u>9.6 times</u> the gross proceeds realized during the control period:

---

[3] These sales <u>exclude</u> sales noted as "Sale to Issuer" or "Sale for Tax Withholdings" on Dhawan's Form 4 submissions of another 172,035 shares for gross proceeds of $16,706,951. When accounting for all sales, Dhawan sold 419,950 shares for gross proceeds of $40,814,861 during the Class Period.

| Sanjay Dhawan – Insider Sales | | | | | |
| Control Period (8-26-2019 through 11-15-2020) | | Class Period (11-16-2020 through 2-4-2022) | | Class Period Holding | Percent Sold During Class Period |
| Shares Sold | Gross Proceeds | Shares Sold | Gross Proceeds | | |
| 43,200 | $2,500,937 | 247,915 | $24,107,910 | 616,342[4] | 40.2% |

**RESPONSE 130**:

130.    To the extent paragraph 130, the chart, and footnotes 3 and 4 characterize the content of insider trading forms filed with the SEC relating to Mr. Dhawan's sales of Company stock, Defendants state that the trading forms speak for themselves, refer the Court to the trading forms for their content, and deny the allegations in paragraph 130, the chart, and footnotes 3 and 4 to the extent they are inconsistent with the content of the trading forms.  Defendants deny the remaining allegations in paragraph 130, the chart, and footnotes 3 and 4.

**COMPLAINT PARAGRAPH 131:**

131.    In a highly suspicious series of transactions, Dhawan first immediately sold more than 100,000 shares in the first month and a half following the start of the Class Period for gross proceeds of approximately $8,200,000. In 2021, Dhawan then aggressively sold more than 147,000 Cerence shares prior to the first corrective disclosure for gross proceeds of nearly $16,000,000.[5] That disclosure occurred before the market open on November 22, 2021, when Cerence first disclosed that its fixed deals had ballooned to $71 million for the year, which would cannibalize

---

[4] Includes 181,589 shares which had vested by the start of the Class Period and 434,753 shares which vested during the Class Period.
[5] On November 11, 2021, and November 16, 2021, just 7 and 4 trading days prior to the first corrective disclosure, respectively, Dhawan received grossly inflated equity awards under the Company's various incentive plans, resulting in a sale, for "tax purposes," of 65,655 shares and gross proceeds of approximately $6.7 million.

revenue in the coming years. These revelations caused Cerence's stock price to collapse by approximately 21% in a single day, falling from $104.06 to $82.59.

**RESPONSE 131**:

131.    Defendants admit that (1) Cerence's common stock closed at $104.06 per share on November 19, 2021; and (2) Cerence's common stock closed at $82.59 per share on November 22, 2021.  To the extent paragraph 131 and footnote 5 characterize the content of insider trading forms filed with the SEC relating to Mr. Dhawan's sales of Company stock, Defendants state that the trading forms speak for themselves, refer the Court to the trading forms for their content, and deny the allegations in paragraph 131 and footnote 5 to the extent they are inconsistent with the content of the trading forms.  Defendants deny the remaining allegations in paragraph 131 and footnote 5.

**COMPLAINT PARAGRAPH 132:**

132.    Gallenberger engaged in similarly suspicious sales. First, on November 17, 2020, much like Dhawan and just days after the start of the Class Period, Gallenberger sold 16,600 shares for proceeds of more than $1.1 million, accounting for 50.8% of his vested holdings. This sale was his largest transaction of the Class Period and occurred just one day after Gallenberger's false and misleading statement on November 16, 2020, concerning prepays. Gallenberger's Class Period sales exceeds his sales during the control period by a factor of 1.4 and exceeded the proceeds from sales by a factor of 1.8.

**RESPONSE 132**:

132.    To the extent paragraph 132 characterizes the content of insider trading forms filed with the SEC relating to Mr. Gallenberger's sales of Company stock, Defendants state that the trading forms speak for themselves, refer the Court to the trading forms for their content, and deny

the allegations in paragraph 132 to the extent they are inconsistent with the content of the trading

forms.  Defendants deny the remaining allegations in paragraph 132.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

**COMPLAINT PARAGRAPH 133:**

133.    Throughout the Class Period, Defendants made numerous false and misleading

statements and omissions, including by: (1) falsely stating that nothing had changed as to the

Company's reliance on fixed license deals and that they were holding fixed license revenue within

the historical range, when they were dramatically increasing it; (2) misleadingly attributing the

Company's revenue growth to sources other than their pull-forward scheme, which materially

contributed to such revenue growth; (3) mischaracterizing the Company's growth as "sustainable,"

when it was not; (4) misleadingly touting the strength of the Company's pipeline, when they were

cannibalizing and materially impairing it; (5) mischaracterizing their minimum commitment deals,

in which no money was due for years, as "prepaid deals" and otherwise obscuring the existence

and nature of minimum commitments; and (6) using knowingly false assumptions to create and

reaffirm the Company's revenue guidance.

**RESPONSE 133**:

133.    Defendants state that paragraph 133 asserts legal conclusions to which no response

is required.  To the extent a response is required, Defendants deny the allegations in paragraph

133.

### A.  False and Misleading Statements and Omissions Concerning the Fourth Quarter and Fiscal Year 2020

**COMPLAINT PARAGRAPH 134:**

134.    On November 16, 2020, Cerence announced the Company's purportedly "Record

Fourth Quarter and Fiscal Year 2020 Results." The press release touted the fact that Cerence's "Q4

revenue increased 21% from last quarter and up 10% from the prior year, setting new quarterly and full year records," and quoted Defendant Dhawan as stating, "Our Q4 financial performance exceeded our expectations for every metric and delivered record revenue, record gross margin and record EBITDA . . . ."

**RESPONSE 134**:

134.    Defendants state that no response is required to the allegations in paragraph 134, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 134.

**COMPLAINT PARAGRAPH 135:**

135.    That same day, Cerence hosted its earnings call for the fourth quarter and fiscal year 2020. During the call, Dhawan again acclaimed the Company's financial results, stating, "By all accounts, our fiscal fourth quarter was the best quarter in the company's history, and "[t]he financial performance of the company was amazing with 10% revenue growth year-over-year and 22% revenue growth sequentially."

**RESPONSE 135**:

135.    Defendants state that no response is required to the allegations in paragraph 135, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 135.

**COMPLAINT PARAGRAPH 136:**

136.    Defendants issued a series of false and misleading statements in connection with this earnings announcement. Throughout the call, Gallenberger repeatedly emphasized that the Company was cutting back on prepays and holding them within the historical range. For instance, an analyst from Needham & Company asked Defendant Gallenberger, "How do we think about

prepay going into next year?... [H]ow do we think about that revenue stream next year?" In response, Gallenberger assured the market that the Company was endeavoring to reduce prepay revenue and that it would remain within the historical range in fiscal year 2021, stating,

> If you recall, in the past, I have said that we're <u>sort of biased towards reducing prepays</u>. However, <u>that's not always inside our control because we have our customers' demand as well</u>. And so that sometimes ebbs and flows. So I think <u>going into FY '21, my view is that it would be down from fiscal year 2020</u>. But <u>certainly, I think it's going to still be within the range that we have seen over the last several years, which is low 40s to high – or low 40s to low 50s</u>. So long-winded question, or answer to your question, but I think <u>that's about the range that we're going to see for FY '21</u>.

**RESPONSE 136**:

136.    To the extent paragraph 136 characterizes the content of the transcript of Cerence's earnings call held on November 16, 2020, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 136 to the extent they are inconsistent with the content of the transcript.  Defendants further state that paragraph 136 asserts legal conclusions to which no response is required.  Defendants deny the remaining allegations in paragraph 136.

**COMPLAINT PARAGRAPH 137:**

137.    It was materially false and misleading for Gallenberger to represent to investors that the Company was "biased towards reducing prepays," to claim that the amount of prepays was "not always inside our control because we have our customers' demand as well," and to state with any degree of "certain[t]y" that fixed license revenue would be "down from fiscal year 2020" – i.e., $54 million – or that it would remain in the "low-40s to low-50s," without disclosing that, in truth, Defendants were directing sales personnel to increase fixed license revenue dramatically, and Gallenberger himself was approving a record number of fixed license deals.

**RESPONSE 137**:

137.   Defendants deny the allegations in paragraph 137.

**COMPLAINT PARAGRAPH 138:**

138.   Also during the call, Dhawan attributed Cerence's "record" results to certain purportedly legitimate business factors. Dhawan stated that "[t]he outperformance was primarily driven by great adoption of our products and services by the auto OEMs, the strong recovery in the auto market, coupled with the prudent financial controls we have implemented in recent quarters."

**RESPONSE 138**:

138.   Defendants state that no response is required to the allegations in paragraph 138, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 138.

**COMPLAINT PARAGRAPH 139:**

139.   It was materially false and misleading for Dhawan to identify the purported legitimate reasons for Cerence's revenue growth – including "great adoption of our products and services by the auto OEMs, the strong recovery in the auto market, [and] the prudent financial controls we have implemented in recent quarters" – without disclosing that, in fact, the Company was driving revenue growth by engaging in a pull-forward scheme, including by (i) pressuring their customers into doing fixed license deals in exchange for steep discounts, and (ii) converting existing variable deals to prepaid deals.

**RESPONSE 139**:

139.   Defendants state that no response is required to the allegations in paragraph 139, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is

required, Defendants deny the allegations in paragraph 139.

**B. False and Misleading Statements and Omissions Concerning the First Quarter of 2021**

**COMPLAINT PARAGRAPH 140:**

140.    On February 8, 2021, Cerence again announced that the Company had achieved "Record First Quarter 2021 Results." The press release touted that "Revenue grew by 23% compared to the same period last fiscal year, setting a new quarterly record" and that Cerence had "Exceeded company quarterly guidance on all . . . financial metrics." Dhawan attributed the Company's purported success to "auto production continued to recover from the impact of Covid-19" and "our strong competitive position enabled by our continued focus on innovation and speed of execution."

**RESPONSE 140**:

140.    Defendants state that no response is required to the allegations in paragraph 140, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 140.

**COMPLAINT PARAGRAPH 141:**

141.    The same day, Cerence held an earnings call, during which Defendants touted the Company's "strong performance" and "record revenue" in the first quarter of 2021. Based on Cerence's purportedly strong performance, Defendants raised the low end of the Company's full-year guidance for 2021.

**RESPONSE 141**:

141.    Defendants state that no response is required to the allegations in paragraph 141, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 141.

**COMPLAINT PARAGRAPH 142:**

142.    Defendants issued a series of false and misleading statements in connection with this earnings announcement. In the press release, Defendant Dhawan attributed Cerence's "stronger than expected start to the fiscal year" to "auto production continu[ing] to recover from the impact of Covid-19" and the Company's "23% revenue growth" to its "strong competitive position enabled by our continued focus on innovation and speed of execution." Dhawan also characterized the Company as "progressing well in all directions; introducing a steady stream of new products, winning new customers, successfully entering adjacent markets, and increasing revenue and profitability."

**RESPONSE 142**:

142.    Defendants state that no response is required to the allegations in paragraph 142, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 142.

