**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CERENCE INC., SANJAY DHAWAN, and MARK J. GALLENBERGER, <br><br> Defendants. | No. 1:22-cv-10321-ADB |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT.................................................................................................................... 4

I.   THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL .......................... 4

    A.   Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class .................................................................................... 5

    B.   The Settlement Was Reached After Arm's-Length Negotiations Between Experienced Counsel with the Benefit of Substantial Discovery and the Assistance of an Experienced Mediator ................................................. 7

    C.   The Proposed Settlement Is Fair, Reasonable, and Adequate in Light of the Costs and Risks of Further Litigation and Similar Factors .................................... 9

        1.   The Risks of Establishing Liability and Damages Support Approval of the Settlement ................................................................. 11

        2.   The Settlement Is Also Fair and Reasonable in Light of Cerence's Potential Difficulty in Funding a Larger Settlement or Judgment............ 14

        3.   All Other Rule 23(e)(2)(C) Factors Also Support Approval .................... 15

    D.   The Settlement Treats Settlement Class Members Equitably Relative to Each Other ........................................................................................ 16

    E.   The Reaction of the Settlement Class ................................................... 16

II.   THE PLAN OF ALLOCATION SHOULD BE APPROVED ....................................... 17

III.   THE NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS ................................................. 19

IV.   THE SETTLEMENT CLASS SHOULD BE CERTIFIED ........................................... 20

CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
 512 F.3d 46 (1st Cir. 2008) ................................................................................................ 11

*In re Apache Corp. Sec. Litig.*,
 2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ........................................................................ 12

*In re AVEO Pharms., Inc. Sec. Litig.*,
 2017 WL 5484672 (D. Mass. Nov. 14, 2017) ...................................................................... 6

*City of Detroit v. Grinnell Corp.*,
 495 F.2d 448 (2d Cir. 1974) ....................................................................................... 5, 7, 9

*Cohen v. Brown Univ.*,
 16 F.4th 935 (1st Cir. 2021) ................................................................................................. 7

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
 216 F.R.D. 197 (D. Me. 2003) ............................................................................................. 4

*Duncan v. Nissan N. Am., Inc.*,
 2020 WL 5901399 (D. Mass. Aug. 25, 2020) ...................................................................... 8

*Eisen v. Carlisle & Jacquelin*,
 417 U.S. 156 (1974) ........................................................................................................... 19

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
 275 F.R.D. 382 (D. Mass. 2011) ...................................................................................... 5, 6

*Hill v. State St. Corp.*,
 2015 WL 127728 (D. Mass. Jan. 8, 2015) ............................................................... 7, 10, 20

*Hochstadt v. Boston Scientific Corp.*,
 708 F. Supp. 2d 95 (D. Mass. 2010) .................................................................................. 17

*Howard v. Liquidity Servs. Inc.*,
 2018 WL 4853898 (D.D.C. Oct. 5, 2018) .......................................................................... 13

*In re Intuniv Antitrust Litig.*,
 2020 WL 8373393 (D. Mass. Dec. 9, 2020) (Burroughs, J.) ............................................... 4

*Kader v. Sarepta Therapeutics, Inc.*,
 887 F.3d 48 (1st Cir. 2018) ................................................................................................ 11

*Lapan v. Dick's Sporting Goods, Inc.*,
 2015 WL 8664204 (D. Mass. Dec. 11, 2015) ...................................................................... 8

ii

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
  233 F.R.D. 306 (E.D.N.Y. 2006) ..................................................................................10

*Medoff v. CVS Caremark Corp.*,
  2016 WL 632238 (D.R.I. Feb. 17, 2016) ...................................................................5, 13

*In re Merrill Lynch & Co. Inc. Res. Reports Sec. Litig.*,
  2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) ...................................................................13

*New England Biolabs, Inc. v. Miller*,
  2022 WL 20583575 (D. Mass. Oct. 26, 2022) .............................................................17

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
  602 F. Supp. 2d 277 (D. Mass. 2009), *aff'd*, 582 F.3d 30 (1st Cir. 2009) ..................5

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  588 F.3d 24 (1st Cir. 2009) ...........................................................................................7

*In re Polaroid ERISA Litig.*,
  240 F.R.D. 65 (S.D.N.Y. 2006) ....................................................................................6

*In re Puerto Rican Cabotage Antitrust Litig.*,
  815 F. Supp. 2d 448 (D.P.R. 2011) .............................................................................14

*Puerto Rico Dairy Farmers Ass'n v. Pagan*,
  748 F.3d 13 (1st Cir. 2014) ...........................................................................................5

