**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CERENCE INC., SANJAY DHAWAN, and MARK J. GALLENBERGER,<br><br>Defendants. | No. 1:22-cv-10321-ADB |

**JOINT DECLARATION OF JOSHUA H. SALTZMAN AND JOHN RIZIO-HAMILTON IN SUPPORT OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S <u>MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................................................. 3

II. PROSECUTION OF THE ACTION ................................................................................ 7

    A. Summary of the Class's Claims ............................................................................ 7

    B. Appointment of Lead Plaintiff and Lead Counsel, and Lead Counsel's Extensive Investigation and Filing of the Operative Complaint ........................... 10

        1. The Appointment of Lead Plaintiff, Lead Counsel, and Liaison Counsel ..................................................................................................... 10

        2. Lead Plaintiff's Investigation and Filing of the Complaint ...................... 11

    C. Defendants' Motion to Dismiss and Filing of Their Answer .............................. 12

    D. Discovery ............................................................................................................. 14

        1. The Pursuit of Discovery from Defendants and Third Parties .................. 14

        2. Lead Plaintiff's Review of Defendants' Documents ................................ 15

        3. Defendants' Written Discovery Requests to Lead Plaintiff ...................... 17

    E. Mediation and Settlement .................................................................................... 18

III. RISKS OF CONTINUED LITIGATION ......................................................................... 20

    A. General Risks in Prosecuting Securities Class Actions ....................................... 21

    B. Specific Risks Concerning This Action ............................................................... 24

        1. Risks Associated with Class Certification ............................................... 24

        2. Risks Associated with Proving Falsity and Materiality ........................... 24

        3. Risks Associated with Proving Scienter ................................................... 25

        4. Risks Associated with Proving Loss Causation and Damages ................. 25

        5. Risks After Trial ...................................................................................... 26

    C. The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial and The Likely Maximum Recoverable Amount in Light of Defendants' Financial Condition ....................................................... 27

IV.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ...................................... 29

V.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ................................. 31

VI.   THE FEE AND EXPENSE APPLICATION .................................................... 35

    A.   The Fee Application ......................................................................... 35

        1.   Lead Plaintiff Has Authorized and Supports the Fee Application ............ 36

        2.   The Time and Labor of Plaintiff's Counsel ............................................. 36

        3.   The Skill and Experience of Plaintiff's Counsel ...................................... 38

        4.   Standing and Caliber of Defendants' Counsel .......................................... 39

        5.   The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ............................... 39

        6.   The Reaction of the Settlement Class to the Fee Application .................. 40

    B.   The Litigation Expense Application ...................................................... 41

VII.   CONCLUSION .......................................................................................... 43

## TABLE OF EXHIBITS

**Exhibit 1**  Declaration of Laken Ryals, Special Assistant Attorney General, Legal Counsel to the Public Employees' Retirement System of Mississippi, in Support of:(I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 2**  Declaration of Eric Miller Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date

**Exhibit 3**  CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2023 YEAR IN REVIEW (2024)

**Exhibit 4**  CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2023 REVIEW AND ANALYSIS (2024)

**Exhibit 5**  Summary of Plaintiffs' Counsel's Lodestar and Expenses

   **Exhibit 5A**  Declaration of John Rizio-Hamilton on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

   **Exhibit 5B**  Declaration of Joshua H. Saltzman on Behalf of Saxena White P.A. in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

   **Exhibit 5C**  Declaration of Peter E. Gelhaar on Behalf of Donnelly, Conroy & Gelhaar, LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expense

   **Exhibit 5D**  Declaration of John L. Davidson on Behalf of Davidson Bowie, PLLC in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 6**  Breakdown of Plaintiffs' Counsel's Expenses by Category

**Exhibit 7**  Compendium of Unpublished Opinions and Authority

We, Joshua H. Saltzman and John Rizio-Hamilton, declare as follows:

1. I, Joshua H. Saltzman, am a Director at the law firm of Saxena White P.A. ("Saxena White"), counsel for Court-appointed Lead Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi" or "Lead Plaintiff"), and co-Lead Counsel for the proposed Settlement Class in the above-captioned securities class action lawsuit (the "Action"). [1]

2. I, John Rizio-Hamilton, am a Partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G," and together with Saxena White, "Lead Counsel"), counsel for Lead Plaintiff, and co-Lead Counsel for the proposed Settlement Class in the Action.

3. We have personal knowledge of the matters set forth herein based on our active supervision of and participation in the prosecution and resolution of the Action and information provided by other Lead Counsel attorneys working under our supervision, and if called on to do so, we could and would testify competently thereto.

4. We respectfully submit this Joint Declaration in support of Lead Plaintiff's motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure (the "Rules") for final approval of the proposed settlement with Defendants Cerence Inc. ("Cerence" or the "Company"), and Sanjay Dhawan and Mark Gallenberger (the "Executive Defendants," and collectively with Cerence, "Defendants") for $30,000,000 in cash (the "Settlement"). If approved, the Settlement will resolve all claims asserted in the Action against Defendants on behalf of the Settlement Class, consisting of all persons or entities who purchased or otherwise acquired Cerence common stock from

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation of Settlement dated September 6, 2024 (ECF No. 72-1) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiff, on behalf of itself and the Settlement Class, and (ii) Defendants Cerence Inc., Sanjay Dhawan, and Mark J. Gallenberger.

November 16, 2020 through February 4, 2022, inclusive, and were damaged thereby.[2] The Court preliminarily approved the Settlement and directed notice thereof to potential Settlement Class members by Order dated September 23, 2024 (ECF No. 78) (the "Preliminary Approval Order").

5.      We also respectfully submit this Joint Declaration in support of: (i) the proposed plan for allocating the net proceeds of the Settlement to eligible Settlement Class Members (the "Plan of Allocation" or "Plan"); and (ii) Lead Counsel's motion, on behalf of Plaintiff's Counsel, for an award of attorneys' fees in the amount of 25% of the Settlement Fund, net of Litigation Expenses; payment of Plaintiff's Counsel's Litigation Expenses in the total amount of $129,748.20; and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), reimbursement of $7,600 to Mississippi for the costs it directly incurred in connection with representing the Settlement Class (the "Fee and Expense Application").[3]

6.      For the reasons discussed below and in the accompanying briefs, we, on behalf of Plaintiff's Counsel, respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be

---

[2] Excluded from the Settlement Class are (i) Defendants; (ii) Immediate Family Members of any Individual Defendant; (iii) any person who is, or was during the Class Period, an officer or director of Cerence; (iv) any affiliates or subsidiaries of Cerence; (v) any entity in which any Defendant has or had a controlling interest during the Class Period; and (vi) the legal representatives, heirs, successors, or assigns of any such excluded persons and entities. Also excluded from the Settlement Class are any persons and entities who or which submit a request for exclusion from the Settlement Class that is accepted by the Court.

[3] "Plaintiff's Counsel" refers collectively to Lead Counsel Saxena White and BLB&G, Court-appointed Liaison Counsel Donnelly, Conroy & Gelhaar, LLP ("DC&G") and additional counsel for Lead Plaintiff, Davidson Bowie, PLLC ("Davidson Bowie").

granted in all respects.[4]  Moreover, the Settlement and Fee and Expense Application have the full

support of Lead Plaintiff—a sophisticated, institutional investor with over $31 billion in assets

under management that has actively supervised the Action since its inception.  *See* Declaration of

Laken Ryals, Special Assistant Attorney General, Legal Counsel to the Public Employees'

Retirement System of Mississippi ("Ryals Decl."), attached hereto as Exhibit 1, at ¶¶ 4-8.

## I.      INTRODUCTION

7.      The proposed Settlement before the Court provides for the resolution of all claims

in the Action in exchange for a cash payment of $30 million, plus interest, for the benefit of the

Settlement Class.  The Settlement Amount has been paid into an escrow account and is earning

interest.  As detailed below, the Settlement provides a significant benefit to the Settlement Class

by conferring a substantial, certain, and immediate recovery while avoiding the risks of continued

litigation, including the risk that the Settlement Class could recover nothing or less than the

Settlement Amount after years of additional litigation, appeals, and delay.