**COMPLAINT PARAGRAPH 143:**

143.    It was materially false and misleading for Dhawan to identify the purported legitimate reasons for Cerence's financial results and revenue growth – such as "auto industry recover[y]" and Cerence's "strong competitive position" and "continued focus on innovation and speed of execution" – without disclosing that, in fact, the Company was driving revenue growth by engaging in a pull-forward scheme, including by (i) pressuring customers into doing fixed license deals in exchange for steep discounts and (ii) converting existing variable deals to prepaid deals.

**RESPONSE 143**:

143.    Defendants state that no response is required to the allegations in paragraph 143,

which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 143.

**COMPLAINT PARAGRAPH 144:**

144.    It was also materially false and misleading for Dhawan to describe Cerence as "progressing well in all directions," including by "increasing revenue and profitability," when, in truth, Defendants' pull-forward scheme was increasing revenue and profitability at the direct expense of the Company's pipeline, backlog, and future revenue growth. Far from "progressing well in all directions," Cerence was, in fact, regressing in each of these areas because of Defendants' pull-forward scheme.

**RESPONSE 144**:

144.    Defendants state that no response is required to the allegations in paragraph 144, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 144.

**COMPLAINT PARAGRAPH 145:**

145.    During the Company's earnings call, Dhawan touted the purported strength of the Company's pipeline, stating, "This current quarter, we have a strong pipeline."  Similarly, in an interview broadcasted by TD Ameritrade Network, Dhawan represented that the Company was "definitely getting great wins from the customers and also increasing the pipeline as well."

**RESPONSE 145**:

145.    Defendants state that no response is required to the allegations in paragraph 145, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 145.

**COMPLAINT PARAGRAPH 146:**

146.     It was materially false and misleading for Dhawan to describe the Company's pipeline as "strong" and "increasing," without disclosing that, by virtue of the pull-forward scheme described above, Defendants were depleting the pipeline of revenue to a highly material degree. As Ortmanns later revealed, it would take up to 10 fiscal quarters for the Company to normalize its license revenue after Defendants' pull-forward scheme.

**RESPONSE 146**:

146.     Defendants state that no response is required to the allegations in paragraph 146, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 146.

**COMPLAINT PARAGRAPH 147:**

147.     During the conference call, Gallenberger also made numerous materially false and misleading statements and omissions. For instance, Gallenberger emphasized that the first quarter results were proof of the supposed strength in the Company's core business, stating, "[T]he business model continues to perform well as evidenced by our Q1 results and by raising our revenue and profit metrics for the year. [S]trength in our core business [contributes to] a bright future for Cerence."

**RESPONSE 147**:

147.     Defendants state that no response is required to the allegations in paragraph 147, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 147.

**COMPLAINT PARAGRAPH 148:**

148.     It was materially false and misleading for Gallenberger to represent that the

Company's "business model continues to perform well as evidenced by our Q1 results" without disclosing that, in fact, Defendants had abandoned their stated business model in favor of their pull-forward scheme and achieved their Q1 results through that scheme.

**RESPONSE 148**:

148.     Defendants state that no response is required to the allegations in paragraph 148, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 148.

**COMPLAINT PARAGRAPH 149:**

149.     It also was materially false and misleading to emphasize the "strong position in the core business" and represent that it contributed to a "bright future," when in fact, the Company's financial results were driven by a pull-forward scheme – not strength in the core business – and that the scheme cannibalized future revenue.

**RESPONSE 149**:

149.     Defendants state that no response is required to the allegations in paragraph 149, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 149.

**COMPLAINT PARAGRAPH 150:**

150.     Gallenberger also misleadingly emphasized the strength of the Company's pipeline, stating, Cerence's "pipeline remains strong as we continue to expand our product offerings and also into adjacent markets, and that is naturally expanding the number of opportunities that we have going into our pipeline."

**RESPONSE 150**:

150.     Defendants state that no response is required to the allegations in paragraph 150,

which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 150.

**COMPLAINT PARAGRAPH 151:**

151.    It was materially false and misleading for Gallenberger to describe the Company's pipeline as "strong" and "naturally expanding," without disclosing that, by virtue of the pull-forward scheme described above, Defendants were depleting the pipeline of revenue to a highly material degree.  As Ortmanns later revealed, it would take up to 10 fiscal quarters for the Company to normalize its license revenue after Defendants' pull-forward scheme.

**RESPONSE 151**:

151.    Defendants state that no response is required to the allegations in paragraph 151, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 151.

**COMPLAINT PARAGRAPH 152:**

152.    Throughout the earnings call, Gallenberger also repeatedly emphasized that the Company was cutting back on prepays as compared to the prior year, and holding them within the historical range, stating,

> Last year, we did about $54 million in prepays and <u>we do expect prepays to be down this year</u>. Historically, we've been in that range of low-40s to low-50s, and I <u>think we're going to stay in that range</u>. So last year, we were at the higher end of that range. This year, I would estimate <u>we'll probably be around in the middle of that range</u>. And so, that's where we see it trending this year.

**RESPONSE 152**:

152.    Defendants state that no response is required to the allegations in paragraph 152, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 152.

**COMPLAINT PARAGRAPH 153:**

153.    Gallenberger reiterated this statement when discussing the Company's growth over auto production, explaining, "[P]repays we're planning to be lower this year, so that's going to have to be reflected in that spread."

**RESPONSE 153**:

153.    Defendants state that no response is required to the allegations in paragraph 153, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 153.

**COMPLAINT PARAGRAPH 154:**

154.    It was materially false and misleading for Gallenberger to represent to investors that the Company was "planning" and "expecting" to reduce fixed license revenue compared to the prior year and holding it within the historical range, without disclosing that, in truth, the Company was directing sales personnel to dramatically increase fixed license revenue, and Gallenberger himself was approving a record number of fixed license deals.

**RESPONSE 154**:

154.    Defendants state that no response is required to the allegations in paragraph 154, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 154.

**COMPLAINT PARAGRAPH 155:**

155.    It was also materially false and misleading for Gallenberger to represent that Cerence was aiming to keep fixed contract revenue in a range of between $40 and $55 million without disclosing that, as the Company ultimately admitted, prepay revenue in that range (1) was "put[ting] a little bit of a damp around growth rates," (2) constituted conversions from variable

revenue to prepay, (3) accelerated revenue for up to 5 years, and (4) that the Company really could only manage around $45 million per year in fixed license revenue.

**RESPONSE 155**:

155.    Defendants state that no response is required to the allegations in paragraph 155, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 155.

**C.  False and Misleading Statements and Omissions Concerning the Second Quarter of 2021**

**COMPLAINT PARAGRAPH 156:**

156.    On May 10, 2021, Cerence announced results for the second quarter of 2021, which Defendants again touted as setting a "new quarterly record of $98.7M [i]n revenue, up 14% compared to the same quarter last fiscal year." The press release highlighted that Cerence had "[e]xceeded company quarterly guidance on all… financial metrics" and again "[r]aised full year revenue and profitability guidance." It also quoted Dhawan as stating, "Once again our results were ahead of expectations as we delivered the highest revenue for any quarter in the company's history."

**RESPONSE 156**:

156.    Defendants state that no response is required to the allegations in paragraph 156, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 156.

**COMPLAINT PARAGRAPH 157:**

157.    On the same day, during the Company's earnings call, Dhawan touted that "[f]or Cerence, this is truly an earnings call," again highlighting the Company's "strong financial

performance in Q2." Gallenberger likewise praised the Company for having "had another strong quarter of excellent financial performance."

**RESPONSE 157**:

157.    Defendants state that no response is required to the allegations in paragraph 157, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 157.

**COMPLAINT PARAGRAPH 158:**

158.    Defendants issued a series of false and misleading statements in connection with this earnings announcement. In the press release, Dhawan stated that "[o]nce again our results were ahead of expectations as we delivered the highest revenue for any quarter in the company's history," which he attributed to the fact that Cerence's "core license business, in particular, performed better than expected as the global auto recovery takes shape."

**RESPONSE 158**:

158.    Defendants state that no response is required to the allegations in paragraph 158, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 158.

**COMPLAINT PARAGRAPH 159:**

159.    It was materially false and misleading for Dhawan to attribute the performance of its license business to the "global auto recovery" without disclosing that, in fact, the Company was driving license revenue growth by engaging in a pull-forward scheme, including by (i) pressuring their customers into doing fixed license deals in exchange for steep discounts, (ii) converting existing variable deals to prepaid deals, and (iii) beginning in mid-2021, inducing customers to accept minimum commitment deals.

**RESPONSE 159**:

159.    Defendants state that no response is required to the allegations in paragraph 159, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 159.

**COMPLAINT PARAGRAPH 160:**

160.    During the earnings call, an analyst from RBC Capital pointed out that year-to-date, "the pre-pay line item" had increased to "mid-teens" and – seeking to understand whether "anything change[d] there" – asked whether Defendants' statements in February about reducing prepays "still hold" and remained "a valid assumption for the year." Gallenberger responded, "Yeah," reaffirming Defendants' February statements about their strategy to reduce prepays and representing that nothing had changed with respect to that strategy. Gallenberger further represented that, because Cerence was "sort of on that same run rate as last year," the Company was roughly on track to be "at the flat level and possibly up" from the $54 million in prepays booked during the prior year. Gallenberger further represented that the increase in prepays was "really driven by one customer that… accounted for over 50% of the entire fixed amount."

**RESPONSE 160**:

160.    To the extent paragraph 160 characterizes the content of the transcript of Cerence's earnings call held on May 10, 2021, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 160 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 160.

**COMPLAINT PARAGRAPH 161:**

161.    It was materially false and misleading for Gallenberger to represent that nothing had changed with respect to the Company's use of prepays, which Defendants purportedly still were holding flat to the prior year, when in fact, Dhawan personally was directing Cerence sales personnel to dramatically increase fixed license sales over the prior year, and Gallenberger was approving a record-high number of prepays. It also was materially false and misleading for Gallenberger to attribute the increase in prepays to one customer, when, in reality, Defendants were driving a Company-wide push for salespeople to pressure their customers into doing prepaid deals, including by offering steep discounts and converting existing variable license contracts to prepaid deals.

**RESPONSE 161**:

161.    Defendants deny the allegations in paragraph 161.

**COMPLAINT PARAGRAPH 162:**

162.    During the earnings call, Dhawan assured investors that the Company's "pipeline continues to be strong and our win rate remains extremely high." When an Evercore analyst asked about whether the Company could "sustain its high-level of bookings" during the second half of fiscal year 2021, Dhawan assured analysts that the Company would be able to "sustain that high-level of bookings," stating, "Yeah.  We do have the pipeline to achieve that. So it's not just a pipe dream. It's supported by facts and a strong pipeline and a strong start to Q3."

**RESPONSE 162**:

162.    Defendants state that no response is required to the allegations in paragraph 162, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 162.

**COMPLAINT PARAGRAPH 163:**

163.    It was materially false and misleading for Dhawan to tout the Company's rate of bookings as sustainable when it was not. Far from being sustainable, those bookings resulted from a scheme that cannibalized the Company's future revenue by (i) pressuring their customers into doing fixed license deals in exchange for steep discounts, (ii) converting existing variable deals to prepaid deals, and (iii) pressuring customers to accept minimum commitment deals.