*In re Relafen Antitrust Litig.*,
  231 F.R.D. 52 (D. Mass. 2005) ..................................................................................4, 5

*Roberts v. TJX Companies, Inc.*,
  2016 WL 8677312 (D. Mass. Sept. 30, 2016) ...............................................................8

*Rolland v. Cellucci*,
  191 F.R.D. 3 (D. Mass. 2000) .......................................................................................9

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 2020 WL 4196468 (S.D.N.Y. July 21, 2020) .....................................................6, 16

*In re Sturm, Ruger, & Co. Sec. Litig.*,
  2012 WL 3589610 (D. Conn. Aug. 20, 2012) ..............................................................10

*In re Synchrony Fin. Sec. Litig.*,
  2023 WL 4992933 (D. Conn. Aug. 4, 2023) ..................................................................9

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
  535 F. Supp. 2d 249 (D.N.H. 2007) .........................................................................14, 17

*Voss v. Rolland*,
  592 F.3d 242 (1st Cir. 2010) ...............................................................................................4

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ...............................................................................................19

*In re Wilmington Tr. Sec. Litig.*,
  2018 WL 6046452 (D. Del. Nov. 19, 2018) ........................................................................6

**STATUTES**

15 U.S.C. § 78u-4(a)(7) ...........................................................................................................18, 19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ............................................................................................................ *passim*

Lead Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi" or "Lead Plaintiff"), on behalf of itself and the Settlement Class, respectfully submits this memorandum of law in support of its motion for final approval of the proposed settlement of this Action (the "Settlement") and approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiff has agreed to settle all claims in this Action in exchange for an all-cash, non-reversionary payment of $30 million.  Lead Plaintiff and Lead Counsel believe that the proposed Settlement is an excellent result for Settlement Class Members in light of the substantial risks of litigation—including risks of proving falsity, scienter, and loss causation, as well as the significant risk that there would not be funds available to pay a judgment or settlement larger than the proposed Settlement.

The proposed Settlement was achieved after extensive litigation efforts, such that Lead Plaintiff and Lead Counsel were able to fully evaluate the strengths and weaknesses of the claims in the Action.  Among other things, Lead Plaintiff conducted an intensive investigation, filed a highly detailed amended complaint, briefed and survived Defendants' motion to dismiss, engaged in extensive discovery—including reviewing over 100,000 pages of documents—and conducted arm's-length negotiations with Defendants, including an eleven-hour mediation session before Greg Danilow of Phillips ADR Enterprises, an experienced mediator, during which the Parties and

---

[1] Unless otherwise noted, all capitalized terms have the meanings given them in the Stipulation of Settlement dated September 6, 2024 (ECF No. 72-1), or in the Joint Declaration of Joshua H. Saltzman and John Rizio-Hamilton in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Joint Declaration" or "Joint Decl."), filed herewith.  Citations herein to "¶ __" and "Ex.__" refer, respectively, to paragraphs in, and exhibits to, the Joint Declaration. Unless stated otherwise, all internal emphasis is added and all internal quotations are omitted.

the mediator carefully examined the respective strengths and weaknesses of Lead Plaintiffs' claims.  ¶¶ 28-60.

The Settlement is a particularly strong result for the Settlement Class in light of the substantial risk posed by Cerence's deteriorating financial condition.  Specifically, Cerence's market capitalization is down roughly 97% from its Class Period highs, and has remained in the $100-150 million range for the past several months, meaning that the $30 million Settlement represents 20-30% of the entire market value of the Company.  ¶ 84.  Additionally, the Settlement recovers the vast majority of Cerence's applicable insurance policies, which were rapidly wasting at the time the Settlement was reached.  The insurance funds available would have continued to dwindle in ongoing litigation, further reducing the amount available to fund a settlement or judgment.  *Id*.  As such, there was a substantial risk that any future recovery could have been smaller than the Settlement Amount.  ¶¶ 9, 64.  The Settlement thus provides the Settlement Class with a substantial and certain monetary recovery, and avoids the risk of recovering less—or nothing at all—after protracted litigation.

In addition to the risks to recovery posed by Cerence's financial condition, Lead Plaintiff faced substantial risks in proving that Defendants' alleged misstatements concerning Cerence's use of fixed contracts were false and misleading, made with scienter, and caused damages to the Settlement Class.  ¶¶ 70-77.  Approximately 90% of the alleged misstatements were dismissed by the Court in its order resolving Defendants' motion to dismiss, including all statements made by Defendant Dhawan.  ¶ 71.  And with respect to the remaining three alleged misstatements about Cerence's fixed contracts, Defendants have argued, and would continue to argue, that these statements were not false or misleading—because Defendants disclosed Cerence's revenue from

2

fixed contracts every quarter—and that they were not made with scienter—because the statements reflected Defendants' sincerely held beliefs at the time of the statements. ¶¶ 71-73.