8.      The proposed Settlement is the result of more than two years of extensive efforts

by Lead Plaintiff and Lead Counsel to prosecute this Action, which included, among other things:

(i) conducting an extensive investigation into the alleged fraud; (ii) drafting the detailed Amended

Complaint (ECF No. 37, the "Complaint" or "Compl.") based on information derived from the

investigation; (iii) opposing Defendants' motion to dismiss through extensive briefing;

(iv) conducting substantial fact discovery; and (v) participating in extended arm's length

---

[4] In conjunction with this Joint Declaration, Lead Plaintiff and Lead Counsel are submitting: (i) the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum"), and (ii) the Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee and Expenses Memorandum").

settlement negotiations, including an eleven-hour mediation session and subsequent negotiations with the assistance of a well-respected mediator.

9.      As a result of these efforts, Lead Plaintiff and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement.  Defendants have vigorously denied that they made any actionable materially false or misleading statements and omissions.  They have further asserted that they did not act with scienter and that Lead Plaintiff would not be able to establish "price impact" or loss causation for any of the alleged misstatements.  In addition to the substantial litigation risks, there was a further risk in this litigation, based on Cerence's financial condition, that there might not be funds available to pay a judgment or settlement larger than the proposed Settlement if litigation had continued.  Indeed, the $30 million Settlement represents over 20% of Cerence's total market capitalization and recovers the vast majority of the available insurance proceeds.  In light of the substantial recovery and the significant continuing risks of litigation, Lead Plaintiff and Lead Counsel believe that the proposed $30 million Settlement here is an excellent result for the Settlement Class.

10.     The Settlement was achieved after arm's-length negotiations between the Parties, including an eleven-hour mediation session with Greg Danilow of Phillips ADR Enterprises, an experienced mediator.  As described further below, the mediation process involved significant disputed issues and hard-fought, arm's-length negotiations.  In advance of the mediation session, Lead Plaintiff submitted a detailed mediation statement and reply statement, which included supporting exhibits compiled from documents produced in the course of discovery.  No agreement was reached at the mediation session.  The Parties only reached an agreement in principle to settle the Action for $30 million following additional arms-length negotiations.

4

11.     Lead Plaintiff Mississippi is a sophisticated institutional investor that actively participated in the Action and closely supervised the work of Lead Counsel, and Mississippi's representatives were actively involved in overseeing the litigation and settlement negotiations. *See* Exhibit 1, at ¶¶ 3-6.  Lead Plaintiff fully endorses the approval of the Settlement.  *Id*., at ¶ 7. Mississippi's close attention to and oversight of this Action, as well as its approval of the proposed Settlement, support the reasonableness of the Settlement.  In enacting the PSLRA, Congress expressly intended to give control over securities class actions to sophisticated investors and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case.  H.R. Conf. Rep. No. 104-369, at *34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733.

12.     Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class.  Due to their substantial efforts, Lead Plaintiff and Lead Counsel are well-informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents an excellent outcome for the Settlement Class.

13.     As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiff's damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court.  The proposed Plan of Allocation provides for distribution to eligible claimants on a *pro rata* basis, fairly based on losses attributable to the wrongdoing alleged in the Complaint.

14.     Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risk.  Lead Counsel prosecuted this case on a fully contingent basis and advanced all litigation-related expenses, and thus bore the substantial risk of an unfavorable result.

For their efforts in achieving the Settlement, Lead Counsel are applying for an award of attorneys' fees for all Plaintiff's Counsel in the amount of 25% of the Settlement Fund, net of expenses. The requested fee has been endorsed by Lead Plaintiff and is reasonable and well within the range of fees that courts in this Circuit and elsewhere have awarded in securities class actions and other complex class actions with comparable recoveries on a percentage basis. In addition, the 25% fee sought here amounts to a modest 1.34 multiplier of Plaintiff's Counsel's lodestar, which is well within the range of multipliers typically awarded in class actions like this one with significant contingency risks.

15.    Lead Counsel's Fee and Expense Application also seeks payment of Litigation Expenses incurred by Plaintiff's Counsel in connection with the institution, prosecution, and settlement of the Action, and payments to Lead Plaintiff for its costs and expenses directly related to their representation of the Settlement Class, as authorized by the PSLRA.

16.    Lead Counsel have worked with the Court-authorized Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), to disseminate notice of the Settlement to the Settlement Class as directed in the Preliminary Approval Order. In this regard, A.B. Data has mailed over 57,000 Notice Packets (consisting of the Notice and Claim Form) to potential Settlement Class Members and nominees. *See* Declaration of Eric Miller, attached hereto as Exhibit 2, at ¶ 11. Additionally, A.B. Data has posted the Notice and Claim Form, along with other documents relevant to the Settlement, on the Settlement website: www.CerenceSecuritiesLitigation.com, and has caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over *PR Newswire*. *Id*. ¶¶ 13, 14.

17.    The reaction of the Settlement Class thus far has been wholly positive. As ordered by the Court and stated in the notices, requests for exclusion from the Settlement Class and

objections are due to be received no later than November 25, 2024.  To date, there have been no objections to any aspect of the Settlement, Plan of Allocation, or Fee and Expense Application, including reimbursement of costs to Lead Plaintiff.  In addition, there have been no requests for exclusion from the Settlement Class.[5]

## II.    PROSECUTION OF THE ACTION

### A.    Summary of the Class's Claims

18.    The claims of Lead Plaintiff and the class in the Action are fully set forth in the operative Amended Class Action Complaint for Violations of the Federal Securities Laws dated July 26, 2022 (ECF No. 37) (the "Complaint").[6]  The Complaint asserts claims under: (i) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), against all Defendants; and (ii) Section 20(a) of the Exchange Act against the Executive Defendants.

19.    Cerence is an artificial-intelligence software company that sells voice-operated virtual assistant software mainly to automobile manufacturers.  Lead Plaintiff alleged that, during the Class Period, Cerence and the Executive Defendants violated the federal securities laws by making materially misleading statements and omissions about the Company's financial results, assuring investors of the sustainability of its strong growth rates.  *See, generally*, ¶¶ 43-63, 133-196.  From the time that it became a standalone company in October 2019 (after it was spun off from Nuance Communications, Inc.), Cerence touted its strong revenue growth.  ¶¶ 32-34.

---

[5] *See* Exhibit 2, ¶ 17.  Should any requests for exclusion or objections be received after the date of this submission, Lead Counsel will address them in their reply papers to be filed with the Court on or before December 9, 2024.

[6] In this Section II.A, citations to "¶ __" refer to paragraphs in the Complaint.

20.    Most of Cerence's revenue comes from its license business. ¶ 36. Cerence licensed its software under two main types of contracts: "variable" and "fixed" contracts. ¶ 37. Under a variable contract, the customer would pay Cerence on a per-license basis as it used or "consumed" the licenses (*i.e.*, as the customer installed the software in each vehicle), and Cerence received and recognized the revenue incrementally as the licenses were consumed. ¶¶ 37-38. Variable licenses generate stable quarterly revenue for the Company. *Id.* By contrast, under a fixed contract (also referred to as a "prepay" or "prepaid" contract), the customer would purchase a fixed number of licenses up front, often at a discount, and Cerence would receive and recognize revenue for all of those licenses as soon as the contract was signed, even though the customer had not yet consumed the licenses. ¶¶ 39-40. Despite the advantage of up-front revenue recognition, fixed contracts resulted in the "cannibalization" of future revenue—in other words, there was no prospect of earning future revenue from a customer who signed a prepaid deal. *Id.*

21.    Lead Plaintiff alleged that, from November 16, 2020 through February 4, 2022, inclusive (the "Class Period"), Defendants assured investors that Cerence was reducing its reliance on fixed contracts, and that the total amount of revenue from fixed contracts would decrease over time. ¶¶ 5, 41-42, 47, 50-51, 54-56. To this end, Defendants repeatedly emphasized to investors that Cerence strived to reduce the Company's level of fixed contracts, assuring the market that Cerence was "biased toward reducing prepays." ¶ 47. With investors intently focused on the subject, Defendants represented that fixed contracts would remain at or below the Company's "historical range" of "low-40s to low-50s [million]" per year, and that Cerence's key "pipeline" or "backlog" of variable contracts would provide substantial and sustainable growth. ¶¶ 136-37.