**RESPONSE 163**:

163.    Defendants state that no response is required to the allegations in paragraph 163, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 163.

**COMPLAINT PARAGRAPH 164:**

164.    It was also materially false and misleading for Dhawan to describe its pipeline as "strong" while concealing that, by virtue of Defendants' pull-forward scheme described above, they were depleting the pipeline of revenue to a highly material degree. As Ortmanns later revealed, it would take up to 10 fiscal quarters for the Company to normalize its license revenue following Defendants' pull-forward scheme.

**RESPONSE 164**:

164.    Defendants state that no response is required to the allegations in paragraph 164, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 164.

**D. False and Misleading Statements and Omissions Concerning the Third Quarter of 2021**

**COMPLAINT PARAGRAPH 165:**

165.    On August 9, 2021, Cerence announced "Strong Third Quarter 2021 Results," touting that the Company's "Revenue grew 29% year-over-year." The press release underscored that Cerence had "[e]xceeded company quarterly guidance on key… profitability metrics" and announced that that the Company had "[i]ncreased FY24 revenue Target from $600M to $700M." The press release also quoted Dhawan as stating that despite "disruption due to the semiconductor shortage," Cerence "delivered 29% revenue growth," which was a "testament to our breadth of customers, products and services."

**RESPONSE 165**:

165.    Defendants state that no response is required to the allegations in paragraph 165, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 165.

**COMPLAINT PARAGRAPH 166:**

166.    During the earnings call, Dhawan again touted Cerence's "strong financial performance in Q3," boasting that the Company's "full year forecast is expected to come in at the high end of the range." Gallenberger likewise described the third quarter as "another quarter of excellent financial performance." He also discussed the $100 million increase in the Company's fiscal year 2024 guidance, which represented an increase of nearly 17% over Defendants' initial 2024 guidance. Gallenberger explained that this increase in guidance was "due to several factors" – Defendants' pull-forward scheme was not among those factors.

**RESPONSE 166**:

166.    Defendants state that no response is required to the allegations in paragraph 166, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 166.

**COMPLAINT PARAGRAPH 167:**

167.    Defendants issued a series of false and misleading statements in connection with this earnings announcement. In the Company's press release, Dhawan attributed the Company's revenue growth to "our breadth of customers, products, and services." And during the earnings call, Dhawan touted the Company's financial results as evidence that "[o]ur multifaceted growth strategy to deliver sustainable growth continues to play out."

**RESPONSE 167**:

167.    Defendants state that no response is required to the allegations in paragraph 167, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 167.

**COMPLAINT PARAGRAPH 168:**

168.    It was materially false and misleading for Dhawan to describe the Company's financial results as evidence of "sustainable growth" and strong bookings when, in fact, (i) those results reflected revenues that had been inflated by Defendants' pull-forward scheme, (ii) that scheme cannibalized future revenue at the expense of the Company's long-term growth, and (iii) thus, the growth was not sustainable.

**RESPONSE 168**:

168.    Defendants state that no response is required to the allegations in paragraph 168, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 168.

**COMPLAINT PARAGRAPH 169:**

169.    Also during the third quarter earnings call, Gallenberger again impressed upon investors that the Company's revenue growth was sustainable, stating, "Our long-term prospects

remain strong and is demonstrated in our updated [2024] model and our focus on innovation and growth, while at the same time creating a profitable business model [that] will benefit the company and our shareholders well into the future."

**RESPONSE 169**:

169.    Defendants state that no response is required to the allegations in paragraph 169, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 169.

**COMPLAINT PARAGRAPH 170:**

170.    It was materially false and misleading for Gallenberger to emphasize the strength of the Company's "long-term prospects" and represent that its business model supported revenue growth "well into the future," when, in reality, Defendants were directing a scheme to pull forward revenue from future quarters at the expense of the Company's long-term growth. By furthering this scheme, Defendants were snuffing out the Company's long-term growth opportunities.

**RESPONSE 170**:

170.    Defendants state that no response is required to the allegations in paragraph 170, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 170.

**COMPLAINT PARAGRAPH 171:**

171.    Defendants also misled investors by increasing the Company's guidance for fiscal year 2024. Defendants based this guidance on certain present or historical facts, namely, (i) the Company's then-present purported strategy to decrease its fixed license revenue or hold it within the historical range and (ii) the absence of any meaningful changes in the Company's business. Indeed, as Gallenberger confirmed just two weeks later, during the August 24, 2021 Raymond

James Diversified Industrials Conference, the assumption that Cerence's fixed license revenue would remain within its historical range of "around $40 million to $55 million per year" was "<u>built into the forecast</u>" in connection with the Company's 2024 guidance.

**RESPONSE 171**:

171.   Defendants state that no response is required to the allegations in paragraph 171, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 171.

**COMPLAINT PARAGRAPH 172:**

172.   This fundamental assumption – and, in turn, the Company's guidance – was materially false and misleading. It was materially false and misleading for Defendants to issue guidance based on the assumption that fixed license revenue would remain within its historical range, when, in fact, Defendants had personally approved a record number of fixed license deals and thus knew that the Company's fixed license revenue had skyrocketed beyond its historical range. Indeed, Gallenberger made this statement toward the end of the fourth quarter of fiscal year 2021 – i.e., the quarter during which the Company generated $25.4 million in fixed license revenue, which drove the Company's fixed license revenue for 2021 to a record-setting high of $71 million.

**RESPONSE 172**:

172.   Defendants state that no response is required to the allegations in paragraph 172, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 172.

**E. Defendants' False and Misleading Statements and Omissions During Industry Conferences Throughout the Fourth Quarter of 2021**

**COMPLAINT PARAGRAPH 173:**

173.    During August and September 2021 – while Cerence's minimum commitment deals and fixed license revenues were skyrocketing – Defendants attended multiple investor conferences and made additional false and misleading statements.

**RESPONSE 173**:

173.    Defendants state that no response is required to the allegations in paragraph 173, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 173.

**COMPLAINT PARAGRAPH 174:**

174.    On August 24, 2021, during the Raymond James Diversified Industrials Conference, an analyst asked "how [to] think about prepaids in the context of [the Company's] overall license forecast" given that "the forecast assume[d] lower production" of vehicles. Gallenberger again represented that the Company was committed to its historical prepaid revenue range, stating, "Prepays, historically, we typically see around $40 million to $55 million per year. And so we're going to see if we're going to keep that – those prepays, which we call fixed volume contracts within that historical range."

**RESPONSE 174**:

174.    Defendants state that no response is required to the allegations in paragraph 174, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 174.

**COMPLAINT PARAGRAPH 175:**

175.    It was materially false and misleading for Gallenberger to represent that Defendants

were committed to minimize and hold the Company's fixed license revenue within its historical range without disclosing that, in truth, the Company was dramatically increasing fixed license revenue, and Gallenberger himself was approving a record number of fixed license deals. When Gallenberger made this statement, the Company was more than halfway through the fourth quarter of fiscal year 2021 – i.e., the quarter during which sales of fixed licenses skyrocketed to $25.4 million and, in turn, drove the Company's fixed license revenue for 2021 to a record-setting high of $71 million, vastly in excess of its historical range.

**RESPONSE 175**:

175.   Defendants state that no response is required to the allegations in paragraph 175, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 175.

**COMPLAINT PARAGRAPH 176:**

176.   On September 14, 2021, Defendants participated in the Jeffries Software Conference. There, Dhawan repeatedly equated fixed license deals to prepaid deals, stating,

> [T]he prepay in our case, when we call it fixed licenses, is… basically a customer choosing to buy inventory in our software before they use our products and include that in their car manufacturing.

> [I]f we were a hardware/software company, then 100% of our license revenue – the variable license revenue should be what you call prepay or what we call fixed licenses basically, because people should really buy our product first, include that in their manufactured car, and then sell it.

> … [T]he main function of the way kind of fixed licenses or prepay get kind of negotiated with the customers is that our customers' purchasing departments all have certain targets in terms of cost reductions and so on. And what they do is they come to us and say, okay, Cerence, we would want to buy X number of kind of licenses upfront and for that can you give us 3%, 5%, 7% discount.

**RESPONSE 176**:

176.   Defendants state that no response is required to the allegations in paragraph 176,

which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 176.

**COMPLAINT PARAGRAPH 177:**

177.    On September 21, 2021, during the Evercore ISI Autotech & AI Forum, Gallenberger again followed the same playbook when describing the Company's fixed license business, stating,

> About one-third of our business is directly tied to what we get from our customers each quarter which are – which we call quarterly royalty reports. And we take revenue, our license revenue based upon these quarterly royalty reports. And that tells us how many cars did our customers ship in that given three-month window and based upon those reports we obviously invoice and revenue based upon those reports. And that accounts for about a third of the company's total revenue. <u>The other two thirds is a combination of fixed contracts, volume contracts which some people call as prepays.</u>

**RESPONSE 177:**

177.    Defendants state that no response is required to the allegations in paragraph 177, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 177.

**COMPLAINT PARAGRAPH 178:**

178.    It was materially false and misleading for Defendants to represent that all of Cerence's fixed license deals were "prepays," when, in fact, a material amount of the Company's fixed license business consisted of minimum commitment deals, in which there was no prepayment whatsoever. In fact, during the fourth quarter, when Defendants made these statements, just 13% of the Company's fixed license deals were prepays, and 87% were minimum commitment deals, in which the Company had booked the full value of the contract up front but actually received no payment at all. As Ortmanns later admitted, "<u>we need to distinguish</u> when it comes to fixed license deals, right? Two variants" – prepays and minimum commitments. Ortmanns then affirmed this

admission in May 2022, when Cerence – under Ortmanns' direction – finally provided written disclosures about minimum commitment deals in its investor presentation and Form 10-Q quarterly report. Similarly, Cerence's current CFO acknowledged that Defendants had not been adequately transparent with respect to minimum commitment deals when he assured investors that "we'll continue to provide – well, <u>hopefully, what you've seen is a little bit more transparency on the levels of these [deals]</u> and the mix of these contracts on a go-forward basis."

**RESPONSE 178**:

178.   Defendants state that no response is required to the allegations in paragraph 178, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 178.

**F.   False and Misleading Statements and Omissions Concerning the Fourth Quarter and Fiscal Year 2021**

**COMPLAINT PARAGRAPH 179:**

179.   On November 22, 2021, Cerence announced results for the fourth quarter and fiscal year 2021. In the press release, Defendants touted that Cerence had "[m]et or exceeded nearly all profitability metrics for the quarter and fiscal year," that "[q]uarterly revenue grew 7.5% year over year," and that "full year revenue grew 17%."

**RESPONSE 179**:

179.    Defendants state that no response is required to the allegations in paragraph 179, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 179.

**COMPLAINT PARAGRAPH 180:**

180.   During the earnings call, Dhawan yet again described the Company's financial results as indicating "strong financial performance in the fourth quarter and full fiscal 2021."

Defendants, however, also were forced to disclose that the Company's fixed license revenue for fiscal year 2021 had skyrocketed to $71 million – a 42% increase over the "max" amount of fixed license revenue that Cerence could manage. Gallenberger reassured analysts and investors that the Company's fixed license revenue would "come down in fiscal 2022."