Lead Plaintiff also faced significant risks in proving loss causation and damages. In particular, Defendants would have argued that the second and third of the three alleged corrective disclosures—which accounted for the vast majority of the Settlement Class's maximum damages—did not reveal any new information relating to fixed contracts and did not "correct" the alleged false statements. ¶¶ 75-76. Had these disclosures been eliminated at summary judgment or trial, the maximum recovery available would have been reduced even further. ¶ 83. The Settlement avoids these risks while providing an excellent and immediate recovery to the Settlement Class.

The approval of Lead Plaintiff and the Settlement Class lends additional support to the fairness and reasonableness of the Settlement. Lead Plaintiff—a sophisticated institutional investor with experience overseeing complex securities class actions—played an active role in monitoring this litigation and fully endorses the Settlement. *See* Declaration of Laken Ryals on behalf of Mississippi (Ex. 1), at ¶¶ 3-7. And while the deadline for exclusions and objections has not yet passed, to date, not a single request for exclusion or objection has been received.

Given these considerations and the other factors discussed below, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiff requests that the Court grant final certification to the Settlement Class and approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members. The Plan of Allocation, which Lead Counsel developed in consultation with Lead Plaintiff's damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims

based on damages they suffered on purchases of Cerence common stock that were attributable to the alleged fraud.

**ARGUMENT**

**I.      THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL**

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims. *See* Fed. R. Civ. P. 23(e). A class-action settlement warrants approval where the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see also Voss v. Rolland*, 592 F.3d 242, 251 (1st Cir. 2010); *In re Intuniv Antitrust Litig.*, 2020 WL 8373393, at *2 (D. Mass. Dec. 9, 2020) (Burroughs, J.).

In determining whether a settlement is fair, reasonable, and adequate, courts consider both "the negotiating process by which the settlement was reached and the substantive fairness of the terms of the settlement compared to the result likely to be reached at trial." *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005). Courts should not "prejudge the merits of the case" or "second-guess the settlement." *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 211 (D. Me. 2003). Instead, the Court's role is limited to "determin[ing] if the parties' conclusion is reasonable." *Id.*

Rule 23(e)(2), as amended in 2018, provides that courts should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

4

Fed. R. Civ. P. 23(e)(2).  In addition, courts in the First Circuit had historically considered the following factors from *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), in evaluating class settlements:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 602 F. Supp. 2d 277, 280-81 (D. Mass. 2009) (quoting *Grinnell*, 495 F.2d at 463), *aff'd*, 582 F.3d 30 (1st Cir. 2009); *Relafen*, 231 F.R.D. at 72 (same).  Lead Plaintiff will discuss the Settlement's "fairness, reasonableness, and adequacy" principally under the four factors listed in Rule 23(e)(2), while also discussing relevant and non-duplicative *Grinnell* factors.[2]

In evaluating the Settlement, the Court also consider the "strong public policy in favor of settlements," especially in class actions. *Puerto Rico Dairy Farmers Ass'n v. Pagan*, 748 F.3d 13, 20 (1st Cir. 2014) ; *Medoff v. CVS Caremark Corp.*, 2016 WL 632238, at *5 (D.R.I. Feb. 17, 2016).

### A.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class

In weighing approval, a court first considers whether "the class representatives and class counsel have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A); *see also In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 391 (D. Mass. 2011).  The

---

[2] The four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by a Court of Appeals, but "rather [seek] to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendment.

adequacy requirement is met where "the interests of the representative party will not conflict with the interests of the class members" and "counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Id.*

Here, Lead Plaintiff's claims are typical of and coextensive with those of the Settlement Class, and Lead Plaintiff does not have any interests that are antagonistic to the interest of other members of the Settlement Class. *See In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at \*4 (D. Mass. Nov. 14, 2017). Lead Plaintiff's claims—like those of all Settlement Class members—were based on alleged injury from the same allegedly materially false and misleading statements made by Defendants during the Class Period. Lead Plaintiff—like all other Settlement Class Members—has an interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Further, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class in their vigorous prosecution of the Action over the past two years and in the negotiation and achievement of the proposed Settlement. Lead Plaintiff is "a sophisticated institutional investor that took an active role in supervising this litigation." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 2020 WL 4196468, at \*4 (S.D.N.Y. July 21, 2020) (approving settlement in securities class action led by Lead Plaintiff). Further, Lead Plaintiff has retained highly experienced counsel who have successfully prosecuted many complex securities class actions throughout the United States. See Exs. 5A-3, 5B-3 (Lead Counsel's firm resumes).[3]    Lead Plaintiff and Plaintiffs' Counsel