22.    However, Lead Plaintiff alleged that, unbeknownst to investors, Defendants actually pushed the Company's sales teams to increase the number of fixed contracts to "pull

forward" revenue in the short term.  ¶¶ 64-65.  Lead Plaintiff alleged that Cerence offered customers discounts to purchase fixed contracts rather than variable ones, or to convert their existing variable contracts to fixed contracts.  ¶ 66.  Lead Plaintiff also alleged that Defendants began to offer "minimum commitment" contracts to its customers, which called for no cash to be paid upfront, but still enabled Cerence to recognize revenue for the entire value of those contracts.  ¶¶ 67-68.

23.     Lead Plaintiff alleged that that Defendants' actions artificially inflated the Company's short-term revenue thereby rendering purported growth rates unsustainable, and also enabled the Executive Defendants to realize enormous amounts of performance-based executive compensation that was directly tied to revenue targets.  ¶¶ 64, 68.

24.     Lead Plaintiff alleged that the price of Cerence common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements, and that the price of the stock declined when the truth was finally revealed in a series of three corrective disclosures.

25.     First, on November 22, 2021, Cerence revealed that its total fixed deal revenue had increased to $71 million for fiscal year 2021—far above its historical range of $40-55 million. Defendants further stated that this would "put a little bit of a damp around growth rates for [2022] and possibly into fiscal 2023 as well, as those licenses get consumed."  ¶¶ 87-88.  In response to this news, Cerence's stock price fell by more than 20% in a single day, declining from a closing price of $104.06 per share on November 19, 2021, to a closing price of $82.59 per share on November 22.  ¶ 90.

26.     Second, on December 15, 2021—less than a month after the first corrective disclosure—Defendant Dhawan resigned as CEO of Cerence.  ¶ 97.  On the news, Cerence's stock

9

price fell by more than 11%, declining from a closing price of $78.08 per share on December 14, 2021, to a closing price of $69.20 per share on December 15, 2021.  ¶ 99.

27.    Third, and finally, on February 7, 2022, Cerence reported its financial results for the first fiscal quarter of 2022.  Cerence disclosed $20.1 million in new fixed contract deals during the first quarter of 2022, meaning that its fixed contract revenue had increased by almost 100% year-over-year, while its variable contract revenue declined 40%.  ¶ 100.  Defendants also lowered revenue guidance, and admitted that increases in fixed revenue had caused the variable revenue decline and harmed the Company's business, creating a "significant headwind to our variable license revenue growth."  ¶¶ 101-103.  And finally, Defendant Gallenberger announced his resignation as CFO.  *Id.* ¶ 101.  On this news, the Company's stock price declined from a closing price of $63.58 per share on February 4, 2022, to a closing price of $43.61 per share on February 7, 2022.  ¶ 110.

**B.    Appointment of Lead Plaintiff and Lead Counsel, and Lead Counsel's Extensive Investigation and Filing of the Operative Complaint**

**1.    The Appointment of Lead Plaintiff, Lead Counsel, and Liaison Counsel**

28.    On April 26, 2022, Mississippi filed a motion seeking appointment as Lead Plaintiff, appointment of Saxena White and BLB&G as Lead Counsel, and appointment of DC&G as Liaison Counsel pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  ECF Nos. 17-19.  On May 12, 2022, after review of Mississippi's lead plaintiff motion and a competing motion filed by another lead plaintiff contender, the Court appointed Mississippi as Lead Plaintiff and approved its selection of BLB&G and Saxena White as Lead Counsel and DG&G as Liaison Counsel for the putative class.  ECF No. 24.

10

### 2.    Lead Plaintiff's Investigation and Filing of the Complaint

29.    Lead Counsel undertook an extensive investigation into the alleged fraud and potential claims that could be asserted by Lead Plaintiff in the Action. This investigation began prior to the Court's appointment of Lead Plaintiff and continued through preparation of the Complaint. The investigation included a careful review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning Cerence; (ii) research reports issued by financial analysts concerning the Company; (iii) reports and other documents filed publicly by Cerence with the U.S. Securities and Exchange Commission ("SEC"); (iv) Cerence's corporate website; (v) interviews with former Cerence employees; (vi) analyses of the price movements in Cerence's securities; and (vii) other publicly available information.

30.    In connection with their investigation, Lead Counsel and their in-house investigators located former employees of Cerence who may have relevant information pertaining to the claims asserted in the Action. This included contacting more than two hundred former Cerence employees and speaking to dozens of them.

31.    On May 26, 2022, the Parties submitted a Stipulation and Joint Motion for Order Regarding Case Schedule, setting forth proposed dates for the filing of the Complaint and the briefing on any expected motion to dismiss. ECF No. 25. The Court approved the proposed schedule on that same date. ECF No. 26.

32.    On July 26, 2022, Lead Plaintiff filed and served a 94-page amended Complaint, asserting claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against defendants Sanjay Dhawan and Mark J. Gallenberger under Section 20(a) of the Exchange Act. ECF No. 37.

11

#### C.     Defendants' Motion to Dismiss and Filing of Their Answer

33.     On September 9, 2022, Defendants filed a 28-page motion to dismiss the Complaint, together with an appendix attaching 58 exhibits totaling almost 1,800 pages of material.  ECF Nos. 39-41.  In their motion, Defendants argued that: (i) Lead Plaintiff failed to sufficiently allege falsity, among other reasons, because Lead Plaintiff purportedly did not adequately allege that any statement or omission was false or misleading, certain of the alleged false statements were forward-looking and protected by the PSLRA's safe harbor provision, and some of the statements were inactionable general statements of corporate optimism; and (ii) the Complaint did not allege specific facts supporting a strong inference of scienter, among other reasons, because the allegations attributed to "FE1" (a former Cerence employee), the allegations of insider stock sales by Defendants Dhawan and Gallenberger, and the allegations regarding Dhawan and Gallenberger's incentive compensation awards purportedly were insufficient to demonstrate scienter.

34.     On October 4, 2022, Lead Plaintiff filed its opposition to Defendants' motion to dismiss the Complaint.  ECF No. 47.  In summary, Lead Plaintiff's opposition argued that: (i) Defendants' alleged false statements were materially misleading, actionable, and not protected by the PSLRA's safe harbor provision; and (ii) the Complaint's allegations viewed holistically were sufficient to show that Defendants made those statements with scienter among other reasons because Defendants were financially motivate to commit fraud, participated directly in the alleged scheme, and the scheme served no legitimate business purpose, which is confirmed by the Company's post-Class Period admissions.

35.     On November 23, 2022, Defendants filed a reply in further support of their motion to dismiss.  ECF No. 48.  Defendants' reply reiterated the arguments made in their motion to dismiss and responded to the arguments in Lead Plaintiff's opposition brief.

36.     On March 25, 2024, the Court granted in part and denied in part Defendants' motion to dismiss the Complaint.  ECF No. 51.  The Court's order, while reducing the number of statements at issue, sustained misstatements throughout the entire Class Period and noted that the Complaint's allegations "collectively support an inference that Defendants were engaged in a scheme to increase Cerence's use of fixed contract arrangements." *Id.* at 31.

37.     As to falsity, the Court found, while "recognizing that this is a close call and would be scrutinized closely for purposes of any summary judgment motion," that Defendants' misstatements were actionable because Cerence's "revenue share from fixed license agreements increased consistently during the class period . . . despite statements from Defendants suggesting they wanted and expected the share of fixed contracts to remain steady, and that fixed contracts would be limited in the future."  *Id.* at 31, 34.  The Court further concluded that Defendants' "statements could suggest to a reasonable investor that the increase in fixed licenses was an aberration, but knowledge of the alleged scheme would have supported an equal or stronger inference that the increase in fixed license agreements was the result of Defendants' intentional scheme to promote them."  *Id.* at 35.

38.     As to scienter, while again noting it was "a close call" (*id.* at 35), the Court found sufficient that Defendants were "(1) 'personally direct[ing]' an undisclosed 'scheme to pull forward revenue and hide [Cerence's] worsening financial condition,' including by 'converting variable deals into less favorable prepaids and minimum commitments,' (*id.* at 14); (2) aware of the revenue consequences of that scheme, (*id.* at 20); and (3) omitting key facts from their disclosures about fixed contracts[.]"  *Id.* at 38.