**RESPONSE 180**:

180.    Defendants state that no response is required to the allegations in paragraph 180, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 180.

**COMPLAINT PARAGRAPH 181:**

181.    Notwithstanding the Company's sky-high fixed license revenue – which Defendants knew had cannibalized future revenue – Defendants announced aggressive revenue guidance for fiscal year 2022. They also reaffirmed the aggressive revenue guidance for fiscal year 2024.  Dhawan indicated that Defendants "stand behind the growth that we have projected" and that there was "no change to the fiscal 2024 model." Gallenberger likewise underscored that Defendants had a "level of comfort that the revenue will come into that 2024 target model."

**RESPONSE 181**:

181.    Defendants state that no response is required to the allegations in paragraph 181, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 181.

**COMPLAINT PARAGRAPH 182:**

182.    Although the truth began to leak out when Defendants were forced to disclose the Company's sky-high fixed license revenue, Defendants attempted to obscure their scheme and past deceit through another series of false and misleading statements. For instance, in the press release,

Dhawan stated, "Our total company revenue grew 17% compared to the auto production growth of 9% over the same time-period, which is [a] testament to… the innovative products and services we continue to bring to market."

**RESPONSE 182**:

182.    Defendants state that no response is required to the allegations in paragraph 182, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 182.

**COMPLAINT PARAGRAPH 183:**

183.    These statements were materially false and misleading. It was materially false and misleading for Defendants to identify the purported legitimate reasons for its revenue growth – including "innovative products and services" – without disclosing that, in fact, the Company was driving revenue growth by engaging in a pull-forward scheme, including by (i) pressuring their customers into doing fixed license deals in exchange for steep discounts, (ii) converting existing variable deals to prepaid deals, and (iii) beginning in mid-2021, inducing customers to accept minimum commitment deals. As the Company's current CFO later acknowledged, conversions did not generate new revenue, but merely "dropped down revenue" from future quarters – "taking it inside the quarter" so that Cerence could recognize the revenue immediately.

**RESPONSE 183**:

183.    Defendants state that no response is required to the allegations in paragraph 183, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 183.

**COMPLAINT PARAGRAPH 184:**

184.    During the earnings call, an analyst from Needham asked Defendants about the

Company's prepaid license revenue, which had ballooned far beyond the Company's historical range. Gallenberger responded that in fiscal year 2021, "<u>it was driven by two larger than typical deals that we had closed in the quarter</u>" and that "<u>it was just that timing which drove it</u>." Gallenberger then further assured investors that this trend would not continue into fiscal year 2022, stating,

> I think if you look into fiscal 2022, <u>we do expect it to recede</u>. <u>We certainly don't think it's going to be a repeat of last year</u> where we had a $71 million record. And if you look at our historical range, we've typically been in that low-40s to mid-50 type range. If you go back three or four years, that's typically been the range from one year to the next.

**RESPONSE 184**:

184.    To the extent paragraph 184 characterizes the content of the transcript of Cerence's earnings call held on November 22, 2021, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 184 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 184.

**COMPLAINT PARAGRAPH 185:**

185.    It was materially false and misleading for Gallenberger to attribute the increase in fixed license deals to "two larger than typical deals" and "timing," when, in reality, Defendants had driven a Company-wide increase in fixed license sales throughout fiscal year 2021, by directing salespeople to (i) pressure their customers into doing fixed license deals in exchange for steep discounts, (ii) convert existing variable deals to prepaid deals, and (iii) induce customers to accept minimum commitment deals.

**RESPONSE 185**:

185.    Defendants deny the allegations in paragraph 185.

**COMPLAINT PARAGRAPH 186:**

186.    It also was materially false and misleading for Gallenberger to represent that the Company's fixed license revenue would recede in fiscal year 2022, without disclosing that, in fact, Defendants already had begun the first quarter of fiscal year 2022 by continuing their strategy of aggressively pushing Cerence sales teams to drive up fixed license revenue through the means discussed above. Cerence has since acknowledged that because of Defendants' aggressive fixed license sales during the first half of 2022, the Company expects that its fixed license revenue for fiscal year 2022 will be at least $80 million.

**RESPONSE 186**:

186.    Defendants state that no response is required to the allegations in paragraph 186, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 186.

**COMPLAINT PARAGRAPH 187:**

187.    Further, Defendants' repeated statements that they were aiming to keep fixed contract revenue in a range of between $40 and $55 million were materially misleading because Defendants failed to disclose, as the Company ultimately admitted, that (i) fixed license revenue in that range was "put[ting] a little bit of a damp around growth rates"; (ii) Defendants often converted variable revenue contracts to prepaid deals; (iii) the Company's sales of fixed deals accelerated up to 5 years of revenue; and (iv) the Company could only manage around $45 million per year in fixed license revenue.

**RESPONSE 187**:

187.    Defendants state that no response is required to the allegations in paragraph 187, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is

required, Defendants deny the allegations in paragraph 187.

**COMPLAINT PARAGRAPH 188:**

188.    As noted, during the earnings call, Defendants reaffirmed their decision to increase the Company's guidance for fiscal year 2024. Dhawan stated that "nothing has changed. We stand by our guide for fiscal 2024 and feel good about it   [T]he net-net basically is, in the fiscal 2024 model,  the core business is going strong, and we stand behind the growth that we have projected in our core business whether its license or connected services or professional services." Gallenberger likewise stated, "[T]he bookings that we're seeing today gives us that level of comfort that the revenue will come in into the 2024 target model."

**RESPONSE 188**:

188.    Defendants state that no response is required to the allegations in paragraph 188, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 188.

**COMPLAINT PARAGRAPH 189:**

189.    It was materially false and misleading for Defendants to state that "nothing has changed" and to reaffirm the 2024 guidance based on the purported absence of any change, when, in truth, Defendants' pull-forward scheme had crippled the Company's prospects for future revenue. Contrary to the statement that "nothing ha[d] changed," Defendants' pull-forward scheme had brought about a fundamental change that made the Company's 2024 guidance unachievable – a fact that was confirmed in short order when the new CEO withdrew the guidance, precisely because it was unachievable, in part because the "dampening" effect of prepaid deals would last well into 2024, contrary to Gallenberger's representation.

**RESPONSE 189**:

189.    Defendants state that no response is required to the allegations in paragraph 189, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 189.

**COMPLAINT PARAGRAPH 190:**

190.    In the investor presentation for the Company's earnings call, Defendants finally, for the very first time, referenced minimum commitments – but did so in an obfuscatory and incomplete manner, which left analysts and investors in the dark as to this new type of fixed deal and its impact. The sole reference to minimum commitments appeared in two inconspicuous, small-text footnotes, which Defendants buried at the bottom of two slides in an investor presentation. Both footnotes read, "Fixed license revenue includes prepaid and minimum commitment deals." The footnotes appeared in a line item for "fixed license revenue," which disclosed the Company's fixed license revenues and year-over year growth for (i) the fourth quarter of fiscal years 2020 and 2021 and (ii) the full fiscal years 2020 and 2021.

**RESPONSE 190**:

190.    Defendants state that no response is required to the allegations in paragraph 190, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 190.

**COMPLAINT PARAGRAPH 191:**

191.    These footnotes were materially false and misleading and omitted material facts. Nowhere did these footnotes disclose (i) that minimum commitments were a new type of fixed license deal, which were not sold at all during fiscal year 2020, (ii) what a minimum commitment deal was, (iii) that minimum commitments were different from prepays in the critical respect that

the Company received <u>zero</u> cash up front, or (iv) the breakdown of fixed license revenue as between prepays and minimum commitments for the fourth quarter of 2021, which would have shown that these deals had skyrocketed to comprise 87% of fixed revenue.

**RESPONSE 191**:

191.    Defendants state that no response is required to the allegations in paragraph 191, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 191.

**COMPLAINT PARAGRAPH 192:**

192.    During the call, an analyst with Needham mistakenly stated – based on Defendants' above-described concealment of key facts concerning minimum commitments – that "prepaid revenue" was "$25 million in the [fourth] quarter" and in "fiscal year 2021" totaled "$71 million." The same analyst then asked about the anticipated "extent of the drop-off in fiscal year 2022 for prepaid given it's so high." He also asked, "[W]hat drove the above average growth in prepay in the September [i.e., fourth] quarter because it was quite significant?" In response, Gallenberger stated "Right. Right. Yeah," representing that "prepays" had increased as described by the Needham analyst.

**RESPONSE 192**:

192.    Defendants state that no response is required to the allegations in paragraph 192, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 192.

**COMPLAINT PARAGRAPH 193:**

193.    It was materially false and misleading for Gallenberger to agree that the Company's prepaid license revenue had increased to $25 million in the fourth quarter and $71 million in fiscal

year 2021, when, in fact, the Company's prepaid license revenue was $3.3 million in the fourth quarter and $48.9 million in fiscal year 2021. It was also materially misleading for Gallenberger to agree that the Company's prepaid license revenue had increased to $25 million in the fourth quarter and $71 million in fiscal year 2021 without disclosing that, in fact, $22.1 million of the fourth quarter revenue and full-year revenue derived from particularly damaging minimum commitment deals, in which there was no prepayment at all.

**RESPONSE 193**:

193.    Defendants state that no response is required to the allegations in paragraph 193, which relate solely to claims dismissed by the 3/25/2024 Order. To the extent a response is required, Defendants deny the allegations in paragraph 193.

**COMPLAINT PARAGRAPH 194:**

194.    Further, it was materially false and misleading for Cerence to state that "[f]ixed license revenue includes… minimum commitment deals" in a table that summarized the Company's fixed license revenue in 2020, when, in fact, none of the Company's revenues in 2020 resulted from minimum commitments, which in 2020, had not been introduced yet. This materially false and misleading disclosure perpetuated the mistaken impression that the Company had not introduced a new and damaging type of fixed license deal, when, in fact, it had.

**RESPONSE 194**:

194.    Defendants state that no response is required to the allegations in paragraph 194, which relate solely to claims dismissed by the 3/25/2024 Order. To the extent a response is required, Defendants deny the allegations in paragraph 194.

**G. Defendants' False and Misleading Statements and Omissions During the Goldman Sachs Global Automotive Conference**

**COMPLAINT PARAGRAPH 195:**

195.    On December 2, 2021, Defendants participated in the Goldman Sachs Global Automotive Conference, during which analysts raised questions about the Company's fixed license revenue from the fourth quarter and fiscal year 2021. When asked about the increasing "amount of revenue that's been recognized but unbilled," Gallenberger responded that the Company's fixed license contract included "components of payment terms, <u>some of those payment terms, if they're not scheduled yet, then it becomes unbilled</u>."

**RESPONSE 195:**

195.    Defendants state that no response is required to the allegations in paragraph 195, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 195.