---

[3] *See also In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at \*8 (D. Del. Nov. 19, 2018) (noting the "skill and efficiency" of the same "highly experienced" firms serving as Lead Counsel in this Action).

vigorously prosecuted the Settlement Class's claims, including by (i) conducting an extensive investigation into the alleged fraud; (ii) drafting the detailed Complaint based on their investigation; (iii) successfully opposing Defendants' motion to dismiss through extensive briefing; (iv) conducting substantial fact discovery; and (v) participating in extended arm's length settlement negotiations, including an eleven-hour mediation sessions with a well-respected mediator.  ¶¶ 28-60.  Accordingly, this factor strongly supports approval of the Settlement.

### B.    The Settlement Was Reached After Arm's-Length Negotiations Between Experienced Counsel with the Benefit of Substantial Discovery and the Assistance of an Experienced Mediator

In reviewing a settlement, the Court also considers whether the settlement "was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(B).  Courts have traditionally considered other related circumstances in determining the "procedural" fairness of a settlement, including counsel's understanding of the strengths and weakness of the case based on factors such as "the stage of the proceedings and the amount of discovery completed," *Grinnell*, 495 F.2d at 462-63, as well as the involvement of a mediator.  The First Circuit has long held that there is a presumption in favor of finding a settlement fair and reasonable where, as here, the settlement is reached after significant discovery and arm's-length negotiations between experienced counsel.  *See, e.g., Cohen v. Brown Univ.*, 16 F.4th 935, 951 (1st Cir. 2021) (where "the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 32-33 (1st Cir. 2009) (same); *Hill v. State St. Corp.*, 2015 WL 127728, at *7 (D. Mass. Jan. 8, 2015) (same).

All of these circumstances strongly support the approval of the Settlement, as the Parties reached the Settlement only after arm's-length negotiations by experienced counsel with the benefit of substantial discovery and the assistance of an experienced mediator.  Beginning in the

7

spring of 2024, the Parties explored the possibility of seeking to resolve the Action by engaging in mediation. The Parties retained Greg Danilow, an experienced mediator with Phillips ADR Enterprises, to act as mediator in the Action, and held a full-day mediation session with Mr. Danilow on August 14, 2024. ¶¶ 55-58. The mediation process included the exchange of detailed mediation statements and supporting documents that addressed the issues of liability and damages, as well as written responses to additional questions posed by the mediator. ¶ 57. The Parties did not reach an agreement at the mediation session, but they made progress and continued their intense settlement negotiations in the week following the session to reach an agreement. ¶ 58. The active role played in the settlement negotiations by an experienced mediator such as Mr. Danilow strongly supports a finding that the Settlement is fair. *See, e.g., Duncan v. Nissan N. Am., Inc.*, 2020 WL 5901399, at *1 (D. Mass. Aug. 25, 2020) (settlement was fair where it was the "result of arm's-length negotiation by experienced counsel before an experienced neutral mediator after multiple days of mediation"); *Roberts v. TJX Companies, Inc.*, 2016 WL 8677312, at *6 (D. Mass. Sept. 30, 2016) (Burroughs, J.) ("the participation of an experienced mediator, also supports the Court's finding that the Settlement is fair, reasonable, and adequate."); *Lapan v. Dick's Sporting Goods, Inc.*, 2015 WL 8664204, at *1 (D. Mass. Dec. 11, 2015) ("The assistance of an experienced mediator . . . reinforces that the Settlement Agreement is non-collusive.").

Moreover, as discussed above, the Parties and their counsel were well informed about the strengths and weaknesses of the case before they agreed to settle. Here, for example, Lead Plaintiff and Lead Counsel conducted a thorough pre-filing investigation by extensively reviewing SEC filings, analyst reports, investor call transcripts, and news articles, and by interviewing dozens of former Cerence employees regarding the events at issue. ¶¶ 29-30. In addition, Lead Plaintiff and Lead Counsel consulted extensively with experts and conducted extensive research. Lead Plaintiff

8

also conducted substantial fact discovery, including obtaining and reviewing over 100,000 pages of documents, and was preparing to serve subpoenas on third parties and to take fact witness depositions when the Settlement was reached.  ¶¶ 40-54.  Accordingly, when the Parties reached their agreement to settle the Action, Lead Plaintiff and Lead Counsel had sufficient information to evaluate their case and the adequacy of the proposed Settlement.