39.     In their Answer filed on April 15, 2024 (ECF No. 59), Defendants denied all of the allegations asserted against them, as well as any liability to Lead Plaintiff and the class, and

asserted 37 affirmative defenses, including (among other things) that (i) the Complaint failed to allege any actionable misstatement or misrepresentation; (ii) the statements were inactionable because they were accompanied by meaningful cautionary language, were corporate puffery, or were forward-looking statements; and (iii) there was no loss causation or damages.

### D.    Discovery

40.    Pursuant to the Court's Order of April 16, 2024 (ECF No. 60), the Parties began to negotiate the matters set forth in their Joint Statement pursuant to Rule 26(f) and Local Rule 16.1 and the Joint Statement was filed on April 30, 2024.  ECF No. 61.  As reflected in the Joint Statement, the Parties agreed to: (i) serve their Initial Disclosures by May 1, 2024; (ii) substantially complete pre-mediation document discovery from key searches of the custodial files of the priority custodians, which included among other others Defendants Dhawan and Gallenberger, by June 28, 2024; (iii) participate in an initial mediation session by August 2024; and (iv) set deadlines on various dates in 2025 and early 2026 for the filing of the class certification motion and related briefing, the fact discovery cutoff, the expert discovery cutoff, summary judgment and Daubert motion briefing, and trial.

41.    On May 7, 2024, the Court entered a case schedule, which accepted the Parties' joint request for agreed-upon deadlines.  Under the operative schedule, document production was to be substantially completed by January 31, 2025, Lead Plaintiff's class certification motion was to be fully briefed by March 14, 2025, and fact discovery was scheduled to close by May 30, 2025. ECF No. 63.

42.    Pursuant to that schedule, the Parties exchanged Initial Disclosures on May 1, 2024.

### 1.    The Pursuit of Discovery from Defendants and Third Parties

43.    Lead Plaintiff served its First Set of Requests for the Production of Documents to Defendants on April 12, 2024, seeking, among other things, documents concerning: any

investigation of the allegations underlying the Complaint by conducted by Cerence or regulatory agencies; Cerence's fixed contracts and their impact on its financial performance and guidance; Cerence's customers' consumption of licenses and related inventory and backlogs; Cerence's earnings calls, investor presentations, and other public statements made during the Class Period; conversion of variable contracts into fixed contracts; executive compensation; and Defendants' applicable insurance policies. Defendants served Responses and Objections to Lead Plaintiff's document requests on May 13, 2024.

44.     The Parties held meet-and-confer sessions to discuss issues regarding Lead Plaintiff's document requests and Defendants' objections and responses on May 15 and 21, 2024 and June 11 and 18, 2024, and Lead Plaintiff sent Defendants a letter regarding the same on June 7, 2024.

45.     Lead Plaintiff served its First Set of Interrogatories on Defendants on May 20, 2024, and Defendants served their Responses and Objections to this interrogatory on June 20, 2024. On July 9, 2024, Lead Plaintiff sent Defendants a letter asking Defendants to supplement their response to Lead Plaintiff's First Set of Interrogatories.

46.     Lead Plaintiff also prepared third-party document subpoenas for certain of Cerence's customers as well as for certain former Company employees.

### 2.     Lead Plaintiff's Review of Defendants' Documents

47.     In connection with the Parties' agreement to produce documents for certain priority custodians in advance of the Parties' agreed-upon early mediation, Defendants produced approximately 19,000 documents to Lead Plaintiff on June 3, 2024,  July 19, 2024, and August 2, 2024.  Defendants also produced documents concerning Cerence's insurance policies.  In total Defendants produced, and Lead Plaintiff reviewed, more than 100,000 pages of documents from a dozen custodians.

48.     Throughout this process, Lead Counsel ensured that the review and analysis of documents was conducted efficiently.  As part of this process, Lead Counsel reviewed, analyzed, and categorized the documents in the case's electronic database.  Before beginning, Lead Counsel developed a review protocol, issue "tags," and guidelines for identifying "Hot" documents, as well as a written manual with guidelines for the review and "coding" of documents.  Using these tools, Lead Counsel tasked its attorneys with reviewing documents, with the documents most likely to be "Hot" put into prioritized batches for review.  Lead Counsel's review and analysis of those documents included substantive analytical determinations as to the importance and relevance of each document—including whether each document was "Hot," "Highly Relevant," "Relevant," or "Not Relevant."  For important case documents, attorneys documented their substantive analysis of the documents' relevance and import by making notations on the document review system, explaining what portions of the documents were important, how they related to the issues in the case, and why the attorney believed that information to be significant.  Attorneys also "tagged" the specific issues that were involved in each document, such as the false statements and corrective disclosures at issue, fixed and minimum commitment contracts, the departures of Defendants Dhawan and Gallenberger from the Company, and their trading during the Class Period.

49.     Throughout their review, Lead Counsel analyzed the adequacy and scope of Defendants' document productions.  For example, attorneys reviewed privilege redactions to assess whether Defendants redacted or withheld potentially non-privileged information.  Lead Counsel also reviewed the productions to determine whether they substantively tracked what had been agreed to be produced.

50.     In addition to regular communications that occurred throughout the review process, attorneys who primarily focused on the document review participated in weekly meetings with the

16

full litigation team from BLB&G and Saxena White.  In advance of these meetings, "Hot" documents and documents that raised questions for discussion that had recently been reviewed and analyzed were compiled and circulated to the broader team.  At the meetings, Lead Counsel discussed those documents, including the reasons they were identified as "Hot," attorneys asked questions and discussed similar documents that had been reviewed, and the team generated ideas for research projects and generated work product following up on identified topics and issues.  These efforts ensured that the entire litigation team learned of and understood the documentary evidence being developed in real-time, provided an opportunity for Lead Counsel to further refine their legal and factual theories, focused the document review team on developing other supporting evidence, and enabled Lead Counsel to ensure that documents were reviewed consistently.  Lead Counsel also conducted follow-up research and drafted analyses concerning topics of interest that arose at those meetings, such as Cerence's deals over time with certain specific customers.

51.     Further, Lead Counsel prepared chronologies of events, and maintained a central repository of key documents organized by issue, which they continually updated and refined as the team's knowledge of issues expanded.  This step enabled attorneys to quickly and efficiently access critical documents in advance of the Parties' August 14, 2024 mediation session.

52.     At the outset of Lead Counsel's document review efforts, Lead Counsel determined that it would be most efficient to utilize in-house litigation support resources at BLB&G, which provided a far more cost-effective document review platform than those provided by third-party vendors.

### 3.     Defendants' Written Discovery Requests to Lead Plaintiff

53.     Defendants also served Lead Plaintiff with discovery requests.  Specifically, on June 28, 2024, Defendants served Lead Plaintiff with their First Set of Requests for Production

and First Set of Interrogatories.  On July 29, 2024, Lead Plaintiff served its Responses and Objections to each of Defendants' discovery requests.

54.    Defendants' discovery requests sought, among other things, documents and information concerning: Lead Plaintiff's ability to satisfy the requirements of Rule 23; Lead Plaintiff's transactions in Cerence securities and its decision-making process for engaging in those transactions; and Lead Plaintiff's interactions with its third-party services providers regarding its transactions in Cerence securities.

### E.    Mediation and Settlement

55.    In connection with their efforts to obtain an early resolution of this case through private mediation, the Parties retained Greg Danilow, Esq. of Phillips ADR Enterprises, a highly experienced mediator, to act as mediator for their August 14, 2024 mediation session.

56.    Mississippi's representatives communicated with Lead Counsel and were updated on the progress of Lead Counsel's prosecution of the claims and the Parties' settlement negotiations both before and throughout the mediation process.

57.    In advance of this mediation session, the Parties prepared detailed mediation statements and replies concerning pertinent liability and damages issues in the case, and exchanged with one another and submitted to Mr. Danilow those mediation submissions together with numerous exhibits before the mediation.  The Parties also submitted detailed written responses to questions from Mr. Danilow, as well as providing additional documents upon his request.

58.    In addition to Mr. Danilow, the participants in the August 14, 2024 mediation session included (i) attorneys from BLB&G and Saxena White; (ii) attorneys from counsel for Defendants, Goodwin Procter LLP; (iii) attorneys for Defendants' insurance carriers; and (iv) in-house counsel from Cerence.  At the mediation session, the Parties engaged in robust and extremely hard-fought negotiations regarding their clients' positions in the litigation.  Despite

18

negotiating these issues for over 11 hours, the Parties were not able to reach a settlement agreement at the mediation.  The parties continued, however, their negotiations after the conclusion of the formal mediation session, which culminated in a mediator's proposal that the Parties accepted to settle the Action for $30 million.