**COMPLAINT PARAGRAPH 196:**

196.    This statement was materially false and misleading. It was materially false and misleading for Gallenberger to attribute the Company's increase in "unbilled" revenue to a mere technicality concerning payment terms, without disclosing that, in truth, most of that increase had resulted from the introduction of and reliance on the minimum commitment deal. In fiscal year 2021, the Company's "recognized but not billed" revenues increased by approximately $36.5 million from the previous year. Of that increase, minimum commitment deals accounted for $22.1 million – i.e., <u>more than 60%</u>.[6] Instead of disclosing that minimum commitments were, in fact, the

---

[6] For minimum commitments, the "payment terms" were such that the Company could recognize 100% of the revenue, even if 0% of that revenue had been billed – resulting in the entire value of the contract falling in the "recognized but unbilled" category. In other words, the full value of every minimum commitment deal was "recognized but unbilled."

main driver of the Company's revenues that had been recognized but not billed, Gallenberger continued to obscure minimum commitment deals from investors.

**RESPONSE 196**:

196.    Defendants state that no response is required to the allegations in paragraph 196 and footnote 6, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 196 and footnote 6.

## VI.    LOSS CAUSATION

**COMPLAINT PARAGRAPH 197:**

197.    The market price of Cerence securities was artificially inflated and maintained by the material misstatements and omissions identified herein.  The artificial inflation in the price of Cerence securities was removed when the facts misstated and omitted by Defendants were revealed to the market through a series of disclosures.

**RESPONSE 197**:

197.    Defendants state that paragraph 197 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 197.

**COMPLAINT PARAGRAPH 198:**

198.    On November 22, 2021, Cerence issued a press release and held an investor conference call to announce its fourth-quarter and full-fiscal-year 2021 financial results. In its disclosures that day, Defendants revealed that the Company's quarterly revenues from its "fixed" deals grew 53% year-over-year, with its annual revenues from its fixed deals ballooning to a "record setting" $71 million for the year – far higher than the $40 to $55 million range that Defendants continually reiterated throughout the Class Period. Although Cerence's former executives attempted to minimize the adverse impact of this dramatic uptick in revenues from

fixed deals, they were ultimately forced to acknowledge (but did so misleadingly) during the November 22 investor call that these deals "put a little bit of a damp around growth rates for [2022] and possibly into fiscal 2023 as well, as those licenses [from the fixed deals] get consumed." But even this modest admission that there might be "a little bit of damp around growth rates" into "possibly" fiscal year 2023 failed to disclose the massive increase in the time that it would take customers to consume the oversold fixed licenses – six to ten quarters, not the four to six quarters that Gallenberger misleadingly suggested.

**RESPONSE 198**:

198.    To the extent paragraph 198 characterizes the content of Cerence's press release dated November 22, 2021 and the transcript of Cerence's earnings call held on November 22, 2021, Defendants state that the press release and transcript speak for themselves, refer the Court to the press release and transcript for their content, and deny the allegations in paragraph 198 to the extent they are inconsistent with the content of the press release and the transcript. Defendants deny the remaining allegations in paragraph 198.

**COMPLAINT PARAGRAPH 199:**

199.    Investors and analysts were troubled by the Company's November 22 disclosures. Analysts at Craig-Hallum, for example, reduced their price target for Cerence's stock by $15 per share, explaining that the Company's "[h]eadline numbers were largely as expected, but under the covers a number of key lines surprised," including that "prepaid license was up 40% sequentially," which "raises concerns about potentially pulling forward revenue." Analysts at Raymond James likewise expressed concern, cautioning that Cerence's "earnings quality was a bit in question given a gigantic contribution in Pre-paid licenses ($25.4m vs $16m estimate)." RBC Capital's analysts

later explained that it was "moving to the sidelines" on Cerence's stock, explaining that the Company was in the "penalty box."

**RESPONSE 199**:

199.     To the extent paragraph 199 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 199 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 199.

**COMPLAINT PARAGRAPH 200:**

200.     In response to the Company's November 22, 2021 disclosures, Cerence's stock price dropped over 20% in a single trading day – up to that point, the largest one-day stock price decline in the Company's history. The decline erased over $800 million in shareholder value, with Cerence's stock falling from a closing price of $104.06 on November 19, 2021 to $82.59 on November 22, 2021.

**RESPONSE 200:**

200.     Defendants admit that (1) Cerence's common stock closed at $104.06 per share on November 19, 2021; and (2) Cerence's common stock closed at $82.59 per share on November 22, 2021.  Defendants deny the remaining allegations in paragraph 200.

**COMPLAINT PARAGRAPH 201**:

201.     However, Cerence and its former CEO Dhawan did not reveal the full truth to investors in their November 22 disclosures. In fact, just the opposite: during and after the November 22 earnings call, Defendants continued to mislead and misrepresent to investors the true nature of the Company's "fixed" revenues. Among other things, they claimed that, in 2022, prepays would likely "recede" and that they "certainly [didn't] think" prepays would reach 2021

levels. They also concealed Cerence's resorting to minimum commitment deals – which they would later disclose accounted for 87% of Cerence's fixed license revenue in fourth-quarter 2021. They further led investors to believe that Cerence would achieve revenue growth the next year, despite the purportedly one-off revenue spike from fixed license deals in the fourth quarter of 2021 and comforted the market by reiterating their 2024 guidance.

**RESPONSE 201**:

201.    To the extent paragraph 201 characterizes the content of Cerence's SEC filings, press releases, and investor presentation transcripts cited in the Amended Complaint, Defendants state that the SEC filings, press releases, and transcripts speak for themselves, refer the Court to the SEC filings, press releases, and transcripts for their content, and deny the allegations in paragraph 201 to the extent they are inconsistent with the content of the SEC filings, press releases, and transcripts.  Defendants deny the remaining allegations in paragraph 201.

**COMPLAINT PARAGRAPH 202:**

202.    On December 15, 2021, Cerence again stunned investors by announcing that Defendant Dhawan – the Company's top executive who directed the strategy to increase "fixed" deals, including minimum commitment deals – had suddenly and unexpectedly "resigned" effective immediately. On this news, the Company's stock price dropped by 11.4%, from $78.08 to $69.20, erasing over $340 million in shareholder value.

**RESPONSE 202**:

202.    Defendants admit that (1) Mr. Dhawan resigned as Cerence's President and Chief Executive Officer and a director of the Company on December 14, 2021; (2) Cerence's common stock closed at $78.08 per share on December 14, 2021; and (3) Cerence's common stock closed

at \$69.20 per share on December 15, 2021. Defendants deny the remaining allegations in paragraph 202.

**COMPLAINT PARAGRAPH 203:**

203.   Analysts and investors quickly connected the announcement of Dhawan's "resignation" to the Company's November 22 disclosures. Analysts at RBC Capital, for example, labeled Defendant Dhawan's resignation announcement "surprising" and a "negative," explaining that, after the November 22 disclosures, "[w]e thought that [Cerence] could be in a near-term penalty box (poor communication, steeper ramp to LT targets) but that the [long-term] attractiveness of the asset was mostly unchanged" – an opinion no longer tenable following Dhawan's resignation. Analysts at Raymond James expressed similar sentiments, stating that "[t]he news is frankly a surprise" and observing that "the stock is acting as such (down 18%). Raymond James further explained that "the abruptness of the announcement, immediate transition, and narrow search effort for the replacement create[d] an uneasy environment," which undermined investor confidence in Cerence. In the same report, Raymond James' analysts expressed hesitations about the 2024 guidance, voicing a need to "see further tangible evidence that management's 2024 numbers are probable."

**RESPONSE 203**:

203.   To the extent paragraph 203 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 203 to the extent they are inconsistent with the content of the analyst reports. Defendants deny the remaining allegations in paragraph 203.

**COMPLAINT PARAGRAPH 204:**

204.   On February 7, 2022, Cerence and its new CEO, Ortmanns, revealed additional

startling facts about the Company's "fixed" deals. Specifically, Cerence and Ortmanns announced that, in first-quarter 2022, Cerence's "fixed" deals amounted to $20 million in revenues – an annual run rate of $80 million that, if maintained, would eclipse the "$71 million record" from the prior year. Cerence further disclosed for the first time that its "fixed" revenues included revenues from "minimum volume commitment contracts from our backlog" that took "four to six quarters" to consume and acknowledged that they did not require upfront payment. The Company further revealed that the Company's use of these minimum commitment deals "[wa]s dampening our variable license revenue growth and [was] creating the headwind for this year and next year as our customers consume those licenses." As a result of these "minimum commitment" deals, the Company was forced to slash its year-end revenue estimates for fiscal year 2022 and withdraw its guidance for fiscal year 2024 altogether. Indeed, when an analyst asked whether, "on the fixed and variable issue, shouldn't that have been kind of anticipated in the original guidance, that this should have been kind of known about when you originally guided," Defendant Gallenberger admitted that Defendants "knew about that, when we were giv[ing] guidance in November."

**RESPONSE 204**:

204.     To the extent paragraph 204 characterizes the content of Cerence's press release dated February 7, 2022 and the transcript of Cerence's earnings call held on February 7, 2022, Defendants state that the press release and transcript speak for themselves, refer the Court to the press release and transcript for their content, and deny the allegations in paragraph 204 to the extent they are inconsistent with the content of the press release and transcript.  Defendants deny the remaining allegations in paragraph 204.

**COMPLAINT PARAGRAPH 205:**

205.     Investors and analysts were stunned by the Company's February 7 disclosures,

including about its "minimum commitment" deals. During Cerence's February 7 investor conference, Raji Gill, an analyst at Needham and Company who had tracked Cerence since its inception, stated that "this is the kind of the first time I've been hearing about fixed commitment of minimum commitments versus prepays." Chris McNally, an analyst with Evercore who also had covered Cerence since its inception, similarly noted that "I feel like fixed minimum contract has not been fully addressed," adding that "we're all confused" by the Company's prior disclosures.

**RESPONSE 205**:

205.    To the extent paragraph 205 characterizes the content of the transcript of Cerence's earnings call held on February 7, 2022, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 205 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 205.

**COMPLAINT PARAGRAPH 206:**

206.    These and other analysts also wrote a series of scathing analyst reports that criticized Cerence and its former CEO for misleading investors about the Company's "fixed" deals. For example, in a February 7 report titled "New CEO Rips the Band Aid Off Prior CEO's Guide," Raymond James reduced its target share for Cerence's stock price by 24%, explaining that the "[t]he ugly part of the [February 7] print has been the amount of previously non disclosed components to revenue that are apparently more one-off in nature." Analysts at Craig-Hallum also questioned whether Defendants had been honest with investors explaining that "guidance/reporting appear to have been very aggressive versus the realities of the business/marketplace" and highlighting that "this quarter was wildly confusing in light of prior

communications as well as our understanding of the revenue categories/lines." Evercore also downgraded its rating of Cerence's stock, explaining that "[w]hen the facts change, I change my mind" and highlighting the "info that has trickled out of CRNC," including the Company's "Fixed License '20/21 Rev[enue]," which had "pulled forward >$30MM" of future revenue.

**RESPONSE 206**:

206.    To the extent paragraph 206 characterizes the content of analyst reports, Defendants state that the analyst reports speak for themselves, refer the Court to the analyst reports for their content, and deny the allegations in paragraph 206 to the extent they are inconsistent with the content of the analyst reports.  Defendants deny the remaining allegations in paragraph 206.

**COMPLAINT PARAGRAPH 207:**

207.    In response to Cerence's February 7, 2022 disclosures, the Company's stock price plummeted an additional 31.4%, from $63.58 per share to $43.61 per share, on exceptionally high trading volume, erasing another $780 million in shareholder value.