Lead Plaintiff strongly supports the Settlement, which further weighs in favor of approval. See Ryals Decl. (Ex. 1) at ¶ 7.  A settlement reached under the supervision and with the endorsement of a "sophisticated institutional investor" such as Lead Plaintiff here is "entitled to an even greater presumption of reasonableness." *In re Synchrony Fin. Sec. Litig.,* 2023 WL 4992933, at *6 (D. Conn. Aug. 4, 2023).  Likewise, the informed judgment of Lead Counsel, which is highly experienced in securities litigation, is entitled to "significant weight." *See Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000) ("When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight.").

## C. The Proposed Settlement Is Fair, Reasonable, and Adequate in Light of the Costs and Risks of Further Litigation and Similar Factors

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C).  In most cases, this will be the most important factor in analyzing a proposed settlement.  *See Grinnell*, 495 F.2d at 455 ("most important factor" is "strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.").[4]

---

[4] Indeed, this factor under Rule 23(e)(2)(C) essentially encompasses at least six of the nine factors of the traditional *Grinnell* analysis.  *See Grinnell*, 495 F.2d at 463 ("(1) the complexity, expense

Here, the Settlement avoids the risks and delays of further litigation while providing a substantial, certain, and immediate benefit to the Settlement Class in the form of a $30 million cash payment.  This is not a claims-made settlement, and the $30 million has already been deposited into an escrow account and is earning interest for the benefit of the Settlement Class.[5]

Courts have long recognized that securities class action litigation is complex and uncertain, and that these factors support the reasonableness of settlement.  *See Hill*, 2015 WL 127728, at *7 ("The complexity of this [securities class action] and the expense and delay that would result if this case were litigated through further motion practice, trial and appeals strongly support approval of the Settlement."); *In re Sturm, Ruger, & Co. Sec. Litig*., 2012 WL 3589610, at *5 (D. Conn. Aug. 20, 2012) ("In evaluating the settlement of a securities class action, federal courts . . . have long recognized that such litigation is notably difficult and notoriously uncertain.").  Such suits "readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *In re Luxottica Grp. S.p.A. Sec. Litig*., 233 F.R.D. 306, 310 (E.D.N.Y. 2006).  This case was no exception.

Absent the Settlement, the continued litigation of the Action would have required the Lead Plaintiff to complete fact discovery, engage in substantial expert discovery, successfully move for class certification, defeat any motions for summary judgment by Defendants, and overcome *Daubert* challenges to expert testimony.  Even assuming Lead Plaintiff successfully overcame these challenges, Lead Plaintiff would still need to prevail at trial and on pre- and post-trial

---

and likely duration of the litigation; . . . (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; . . . (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation").

[5] Because this is not a claims-made settlement, Defendants have no right to the return of any portion of Settlement based on the number or amount of Claims submitted.  *See* Stipulation ¶ 2.3.

motions. Lead Plaintiff faced these numerous and significant risks, which necessarily involved substantial costs and delays, all without any assurance of obtaining a better (or indeed any) recovery. ¶¶ 61-86. Given these meaningful litigation risks, and the immediacy and amount of the $30 million recovery, Lead Plaintiff and Lead Counsel believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class. ¶ 86.

### 1. The Risks of Establishing Liability and Damages Support Approval of the Settlement

Lead Plaintiff believes that its claims are meritorious but recognizes that this Action presented several substantial risks to establishing both liability and damages.

### (a) Risks to Proving Liability

To prevail through litigation, Lead Plaintiff would have been required to prove the elements of a claim under § 10(b): "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 56 (1st Cir. 2018) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008)). Defendants would have had substantial arguments concerning each of these issues.

First, Defendants would continue to argue that the alleged misstatements (that had not already been dismissed) were not materially false and misleading because, *inter alia*, Cerence fully and accurately disclosed its revenue from fixed contracts during each quarter, and also disclosed its use of minimum commitment contracts, such that no investor could have been misled by Cerence's use of those contracts. ¶ 71. Indeed, the Court's motion to dismiss order—while allowing the case to proceed to discovery—dismissed many of the false statements alleged in the Complaint, including all of the statements made by Defendant Dhawan. *Id.* Additionally, the

11

Court specifically noted that the sustained statements were a "close call" and "would be scrutinized closely for purposes of any summary judgment motion."  ECF No. 51 at 34.

Second, Defendants would continue to argue that they did not act with fraudulent intent. Defendants would continue to assert, among other things, that Defendants Gallenberger and Dhawan's public statements reflected their honestly held beliefs about fixed contracts, and that they believed they were providing full and adequate information to investors by disclosing the volume of Cerence's fixed revenue every quarter.  ¶¶ 72-73.  Had the Court accepted Defendants' arguments on either falsity or scienter, all of the Settlement Class's claims could have been eliminated, barring any recovery.