59.     Following their agreement in principle, the Parties negotiated the final terms of the Settlement and drafted the Stipulation of Settlement and related settlement papers.  On September 6, 2024, the Parties executed the Stipulation, which embodies the Parties' final and binding agreement to settle the Action.  See ECF No. 72-1.  On September 6, 2024, Lead Plaintiff submitted the Parties' Stipulation to the Court as part of its motion for preliminary approval of the Settlement. ECF Nos. 72-73.

60.     On September 18, 2024, the Court held a hearing on the motion for preliminary approval.  ECF No. 77.  On September 23, 2024, the Court entered its Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 78) ("Preliminary Approval Order"), which, among other things: (1) preliminarily approved the Settlement; (2) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice of the Settlement to be given to potential Settlement Class Members through mailing of the Notice and Claim Form, posting the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *Investor's Business Daily* and over the *PR Newswire*; (3) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application; and (4) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application.  The

Preliminary Approval Order also scheduled the Settlement Hearing for December 16, 2024 at 10:00 a.m. to determine, among other things, whether the Settlement should be finally approved.

## III.   RISKS OF CONTINUED LITIGATION

61.   The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $30 million cash payment.  Lead Plaintiff and Lead Counsel believe that the proposed Settlement is an excellent result for the Settlement Class.

62.   As explained below, Lead Plaintiff faced significant risks with respect to proving liability and recovering full damages in this case.  To prevail in this case, Lead Plaintiff had the burden to convince a unanimous jury by a preponderance of the evidence of each of the elements of its claims, including that (i) Defendants made misstatements and omissions; (ii) the misstatements and omissions were material; (iii) the misstatements and omissions were made with scienter (*i.e.*, knowingly or with deliberate recklessness); (iv) investors relied upon the misstatements and omissions; and (v) Defendants' fraud caused investors' losses.

63.   Absent a settlement, Lead Plaintiff would still need to prevail at several additional stages of the litigation, including defeating Defendants' anticipated opposition to Lead Plaintiff's motion for class certification, Defendants' anticipated motion for summary judgment, at trial, and on appeal.  At each of these stages, Lead Plaintiff would have faced significant risks related to establishing liability and full damages, including, among other things, overcoming Defendants' falsity, scienter, and loss causation challenges.  Even after any trial, Lead Plaintiff likely would have faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Lead Plaintiff from successfully obtaining a recovery for the Settlement Class.

64.   The Settlement Amount—$30 million in cash, plus interest—represents a significant recovery for the Settlement Class.  As discussed below, it also represents a significant

portion of the recoverable damages in the Action as determined by Lead Plaintiff's damages expert—particularly after considering Defendants' substantial arguments with respect to liability and damages. Moreover, as discussed below, questions about Cerence's financial condition and the limits on available insurance (which continued to dwindle as litigation continued) created risks that Lead Plaintiff would be unable to recover a judgment substantially larger than (or even as large as) the Settlement after additional years of litigation. For all these reasons, there was a significant risk that, after years of protracted litigation, Lead Plaintiff and the Settlement Class would have achieved no recovery at all, or a smaller recovery than the Settlement Amount.

### A.      General Risks in Prosecuting Securities Class Actions

65.      Securities class actions face serious risks of dismissal and non-recovery at all stages of the litigation. Data from Cornerstone Research shows that, in each year from 2014 through 2020, approximately half of all securities class actions filed were dismissed. *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2023 YEAR IN REVIEW (2024), attached hereto as Exhibit 3, at 19.

66.      Even when they have survived motions to dismiss, securities class actions may be defeated either at the class certification stage or at summary judgment. For example, class certification has been denied in numerous securities cases in recent years. *See, e.g., Shupe v. Rocket Companies, Inc.,* 2024 WL 4349172 (E.D. Mich. Sept. 30, 2024); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017), *reconsideration denied*, 2018 WL 3472334 (N.D. Cal. Jan. 18, 2018), *and leave to appeal denied*, *Oklahoma Firefighters Pension & Ret. Sys. v. Finisar Corp.*, 2018 WL 3472714 (9th Cir. July 13, 2018); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193 (S.D.N.Y. Mar. 19, 2015); *Sicav v. James Jun Wang*, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013);

*George v. China Auto. Sys., Inc.*, 2013 WL 3357170 (S.D.N.Y. July 3, 2013); *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 651 (N.D. Cal. 2018); *Smyth v. China Agritech, Inc.*, 2013 WL 12136605 (C.D. Cal. Sept. 26, 2013); *In re STEC Inc. Sec. Litig.*, 2012 WL 6965372 (C.D. Cal. Mar. 7, 2012). And in a number of other cases, class periods have been shortened significantly by the elimination of corrective disclosures and/or false statements at the class certification stage on "price impact" grounds—thus reducing available damages.  *See, e.g., In re FibroGen Sec. Litig.,* 2024 WL 1064665 (N.D. Cal. Mar. 11, 2024); *In re Apache Corp. Sec. Litig.*, 2024 WL 532315 (S.D. Tex. Feb. 9, 2024).

67.    Multiple securities class actions also have been dismissed at the summary judgment stage.  *See In re Bos. Sci. Corp. Sec. Litig*., 708 F. Supp. 2d 110, 113 (D. Mass. 2010), *aff'd sub nom. Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp*., 649 F.3d 5 (1st Cir. 2011); *In re Mylan N.V. Sec. Litig*., 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) (granting summary judgment after approximately six years of litigation); *In re Allergan PLC Sec. Litig*., 2022 WL 17584155 (S.D.N.Y. Dec. 12, 2022) (granting summary judgment after approximately four years of litigation); *Murphy v. Precision Castparts Corp*., 2021 WL 2080016, at *6 (D. Or. May 24, 2021) (granting summary judgment after approximately five years of litigation); *In re Retek Inc. Sec. Litig*., 621 F. Supp. 2d 690 (D. Minn. 2009) (granting summary judgment on loss causation grounds after seven years of litigation); *In re Barclays Bank PLC Sec. Litig*., 2017 WL 4082305 (S.D.N.Y. September 13, 2017) (summary judgment granted after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig*., 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation); *see also In re Xerox Corp. Sec. Litig*., 935 F. Supp. 2d 448 (D. Conn. 2013), aff'd, 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands Corp*., 2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom., Pompano Beach*

*Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010). Even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions. *See, e.g., Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

68.    Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, and overcoming *Daubert* motions, there remain significant risks that a jury will not find the defendants liable or award expected damages. *See, e.g., In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023), *aff'd*, 2024 WL 4688894 (9th Cir. Nov. 6, 2024) (jury verdict for defense delivered in securities class action involving Elon Musk's tweets about taking Tesla private even though that court had already found the tweets were false and Musk acted recklessly in issuing them, and the same conduct had resulted in SEC charges and a settlement). Further, post-trial motions, based on a complete record, also present substantial risks. For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs' favor on liability in 2010. 2011 WL 1585605, at *6 (S.D. Fla. Apr. 25, 2011). In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. *Id.* at *38. In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

23

### B.   Specific Risks Concerning This Action

69.   While Lead Plaintiff believes that its claims have merit, Lead Plaintiff faced substantial risks that Defendants would succeed in eliminating all or part of the case in connection with class certification, summary judgment, pre-trial motions, at trial, or on post-trial appeal.

#### 1.   Risks Associated with Class Certification

70.   At the time the Settlement was reached, Lead Plaintiff had not yet filed its motion for class certification. Although Lead Plaintiff likely would have been able to make a successful *prima facie* showing that the proposed class would meet all elements of Rule 23 of the Federal Rules of Civil Procedure, Defendants would have had an opportunity to "rebut the presumption of reliance" typically applied under Rule 23(b)(3) if they could "show that the misrepresentation in fact did not lead to a distortion of price" by making "[a]ny showing that severs the link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff," *i.e.* by showing a lack of "price impact." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113 (2021). In some cases, courts have found that there was no price impact with respect to particular corrective disclosures. *See, e.g.*, *FibroGen*, 2024 WL 1064665, at *11 (finding no price impact after a specified date, eliminating final corrective disclosure, and certifying shorter class period than that proposed by plaintiff). For the same reasons discussed further below (in connection with loss causation), Lead Plaintiff faced a risk that the Court may find that one or more of the alleged corrective disclosures was not corrective of any of the alleged misstatements. Had that taken place, the Class Period could, at a minimum, have been shortened, which would in turn reduce the size of the class as well as the total damages available to them.