**RESPONSE 207**:

207.    Defendants admit that (1) Cerence's common stock closed at $63.58 per share on February 4, 2022; and (2) Cerence's common stock closed at $43.61 per share on February 7, 2022.  Defendants deny the remaining allegations in paragraph 207.

**COMPLAINT PARAGRAPH 208:**

208.    In total, investors suffered over $1.9 billion in market capitalization losses as a result of the revelations discussed above. The price of Cerence's stock continued to decline. As of this date, Cerence's stock trades more than 80% down from its highest price during the Class Period.

**RESPONSE 208**:

208.     Defendants deny the allegations in paragraph 208.

**VII.     ADDITIONAL SCIENTER ALLEGATIONS**

**COMPLAINT PARAGRAPH 209:**

209.     In addition to the facts set forth above, the facts summarized below further demonstrate that Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein.

**RESPONSE 209**:

209.     Defendants state that paragraph 209 is a characterization of the Amended Complaint to which no response is required.  Defendants further state that paragraph 209 asserts legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the allegations in paragraph 209.

**COMPLAINT PARAGRAPH 210:**

210.     *First*, as detailed above, throughout the Class Period, Dhawan personally directed the Company's undisclosed strategy to focus on prepaid and minimum commitment deals. Dhawan personally ordered Cerence's salesforce to enter into prepaid deals, to convert existing variable license deals into prepaid deals, and then to enter into minimum commitment deals. Cerence's new CEO admitted at the end of and after the Class Period that the decision to emphasize fixed license deals and the approval of such deals rested with Dhawan.

**RESPONSE 210**:

210.     Defendants deny the allegations in paragraph 210.

**COMPLAINT PARAGRAPH 211:**

211.     Moreover, FE1 reported that Dhawan "strongly pushed the prepayment deals" beginning in early 2020, and that this heavy pressure continued every quarter until FE1 left the

Company in September 2021. FE1 reported that this pressure was applied in the second month of each quarter.

**RESPONSE 211**:

211.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 211.  Defendants deny the remaining allegations in paragraph 211.

**COMPLAINT PARAGRAPH 212:**

212.    FE1 reported that the "order from Sanjay" Dhawan to do prepaid deals was given in a variety of ways. FE1 reported that Dhawan would hold phone calls with FE1 and Egon Jungheim during which Dhawan would pressure FE1 to push prepay contracts. FE1 further reported that he frequently received emails from Dhawan pressuring sales managers to push prepay contracts. FE1 reported that "no one was able to escape from it."

**RESPONSE 212**:

212.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 212.  Defendants deny the remaining allegations in paragraph 212.

**COMPLAINT PARAGRAPH 213:**

213.    FE1 reported that Dhawan "ordered sales personnel from all over the world" to do prepaid deals. FE1 was told by Egon Jungheim every quarter that Dhawan had ordered sales personnel from all over the world to enter into prepaid deals. Jungheim also told FE1 how much in prepaid deals the salesforce was supposed to do in Japan.

**RESPONSE 213**:

213.    Defendants lack knowledge or information sufficient to form a belief about whether

FE1 made the statements attributed to FE1 in paragraph 213.  Defendants deny the remaining allegations in paragraph 213.

**COMPLAINT PARAGRAPH 214:**

214.   FE1 further reported that Dhawan applied the same heavy pressure to sales managers to convert existing variable contracts to prepaid contracts in order to get the cash up front. Again, FE1 reported that in the second month of each quarter, Dhawan would order sales managers to convert typical variable deals into prepay deals.

**RESPONSE 214**:

214.   Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 214.  Defendants deny the remaining allegations in paragraph 214.

**COMPLAINT PARAGRAPH 215:**

215.   Moreover, FE1 reported that when the "customer hesitated" on a prepaid deal, "Sanjay and Egon pushed us to propose" deals in which the customer would commit to a "total projected volume and amount" – i.e., minimum commitment deals. FE1 reported that offering these deals was the only way not to get Dhawan "too mad." FE1 reported that Dhawan was "constantly" looking for the salesforce to do minimum commitment deals.

**RESPONSE 215**:

215.   Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 215.  Defendants deny the remaining allegations in paragraph 215.

**COMPLAINT PARAGRAPH 216:**

216.   In short, Defendant Dhawan not only had knowledge of these facts, but he was also

the prime mover behind them – and his active participation in these activities strongly supports an inference of scienter.

**RESPONSE 216**:

216.    Defendants deny the allegations in paragraph 216.

**COMPLAINT PARAGRAPH 217:**

217.    ***Second***, Defendants Dhawan and Gallenberger approved prepaid and minimum commitment deals over $1 million. FE1 reported that, after the customer signed the contract, it was sent to Cerence headquarters. Dhawan and Gallenberger reviewed the contract, and then it was sent to Cerence's general counsel to sign.  FE1 confirmed that Dhawan and Gallenberger needed to approve the contract before the general counsel could sign it. Given that they approved the contracts at issue, the Executive Defendants clearly had knowledge of Cerence's ballooning prepaid and minimum commitment deals at the same time they were telling investors that Cerence was minimizing these contracts.

**RESPONSE 217**:

217.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 217.  Defendants deny the remaining allegations in paragraph 217.

**COMPLAINT PARAGRAPH 218:**

218.    ***Third***, Cerence actively tracked consumption of prepaid licenses, and thus, Defendants had information showing the huge backlog of prepaid sales they had created and how it was choking the Company's demand and revenue stream.  FE1 reported that when the Company entered into a prepaid deal, the customer had to report the number of consumed licenses per quarter in what is called a royalty report. The royalty report was sent to the Company at

royalty.reports@cerence.com or to the local salesperson.  FE1 further reported that, typically, on the twentieth day of the first month of the quarter, customers would send the royalty report for the prior quarter, and the report indicated the consumed license numbers for the applicable quarter. FE1 reported that Cerence's royalty report team in Burlington, Massachusetts, (where Dhawan and Gallenberger were based) reviewed the reports. On March 7, 2022, in a stunning disclosure, Cerence's new CEO admitted that prepay contracts would take approximately six to ten quarters to consume, squarely contradicting Gallenberger's November 22, 2021 statement that fixed contracts would only "sometimes" have a two-year impact.

**RESPONSE 218**:

218.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 218.  Defendants deny the remaining allegations in paragraph 218.

**COMPLAINT PARAGRAPH 219:**

219.    *Fourth*, Defendants introduced a new and particularly dangerous type of deal during the Class Period, the minimum commitment contract, and yet made no meaningful disclosure to investors. Defendants introduced this deal to entice customers that were hesitant to do a prepaid deal, as noted above. The minimum commitment deal enabled Cerence to book all the revenue up front. Yet under this type of deal, Cerence received no cash at all up front and harmed its future demand by pulling forward revenue for as much as 5 years at a discounted rate. Thus, while the deal allowed Cerence to show revenues to Wall Street and buoy its stock price, it was long term harmful in that the Company cannibalized future demand, did so at a discounted rate, and yielded no cash to Cerence initially.

**RESPONSE 219**:

219.    Defendants state that no response is required to the allegations in paragraph 219, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 219.

**COMPLAINT PARAGRAPH 220:**

220.    Minimum commitment deals comprised 87% of the Company's fixed license revenue in the fourth quarter of 2021 and 100% of the Company's fixed license revenue in the first quarter of 2022. Rather than disclose this new, significant source of revenue, Defendants made no meaningful disclosure – instead, they conflated "prepaid" and "minimum commitment" deals in their statements during investor conferences and buried an incomplete and misleading footnote in a slide presentation that cursorily referenced, but did not explain, "minimum commitments." As the analyst reactions to the belated disclosure of these deals made clear, investors were acutely interested in knowing that Cerence had entered into massive amounts of these contracts to inflate its short-term results – yet Defendants concealed these facts while "constantly" pushing Cerence's salesforce to make these types of sales. Such conduct is indicative of severe recklessness, if not actual intent.

**RESPONSE 220**:

220.    Defendants state that no response is required to the allegations in paragraph 220, which relate solely to claims dismissed by the 3/25/2024 Order.  To the extent a response is required, Defendants deny the allegations in paragraph 220.

**COMPLAINT PARAGRAPH 221:**

221.    *Fifth*, Defendants Dhawan and Gallenberger undertook these actions knowing full well that Dhawan's orders to increase prepaid and minimum commitment contracts was harmful

to Cerence's future revenue stream. FE1 reported that before the spinoff, the trend at Nuance was to reduce reliance on prepaid contracts, and Jungheim was trying to reduce reliance on prepaid contracts at Nuance.

**RESPONSE 221**:

221.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 221.  Defendants deny the remaining allegations in paragraph 221.

**COMPLAINT PARAGRAPH 222:**

222.    The harmful impact of the prepaid deals was widely known at Cerence when Defendants did an about-face and began relying very heavily on prepaid deals. FE1 reported that every salesperson at Cerence knew that the prepaid deals were harming the future growth of the Company. FE1 discussed this with others at Cerence because other sales employees were very unhappy about being forced to sell prepaid contracts. FE1 discussed this with the other three sales managers in Japan.

**RESPONSE 222**:

222.    Defendants lack knowledge or information sufficient to form a belief about whether FE1 made the statements attributed to FE1 in paragraph 222.  Defendants deny the remaining allegations in paragraph 222.

**COMPLAINT PARAGRAPH 223:**

223.    Defendants themselves acknowledged in their public statements that prepaid deals had a negative impact on Cerence. For instance, Defendant Gallenberger stated on the Company's Q1 2020 conference call, "[T]he use of prepaid contracts is something that we expect to potentially reduce over time, which will result in strong bottom line performance of the company."

**RESPONSE 223**:

223.    To the extent paragraph 223 characterizes the content of the transcript of Cerence's earnings call held on February 11, 2020, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 223 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 223.

**COMPLAINT PARAGRAPH 224:**

224.    ***Sixth***, despite their knowledge that prepaid deals had a material negative impact on Cerence's future revenue stream, Defendants Dhawan and Gallenberger had particularly strong motives to increase the Company's prepaid and minimum commitment deals during the Class Period. To start, by the time the Class Period began, a microchip shortage had gripped the global economy, causing automobile production to slow and even decline. This posed an extremely serious threat to the Company's growth story because, under the variable license model, Cerence could only recognize and publicly report revenue once a car was actually produced with the installed software. Were Cerence's revenues to decline or decelerate as production slowed as a result of the chip shortage, the growth story would fall apart, the Company's stock price would fall, and Defendants' jobs would be jeopardized – as actual events ultimately bore out. In contrast to variable license deals, prepaid and minimum commitment deals allowed Defendants to book all the revenue up front, thereby showing stronger revenue results to Wall Street.

**RESPONSE 224**:

224.    Defendants admit that, during the COVID-19 pandemic, there were supply chain challenges in the automotive industry related to semiconductor devices that are used in automobiles.  Defendants deny the remaining allegations in paragraph 224.

**COMPLAINT PARAGRAPH 225:**

225.    ***Seventh***, as set forth above, Defendants' pull-forward scheme enabled the Company to report that Cerence had met or exceeded its revenue guidance in every fiscal year during the Class Period (fiscal years 2020 and 2021) and the vast majority of fiscal quarters during the Class Period.