### (b) Risks Concerning Class Certification, Loss Causation and Damages

Lead Plaintiff also faced substantial risks to certifying a class for the full Class Period,[6] establishing loss causation, and proving damages.  ¶¶ 70, 75-77.  First, Defendants would have challenged whether the alleged corrective disclosures were sufficiently connected to the alleged fraud that they could be considered corrective disclosures and the cause of any damages for the Settlement Class.  Indeed, Defendants would have had multiple opportunities to raise such challenges—including on "price impact" grounds at class certification, as well as on loss causation grounds at summary judgment and at trial.  For example, the second alleged corrective disclosure—the announcement of Dhawan's resignation—was at significant risk of being eliminated on lack of price impact or loss causation grounds, as Defendants would have argued it neither revealed new information directly related to the fraud nor expressly connected the

---

[6] Because some courts in recent years have engaged in price impact analyses at the class certification stage to determine whether a corrective disclosure was, in fact, corrective, and because such analysis often overlaps with a loss causation analysis, risks relating to price impact and loss causation are discussed together herein.

resignation to the fraud. *See, e.g., In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at \*10 (S.D. Tex. Feb. 9, 2024) (executive resignation was not a corrective disclosure where it was unclear "what aspect of the defendants' prior statements was rendered false or misleading that was not already known …"). Similarly, Defendants would have argued that the third alleged corrective disclosure did not reveal anything new about Defendants' fixed contracts. ¶ 76.

Moreover, Defendants were expected to vigorously dispute what portion (if any) of Cerence's stock price declines following each of the alleged corrective disclosures was attributable to the disclosure of the alleged revenue acceleration scheme—as opposed to other "confounding" factors affecting Cerence's business (such as the impact of negative trends in the automobile market and disclosures relating to Cerence's other lines of business). ¶ 77. After accounting for potential confounding information, Lead Plaintiff's expert calculated the maximum amount of likely recoverable damages of $430 million, which assumed that Lead Plaintiff would prevail on all of the alleged misstatements and all three corrective disclosures. ¶¶ 82-83. But Plaintiffs' expert also calculated that, had the Court eliminated the second and third corrective disclosures, maximum damages could have been as low as $82 million. ¶ 83. As such, the $30 million Settlement represents at least 7%, and as much as 37%, of maximum damages—placing it well into the higher end of the range of typical recoveries in securities class actions. *See, e.g., Howard v. Liquidity Servs. Inc.*, 2018 WL 4853898, at \*5 (D.D.C. Oct. 5, 2018) (taking into account risks to maximum damages calculation and finding that a "settlement that ranges from approximately 4 percent to 14 percent of potentially recoverable damages compares favorably with other similar securities class-action settlements."); *CVS Caremark Corp.*, 2016 WL 632238, at \*6 (approving settlement recovering 5.33% of maximum damages and noting that it was "well above the median percentage of settlement recoveries in comparable securities class action cases"); *see also In re*

13

*Merrill Lynch & Co. Inc. Res. Reports Sec. Litig*., 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (settlement representing 6.25% of estimated maximum damages was at the "higher end of the range of reasonableness of recovery in class action[] securities litigations").

Moreover, Defendants would undoubtedly have presented a well-qualified expert who would opine that the Settlement Class's damages were small or nonexistent. While Lead Plaintiff would have had its own well-qualified expert on these issues, there is no way to predict with any degree of certainty which expert's opinions the jury would have accepted. Had the jury accepted some or all of Defendants' expert's views, damages would been materially reduced, and potentially eliminated. *See In re Tyco Int'l, Ltd. Multidistrict Litig*., 535 F. Supp. 2d 249, 260-61 (D.N.H. 2007) ("even if the jury agreed to impose liability, the trial would likely involve a confusing 'battle of the experts' over damages").

### 2.    The Settlement Is Also Fair and Reasonable in Light of Cerence's Potential Difficulty in Funding a Larger Settlement or Judgment

The $30 million Settlement is also an excellent result in light of Cerence's deteriorated financial condition and potential difficulty in funding a larger settlement or judgment. During the Class Period, Cerence common stock traded for as much as $133 per share, but on August 22, 2024, the date the parties accepted the Mediator's recommendation, Cerence's stock closed at $3.41 per share—a decline of approximately 97% from Class Period highs. ¶ 84. Likewise, the Company's market capitalization had shrunk by approximately 97% and was less than $150 million. *Id.* Moreover, the Settlement recovers the vast majority of Defendants' remaining available directors' and officers' liability insurance, which was rapidly wasting, and would continue to waste in ongoing litigation. *Id.* As such, even if Lead Plaintiff had prevailed at multiple further stages of litigation—including class certification, summary judgment, and trial— there is a significant risk that any recovery would be no larger than, or potentially even smaller

14

than, the $30 million Settlement Amount. The Settlement avoids these risks and provides a prompt and certain benefit to the Settlement Class. *See, e.g., In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 474 (D.P.R. 2011) (defendants' financial condition supported approval of settlement).