#### 2.   Risks Associated with Proving Falsity and Materiality

71.   Defendants would continue to assert that they made no false or misleading statements regarding their use of fixed contracts. Specifically, Defendants had argued, and would

continue to argue, that Cerence fully and accurately disclosed its revenue from fixed contracts during each quarter, and also disclosed its use of minimum commitment contracts, such that no investor could have been misled by Cerence's increased use of those contracts. Indeed, the Court's motion to dismiss order—while allowing the case to proceed to discovery—dismissed many of the false statements alleged in the Complaint, including all of the statements made by Defendant Dhawan. Additionally, the Court specifically noted that the sustained statements were a "close call" and "would be scrutinized closely for purposes of any summary judgment motion." ECF No. 51 at 34.

### 3.    Risks Associated with Proving Scienter

72.    Even if Lead Plaintiff had been able to establish falsity and materiality, it would have faced significant risk in establishing Defendants' scienter.

73.    Defendants would continue to argue that they did not act with fraudulent intent, and that there was no scheme in place to defraud investors. Defendants would continue to assert, among other things, that Defendants Gallenberger and Dhawan's public statements reflected their honestly held beliefs about fixed contracts, and that they believed they were providing full and adequate information to investors by disclosing the volume of Cerence's fixed revenue every quarter.

74.    Had Lead Plaintiff failed to create a triable issue regarding scienter at summary judgment, or failed to prevail on establishing scienter at trial, the Settlement Class would not be able to recover anything in this Action.

### 4.    Risks Associated with Proving Loss Causation and Damages

75.    Even if Lead Plaintiff had successfully established Defendants' material misrepresentations and scienter, it would still have faced meaningful challenges in establishing loss causation and damages in this Action.

76.     Specifically, Defendants would have challenged whether the alleged corrective disclosures were sufficiently connected to the alleged revenue acceleration scheme that they could be considered the cause of any damages for the Settlement Class.  For example, the second alleged corrective disclosure—the announcement of Dhawan's resignation—was at significant risk of being eliminated on lack of price impact or loss causation grounds, as Defendants would have argued it neither revealed new information directly related to the fraud nor expressly connected the resignation to the fraud.  *See, e.g., In re Apache Corp. Sec. Litig*., 2024 WL 532315, at *10 (S.D. Tex. Feb. 9, 2024) (executive resignation was not a corrective disclosure where it was unclear "what aspect of the defendants' prior statements was rendered false or misleading that was not already known …").  And similarly, Defendants would have argued that the third alleged corrective disclosure did not reveal anything new about Defendants' fixed contracts.

77.     Moreover, Defendants were expected to vigorously dispute what portion (if any) of Cerence's stock price declines following each of the alleged corrective disclosures was attributable to the disclosure of the alleged revenue acceleration scheme—as opposed to other "confounding" factors affecting Cerence's business (such as the impact of negative trends in the automobile market and disclosures relating to Cerence's other lines of business).

### 5.     Risks After Trial

78.     Even if Lead Plaintiff overcame all the above risks and prevailed at trial, Defendants would have appealed any judgment in Lead Plaintiff's and the class's favor.  Such an appeal could have taken years, and could have been successful.  For example, in *Glickenhaus & Co. v. Household Int'l Inc*., 787 F.3d 408 (7th Cir. 2015), a securities fraud class action alleging a massive predatory lending scheme, the plaintiffs won a trial verdict.  Defendants appealed, challenging loss causation, as well as a jury instruction about who legally "made" a statement for

26

liability purposes.  Defendants prevailed, and the Seventh Circuit set aside the judgment that plaintiffs had won.

79.     Moreover, even if a judgment in Lead Plaintiff's favor was affirmed on appeal, Defendants may then have sought to challenge the reliance and damages of each class member, including Lead Plaintiff, in an extended series of individual proceedings.  Thus, even if Lead Plaintiff and the class prevailed at trial, the subsequent processes of an appeal and challenges to individual class members could have severely reduced or even eliminated any recovery—and, at minimum, could have added several years of further delay.

80.     The Settlement eliminates these significant litigation risks and provides a substantial and certain recovery for the Settlement Class.  *See Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *13 (S.D.N.Y. Oct. 16, 2019) ("The Parties developed and would have presented competing evidence on these issues, including competing expert evidence.  While Lead Plaintiff proceeded as though it had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages[.]").

### C.     The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial and The Likely Maximum Recoverable Amount in Light of Defendants' Financial Condition

81.     The Settlement Amount—$30 million in cash, plus interest—represents a significant recovery for the Settlement Class.  The Settlement is more than twice the size of the median securities class action settlement in the First Circuit from 2014 to 2023 ($14.1 million). *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2023 REVIEW AND ANALYSIS (2024), attached hereto as Exhibit 4, at 20.

82.     The $30 million Settlement is also a very favorable result when it is considered in relation to the maximum amount of damages that could be reasonably established at trial, in the event that Lead Plaintiff prevailed on class certification and liability issues, including falsity and

27

scienter, at summary judgment. Assuming Lead Plaintiff prevailed on all class certification and liability issues, its damages expert had determined that that maximum reasonably recoverable damages at trial would be approximately $430 million.

83.    Importantly, however, this estimated range assumes Lead Plaintiff's complete success in establishing Defendants' liability on the remaining claims, certification of the entire alleged Class Period, and that the trier of fact would reject Defendants' loss causation and damages arguments. Lead Plaintiff's damages expert calculated that, in the event that the Court eliminated the second and third alleged corrective disclosures—either at class certification, summary judgment—or trial—maximum damages would be just $82 million. Thus, the $30 million Settlement represents at least 7% and as much as 37% of the maximum recoverable damages, which is well above the range of recovery seen in comparable cases. *See, e.g., Howard v. Liquidity Servs. Inc.*, 2018 WL 4853898, at *5 (D.D.C. Oct. 5, 2018) (taking into account risks to maximum damages calculation and finding that a "settlement that ranges from approximately 4 percent to 14 percent of potentially recoverable damages compares favorably with other similar securities class-action settlements."); *Medoff v. CVS Caremark Corp.*, 2016 WL 632238, at *6 (D.R.I. Feb. 17, 2016) (approving settlement recovering 5.33% of maximum damages and noting that it was "well above the median percentage of settlement recoveries in comparable securities class action cases"); *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (settlement representing 6.25% of estimated maximum damages was at the "higher end of the range of reasonableness of recovery in class action securities litigations").

84.    Moreover, Cerence's financial condition at the time of settlement and its wasting insurance policies posed additional risks to the total recovery available to the Settlement Class. During the Class Period, Cerence common stock traded for as much as $133 per share, but on

August 22, 2024, the date the parties accepted the mediator's settlement recommendation, Cerence's stock closed at $3.41 per share—a decline of approximately 97% from its Class Period high. Likewise, the Company's market capitalization had shrunk by approximately 97% and was less than $150 million. Thus, the $30 million Settlement represents more than 20% of the Company's total market capitalization, which is a very substantial proportion. And, of course, there was no guarantee of what Cerence's financial condition might look at the time any trial verdict was reached and upheld on appeal. In addition, the Settlement recovers the vast majority of Defendants' remaining available directors' and officers' liability insurance, which was rapidly wasting, and would have continued to waste in ongoing litigation.

85.    Thus, even if Lead Plaintiff had prevailed at class certification, summary judgment, at trial, there would be a significant risk that the recovery available would be smaller than the Settlement Amount. The Settlement avoids these risks and provides an immediate and certain benefit to the Settlement Class.

86.    Given the meaningful litigation risks, and the immediacy and amount of the $30,000,000 recovery for the Settlement Class, Lead Plaintiff and Lead Counsel believe that the Settlement is an excellent result; fair, reasonable, and adequate; and in the best interest of the Settlement Class.