**RESPONSE 225**:

225.    Defendants state that paragraph 225 is a characterization of the Amended Complaint to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 225.

**COMPLAINT PARAGRAPH 226:**

226.    ***Eighth***, as also set forth above, Defendants Dhawan and Gallenberger had personal financial motives to accelerate Cerence's revenue recognition by the end of fiscal year 2021. Dhawan's and Gallenberger's cash and performance-share incentive compensation for fiscal-year 2021 depended significantly on Cerence's revenue performance, and the Executive Defendants used the pull-forward scheme to achieve a near-maximum payout opportunity worth millions of dollars.

**RESPONSE 226**:

226.    To the extent paragraph 226 characterizes the content of Cerence's SEC filings relating to the Company's incentive compensation plans, Defendants state that the SEC filings speak for themselves, refer the Court to the SEC filings for their content, and deny the allegations in paragraph 226 to the extent they are inconsistent with the content of the SEC filings.  Defendants deny the remaining allegations in paragraph 226.

**COMPLAINT PARAGRAPH 227:**

227.    *Ninth*, Defendants Dhawan and Gallenberger engaged in suspicious insider trading during the Class Period, as set forth above.

**RESPONSE 227**:

227.    Defendants deny the allegations in paragraph 227.

**COMPLAINT PARAGRAPH 228:**

228.    *Tenth*, Defendant Gallenberger himself admitted that the Company reaffirmed its guidance for fiscal year 2024 based on knowingly false assumptions. When an analyst from Wells Fargo asked whether the "fixed and variable issue… should have been kind of known about when you originally guided," Gallenberger admitted, "<u>Yes, we knew about that, when we were giv[ing] guidance in November</u>."

**RESPONSE 228**:

228.    To the extent paragraph 228 characterizes the content of the transcript of Cerence's earnings call held on February 7, 2022, Defendants state that the transcript speaks for itself, refer the Court to the transcript for its content, and deny the allegations in paragraph 228 to the extent they are inconsistent with the content of the transcript.  Defendants deny the remaining allegations in paragraph 228.

## VIII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

**COMPLAINT PARAGRAPH 229:**

229.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements and omissions pleaded in this Complaint.

**RESPONSE 229**:

229.    Defendants state that paragraph 229 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 229.

**COMPLAINT PARAGRAPH 230:**

230.    None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements, statements of purportedly current facts and conditions at the time the statements were made (including statements about the reasons for Cerence's results, the sustainability and quality of Cerence's sales pipeline, Cerence's current business strategies, and whether Cerence's fixed license deals reflected prepayment or not), or statements rendered materially misleading for omitting existing facts.

**RESPONSE 230**:

230.    Defendants state that paragraph 230 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 230.

**COMPLAINT PARAGRAPH 231:**

231.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the reasons for Cerence's results, the sustainability and quality of Cerence's sales pipeline, Cerence's current business strategies, and whether Cerence's fixed license deals reflected prepayment or not. Given the then-existing facts contradicting Defendants' statements,

any generalized risk disclosures made by Cerence were insufficient to insulate Defendants from liability for their materially false and misleading statements.

**RESPONSE 231**:

231.    Defendants state that paragraph 231 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 231.

**COMPLAINT PARAGRAPH 232:**

232.    Cerence's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

**RESPONSE 232**:

232.    Defendants state that paragraph 232 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 232.

**COMPLAINT PARAGRAPH 233:**

233.    Further, Defendants are liable for any false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the false forward-looking statement was authorized and approved by an executive officer of Cerence who knew that the statement was false when made.

**RESPONSE 233:**

233.    Defendants state that paragraph 233 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 233.

## IX.    PRESUMPTION OF RELIANCE

**COMPLAINT PARAGRAPH 234:**

234.    At all relevant times, the market for Cerence's common stock was an efficient market for the following reasons, among others:

      a.    Cerence common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

      b.    As a regulated issuer, Cerence filed periodic public reports with the SEC and NASDAQ;

      c.    Cerence regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.    Cerence was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

**RESPONSE 234**:

234.    Defendants state that paragraph 234 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 234.

**COMPLAINT PARAGRAPH 235:**

235.    As a result of the foregoing, the market for Cerence's common stock reasonably promptly digested current information regarding Cerence from all publicly available sources and reflected such information in the price of Cerence common stock. All purchasers of Cerence common stock during the Class Period suffered similar injury through their purchase of Cerence common stock at artificially inflated prices, and a presumption of reliance applies.

**RESPONSE 235**:

235.    Defendants state that paragraph 235 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 235.

**COMPLAINT PARAGRAPH 236:**

236.    A class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

**RESPONSE 236**:

236.    Defendants state that paragraph 236 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 236.

## X.    CLASS ACTION ALLEGATIONS

**COMPLAINT PARAGRAPH 237:**

237.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Cerence securities between November 16, 2020, and February 4, 2022,

inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants; the officers and directors of Cerence at all relevant times; members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns; Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and any entity in which Defendants or their immediate families have or had a controlling interest.

**RESPONSE 237**:

237.   Defendants state that paragraph 237 is a characterization of the Amended Complaint to which no response is required.  Defendants further state that paragraph 237 asserts legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the allegations in paragraph 237.

**COMPLAINT PARAGRAPH 238:**

238.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cerence shares were actively traded on the NASDAQ. As of November 23, 2021, Cerence had over 38 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Class members who purchased Cerence common stock may be identified from records maintained by Cerence or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

**RESPONSE 238**:

238.    Defendants state that paragraph 238 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 238.

**COMPLAINT PARAGRAPH 239:**

239.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

**RESPONSE 239:**

239.    Defendants state that paragraph 239 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 239.

**COMPLAINT PARAGRAPH 240**:

240.    Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Among the questions of fact and law common to the Class are (a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein; (b) whether the Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts; (c) whether Defendants acted with scienter; and (d) the proper way to measure damages.

**RESPONSE 240**:

240.    Defendants state that paragraph 240 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 240.

**COMPLAINT PARAGRAPH 241:**

241.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

**RESPONSE 241**:

241.    Defendants state that paragraph 241 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 241.

### XI.    CLAIMS FOR RELIEF

**COUNT I**
**for Violations of Section 10(b) of the Exchange Act and**
**SEC Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

**COMPLAINT PARAGRAPH 242:**

242.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

**RESPONSE 242**:

242.    Defendants repeat and incorporate by reference each of their responses to the paragraphs as if set forth fully herein.

**COMPLAINT PARAGRAPH 243:**

243.    This Count is asserted on behalf of all members of the Class against Defendants Cerence, Dhawan, and Gallenberger for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

**RESPONSE 243**:

243.    Defendants state that paragraph 243 is a characterization of the Amended Complaint to which no response is required.  Defendants further state that paragraph 243 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 243.

**COMPLAINT PARAGRAPH 244:**

244.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**RESPONSE 244**:

244.    Defendants deny the allegations in paragraph 244.

**COMPLAINT PARAGRAPH 245:**

245.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Cerence securities at artificially inflated prices.

**RESPONSE 245**:

245.    Defendants deny the allegations in paragraph 245.

**COMPLAINT PARAGRAPH 246:**

246.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they
(i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material
fact and/or omitted to state material facts necessary to make the statements not misleading; and
(iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon
the purchasers of the Company's securities in an effort to maintain artificially high market prices
for Cerence securities.

**RESPONSE 246**:

246.    Defendants deny the allegations in paragraph 246.

**COMPLAINT PARAGRAPH 247:**

247.    Defendants, individually and in concert, directly and indirectly, by the use, means
or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a
continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class;
made various untrue and/or misleading statements of material facts and omitted to state material
facts necessary in order to make the statements made, in light of the circumstances under which
they were made, not misleading; made the above statements intentionally or with deliberate
recklessness; and employed devices and artifices to defraud in connection with the purchase and
sale of Cerence securities, which were intended to, and did, (a) deceive the investing public,
including Lead Plaintiff and the Class, regarding, among other things, (i) Cerence's practices and
plans concerning fixed license deals; (ii) the sustainability of Cerence's revenues and revenue
growth; (iii) the strength and health of Cerence's sales pipeline; (iv) Cerence's revenue guidance;

(v) the reasons for Cerence's engaging in fixed license deals; (vi) the fact that Cerence was converting existing variable contracts into fixed contracts; and (vii) Cerence's use of minimum commitment deals; (b) artificially inflate and maintain the market price of Cerence securities; and (c) cause Lead Plaintiff and other members of the Class to purchase Cerence securities at artificially inflated prices and suffer losses when the true facts became known.

**RESPONSE 247**:

247.    Defendants deny the allegations in paragraph 247.

**COMPLAINT PARAGRAPH 248:**

248.    Defendants Cerence, Dhawan, and Gallenberger are liable for all materially false and misleading statements made during the Class Period, as alleged above.

**RESPONSE 248**:

248.    Defendants deny the allegations in paragraph 248.

**COMPLAINT PARAGRAPH 249:**

249.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Cerence securities, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

**RESPONSE 249**:

249.    Defendants deny the allegations in paragraph 249.

**COMPLAINT PARAGRAPH 250:**

250.    Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Cerence securities, which inflation

was removed from its price when the true facts became known.

**RESPONSE 250**:

250.     Defendants deny the allegations in paragraph 250.

**COMPLAINT PARAGRAPH 251:**

251.     Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Cerence's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Cerence's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Cerence's securities to decline.

**RESPONSE 251**:

251.     Defendants deny the allegations in paragraph 251.

**COMPLAINT PARAGRAPH 252:**

252.     Defendants' numerous false and misleading statements and omissions artificially inflated the price of Cerence securities. That artificial inflation was removed in direct response to information revealed in a series of disclosures, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions. As set forth above, these disclosures and/or materializations divulged or revealed information that gradually corrected Defendants' prior

misrepresentations and omissions of material fact, and/or disclosed facts Defendants misrepresented or omitted that were a substantial factor in causing investors' economic loss.

**RESPONSE 252**:

252.    Defendants deny the allegations in paragraph 252.

**COMPLAINT PARAGRAPH 253:**

253.    None of these revelations was sufficient on its own to fully remove the inflation from the price of the Company's securities because each only partially revealed Cerence's financial state that had been concealed from, or misrepresented to, investors. Moreover, as explained above, the corrective impact of the disclosures alleged herein was tempered by Defendants' continual reassuring statements and failure to fully disclose the truth.

**RESPONSE 253**:

253.    Defendants deny the allegations in paragraph 253.

**COMPLAINT PARAGRAPH 254:**

254.    The timing and magnitude of the declines in Cerence's share price negate any inference that Lead Plaintiff's or the Class's losses were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct.

**RESPONSE 254**:

254.    Defendants deny the allegations in paragraph 254.

**COMPLAINT PARAGRAPH 255:**

255.    Accordingly, as a result of their purchases of Cerence securities during the Class Period, Lead Plaintiff and the Class suffered economic loss and damages under the federal securities laws.