### 3.    All Other Rule 23(e)(2)(C) Factors Also Support Approval

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). These factors also support final approval.

First, the procedures for processing Settlement Class Members' claims and distributing the Settlement's proceeds to eligible claimants here are well-established methods that have been used in hundreds of other securities class actions. The net proceeds of the Settlement proceeds will be distributed to eligible Settlement Class Members who submit required Claim Forms and supporting documentation to the Court-appointed Claims Administrator, A.B. Data, Ltd. ("A.B. Data")—an experienced claims administration firm. A.B. Data will (a) review and process the submitted Claims under the supervision of Lead Counsel, (b) provide Claimants with an opportunity to cure any deficiencies and bring any unresolved Claims disputes to the Court, and (c) ultimately send claimants their *pro rata* share of the Net Settlement Fund. This type of claims processing is standard in securities class actions because neither Lead Plaintiff nor Cerence possess individual investors' trading data that would otherwise allow the Parties to create a "claims-free" process to distribute the Settlement funds.

Second, the relief provided by the Settlement remains adequate upon consideration of the terms of the proposed award of attorneys' fees. As discussed in the accompanying Fee

15

Memorandum, the requested attorneys' fees of 25% of the Settlement Fund, net of litigation expenses, to be paid upon the Court's approval, are fair and reasonable.  Of particular note, the approval of the attorneys' fee award is separate from the approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees.  *See* Stipulation ¶ 5.3.

Last, as previously disclosed, the only agreement the Parties entered into—in addition to the Stipulation—was a confidential Supplemental Agreement that provides Cerence with the option to terminate the Settlement in the event that Settlement Class Members who timely and validly request exclusion from the Settlement Class meet a certain threshold.  *See* Stipulation ¶ 6.4. This type of agreement is "a standard provision in securities class actions and has no negative impact on the fairness of the Settlement."  *Signet Jewelers*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020).

### D.    The Settlement Treats Settlement Class Members Equitably Relative to Each Other

Rule 23(e)(2)(D) requires that the Court assess whether "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  As discussed below in Section II, under the proposed Plan of Allocation, eligible Claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on the amount and timing of their transactions in Cerence common stock.  Lead Plaintiff will receive the same level of *pro rata* recovery, calculated under the same Plan of Allocation provisions, as all other Settlement Class Members.

### E.    The Reaction of the Settlement Class

The reaction of the Settlement Class to date also supports approval of the Settlement.  As of November 11, 2024, A.B. Data had mailed a total of 57,080 copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and their

nominees. *See* Miller Decl. (Ex. 2), at ¶ 11. The Notice set out the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to opt out of the Settlement Class or object to any aspect of the Settlement. While the deadline to request exclusion or object has not yet passed, to date, no objections to the Settlement or the Plan of Allocation and no requests for exclusion have been received. The deadline for submitting objections and requests for exclusion is November 25, 2024. As provided in the Preliminary Approval Order, Lead Plaintiff will file reply papers on December 9, 2024 addressing all requests for exclusion and any objections that may be received.

## II.     THE PLAN OF ALLOCATION SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See Tyco*, 535 F. Supp. 2d at 262; *Hochstadt v. Boston Scientific Corp.*, 708 F. Supp. 2d 95, 109 (D. Mass. 2010). A plan of allocation is fair and reasonable as long as it has a "reasonable, rational basis." *New England Biolabs, Inc. v. Miller*, 2022 WL 20583575, at *4 (D. Mass. Oct. 26, 2022). In determining whether a plan of allocation is reasonable, "courts give great weight to the opinion of experienced counsel." *Id*.

Here, the proposed Plan of Allocation (or "Plan") was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert and was set forth in full in the Notice mailed to potential Settlement Class Members. *See* Miller Decl. (Ex. 2), Ex. A, at pp. 14-18. Lead Counsel respectfully submit that the Plan provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms, based on the damages they suffered related to the alleged fraud. ¶ 101.

The Plan calculates a Recognized Loss Amount for each purchase or acquisition of Cerence common stock during the Class Period. ¶ 98. Lead Plaintiff's damages expert calculated the estimated amount of artificial inflation in the price of Cerence common stock during the Class

17

Period that allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions by considering the price change in Cerence common stock in reaction to the alleged corrective disclosures, adjusting for price changes attributable to market or industry factors on those days. ¶ 96.