## IV.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

87.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class. The Preliminary Approval Order also set a November 25, 2024 deadline for Settlement Class Members to submit objections to the Settlement, the Plan

of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final approval hearing date of December 16, 2024.

88.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data, Lrd. ("A.B. Data"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $300,000.  To disseminate the Notice, A.B. Data obtained information from Cerence and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members.  *See* Declaration of Eric Miller Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Miller Decl."), attached hereto as Exhibit 2, at ¶¶ 4-12.

89.    A.B. Data began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on October 2, 2024. *See* Miller Decl. ¶¶ 4-7.  As of November 11, 2024, A.B. Data had disseminated a total of 57,080 Notice Packets to potential Settlement Class Members and nominees.  *Id*. ¶ 11.

90.    On October 14, 2024, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the *PR Newswire*.  *Id*. ¶ 13.

91.     Lead Counsel also caused A.B. Data to establish a dedicated settlement website, www.CerenceSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as the Stipulation, Preliminary Approval Order, and Amended Complaint. *See* Miller Decl. ¶ 14. That website became operational on October 2, 2024. *Id*. Lead Counsel also made copies of the Notice and Claim Form and other documents available on their own websites, www.blbglaw.com and www.saxenawhite.com.

92.     As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Application, or to request exclusion from the Settlement Class is November 25, 2024. To date, no requests for exclusion have been received. *See* Miller Decl. ¶ 17. In addition, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received. Lead Counsel will file reply papers on or before December 9, 2024 that will address any requests for exclusion or objections that may be received.

## V.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

93.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than January 30, 2025. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

94.     Lead Counsel consulted with Lead Plaintiff's damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation"). Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the

Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.

95.     The Plan of Allocation is set forth at pages 14 to 18 of the Notice. *See* Miller Decl., Ex. A at pp. 14-18.  As described in the Notice, the objective of the Plan of Allocation is to distribute the Settlement proceeds equitably among those Settlement Class Members who suffered economic losses as a proximate result of the securities law violations alleged in the Action. *See* Notice ¶ 73.  The calculations under the Plan of Allocation are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* ¶ 75.

96.     In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amount of artificial inflation in the per-share price of Cerence common stock that was allegedly proximately caused by Defendants' alleged materially false and misleading statements and omissions the Court previously found to be adequately alleged. *See* Notice ¶ 76. In calculating the estimated artificial inflation allegedly caused by those misrepresentations and omissions, Lead Plaintiff's damages expert considered the price changes in Cerence common stock in reaction to the public disclosures that allegedly corrected the alleged misrepresentations and omissions, adjusting for price changes attributable to market or industry factors. *Id.*  Based on these calculations, there was a total of $49.60 in estimated artificial inflation per share in the Cerence common stock price at the beginning of the Class Period that was removed though the series of three corrective disclosures. *Id.*

97.     In order to have recoverable damages in connection with purchases or acquisitions of Cerence common stock during the Class Period, the disclosure of the alleged misrepresentations or omissions must be the cause of the decline in the price of the Cerence common stock.  In this

32

case, Lead Plaintiff alleged that Defendants made false statements and omitted material facts during the Class Period (November 16, 2020 through February 4, 2022), which had the effect of artificially inflating the prices of Cerence common stock, and that the artificial inflation was removed from the price of Cerence common stock as the result of the alleged corrective disclosures that occurred on November 22, 2021, December 15, 2021, and February 7, 2022.  In order to be eligible under the Plan of Allocation, shares of Cerence common stock must have been purchased or otherwise acquired during the Class Period and held through the issuance of at least one alleged corrective disclosure.  *See* Notice ¶¶ 74, 78-79.

98.     Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of Cerence common stock during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided.  For shares purchased during the Class Period and sold prior to November 22, 2021, the Recognized Loss Amount is zero, because, as discussed above, those shares were not damaged by the alleged fraud.  *See* Notice ¶ 79(a).  For shares purchased during the Class Period and sold from November 22, 2021 through February 4, 2022, inclusive, the Recognized Loss Amount is calculated as the lesser of: (i) the decline in alleged inflation during the holding period; or (ii) the purchase price minus the sale price.  *Id*. ¶ 79(b).  For shares purchased during the Class Period and sold during the 90-day period after the Class Period, Recognized Loss Amounts are calculated as the least of: (i) the decline in alleged inflation during the holding period; (ii) the purchase price minus the sale price; or (iii) the purchase price minus the average closing price between February 7, 2022 and the date of sale.  *See Id*. ¶ 79(c).  For shares purchased during the Class Period and held until the end of 90-day period after the Class Period (May 6, 2022) or longer, the Recognized Loss Amount is the lesser of: (i) the

decline in alleged inflation during the holding period; or (ii) the purchase price minus $34.84, the average closing price for Cerence stock between February 7, 2022 and May 6, 2022. *Id*. ¶ 79(d).

99.     The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of Cerence common stock during the Class Period is the Claimant's "Recognized Claim." Notice ¶ 80. The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Notice ¶ 84. If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant. *Id*. ¶ 85. Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum. *Id*.

100.    One hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Notice ¶ 89. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to Greater Boston Legal Services, a non-sectarian, not-for-profit, 501(c)(3) organization selected by the Parties, if approved by the Court. *See id*.

101.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of Cerence common stock that were attributable to the misconduct alleged in the Action. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair

and reasonable and should be approved by the Court.  To date, no objections to the proposed Plan of Allocation have been received.

## VI.   THE FEE AND EXPENSE APPLICATION

102.   In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court, on behalf of Plaintiff's Counsel, for an award of attorneys' fees of 25% of the Settlement Fund, net of Litigation Expenses awarded, plus interest earned at the same rate as the Settlement Fund (the "Fee Application").  Lead Counsel also request payment for litigation expenses incurred by Plaintiff's Counsel in connection with the prosecution and settlement of the Action in the amount of $129,748.20.  Lead Counsel further request reimbursement to Lead Plaintiff of $7,600 in costs and expenses that Lead Plaintiff incurred directly related to its representation of the Settlement Class, as permitted by the PSLRA, 15 U.S.C. § 78u-4(a)(4).  The requested attorneys' fees, litigation expenses, and PSLRA award are to be paid from the Settlement Fund.  The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

### A.   The Fee Application

103.   Lead Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Lead Plaintiff and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and taking into account the litigation risks faced in a class action.  Use of the percentage method has been recognized as appropriate by the First Circuit in comparable cases.

104.     Based on the quality of the result achieved, the extent and quality of the work performed by Lead Counsel and Liaison Counsel, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 25% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is well within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1.     Lead Plaintiff Has Authorized and Supports the Fee Application

105.     Lead Plaintiff is a sophisticated institutional investor that closely supervised and monitored the prosecution and settlement of the Action.  *See* Ryals Decl. (Ex. 1), at ¶¶ 3-6.  Lead Plaintiff fully supports Lead Counsel's requested fee of 25% of the Settlement Fund.  Lead Plaintiff has carefully evaluated the Fee Application and believes that it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Plaintiffs' Counsel.  *See id*. ¶ 8.  Lead Plaintiff's endorsement of Lead Counsel's Fee Application further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.     The Time and Labor of Plaintiff's Counsel

106.     The time and labor expended by Plaintiff's Counsel in pursuing this Action and achieving the Settlement support the reasonableness of the requested fee.  Attached as Exhibits 5A, 5B, 5C and 5D are the declaration of John Rizio-Hamilton on behalf of BLB&G, the declaration of Joshua H. Saltzman on behalf of Saxena White, the declaration of Peter E. Gelhaar on behalf of Liaison Counsel Donnelly, Conroy & Gelhaar, LLP, and the declaration of John L. Davidson on behalf of Davidson Bowie in support of the motion for attorneys' fees and litigation expenses ("Fee and Expense Declarations").  The Fee and Expense Declarations indicate the

amount of time spent by each attorney and the professional support staff employed by each firm on the Action from its inception through October 31, 2024, and the lodestar calculations based on their current hourly rates. The Fee and Expense Declarations also include schedules of expenses incurred by each firm, delineated by category. These Declarations were prepared from contemporaneous daily time records and expense records regularly maintained and prepared by the respective firms, which are available at the request of the Court.