**RESPONSE 255**:

255.   Defendants deny the allegations in paragraph 255.

**COMPLAINT PARAGRAPH 256:**

256.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

**RESPONSE 256**:

256.   Defendants deny the allegations in paragraph 256.

<u>**COUNT II**</u>
**for Violations of Section 20(a) of the Exchange Act**
<u>**(Against Defendants Dhawan and Gallenberger)**</u>

**COMPLAINT PARAGRAPH 257:**

257.   Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

**RESPONSE 257**:

257.   Defendants repeat and incorporate by reference each of their responses to the paragraphs as if set forth fully herein.

**COMPLAINT PARAGRAPH 258:**

258.   This count is asserted on behalf of all members of the Class against Defendants Dhawan and Gallenberger for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

**RESPONSE 258**:

258.   Defendants state that paragraph 258 is a characterization of the Amended Complaint to which no response is required.  Defendants further state that paragraph 258 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 258.

**COMPLAINT PARAGRAPH 259:**

259.    As noted above, Cerence violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

**RESPONSE 259**:

259.    Defendants deny the allegations in paragraph 259.

**COMPLAINT PARAGRAPH 260:**

260.    In connection with those violations, Defendants Dhawan and Gallenberger acted as controlling persons of Cerence within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Cerence, Defendants Dhawan and Gallenberger had the power and ability to control the actions of Cerence and its employees. By reason of such conduct, Defendants Dhawan and Gallenberger are liable pursuant to Section 20(a) of the Exchange Act.

**RESPONSE 260**:

260.    Defendants state that paragraph 260 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 260.

**XII.    PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## RESPONSE TO LEAD PLAINTIFFS' PRAYER FOR RELIEF

Defendants deny any wrongdoing and, except as expressly admitted in paragraphs 1 through 260 above, deny all allegations, and specifically deny that Lead Plaintiff or the putative class members whom Lead Plaintiff purports to represent are entitled to any of the relief prayed for against the Defendants.

## XIII.   JURY TRIAL DEMANDED

Lead Plaintiff demands a trial by jury.

## RESPONSE TO LEAD PLAINTIFFS' JURY TRIAL DEMAND

Defendants state that no response is required to Lead Plaintiff's jury trial demand.

## AFFIRMATIVE DEFENSES

Defendants offer the following Defenses in response to the allegations set forth in the Amended Complaint. Defendants reserve the right to amend this Answer, to amend, modify and/or supplement their Defenses, and to plead and assert additional Defenses as they become known and appropriate during the course of the litigation, including without limitation any Defenses that may arise as a result of any findings, conclusions, or other action taken. The statement of any Defense does not assume the burden of proof on any issue as to which applicable law places the burden on Plaintiff. To the extent that any of the Defenses asserted herein or to be asserted in the future is mutually exclusive with another Defense asserted herein or to be asserted in the future, such Defense is asserted in the alternative to the other.

### FIRST AFFIRMATIVE DEFENSE

Lead Plaintiff is not entitled to the certification of any class because Lead Plaintiff's claims are not suitable for a class action under Rule 23 of the Federal Rules of Civil Procedure or any other applicable law, and Lead Plaintiff is not a suitable class representative.

### SECOND AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the Amended Complaint fails to state a claim upon which relief can be granted.

### THIRD AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the Amended Complaint fails to meet the requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. §§ 78u-4 and 78u-5 ("PSLRA").

## FOURTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Plaintiff has failed to plead their claims against Defendants with particularity.

## FIFTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because it fails to allege any actionable misstatement or misrepresentation by any Defendants.

## SIXTH AFFIRMATIVE DEFENSE

This Action is barred, in whole or in part, because none of the alleged misrepresentations or omissions referenced in the Amended Complaint were, in fact, false or misleading in any way.

## SEVENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the statements alleged in the Amended Complaint, if any were in fact made, did not contain untrue material facts and all statements alleged to have been made (if any) had a reasonable basis in fact and/or were immaterial as a matter of law.  At all relevant times, Defendants acted without intent to defraud and without recklessness, and Defendants believed, at the time the statements alleged in the Amended Complaint were made, if any were in fact made, that those statements were correct and not misleadingly incomplete.

## EIGHTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the allegedly untrue statements of fact and omissions of fact referenced in the Amended Complaint were immaterial as a matter of law.

## NINTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the statements alleged in the Amended Complaint, if any were in fact made, were accompanied by meaningful cautionary language, were

corporate puffery, or were forward-looking statements, and are rendered inactionable by the safe harbor provisions of the PSLRA, 15 U.S.C. § 78u-5.

**TENTH AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, because Lead Plaintiff lacks standing to sue or to pursue any claims against Defendants.

**ELEVENTH AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, because Defendants did not act with the requisite scienter. Defendants did not make any of the alleged misrepresentations or omissions in the Amended Complaint with the intent to deceive and/or for the purpose of inducing the purchase or sale of a security by Lead Plaintiff or the putative class members who Lead Plaintiff purports to represent. Defendants are not liable for Lead Plaintiff's claims because Defendants did not know, and could not have known with the exercise of reasonable care, the untruth of any alleged misrepresentations or the fact of any material omission.

**TWELFTH AFFIRMATIVE DEFENSE**

The action is barred, in whole or in part, because the actual facts that Lead Plaintiff alleges to have been misrepresented or omitted were in fact known to and entered the securities market through credible sources. Lead Plaintiff is not entitled to any recovery because the substance of the allegedly material information that Plaintiff alleges to have been omitted or misrepresented was in fact disclosed in Cerence's own public filings and announcements, in the documents and securities referenced in the Amended Complaint, in the public disclosures of other parties and non-parties, and from other sources that were otherwise publicly available and/or widely known to the market and to the investing community.

## THIRTEENTH AFFIRMATIVE DEFENSE

The action is barred, in whole or in part, because Lead Plaintiff and the market were informed of the material information and risks associated with their investments in SEC filings and their amendments, press releases, proxy statements, advertisements, and other materials available to Lead Plaintiff and/or the market.

## FOURTEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because at all relevant times Defendants had no duty to disclose the allegedly omitted information.

## FIFTEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Defendants were under no duty to revise, update, and/or correct any previously made statements that Lead Plaintiff alleges were not subsequently revised, updated and/or corrected.

## SIXTEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Lead Plaintiff has not suffered any legally cognizable injury or damage.

## SEVENTEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Defendants deny that they fraudulently, recklessly, negligently or otherwise engaged in any act of deceit, conspiracy, fraud, or any other action, alleged conduct, or alleged omission, which was a proximate cause of any injury to Lead Plaintiff or the putative class members who Lead Plaintiff purports to represent.

## EIGHTEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, due to the absence of loss causation.  Specifically, Defendants were not the cause of any alleged injury or loss or damages suffered by Lead Plaintiff

or the putative class members who Lead Plaintiff purports to represent. Any injury or loss or damages suffered by Lead Plaintiff or the putative class members who Lead Plaintiff purports to represent is the proximate result, either in whole or in part, of actions or omissions of persons or entities other than, or superseding and intervening events unconnected to, Defendants.

### NINETEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because of the absence of actual or justifiable reliance by Lead Plaintiff or the putative class members who Lead Plaintiff purports to represent on the statements, acts, or omissions alleged in the Amended Complaint to have been made. Lead Plaintiff or the putative class members who Lead Plaintiff purports to represent would have purchased Cerence stock even with full knowledge of the facts that Plaintiff now alleges were misrepresented or omitted.

### TWENTIETH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by the doctrines of contributory negligence, comparative negligence, and/or assumption of risk. Lead Plaintiff either knew or should have known about the matters alleged in the Amended Complaint, and their own negligence or other fault proximately contributed to the injuries allegedly suffered by Lead Plaintiff.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by the applicable statutes of limitations and other applicable periods of repose.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by the doctrine of laches.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because, and to the extent that, the alleged

misrepresentations contain expressions of belief or opinion, including expressions of opinions that Lead Plaintiff has not alleged and cannot prove were not truly held.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Defendants justifiably relied on information provided to them by others.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Defendants are not liable for any portion of Lead Plaintiff's loss or damage caused by factors other than the misrepresentations and omissions alleged in the Amended Complaint.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Lead Plaintiff and the putative class members who Lead Plaintiff purports to represent failed to take reasonable action to mitigate any damages allegedly sustained as a result of the facts alleged in the Amended Complaint.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the alleged damages are speculative and thus not recoverable.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Lead Plaintiff and the putative class members who Lead Plaintiff purports to represent are not entitled to the compensatory damages requested in the Amended Complaint.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Lead Plaintiff and the putative class members who Lead Plaintiff purports to represent are not entitled to recovery of attorneys' fees or

any other costs and expenses requested in the Amended Complaint.

### THIRTIETH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because, and to the extent that, any relief or recovery would unjustly enrich or constitute a windfall to Lead Plaintiff and the putative class members who Lead Plaintiff purports to represent.  Any damages that may be awarded in connection with the claims asserted in the Amended Complaint are offset and/or must be reduced by the amount of the tax benefits accruing to Lead Plaintiff and the putative class members who Lead Plaintiff purports to represent, by virtue of their deductions of capital loss, in order to prevent unjust enrichment of Lead Plaintiff and the putative class members who Lead Plaintiff purports to represent.

### THIRTY-FIRST AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by the doctrines of estoppel, unclean hands, fraud, *in pari delicto*, waiver, ratification, and/or other related equitable doctrines.

### THIRTY-SECOND AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, due to Defendants' compliance with all statutes, regulations, or other laws in effect at the time of the conduct alleged in the Amended Complaint.

### THIRTY-THIRD AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, to the extent it seeks to impose upon Defendants disclosure obligations that are inconsistent with, or in excess of, those imposed pursuant to the federal securities laws, including the Exchange Act and the rules and regulations promulgated thereunder by the SEC.

**THIRTY-FOURTH AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, because Lead Plaintiff cannot establish the primary liability necessary to assert a control person liability claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Mr. Dhawan and Mr. Gallenberger are not control persons and not subject to control person liability, as Mr. Dhawan and Mr. Gallenberger and their subordinates acted in good faith and did not directly or indirectly induce any act alleged to constitute a violation of Section 10(b) of the Exchange Act.

**THIRTY-FIFTH AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, by SEC Rule 10b5-l.

**THIRTY-SIXTH AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, by virtue of statutory defenses, including, but not limited to, 15 U.S.C. § 78t(a), or the governing local laws of this jurisdiction.

**THIRTY-SEVENTH AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, because other parties not named in the Amended Complaint may be indispensable parties to this Action.


WHEREFORE, Defendants respectfully request that a final judgment be entered in their favor dismissing the Amended Complaint with prejudice; awarding Defendants the reasonable costs of this action, including reasonable attorneys' fees; and granting Defendants such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Defendants demand a trial by jury of all issues so triable.

Dated:  April 15, 2024

By Their Attorneys,


/s/ *Deborah S. Birnbach*
Deborah S. Birnbach (BBO No. 628243)
Justin D. Ward (BBO No. 711928)
Brendan Blake (BBO No. 710755)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617-570-1000
Fax.: 617-523-1231
dbirnbach@goodwinlaw.com
jward@goodwinlaw.com
bblake@goodwinlaw.com

**CERTIFICATE OF SERVICE**

I, Deborah Birnbach, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on any counsel who are not served through the CM/ECF system on April 15, 2024.

*/s/ Deborah S. Birnbach*