In general, Recognized Loss Amounts under the Plan are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares. ¶ 98. Claimants who purchased and sold all their Cerence shares before the initial corrective disclosure, which occurred on November 22, 2021, will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions, because any loss suffered on those sales would not be the result of the alleged misstatements in the Action. ¶ 97. Similarly, there will be no Recognized Loss Amount for shares that were purchased and sold between subsequent alleged corrective disclousres. *Id.*[7]

The sum of a claimant's Recognized Loss Amounts for all purchases and acquisitions of Cerence common stock during the Class Period is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. ¶ 99.

Under the Plan of Allocation, the entire Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent distributions to Authorized Claimants

---

[7] In addition, consistent with the PSLRA, Recognized Loss Amounts for shares of Cerence common stock sold during the 90-day period after the end of the Class Period, or held to the end of that 90-day period, are further limited to the difference between the purchase price and the average closing price of the stock during that period. ¶ 98.

will be conducted.  Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective, will those funds be donated to Greater Boston Legal Services, subject to approval by the Court.  ¶ 100.

Lead Counsel believe that the proposed Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Action.  ¶ 101.  Moreover, as noted above, following mailing of more than 57,000 copies of the Notice, which contained the Plan of Allocation, no objections to the Plan have been received.  *See id*.; Miller Decl. ¶ 11.

## III.   THE NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974).  The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 114 (2d Cir. 2005).

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.  The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7), including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a

description of Settlement Class Members' right to opt-out of the Settlement Class or to object to the Settlement, the Plan of Allocation, or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

As noted above, in accordance with the Court's Preliminary Approval Order, the Court-approved Claims Administrator began mailing copies of the Notice Packet to potential Settlement Class Members on October 2, 2024. *See* Miller Decl. ¶¶ 4-7. As of November 11, 2024, A.B. Data had disseminated 57,080 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id*. ¶ 11. In addition, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on October 14, 2024. *See id*. ¶ 13. Copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and Complaint were made available on the settlement website maintained by A.B. Data beginning on October 2, 2024, *see id*. ¶ 14, as well as on Lead Counsel's websites, *see* Joint Decl. ¶ 91.

This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g., Hill*, 2015 WL 127728, at *14 (approving similar notice program).

## IV.   THE SETTLEMENT CLASS SHOULD BE CERTIFIED

For the reasons set forth in Lead Plaintiffs' motion for preliminary approval (ECF No. 73 at 14-19), the Court should also finally certify the Settlement Class for purposes of this Settlement.

**CONCLUSION**

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and the proposed Plan of Allocation as fair, reasonable, and adequate.

20

DATED:  November 11, 2024                    Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**              **SAXENA WHITE P.A.**
  **& GROSSMANN LLP**

/s/ *John Rizio-Hamilton*                    /s/ *Steven B. Singer*
John Rizio-Hamilton (*pro hac vice*)         Steven B. Singer (*pro hac vice*)
Hannah Ross (*pro hac vice*)                 Joshua H. Saltzman (*pro hac vice*)
Alec T. Coquin (*pro hac vice*)              Sara DiLeo (*pro hac vice*)
Mathews R. de Carvalho (*pro hac vice*)      10 Bank Street, 8th Floor
1251 Avenue of the Americas                  White Plains, New York 10606
New York, New York 10020                     (914) 437-8551
(212) 554-1400                               ssinger@saxenawhite.com
johnr@blbglaw.com                            jsaltzman@saxenawhite.com
hannah@blbglaw.com                           sdileo@saxenawhite.com
alec.coquin@blbglaw.com
mathews.decarvalho@blbglaw.com

Jonathan D. Uslaner (*pro hac vice*)         Maya Saxena
2121 Avenue of the Stars, Suite 2575         Joseph E. White III (BBO #648498)
Los Angeles, CA 90067                        7777 Glades Road, Suite 300
(310) 819-3470                               Boca Raton, Florida 33434
jonathanu@blbglaw.com                        (561) 394-3399
                                             msaxena@saxenawhite.com
                                             jwhite@saxenawhite.com

*Lead Counsel for Lead Plaintiff Public*
*Employees' Retirement System of Mississippi*

**DAVIDSON BOWIE, PLLC**
John L. Davidson (*pro hac vice*)
1062 Highland Colony Parkway
200 Concourse, Suite 275
Ridgeland, Mississippi 39157
(601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Lead Plaintiff Public*
*Employees' Retirement System of Mississippi*

21