107. As set forth in the Fee and Expense Declarations, Plaintiff's Counsel have collectively expended 9,116.45 hours in the prosecution of this Action, with a total lodestar of $5,556,671.25. If the Court awards the Litigation Expenses as requested, the requested fee of 25% of the Settlement Fund, net of expenses, will be $7,465,663, plus interest. Accordingly, the requested fee is amounts to a 1.34 multiplier on Plaintiff's Counsel's lodestar. As discussed in the Fee Memorandum, the fact the fee sought provides only a modest multiplier of Plaintiff's Counsel's lodestar supports the reasonableness of the requested fee.

108. As described above in greater detail, the work that Plaintiff's Counsel performed in this Action included: (i) conducting a thorough investigation into the class's claims, which involved a detailed review of publicly available information, interviews with former Cerence employees, and extensive legal research to confirm the theories of liability that Lead Plaintiff could pursue on behalf of the class and satisfy the applicable pleading standards; (ii) drafting and filing the detailed amended complaint based on this investigation; (iii) successfully briefing and opposing Defendants' motion to dismiss; (iv) engaging in extensive discovery efforts, including the review of over 100,000 pages of documents and participation in numerous meet and confer sessions with Defendants regarding the scope of that discovery; and (v) engaging in vigorous arm's-length negotiations (including a lengthy in-person mediation session) to achieve the

37

Settlement. At all times throughout the Action, Plaintiff's Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Class, whether through settlement or trial, by the most efficient means possible.

109.   As detailed above, throughout this case, we devoted substantial time to the prosecution of the Action. We maintained control of and monitored the work performed by other lawyers at Saxena White and BLB&G. While we personally devoted substantial time to this case, other experienced attorneys at our firms were involved throughout the litigation. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Plaintiff's Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

### 3.   The Skill and Experience of Plaintiff's Counsel

110.   The skill and expertise of Plaintiff's Counsel also support the requested fee. As demonstrated by the firm resumes attached as Exhibits 5A-3 and 5B-3 hereto, Lead Counsel are among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. BLB&G and Saxena White are consistently ranked among the top plaintiffs' firms in the country. Further, both firms have taken complex cases such as this to trial, and they are among the few firms with experience doing so on behalf of plaintiffs in securities class actions. Liaison Counsel DC&G is also highly skilled and extremely knowledgeable counsel, and Davidson Bowie has worked extensively with Lead Plaintiff Mississippi, including assisting in its representation in prior securities class actions. We believe Plaintiff's Counsel's skill and their willingness and ability to prosecute the claims vigorously through trial, if necessary, added valuable leverage in the settlement negotiations.

### 4.    Standing and Caliber of Defendants' Counsel

111.    The quality of the work performed by Plaintiff's Counsel in attaining the Settlement should also be evaluated in light of the quality of its opposition.  Defendants were represented by attorneys from Skadden, Arps, Slate, Meagher & Flom LLP and Goodwin Procter LLP—highly experienced and highly skilled law firms that zealously represented their clients.  In the face of this skillful and well-financed opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that will significantly benefit the Settlement Class.

### 5.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

112.    The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Plaintiff's Counsel in bringing this Action to a successful conclusion are described above.  Those risks are relevant to the Court's evaluation of an award of attorneys' fees.  Here, the risks assumed by Plaintiff's Counsel, and the time and expenses incurred without any payment, were extensive.

113.    From the outset, Plaintiff's Counsel understood that they were embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that vigorous prosecution of the case would require.  In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands.  Because complex securities litigation generally proceeds for several years before

39

reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiff's Counsel have received no compensation during the more than two-year duration of this Action and no reimbursement of out-of-pocket expenses, yet they have devoted more than 9,000 hours and incurred more than $120,000 in expenses in prosecuting this Action for the benefit of Cerence investors.

114.    Plaintiff's Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset this case presented a number of significant risks and uncertainties.

115.    As noted above, the Settlement was reached only after Lead Counsel had overcome Defendants' motion to dismiss and conducted document discovery. However, had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to complete fact discovery (including taking depositions of the Executive Defendants and several other Cerence officers); conduct substantial expert discovery; fully brief a motion for class certification; oppose Defendants' expected motions for summary judgment; and prepare and take the case to trial. Moreover, even if the jury returned a favorable verdict after trial, it is likely that any verdict would be the subject of post-trial motions and appeals.

116.    Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class. In light of this recovery and Plaintiff's Counsel's investment of time and resources over the course of the litigation, Lead Counsel believe the requested attorneys' fee is fair and reasonable and should be approved.

### 6.    The Reaction of the Settlement Class to the Fee Application

117.    As noted above, as of November 11, 2024, over 57,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund. *See* Miller Decl. ¶ 11 and Ex. A (Notice ¶¶ 5, 51). In addition, the Court-approved Summary Notice has been published in

40

*Investor's Business Daily* and transmitted over the *PR Newswire*. *See* Miller Decl. ¶ 13. To date, no objections to the request for attorneys' fees have been received.

118.     In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that the requested fee is fair and reasonable.

### B.     The Litigation Expense Application

119.     Lead Counsel also seek payment from the Settlement Fund of $129,748.20 for litigation expenses reasonably incurred by Plaintiffs' Counsel in connection with the prosecution and resolution of the Action (the "Expense Application").

120.     From the outset of the Action, Plaintiff's Counsel have been aware that they might not recover any of their expenses (if the litigation was unsuccessful), and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Plaintiff's Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, Plaintiff's Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

121.     As set forth in the Fee and Expense Declarations included in Exhibit 5, Plaintiff's Counsel have incurred a total of $129,748.20 in unreimbursed litigation expenses in connection with the prosecution of the Action. The expenses are summarized in Exhibit 6, which identifies each category of expense, *e.g.*, expert costs, mediation fees, on-line legal and factual research, document management costs, telephone, and travel costs, and the amount incurred for each

41

category.    These expenses are reflected on the books and records maintained by Plaintiff's Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  These expenses are recorded separately by Plaintiff's Counsel and are not duplicated by the firms' hourly rates.

122.    Of the total amount of expenses, $64,812.50, or approximately 50%, was expended for the retention of experts.  Lead Counsel consulted with an accounting expert and with financial economics experts (concerning loss causation and damages issues) during its investigation and the preparation of the Complaint, during the course of discovery, and in preparation for settlement negotiations.  These experts' advice was instrumental in Lead Counsel's appraisal of the claims and in helping achieve the favorable result in the Action.

123.    Plaintiffs' Counsel also incurred a total of $35,109.99 for the costs of on-line factual and legal research, which together accounted for approximately 27% of the total expenses.

124.    Lead Plaintiff's share of the mediation costs paid to Phillips ADR for the services of Mr. Danilow were $15,650.00 or 12% of the total expenses.

125.    The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, travel costs, telephone charges, postage, and copying costs.

126.    In addition, Lead Plaintiff Mississippi seeks reimbursement of $7,600 for the reasonable costs and expenses that it incurred directly in connection with its representation of the Settlement Class, based on the substantial time dedicated to the Action by its employees and the employees of the Mississippi Office of the Attorney General.  Such payments are expressly

authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 18-19.

127.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $300,000, which might include a PLSRA award for Lead Plaintiff.  Notice ¶¶ 5, 51.  The total amount requested, $137,348.20, which includes $129.748.20 for Plaintiff's Counsel's litigation expenses and $7,600.00 for Lead Plaintiff's requested PSLRA award, is well below the $300,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

128.    The expenses incurred by Plaintiff's Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submit that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

129.    Attached hereto as Exhibit 7 is a compendium of true and correct copies of the following unpublished opinions and authority cited in the Fee Memorandum.

## VII.    CONCLUSION

130.    For all the reasons set forth above, Lead Plaintiff respectfully submits that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submit that the requested fee in the amount of 25% of the Settlement Fund, net of Litigation Expenses, should be approved as fair and reasonable, and the request for payment of Plaintiffs' Counsel's expenses in the amount of $129,748.20 should also be approved, as well as Lead Plaintiff's request for $7,600 in reasonable costs that were directly related to its representation of the Settlement Class, as authorized by the PSLRA.

We declare, under penalty of perjury that the foregoing is true and correct.

Executed in White Plains, New York this 11th day of November 2024

*/s Joshua H. Saltzman*
JOSHUA H. SALTZMAN


Executed in New York, New York this 11th day of November 2024

*/s John Rizio-Hamilton*
JOHN RIZIO-HAMILTON

44